## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THEODORA F. ANTAR,<br>*Individually & as next friend and legal guardian of her minor children A.L. and J.V., and on behalf of all others similarly situated.*<br><br>*Plaintiff*,<br><br>v.<br><br>HON. JANE KUPSON GROSSMAN *Official & individual capacities*, HON. JESSICA C. TORRES SHLATZ, *Official & individual capacities*, JUDICIAL BRANCH OF THE STATE OF CONNECTICUT, SENIOR OFFICE CLERK TIMOTHY AUGERI SCJM WATERBURY, *Official & individual capacities*, PETER FRADIANI, *Official & individual capacities*, RACHAEL LEVINE, *Official & individual capacities*, LEVINE LITIGATION LLC, TOWN OF ORANGE, ORANGE DEPARTMENT OF POLICE SERVICES, CITY OF NEW BRITAIN, ABDELGHANY ANTAR, ADAM REMBISZ, *Official and individual capacities,* ALEXANDRA WARZOCHA, *Official and individual capacities*, ALEXIS SMITH*, Official & individual capacities,* ALEXIS STAMOS, *Official and individual capacities*, ALLIE JACOBS*, Official and individual capacities,* AMANDA NUGENT*, Official & individual capacities,* AMANDA DEVAN NARDOZZI*, Official and individual capacities*, AMBER DOE, *Official and individual capacities, See pg. 2\** | **CASE NO. 3:23-cv-01337**<br><br>**COMPLAINT FOR FRAUD, RACKETEERING, VIOLATIONS OF CIVIL RIGHTS, ABUSE OF PROCESS, AND CIVIL CONSPIRACY**<br><br><br>**DEMAND FOR JURY TRIAL**<br><br><br><br>PLAINTIFF'S SECOND AMENDED COMPLAINT |

DEFENDANTS CONTINUED FROM PAGE 1:

SGT. AMEER WILLIAMS, *Official & individual capacities,* AMINA CONNELLY, *Official & individual capacities* ANASTASIA GANIM, *Official and individual capacities,* ANDREW KNOTT, *Official & individual capacities*,   ANDREW MARSHALL, *Official & individual capacities*, ALEXANDRA ALEXIADES, *Official and individual capacities,* ELIAS ALEXIADES, *Official and individual capacities,* CITY OF NEW HAVEN CORPORATION COUNSEL DEPARTMENT, GREGORY STAMOS, *Official and individual capacities,* CITY OF MILFORD, MILFORD POLICE DEPARTMENT,  ANN DENNY, *Official & individual capacities*, ANNAMARIA BARANOWSKI, *Official & individual capacities*, ANNISA KLAPPROTH *Official & individual capacities*, ANTHONY ZUPPARDI, *Official & individual capacities,* ANY AND ALL CLERKS/JUDICIAL MARSHALS PRESENT AT NEW HAVEN SUPERIOR COURT ON 4/8/22 6/1/22 6/28/22 4/5/23 5/25/23 6/15/23 8/1/23 & 10/4/23, *Official and individual capacities*, ASHLEY GRAY, ASST. CHIEF MAX MARTINS, *Official and individual capacities*, ASSISTANT CLERK DYLAN WINGARD, *Official and individual capacities*, ASSISTANT STATE'S ATTORNEY LAURA DELEO, *Official and individual capacities*, ASSISTANT STATE'S ATTORNEY REBECCA BARRY, *Official and individual capacities*, BARBARA BELLUCCI, *Official and individual capacities*, BASIL R.A. MAHONEY, *Official and individual capacities*,   BENJAMIN ABRAMS, *Official and individual capacities,* BENJAMIN GETTINGER, *Official and individual capacities*, BETSY KELLER, *Official and individual capacities*, BHCARE INC, BHCARE FOUNDATION INC, BLAKE SULLIVAN, *Official and individual capacities,* BRAD SAXTON, *Official and individual capacities*, BRUCE MARTIN, BUNNY VILLAGE LEARNING CENTER LLC, CARLA SMITH STOVER, PHD., *Official and individual capacities*, CARRIE BRICKHOUSE, *Official and individual capacities*,   CASEY BRINKMAN, *Official and individual capacities*, JILL ROSENFELD, *Official and individual capacities*, CAT ITAYA, *Official and*

*individual capacities,* CENTER FOR CHILDREN'S ADVOCACY INC.,   CHARLES & BONI-VENDOLA LLC, CHRIS R. NELSON, *Official and individual capacities*,  CHRISTINA DOE, *Official and individual capacities*,  CHRISTOPHER GANIM, CHRISTOPHER KATAGIS, CITY OF NEW HAVEN, CITY OF WATERBURY, ASSISTANT SUPERVISORY STATES ATTORNEY COLLEEN V. ZINGARO, *Official and individual capacities,* ASSOCIATION OF COURT SECURITY OFFICERS-CONNECTICUT INC., JEFFREY S. LEHMAN, *Official and individual capacities,* CONNECTICUT ALLIANCE TO END SEXUAL VIOLENCE INC., CONNECTICUT COALITION AGAINST DOMESTIC VIOLENCE INC., CONNECTICUT DEPARTMENT OF PUBLIC SAFETY, CONNECTICUT HUSKY HEALTH, CONNECTICUT JUDICIAL BRANCH CENTRALIZED ADA OFFICE, CONNECTICUT JUDICIAL REVIEW COUNCIL, CONNECTICUT OFFICE OF THE VICTIM ADVOCATE, CONNECTICUT OFFICE OF VICTIM SERVICES, CONNECTICUT STATE DEPARTMENT OF CHILDREN AND FAMILIES, CONNECTICUT PROTECTIVE MOMS INC., CONNECTICUT STATE CHILD SUPPORT ENFORCEMENT SERVICES, CONNECTICUT STATE DEPARTMENT OF SOCIAL SERVICES, CONNECTICUT STATE DIVISION OF CRIMINAL JUSTICE, CONNECTICUT STATE POLICE TROOP I BETHANY, CONNECTICUT WOMEN'S EDUCATION AND LEGAL FUND, CONOR DUFFY, *Official and individual capacities*, CRIS DOE, *Official and individual capacities*,   MAGISTRATE CYNTHIA ANGER, *Official and individual capacities,* DANIEL BURNS, *Official and individual capacities*, JOSHUA PASCALE, *Official and individual capacities,* DENNIS REILLY, *Official and individual capacities*, DIAMANTO ANTONELLIS, DISPATCHER WHITHAM #206, *Official and individual capacities*, DONALD CRETELLA, *Official & individual capacities,*  DONNA DICOSMO, *Official & individual capacities*, DR. ANTHONY CAMPAGNA, *Official and individual capacities*,  DR. ERIC FRAZER, *Official and individual capacities*, CONNECTICUT LEGAL SERVICES, INC., DR. KIMBERLY CITRON, *Official*

3- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*and individual capacities*, DR. ROBERT HORWITZ, *Official and individual capacities*, DR. WENDY LEVY, *Official and individual capacities*, OFFICER E AVILES OF THE NEW HAVEN POLICE DEPARTMENT #263, *Official and individual capacities*, ELIZABETH PROTZMAN, *Official and individual capacities*, ELWYN BREWSTER QUIRK, *Official and individual capacities*,  ERIN KRYGIER, *Official and individual capacities,* EUGENE ZINGARO, *Official & individual capacities*, GABRIEL MINA, *Official & individual capacities*,  GANIM LEGAL LLC, GERALD VIGLIONE JR., *Official & individual capacities*, GINA KILLIAN, *Official and individual capacities*, GOVERNOR NED LAMONT, *Official and individual capacities*, GREGORY GALLO, *Official & individual capacities*, HAPPY EVEN AFTER FAMILY LAW LLC, SUSAN LETTELLEIR, *Official & individual capacities*, HEALING SPRINGS WELLNESS CENTER LLC, HEATHER COLLINS, *Official and individual capacities,* DAVID ROHAN, *Official & individual capacities*,  WOODBRIDGE CHILD CENTER INC., DAWN MORETTI, *Official & individual capacities*, JOCELYN PERCELL, *Official & individual capacities*, JESSICA MAYBECK, *Official & individual capacities*, HEAVENLY GIFT CHILDCARE CENTER LLC, HON. ARTHUR HILLER, *Official and individual capacities,* HON. CHERIE PHOENIX-SHARPE, *Official and individual capacities*, HON. CHRISTINE P. RAPILLO, *Official and individual capacities,* HON. CHRISTOPHER GRIFFIN, *Official and individual capacities*, HON. DAWNE G. WESTBROOK, *Official and individual capacities,* HON. EDWARD GRAZIANI, *Official and individual capacities*, HON. ERIKA MONIQUE TINDILL, *Official and individual capacities*, HON. JAMES ABRAMS, *Official and individual capacities,* HON. JAMES KENEFICK, *Official and individual capacities*, HON. KEVIN RANDOLPH, *Official and individual capacities*, HON. MARGARITA H. MOORE, *Official and individual capacities*, HON. MARK T. GOULD, *Official and individual capacities,* HON. MATTHEW P. VACCARELLI, *Official and individual capacities,* HON. MAUREEN PRICE-BORELAND, *Official and individual capacities*, NEXSTAR MEDIA GROUP INC.,

4- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

HON. JON M. ALANDER, *Official and individual capacities,* TOWN OF MIDDLEBURY, OFFICER MORTALLI OF THE HAMDEN POLICE DEPARTMENT, *Official and individual capacities,* SEVERAL OTHER JANE DOE AND JOHN DOE OFFICERS FROM THE HAMDEN POLICE DEPARTMENT, *Official and individual capacities,* HON. MICHAEL KAMP, *Official and individual capacities*, HON. PETER BROWN, *Official and individual capacities*, HON. SCOTT JONES, *Official and individual capacities,* HON. TAMMY GEATHERS, *Official and individual capacities*, DOROTHY DANIEL RODDY, *Official and individual capacities,* HOWARD LEVINE, *Official and individual capacities*, IRENE ANTAR O.D., *Official and individual capacities,* JAMES HENKE, *Official and individual capacities*, JAMES LAMBO, *Official and individual capacities,* JAMES ZEOLI FIRST SELECTMAN OF THE TOWN OF ORANGE, *Official and individual capacities,* JOHN CARANGELO, *Official and individual capacities*, PJ SHANLEY, *Official and individual capacities*, SAMANTHA D'OCCHIO, *Official and individual capacities,* MITCHELL R. GOLDBLATT, *Official and individual capacities*, RALPH OKENQUIST, *Official and individual capacities*, JUDY W. WILLIAMS, *Official and individual capacities*, TOWN OF ORANGE CONNECTICUT BOARD OF SELECTMEN, TOWN OF ORANGE BOARD OF POLICE COMMISSIONERS, TOWN OF ORANGE BOARD OF POLICE COMMISSIONER CHAIRMAN JACK BARTON, *Official and individual capacities,* MARIAN HURLEY, *Official and individual capacities,* ROY CUZZOCREO, *Official and individual capacities,* NYJAHWHAN WALKER, *Official and individual capacities,* CHRISTOPHER CARVETH, *Official and individual capacities,* JAMIE HOBART LAMBO, *Official and individual capacities*, JANE ADAMIK, *Official and individual capacities*, JANET ORTIZ, *Official and individual capacities*, MAGISTRATE JENNIFER AGUILAR, *Official and individual capacities,* JENNIFER GALLO LODICE, JESSICA MAYO PH.D, *Official and individual capacities*, JESSICA STRUSKY, *Official and individual capacities*, JIA LUO, *Official and individual capacities*, JOAQUINA BORGES KING, *Official and*

5- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*individual capacities,* JOHN PARESE, *Official and individual capacities*, JOSEPH DECICCO, *Official and individual capacities*, JOSEPH M. PORTO, *Official and individual capacities*, JOSEPH MERSCHMAN, *Official and individual capacities*, JOSH LAMBO, *Official and individual capacities*, JUDICIAL MARSHAL ANDREWS OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,* JUDICIAL MARSHAL HAYDEN #567 OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,* JUDICIAL MARSHAL RUNLETT OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities*, JUSTIN ATTAI, *Official and individual capacities*, KATHERINE VERANO, *Official and individual capacities*,  KAREN BOWERS, *Official and individual capacities* , KATHERINE VERANO, *Official and individual capacities*, SAFE FUTURES INC., KEVIN DUNN, *Official and individual capacities,* KLINGBERG FAMILY CENTER INC., KRISTIANNA TYLER, *Official and individual capacities*, KRISTIN WOLF, *Official and individual capacities*, LANCIA BLATCHLEY, *Official and individual capacities*, LARAE PLUMMER, *Official and individual capacities*, LEONARD RODRIGUEZ, *Official and individual capacities*, LIEUTENANT ANDERSON OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* CLERK LINDA DOE FROM THE DERBY COURT, *Official and individual capacities*, LIEUTENANT BENJAMIN BORELLI OF THE CONNECTICUT STATE POLICE TROOP I BETHANY, *Official and individual capacities,* LIEUTENANT DERUBEIS OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* LIEUTENANT JOHN PRISAVAGE OF THE NEW BRITAIN POLICE DEPARTMENT, *Official and individual capacities*, LIEUTENANT JUDICIAL MARSHAL DADIO BADGE #113 OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,* LISA B. GLIBERTO, *Official and individual capacities*,  DETECTIVE LISA R. STEEVES OF THE NEW BRITAIN POLICE DEPARTMENT, *Official and individual capacities*, LIZZY CRETELLA, LORI DOE CLERK OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,*

LORI SEMRAU, *Official and individual capacities*, LOUIS A. ANNECCHINO, *Official and individual capacities*, LUZ SANTANA, *Official and individual capacities*, LYNDA SORENSEN, *Official and individual capacities,* MAKANA ELLIS, *Official and individual capacities*, MARESSA LATORACCA, *Official and individual capacities*, MARGARET PENNY MASON, *Official and individual capacities*, MARGOT KENEFICK BURKLE, *Official and individual capacities*, MARK D. PHILLIPS, *Official and individual capacities*, MARK WACHTER, MARTHA WEILER, MARY KOZICKI, *Official and individual capacities*, MARY-ANN CHARLES, MATTHEW JOHN LODICE, *Official and individual capacities*, MATTHEW J. LODICE ON BEHALF OF HIS MINOR CHILD D.L., *Official and individual capacities*, MATTHEW LODICE ON BEHALF OF HIS MINOR CHILD S.L., *Official and individual capacities,* MAURA MASTRONY, *Official and individual capacities*, MEGAN C. MCGRATH, *Official and individual capacities*, MELISSA SWAN, MAYOR JOE GANIM, *Official and individual capacities*, MEREDITH MCGLOIN, *Official and individual capacities*, MERIT LAJOIE, *Official and individual capacities,* MICHAEL HILLIS, MICHELLE M. MURPHY, *Official and individual capacities*, MILFORD SUPERIOR COURT CLERK LAURA, *Official and individual capacities,* MONICA CLOUD ROGERS, *Official and individual capacities*, MONICA PEREZ, *Official and individual capacities*, NANCY DOE CLERK FROM THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,* NANCY SASSER, *Official and individual capacities,* NANCY VALENTINO, *Official and individual capacities*, NATALIE CABAN, *Official and individual capacities*, NEW BRITAIN POLICE DEPARTMENT, NEW HAVEN CHILD SUPPORT ENFORCEMENT SERVICES, NEW HAVEN COUNTY BAR ASSOCIATION, NEW HAVEN LEGAL ASSISTANCE ASSOCIATION INC., NEW HAVEN POLICE DEPARTMENT, NICOLE TUNG, *Official and individual capacities,* NUMEROUS JANE DOE AND JOHN DOE DISPATCH AND POLICE OFFICERS OF THE CONNECTICUT STATE POLICE TROOP I BETHANY DEPARTMENT, *Official and individual capacities,*

NUMEROUS JANE DOE AND JOHN DOE DISPATCH AND POLICE OFFICERS OF THE NEW BRITAIN POLICE DEPARTMENT, *Official and individual capacities*, OFFICER STRZALKA # 341 OF THE NEW BRITAIN POLICE DEPARTMENT, *Official and individual capacities*, NUMEROUS JANE DOE AND JOHN DOE DISPATCH AND POLICE OFFICERS OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, OFFICE OF VICTIM COMPENSATION, OFFICE OF VICTIM SERVICES TRAINING, OFFICER ALIZA ESPOSITO OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, OFFICER ANDREW SATKOWSKI OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* OFFICER ARTABANE OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* OFFICER BAILEY OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, OFFICER JEFFREY FERNANDES OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* OFFICER JOHN LANE OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* OFFICER JUSTIANO NIEVES OF THE NEW HAVEN POLICE DEPARTMENT #221, *Official and individual capacities*, OFFICER KURT CORREIA #132 OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,*  OFFICER PADRO OF THE WATERBURY POLICE DEPARTMENT, *Official and individual capacities*, OFFICER PISCITELLI OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, OFFICER REPICE OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, OFFICER RISTIANO OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,*  OFFICER TAYLOR OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,*  OFFICER YELENIK OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, DEAN PAUL CHILL, *Official and individual capacities,* PAUL GANIM, *Official and individual capacities*, PAUL LODICE JR., *Official and individual capacities*, PAUL LODICE SR., *Official and individual capacities,* PREFERRED

PEDIATRICS, QUINNIPIAC UNIVERSITY, QUINNIPIAC UNIVERSITY SCHOOL OF LAW, RACHEL REEVES, *Official and individual capacities*, RANDI CALABRESE, *Official and individual capacities,* RANEIL SMITH, *Official and individual capacities*, RAPE CRISIS CENTER OF MILFORD INC, JANE DOE EMPLOYEES OF PREFERRED PEDIATRICS LLC, *Official and individual capacities,* RENEE CASEY MD, *Official and individual capacities*, RENEW YOUR MIND LLC, REPRESENTATIVE MARY WELANDER, *Official and individual capacities,* CHIEF ROBERT J. GAGNE, *Official and individual capacities*, ROBERT MCCONNELL, *Official and individual capacities*, ROY BOWERS, *Official and individual capacities*, SAFE HAVEN OF GREATER WATERBURY, SANDRA LUGO GINES, *Official and individual capacities*, SARAH HANNA, *Official and individual capacities*, SCOTT LODICE, *Official and individual capacities*, JAY GROSSMAN, *Official and individual capacities*, SCOTT LODICE ON BEHALF OF HIS MINOR CHILD T.L., *Official and individual capacities*, SEAN MCELLIGOTT, *Official and individual capacities*, SENATOR JAMES MARONEY, *Official and individual capacities*, SERGEANT BARTLEY OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, SERGEANT JARED BARSELAU OF THE NEW BRITAIN POLICE DEPARTMENT, *Official and individual capacities*, HON. KAREN DEMEOLA, *Official and individual capacities,* SERGEANT JOEL PORTORREAL OF THE CONNECTICUT STATE POLICE TROOP I OF BETHANY, *Official and individual capacities,* SERGEANT JUDICIAL MARSHAL POWERS BADGE #157 OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities*, SERGEANT JUDICIAL MARSHAL SCHWEITZER BADGE #129 OF THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities*, SERGEANT KIRBY OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities*, SEVERAL JANE DOE AND JOHN DOE CONNECTICUT JUDICIAL MARSHALS FROM THE MILFORD SUPERIOR COURT, *Official and individual capacities*, SEVERAL JANE DOE AND JOHN DOE CONNECTICUT

JUDICIAL MARSHALS FROM THE NEW HAVEN SUPERIOR COURT, *Official and individual capacities,* SEVERAL JANE DOE AND JOHN DOE DERBY SUPERIOR COURT CLERKS, *Official and individual capacities*, SEVERAL JANE DOE AND JOHN DOE MILFORD CONNECTICUT SUPERIOR COURT CLERKS, *Official and individual capacities,* SEVERAL JANE DOE AND JOHN DOE NEW HAVEN SUPERIOR COURT CLERKS, *Official and individual capacities*, SHAKERIA BROWN, *Official and individual capacities*, SHARI-LYNNE CUOMO SHORE, *Official and individual capacities*, STEPHEN M. CARROLL, *Official and individual capacities*, SHAWNIEL CHAMANLAL, *Official and individual capacities*, SHELBY SUMMERS, *Official and individual capacities,* STACY VOTTO, *Official and individual capacities*, STAN STRUSKY, *Official and individual capacities,* STATE OF CONNECTICUT, STATE OF CONNECTICUT SENATE DEMOCRATS, STEPHANIE BERNSTEIN, *Official and individual capacities,* STEPHANIE ROBERGE, *Official and individual capacities*, STEPHANIE SGAMBATI, *Official and individual capacities*, TAHLISA BROUGHAM, *Official and individual capacities*, TAMAR BIRCKHEAD, *Official and individual capacities*, THE CENTER FOR FAMILY JUSTICE INC., THE DECICCO LAW FIRM LLC, THE UMBRELLA CENTER FOR DOMESTIC VIOLENCE SERVICES OF BHCARE, THE UNIVERSITY OF CONNECTICUT, THOMAS A. ESPOSITO, *Official and individual capacities*, TIM POTHIN, *Official and individual capacities*, TOWN OF ORANGE FIRST SELECTMANS OFFICE, UNIVERSITY OF CONNECTICUT SCHOOL OF LAW, US DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION, VICTIM RIGHTS CENTER OF CONNECTICUT, VIOLENCE AGAINST WOMEN PREVENTION PROGRAM, WELTY ESPOSITO & WEILER LLC, WHOLE HOUSE REMODELING COMPANY LLC, WILLIAM TONG, *Official and individual capacities*, YALE CHILD ABUSE CLINIC, SAFE FUTURES INC.,YALE UNIVERSITY, YALE UNIVERSITY CHILD STUDY CENTER, ZINGARO CRETELLA AND RASILE LLC, DAVID A. CARLSON, *Official and individual capacities,* LYNN

PELLEGRINO, *Official and individual capacities,* DIVORCE SOLUTIONS OF CONNECTICUT, CONNECTICUT CRIMINAL DEFENSE LAWYERS ASSOCIATION, COLEMAN LAW LLC, THE CONNECTICUT COUNCIL FOR NON-ADVERSARIAL DIVORCE, PELLEGRINO & PELLEGRINO LLC, AISHA ROCHE, *Official and individual capacities*, WATERBURY POLICE DEPARTMENT OPERATOR 452, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE DISPATCH OPERATORS FROM THE WATERBURY POLICE DEPARTMENT ON DUTY FROM 10/8/23-10/11/23, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE DETECTIVES FROM THE WATERBURY POLICE DEPARTMENT ON DUTY FROM 10/8/23-10/11/23, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE OFFICERS FROM THE WATERBURY POLICE DEPARTMENT ON DUTY FROM 10/8/23-10/11/23, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE SOCIAL WORKERS FROM THE DEPARTMENT OF CHILDREN AND FAMILIES PRESENT AND INVOLVED IN INCIDENTS OF 10/8/23-10/11/23, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE SOCIAL WORKERS FROM THE DEPARTMENT OF CHILDREN AND FAMILIES 24 HOUR CARE LINE OPERATOR SYSTEM WHO TOOK REPORTS REGARDING A.L AND THE INCIDENTS OF 10/8/23-10/11/23, *Official and individual capacities,* CATHERINE WHELAN, *Official and individual capacities*, CATHERINE WHELAN LAW LLC, CARMELINA CALABRESE, *Official and individual capacities,* SUPERVISOR STEPHANIE N. DOE DIRECTOR OF QUALITY FOR THE QUALITY DEPARTMENT OF ST. MARY'S HOSPITAL, *Official and individual capacities,* KELLY PINTO, *Official and individual capacities,* DETECTIVE AGUILAR OF THE WATERBURY POLICE DEPARTMENT, *Official and individual capacities,* ANY AND ALL JANE DOE AND JOHN DOE PARAMEDICS DISPATCHED TO 48 QUARRY HILL RD WATERBURY CT IN RESPONSE TO THE WELFARE OF MINOR CHILD A.L FOR ANY AND ALL OF THE INCIDENTS OF 10/8/23-

10/11/23, *Official and individual capacities*,   ANY AND ALL JANE DOE AND JOHN DOE WATERBURY POLICE DEPARTMENT OFFICERS DISPATCHED TO 48 QUARRY HILL RD WATERBURY CT IN RESPONSE TO THE WELFARE OF MINOR CHILD A.L FOR ANY AND ALL OF THE INCIDENTS OF 10/8/23-10/11/23, *Official and individual capacities*,  ANY AND ALL JANE DOE AND JOHN DOE EMPLOYEES OF SAINT MARY'S HOSPITAL WHO HAD ANY CONTACT WITH A.L. OR WERE PRESENT AT SAINT MARY'S HOSPITAL FROM 10/8/23-10/11/23, *Official and individual capacities*, HONORABLE JUDGE JON M. ALANDER, *Official and individual capacities*, OFFICER J. SEEGER OF THE WATERBURY POLICE DEPARTMENT, *Official and individual capacities,* KIM COLEMAN, *Official and individual capacities*, MELANIE S. BUCKLEY, *Official and individual capacities*, SAINT MARY'S HOSPITAL, AMANDA DOE, *Official and individual capacities*, SAFE FUTURES INC., GERAGHTY & BONNANO LLC, MARK DUBOIS, NEW HAVEN COUNTY BAR FOUNDATION INC, CONNECTICUT BAR ASSOCIATION, EMILY KULIKAUSKAS, *Official and individual capacities*, THE FOUNDATION OF THE NEW HAVEN COUNTY BAR, CLIFFORD GARNETT, *Official and individual capacities,* OFFICER NASUFI OF THE WATERBURY POLICE DEPARTMENT, *Official and individual capacities,* OFFICE OF THE STATES ATTORNEY JUDICIAL DISTRICT OF ANSONIA-MILFORD, ACCESS HEALTH INTERNATIONAL INC.,  TOWN OF HAMDEN, HAMDEN POLICE DEPARTMENT, OFFICER JOSEPHY MORTALI OF THE HAMDEN POLICE DEPARTMENT, *Official and individual capacities*, JULIO ORTIZ, *Official and individual capacities*, FORTIFIED INVESTIGATIONS AND SECURITY LLC, CONNECTICUT BAR ASSOCIATION INC., DIRECTOR OF HEALTH FOR THE TOWN OF ORANGE AMIR MOHAMMAD, *Official and individual capacities*. LISA ZAPPONE, *Official and individual capacities*, TRINITY HEALTH, INC., TRINITY HEALTH OF NEW ENGLAND CORPORATION INC., SAINT MARY'S HOSPITAL OF WATERBURY, TRINITY HEALTH OF

12- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

NEW ENGLAND EMERGENCY MEDICAL SERVICES INC., THE COMMUNITY FOUNDATION FOR GREATER NEW HAVEN INC., VALENTINA RESTREPO, *Official and individual capacities*, KELLI DALY RN, *Official and individual capacities*, DIANA LOPUSNY MD, *Official and individual capacities*, ALLISON PEARSON FNP, *Official and individual capacities*, PREFERRED PEDIATRICS, LLC., FATHER PETER J. ORFANAKOS, *Official & individual capacities*,   SAINT BARBARA GREEK ORTHODOX CHURCH, GREEK ORTHODOX ARCHDIOCESE OF AMERICA, ANTHONY INGALA, *Official and individual capacities,* SOUTHINGTON HIGH SCHOOL, TOWN OF SOUTHINGTON,  ROSA CHIROPRACTIC AND WELLNESS, ROSA CHIROPRACTIC CENTER, RICHARD BLUMENTHAL, *Official and individual capacities,* CT PROBATE E-FILING, DANIEL MINA, *Official and individual capacities,* THE COMMISSIONERS CIGAR LOUNGE LLC, CONNECTICUT DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION, SEVERAL JANE DOE AND JOHN DOE DISPATCH WORKERS EMPLOYED BY MILFORD POLICE DEPARTMENT, *Official and individual capacities,* SEVERAL JANE DOE AND JOHN DOE OFFICERS EMPLOYED BY MILFORD POLICE DEPARTMENT, *Official and individual capacities,* OFFICER M. KREITMAN #21 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* OFFICER SCHOTT #33 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* LISA A. KNOPF, *Official and individual capacities*, KNOPF LAW LLC, OFFICER VAKOS #139 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* OFFICER V. SENATORE #87 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* SERGEANT LACY #310 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* CLERK MAGDALA DOE OF THE MILFORD SUPERIOR COURT, *Official and individual capacities,* JOHN LAMBO, *Official and individual capacities*, SERGEANT O'KEEFE #320 OF THE MILFORD POLICE DEPARTMENT, *Official and individual capacities,* JUDICIAL

13- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

MARSHAL SANTANA FOR THE MILFORD SUPERIOR COURT, *Official and individual capacities,* STATES ATTORNEY MARGARET E. KELLEY, *Official and individual capacities,* CONNECTICUT DEPARTMENT OF CORRECTIONS, OFFICE OF THE PROBATE COURT ADMINISTRATOR, YORK CORRECTIONAL INSTITUTION, CONNECTICUT FATHERHOOD INITIATIVE, CONNECTICUT DEPARTMENT OF LABOR, CONNECTICUT DEPARTMENT OF DEVELOPMENTAL SERVICES, MIDDLEBURY POLICE DEPARTMENT, OFFICER R.M. GUSTO OF THE MIDDLEBURY POLICE DEPARTMENT, *Official and individual capacities*, KYLIE VACCARELLI BCBA LBA, *Official and individual capacities*,  CT BAR INSTITUTE INC., HON. LYNDA B. MUNRO, *Official and individual capacities*, CHRISTOPHER SMITH, *Official and individual capacities,* EUNICE DOE CLERK OF THE MILFORD SUPERIOR COURT, *Official and individual capacities*, JANE DOE CLERK FROM MILFORD SUPERIOR COURT WHO SIGNED PLAINTIFF'S FEE WAIVER APPLICATION ON 9/21/23, *Official and individual capacities*, AUTUMN AMES, *Official and individual capacities*, STATE OF CONNECTICUT DEPARTMENT OF ADMINISTRATIVE SERVICES STATE MARSHAL COMMISSION, LISA B. GILIBERTO, *Official and individual capacities,* HON. GERARD ADELMAN, *Official and individual capacities,* STEVEN DEMBO, *Official and individual capacities,* SIDNEY HOROWITZ, PH.D., *Official and individual capacities,* OFFICER RAY LAPLANTE OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities,* YALE LAW SCHOOL LEARNING CENTER INC., DAVE CARLSON, *Official and individual capacities,* NEW HAVEN SUPERIOR COURT CLERK MIKE DOE, *Official and individual capacities,* HONORABLE HOLLY ABERY-WETSTONE, *Official and individual capacities,* STATEWIDE LEGAL SERVICES OF CONNECTICUT, INC., STEPHANIE JANES, *Official and individual capacities*, CINDY DUGAN OF THE RAPE CRISIS CENTER OF MILFORD, *Official and*

*individual capacities,* BRIAN HOBART, *Official and individual capacities,* and OFFICER HUNT OF THE ORANGE POLICE DEPARTMENT, *Official and individual capacities.*

## PLAINTIFF'S SECOND AMENDED COMPLAINT

This lawsuit unveils the shocking veil of secrecy and conspiratorial activities which has been led by several revered institutions to mastermind and execute a "Cash for Kids" operation involving a multitude of state departments, agencies, and affiliates. The State of Connecticut has created an intricate system within which mothers and women have been systematically marginalized and children have been perpetually harmed and mistreated.

Plaintiff Theodora F. Antar (hereinafter "Plaintiff" or "Ms. Antar"), *both individually and as next friend and legal guardian of her minor children J.V. and A.L., and on behalf of all others similarly situated,* brings this Complaint for fraud, civil conspiracy to commit fraud, abuse of process, civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c))("Federal RICO") as well as multiple additional claims, both supplemental and original, of violations of plaintiffs rights by way of Complaint against the above captioned Defendants for cause alleging and stating as follows:

## THE PARTIES

1. Plaintiffs are as follows:

1. Plaintiff Theodora Antar, *both individually and as next friend and legal guardian of her minor children J.V. and A.L. and on behalf of a significant class of aggrieved individuals,* is a resident of, and is domiciled in the State of Connecticut residing at 856 Shagbark Drive, Orange, CT, 06477. Plaintiff is a living, breathing, private being and is not defined as an entity under contract law. Rather, plaintiff is a living, breathing, private individual as are her minor children A.L. and

J.V., and plaintiff and her minor children have inalienable rights under the United States Constitution.

2. Defendants are as follows:

All Defendant judges are being sued in exercise of absolute discretion, personal opinion, under color of state law, for private agenda, in abuse of office, and outside judicial function.

1. Defendant Honorable Jane Kupson Grossman, *Official and individual capacities,* is the Presiding Judge and AAJ for the Post-Judgment Family Division of the New Haven Superior Court located at 235 Church street, New Haven, CT, the former President of the Family Law Section of the New Haven County Bar Association, President of the Board of the Connecticut Women's Education and Legal Fund, former Presiding Judge for Criminal Matters for New Haven Superior Court at 121 Elm St, New Haven, CT, former Magistrate Judge for New Haven, Bridgeport, and Waterbury CT, and is an adjunct professor at Quinnipiac University School of Law with an official address of 235 Church street, New Haven, CT, 06510.

2. Defendant Honorable Jessica C. Torres Shlatz, *Official & individual capacities,* is a superior court judge for the State of Connecticut Superior Court for Juvenile Matters with an address of 7 Kendrick Avenue, Waterbury, CT, 06702.

3. Defendant Judicial Branch for the State of Connecticut is state government office with a publicly listed address at 20 Park Pl, Vernon, CT 06066.

4. Defendant Senior Office Clerk Timothy Augeri SCJM Waterbury, *Official & individual capacities,* is a senior office clerk for the State of Connecticut Superior Court for Juvenile Matters with an address of 7 Kendrick Avenue, Waterbury, CT, 06702.

5. Defendant Peter Fradiani, *Official & individual capacities,* is a deputy clerk for juvenile matters for the New Britain State's Attorney's office for Juvenile Matters at New Britain with an address

of 20 Franklin Square, New Britain, CT, 06051.

6. Defendant Rachael Levine, *Official & individual capacities,* is an attorney employed at Levine Litigation LLC and former employee of the State of Connecticut representing the Department of Children and Families with an address of 304 Federal Road, Suite 206, Brookfield, CT, 06804.

7. Defendant Joshua Pascale, *Official and individual capacities,* is an employee of Levine Litigation LLC and the court-appointed counsel for plaintiff's minor child A.L. with an address of 304 Federal Road, Suite 206, Brookfield, CT, 06804.

8. Defendant Levine Litigation LLC is a law firm located in the State of Connecticut with an address of 304 Federal Road, Suite 206, Brookfield, CT, 06804.

9. Defendant Town of Orange is a Town located in New Haven County, in the State of Connecticut with an official address of 617 Orange Center Rd, Orange, CT, 06477.

10. Defendant Orange Department of Police Services is a police department located at 314 Lambert Rd, Orange, CT, 06477.

11. Defendant City of New Britain is a City located in Hartford County, in the State of Connecticut with an official address of 27 West Main st, New Britain, CT, 06051.

12. Defendant Abdelghany Antar is the biological father of the plaintiff and is domiciled in the State of Connecticut residing at 156 Wintonbury Ave B 112, Bloomfield, CT, 06002.

13. Defendant Adam Rembisz, *Official and individual capacities,* is the Captain Criminal Investigations Division of the City of New Britain Police Department. The official address is 10 Chestnut Street, New Britain, CT, 06051.

14. Defendant Alexandra Warzocha, *Official and individual capacities*, is a resident of and is domiciled in the State of Connecticut and is legal assistant and an employee of Zingaro, Cretella, and Rasile LLC with an official address of 681 State St, New Haven, CT, 06510.

15. Defendant Alexis Smith, *Official and individual capacities,* is a resident of and is domiciled in the State of Connecticut and is the Executive Director at New Haven Legal Assistance Association, Inc. with an official address of 205 Orange Street, New Haven, CT, 06510.

16. Defendant Alexis Stamos, *Official and individual capacities,* is the owner and operator of Defendant Tiny But Mighty Family Childcare LLC and a resident of the State of Connecticut with an address of 4 Bungay Terrace, Seymour, CT, 06483.

17. Defendant Allie Jacobs, Esq., *Official and individual capacities,* is a resident of and is domiciled in the State of Connecticut and is one of the Executive Committee Members of the New Haven County Bar Association. She is an alumnus of Quinnipiac University School of Law, a former Assistant Clerk in Family Matters at New Haven Superior Court for Honorable James G. Kenefick, Jr., and the Co-founder and co-chair of the New Haven County Bar Association LGBTQ Committee. She is employed at Jacobs & Jacobs Injury lawyers with an official address of One Audubon, 1 Audubon Suite 103, New Haven, CT, 06511.

18. Defendant Amanda C. Nugent, *Official and individual capacities,* is a resident of and is domiciled in the State of Connecticut and is the President-elect Executive Committee Officer for the New Haven County Bar Association with an official address of 900 Chapel St #10, New Haven, CT, 06510.

19. Defendant Amanda Devan Nardozzi, *Official and individual capacities,* is a resident of and is domiciled in the State of Connecticut and is the Executive Director at Safe Haven of Greater Waterbury Inc. She is a member of the International Association of Chiefs of Police, former Commission Member of the Environmental Control Commission for the City of Waterbury, current Board of Director member for Jane Doe No More Inc., current Board of Director member for the Boys and Girls Club of Greater Waterbury, current corporator of Thomaston Savings Bank,

Current Commissioner for the Board of Education for the City of Waterbury, former State of Connecticut Department of Corrections Correctional Officer, former patrol officer, detective, police sergeant, and detective sergeant for the Naugatuck Police Department, former director of the Police Recertification Program for Post University, current CT Post Certified Instructor for Police Officer Standards and Training, and former board member for the Connecticut Public Broadcasting Network. The official address is listed at 29 Central Avenue, Waterbury, CT, 06702.

20. Defendant Amber Doe, *Official and individual capacities,* is a resident of the state of Connecticut and is presumed to be a romantic partner of Defendant Matthew J. Lodice. Her address and true identity are unknown at this time.

21. Defendant Sergeant Ameer Williams, #745 of the New Haven Police Department, *Official and individual capacities,* is an employee of the New Haven Police Department and City of New Haven. The official address is 1 Union Ave, New Haven, CT, 06510.

22. Defendant Amina Connelly, *Official and individual capacities*, is the Deputy Chief Clerk for Family Matters for the New Haven Superior Court located at 235 Church st, New Haven, CT, 06510.

23. Defendant Anastasia Ganim, *Official and individual capacities*, is a resident of the state of Connecticut and is the biological sister of the plaintiff. She is a state employee employed with Hamden Public Schools and sits as president on the executive board of the Peck Place PTO. The official address is 314 Demarest Drive, Orange, CT, 06477.

24. Defendant Andrew Knott, *Official and individual capacities*, is the President of the Executive Committee of The New Haven County Bar Association. The official address is 900 Chapel St #10, New Haven, CT, 06510.

25. Defendant Andrew Marshall, *Official and individual capacities,* is a resident of the state of

Connecticut. He is a PCA at Waterbury Hospital, an Emergency Medical Technician at Medtronic, and a former Emergency Medical Technician Supervisor at Naugatuck Ambulance. His official address is 28 Miller rd., Bethany, CT, 06524.

26. Defendant Alexandra Alexiades, *Official and individual capacities,* is a resident of the state of Connecticut and the cousin of defendant Wachter. She is a registered nurse employed by Yale New Haven Health and an alumnus of Quinnipiac University with an address of 1073 Racebrook Road, Woodbridge, CT, 06525.

27. Defendant Elias Alexiades, *Official and individual capacities,* is the Assistant Corporation Counsel for the Corporation Counsel Department for the City of New Haven with a listed address of 165 Church Street, New Haven, CT, 06510.

28. Defendant City of New Haven Corporation Counsel Department is a municipal department located in the State of Connecticut and has a listed address of 165 Church Street, New Haven, CT, 06510.

29. Defendant Gregory Stamos, *Official and individual capacities,* is an alumnus of Defendant University of Connecticut and is the father of Defendant Alexis Stamos and is the General Counsel for Defendant Saint Barbara Greek Orthodox Church with an address of 480 Racebrook Road, Orange, CT, 06477.

30. Defendant City of Milford is a municipality in the State of Connecticut with an official address of 110 River Street, Milford, CT, 06460.

31. Defendant Milford Police Department is a police department in the City of Milford with an address of 430 Boston Post Road, Milford, CT, 06460.

32. Defendant Sergeant O'Keefe #320 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

20- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

33. Defendant Sergeant Lacy #310 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

34. Defendant Officer V. Senatore #87 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

35. Defendant Officer Schott #33 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

36. Defendant Officer Vakos #139 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

37. Defendant Officer M. Kreitman #21 of the Milford Police Department, *Official and individual capacities,* is an employee of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

38. Defendant Several Jane Doe and John Doe Officers employed by the Milford Police Department, *Official and individual capacities,* are employees of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

39. Defendant Several Jane Doe and John Doe Dispatch Workers employed by the Milford Police Department, *Official and individual capacities,* are employees of the Milford Police Department with an address of 430 Boston Post Road, Milford, CT, 06460.

40. Defendant Ann Denny, *Official and individual capacities*, is the administrative assistant for the First Selectman's office for the Town of Orange, CT. The official address is 617 Orange Center

Rd, Orange, CT, 06477.

41. Defendant Annamaria Baranowski, *Official and individual capacities*, is an employee of the State of Connecticut Judicial System Family Services Division at the New Haven Superior Court at 235 Church St, New Haven, CT, 06510.

42. Defendant Annisa Klapproth, *Official and individual capacities*, is one of the Executive Committee Members of the New Haven County Bar Association, with an official address of 900 Chapel St #10, New Haven, CT, 06510.

43. Defendant Anthony Zuppardi, *Official and individual capacities*, is a resident of the state of Connecticut and is a volunteer firefighter/EMT for the North Farms Volunteer Fire Department Inc. with an official address of 95 North Ridgeland Road, Wallingford, CT, 06492.

44. Defendant Any and all Clerks/Judicial Marshals Present at New Haven Superior Court on 4/8/22 6/1/22 6/28/22 4/5/23 5/25/23 6/15/23 8/1/23 & 10/4/23 is any and all clerks and judicial marshals that were present at the New Haven Superior Court on the dates of 4/8/22, 6/1/22, 6/28/22, 4/5/23, 5/25/23, 6/15/23, 8/1/23 and 10/4/23. The official address is 235 Church Street, New Haven, CT, 06510.

45. Defendant Ashley Gray is a resident of the state of Connecticut and is domiciled in Connecticut and resides at 13 Plank rd., Prospect, CT, 06712.

46. Defendant Assistant Chief Max Martins, *Official and individual capacities*, is the Assistant Chief for the Orange Police Department for the Town of Orange in the State of Connecticut with an official address of 314 Lambert Rd, Orange, CT, 06477.

47. Defendant Assistant Clerk Dylan Wingard, *Official and individual capacities*, is the Assistant Clerk for the New Haven Superior Court with an official address of 235 Church Street, New Haven, CT, 06510.

48. Defendant Assistant States Attorney Laura DeLeo, *Official and individual capacities*, is a state's attorney for the Derby GA5 court in Derby, CT, with an official address of 106 Elizabeth Street, Derby, CT, 06418.

49. Defendant Clerk Linda Doe from the Derby Court, *Official and individual capacities,* is a clerk for the Derby GA5 court in Derby, CT, with an official address of 106 Elizabeth Street, Derby, CT, 06418.

50. Defendant States Attorney Margaret E. Kelley, *Official and individual capacities*, is a States Attorney for the State of Connecticut Ansonia-Milford Criminal Division and has an official address of 14 West River Street, Milford, CT, 06460.

51. Defendant Office of the States Attorney Judicial District of Ansonia-Milford is a branch of the State of Connecticut Judicial System located at 14 West River Street, Milford, CT, 06460.

52. Defendant Supervisory Assistant States Attorney Rebecca Barry*, Official and individual capacities*, is a state's attorney for the Derby GA5 court in Derby, CT, with an official address of 106 Elizabeth Street, Derby, CT, 06320.

53. Defendant Barbara Bellucci*, Official and individual capacities*, is the Family Violence Victim Advocate at the Derby Superior Court GA5 for the Umbrella Center for Domestic Violence Services—A program of BHcare, with an official address of 106 Elizabeth Street, Derby, CT, 06320.

54. Defendant Basil R.A. Mahoney*, Official and individual capacities*, is a public member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

55. Defendant Benjamin Abrams*, Official and individual capacities*, is the Assistant Attorney General at the Office of the Attorney General for the State of Connecticut, with an official address of 165

Capitol Avenue, Hartford, CT, 06106.

56. Defendant Benjamin Gettinger, *Official and individual capacities*, is an Executive Committee Officer for the New Haven County Bar Association, with an official address of 900 Chapel St #10, New Haven, CT, 06510.

57. Defendant Betsy Keller, *Official and individual capacities,* is the founder of Connecticut Protective Moms, a 501(c) (3) non-profit organization registered in the State of Connecticut at 2389 Main Street, Suite 100, Glastonbury, CT, 06033.

58. Defendant BHcare Inc. is a non-profit 501(c)(3) tax exempt organization in the State of Connecticut that identifies as a Certified Community Behavior Health Clinic. They cite their mission as being "to improve community health and quality of life of individuals by providing mental health, addiction, and domestic violence services. The official address is listed as 127 Washington Avenue, North Haven, CT, 06473.

59. Defendant BHcare Foundation Inc. is a non-profit 501(c)(3) tax exempt organization in the State of Connecticut that identifies as a Certified Community Behavior Health Clinic. They cite their mission as being "fundraising to provide support to BHcare, Inc. which is a 501(c)(3) organization whose mission is to improve community health and quality of life of individuals by providing mental health addiction and domestic violence services." The official address is listed as 127 Washington Avenue, North Haven, CT, 06473.

60. Defendant Blake Sullivan, *Official and individual capacities*, is the Assistant Attorney General at the Office of the Attorney General for the State of Connecticut, with an official address of 165 Capitol Avenue, Hartford, CT, 06106.

61. Defendant Brad Saxton, *Official and individual capacities*, is an Executive Committee Officer for the New Haven County Bar Association, with an official address of 900 Chapel St #10, New

Haven, CT, 06510.

62. Defendant Bruce Martin is a resident of the State of Connecticut and is domiciled at 14 Woodbury Court, Wolcott, CT, 06716.

63. Defendant Bunny Village Learning Center LLC is a childcare center located at 41 Village Ln., Ste. 101-103, Bethany, CT, 06454.

64. Defendant Carla Smith Stover, Ph.D., *Official and individual capacities*, is a Professor and Licensed Clinical Psychologist employed at the Yale University Child Study Center at 230 S. Frontage Rd, New Haven, CT, 06520.

65. Defendant Carrie Brickhouse, Director of Heavenly Gift LLC*, Official and individual capacities*, is the Director working at Heavenly Gift Childcare Center LLC at 14 Park Street #106, Thomaston, CT, 06787.

66. Defendant Casey Brinkman, *Official and individual capacities*, is an executive member of Connecticut Protective Moms and is a registered respiratory therapist at Yale New Haven Hospital with a listed address of 33 Madison Street, East Hartford, CT, 06118.

67. Defendant Jill Rosenfeld, *Official and individual capacities*, is an administrative member of Connecticut Protective Moms with an official address of 2389 Main Street, Suite 100, Glastonbury, CT, 06033.

68. Defendant Cat Itaya, *Official and individual capacities*, runs the Federal Pro Se Legal Assistance Program for New Haven Legal Assistance Association Inc, with an official address of 205 Orange Street, New Haven, CT, 06510.

69. Defendant Center for Children's Advocacy Inc. is a nonprofit law firm located in Connecticut which identifies themselves as "fight[ing] for the legal rights of Connecticut's most vulnerable children." They are a 501(c)(3) tax-exempt corporation that has a mission stated as being to

"promote the legal rights and interests of poor children who are dependent for their care upon Connecticut's judicial, child welfare, health, mental health, education, and juvenile systems. They have an official address of 65 Elizabeth Street, Hartford, CT, 06105.

70. Defendant Charles & Boni-Vendola, LLC is a law firm registered in the state of Connecticut with a registered address of 31 Broadway, North Haven, CT, 06473.

71. Defendant Chris R. Nelson, *Official and individual capacities*, is an executive committee member of the New Haven County Bar Association, with an official address of 900 Chapel St #10, New Haven, CT, 06510.

72. Defendant Christina Doe, *Official and individual capacities*, is a clerk from the New Haven Superior Court Clerk's Office at 235 Church st, New Haven, CT, 06510.

73. Defendant Christopher Ganim, *Official and individual capacities*, is the brother-in-law of the plaintiff and is a resident of the Town of Orange in New Haven County in the State of Connecticut with an address of 314 Demarest Drive, Orange, CT, 06477.

74. Defendant Christopher Katagis, *Official and individual capacities*, is the son of the Defendant Diamanto Antonellis and a resident of the State of Connecticut residing at 21 Burma road, Woodbridge, CT, 06525.

75. Defendant Christopher Smith, *Official and individual capacities*, is the husband of the Defendant Elizabeth Protzman and a resident of the State of Connecticut residing at 16 Myrna Drive, Marlborough, CT, 06447.

76. Defendant City of New Haven is a City located in the State of Connecticut, with an official address of 165 Church Street, New Haven, CT, 06510.

77. Defendant City of Waterbury is a City located in the State of Connecticut, with an official address of 235 Grand Street, Waterbury, CT, 06702.

78. Defendant Supervisory Assistant State's Attorney Colleen V. Zingaro, *Official and individual capacities*, is the Supervisory Assistant State's Attorney for Violent Crimes/Special Victims Unit, with an official address of 1061 Main street, Fairfield, CT, 06604.

79. Defendant Connecticut Alliance to End Sexual Violence Inc. is a nonprofit 501(c)(3) tax exempt corporation organized in the State of Connecticut with a registered address of 96 Pitkin Street, East Hartford, CT, 06108.

80. Defendant Association of Court Security Officers-Connecticut is a nonprofit 501(c)(3) tax exempt corporation organized in the state of Connecticut with an official address of 141 Church Street, New Haven, CT, 06510.

81. Defendant Connecticut Coalition Against Domestic Violence is a nonprofit 501(c)(3) tax exempt corporation organized in the state of Connecticut with an official address of 655 Winding Brook Drive, Suite 4050, Glastonbury, CT, 06033.

82. Defendant Connecticut Department of Public Safety is a branch of the State of Connecticut, with an official address at Washington Building, Middletown, CT, 06457.

83. Defendant Officer R.M. Gusto of the Middlebury Police Department, *Official and individual capacities*, is an officer employed by the Town of Middlebury with an official address of 200 Southford Road, Middlebury, CT, 06762.

84. Defendant Access Health International Inc is a 501(c)(3) tax exempt corporation organized in the State of New York that administers the State of Connecticut Husky Health program and acts as a branch of the State of Connecticut Department of Social Services. The official address is 1016 Fifth Avenue No 11A C, New York, NY, 10028.

85. Defendant Connecticut Husky Health is a branch of Defendant Access Health International Inc. The official address is 1016 Fifth Avenue No 11A C, New York, NY, 10028.

86. Defendant Jeffrey S. Lehman is on the board of directors for Access Health International Inc, with an official address is 1016 Fifth Avenue No 11A C, New York, NY, 10028.

87. Defendant Connecticut Judicial Branch Centralized ADA Office is a branch of the State of Connecticut Judicial System, with an official address of 90 Washington Street, Hartford, CT, 06106.

88. Defendant Connecticut Judicial Review Council is a self-governing administrative body in the State of Connecticut, with an official address of 505 Hudson St, #5, Hartford, CT, 06106.

89. Defendant Connecticut Department of Emergency Services and Public Protection is a branch of the state of Connecticut, with an official address at Washington Building, Middletown, CT, 06457.

90. Defendant Connecticut Legal Services Inc. is a non-profit 501(c)(3) tax exempt corporation that acts as a legal aid agency in the State of Connecticut, with an official address of 62 Washington Street, 4th Floor, Middletown, CT, 06457.

91. Defendant Connecticut Office of Victim Advocate is an administrative branch of the State of Connecticut with an office address of 505 Hudson Street, Hartford, CT, 06106.

92. Defendant Connecticut Office of Victim Services is an oversight agency that is an administrative office in the State of Connecticut, with an office address of 225 Spring Street, 4th Floor, Wethersfield, CT, 06109.

93. Defendant Connecticut Protective Moms Inc. is a 501(c)(3) non-profit organization located in the State of Connecticut at 2389 Main Street, Suite 100, Glastonbury, CT, 06033.

94. Defendant Connecticut State Child Support Enforcement Services is an administrative agency that is under the Connecticut Department of Social Services with an office address of P.O. Box 990036, Hartford, CT, 06199-0036.

95. Defendant Connecticut State Department of Children and Families is an administrative agency for

the State of Connecticut and is a child protection agency with an office address of 506 Hudson Street, Hartford, CT, 06106.

96. Defendant Connecticut State Department of Social Services is a welfare benefit agency for the State of Connecticut, located at 3580 main street, Hartford, CT, 06120.

97. Defendant Connecticut State Division of Criminal Justice is a division of the criminal sector of the State of Connecticut Judicial Branch, located at 300 Corporate Place, Rocky Hill, Connecticut, 06067.

98. Defendant Lisa A. Knopf is an attorney licensed in the state of Connecticut with an address of 3333 Main Street, Stratford, CT, 06614.

99. Knopf Law LLC is a law firm owned by Defendant Lisa A. Knopf with an address of 3333 Main Street, Stratford, CT, 06614.

100.    Defendant Lynn Pellegrino, *Official and individual capacities,* is an attorney employed at Pellegrino & Pellegrino, the founding member of Divorce Solutions of Connecticut, and a member of the Connecticut Counsel for Non-Adversarial Divorce, with an address of 59 Elm Street, Suite 215, New Haven, CT, 06510.

101.    Defendant Divorce Solutions of Connecticut is an organization registered in the State of Connecticut with a listed address of P.O. Box 1073, Madison, CT, 06443.

102.    Defendant The Connecticut Council for Non-adversarial Divorce is an organization registered I the State of Connecticut with a listed address of P.O. Box 1551, Naugatuck, CT, 06770.

103.    Defendant Pellegrino & Pellegrino LLC is a law firm located in the State of Connecticut with a registered address of 30 Fountain Street, New Haven, CT, 06510.

104.    Defendant Aisha Roche is a staff attorney at the Children's Law Center of Connecticut with an address of 30 Arbor Street, Hartford, CT, 06106.

105.     Defendant Connecticut State Police Troop I Bethany is a branch of the Connecticut State

Police for the State of Connecticut, located at 631 Amity Rd, Bethany, CT, 06524.

106.     Defendant Connecticut Women's Education and Legal Fund is a non-profit organization

located in the State of Connecticut with an address of PO Box 320460, Hartford, CT, 06132.

107.     Defendant Conor Duffy, *Official and individual capacities*, is a member of the Executive

Committee of the New Haven County Bar Association. The registered address is listed as 900

Chapel St #10, New Haven, CT, 06510.

108.     Defendant Cris Doe, *Official and individual capacities*, is a phone operator for Safe Haven

of Waterbury Inc. and covers the 24/7 hotline. The address is listed as 29 Central Ave, Waterbury,

CT, 06702.

109.     Defendant Magistrate Cynthia Anger, *Official and individual capacities*, is a small claims

magistrate for the Ansonia-Milford JD handling small claims matters in Milford Superior Court,

with an address of 14 West River street, Milford, CT, 06460.

110.     Defendant Daniel Burns, *Official and individual capacities*, is a member of the New Haven

Legal Assistance Association, Inc. with an official address of 205 Orange Street, New Haven, CT,

06510.

111.     Defendant Lisa Zappone, *Official and individual capacities*, is former Connecticut State

Marshal and an employee of the Family Relations Division for the Family branch of the New

Haven Superior Court at 235 Church st, New Haven, CT, 06510.

112.     Defendant Dennis Reilly, *Official and individual capacities*, is an employee of the Family

Relations Division for the Family branch of the New Haven Superior Court at 235 Church st, New

Haven, CT, 06510.

113.     Defendant Diamanto Antonellis *Official and individual capacities* is the biological mother

of the defendants Christopher Katagis, Irene Antar, and Anastasia Ganim as well as of the plaintiff. Her address is 21 Burma Road, Woodbridge, CT, 06525.

114.     Defendant Dispatcher Whitham #206 of OPD, *Official and individual capacities*, is a dispatcher employed with the Town of Orange Police Department, with an official address of 314 Lambert Rd, Orange, CT, 06477.

115.     Defendant Town of Middlebury is a town in the state of Connecticut with an address of 1212 Whittemore Road, Middlebury, CT, 06702.

116.     Defendant Middlebury Police Department is a police department in the town of Middlebury with an address of 200 Southford Road, Middlebury, CT, 06762.

117.     Defendant Donald Cretella, Esq*., Official and individual capacities,* is an attorney at Zingaro, Cretella, and Rasile LLC and an adjunct professor at Quinnipiac University School of Law, with an official address of 681 State Street, New Haven, CT, 06511

118.     Defendant Donna Dicosmo, *Official and individual capacities,* is a business partner and investor in the Defendant Whole House Remodeling Company LLC and of the Defendant Matthew J. Lodice and resides at 55 Quarry Hill road, Waterbury, CT, 06706.

119.     Defendant Dr. Anthony Campagna, *Official and individual capacities,* is a mental health professional who regularly conducts business with the State of Connecticut Judicial Branch, with a listed address of 1844 Whitney Ave, 2nd Floor, Hamden, CT, 06517.

120.     Defendant Dr. Eric Frazer*, Official and individual capacities,* is a mental health professional who regularly conducts business with the State of Connecticut Judicial Branch. He is an employee of Yale School of Medicine with an address as 333 Cedar Street, New Haven, CT, 06510.

121.     Defendant Dr. Kimberly Citron, PH.D., *Official and individual capacities*, is a mental

health professional who regularly conducts business with the State of Connecticut Judicial Branch. Her listed address is 396 Main Street, Cheshire, CT, 06410.

122.    Defendant Dr. Robert Horwitz, *Official and individual capacities,* is a mental health professional who regularly conducts business with the State of Connecticut Judicial Branch and a board member of the Connecticut Council for Non-adversarial Divorce located at 258 Bradley Street, New Haven, CT, 06510.

123.    Defendant Dr. Wendy Levy PsyD, is a mental health professional who regularly conducts business with the State of Connecticut Judicial Branch with an address at 1465 Post Road East, in Westport, CT, 06880.

124.    Defendant Officer E. Aviles of New Haven Police Department Badge # 263, *Official and individual capacities*, is a police officer for the New Haven Police Department and employee of the City of New Haven, Connecticut at 1 Union Avenue, New Haven, CT, 06511.

125.    Defendant Elizabeth Protzman, *Official and individual capacities*, is the Director of Communications and Nonprofit development at Onyx Elite Consulting Services, the Director of Communications at Winning Ways, Inc. of Connecticut, and a Business Consultant for Smith PR Company located at 279 North Main street, Branford, CT, 06405.

126.    Defendant Elwyn Brewster Quirk, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association, with an address of 900 Chapel St #10, New Haven, CT, 06510.

127.    Defendant Erin Krygier, *Official and individual capacities*, is the caseflow coordinator assigned to the New Haven Superior Court at 235 Church street, New Haven, CT handling family caseflow requests with an address of 235 Church street, New Haven, CT, 06510.

128.    Defendant Eugene Zingaro, Esq. is the partner of Donald Cretella, Esq. at Zingaro, Cretella,

and Rasile LLC, with a registered address of 681 State Street, New Haven, CT, 06511.

129.     Defendant Gabriel Mina is a sub-contractor employed by Whole House Remodeling Company LLC working under the supervision and direction of Defendant Matthew J. Lodice, with an address at 57 Westport drive, Waterbury, CT, 06706.

130.     Defendant Daniel Mina is a resident of the state of Connecticut and owner of Defendant The Commissioners Cigar Lounge LLC with a listed address of 350 Fairfield Ave, Waterbury, CT, 06708.

131.     Defendant The Commissioners Cigar Lounge LLC is a business registered in the State of Connecticut with a listed address of 350 Fairfield Ave, Waterbury, CT, 06708.

132.     Defendant Ganim Legal LLC is a law firm located at 2370 Park Ave, Bridgeport, CT, 06604.

133.     Defendant Gerald Viglione Jr., *Official and individual capacities,* is the father of plaintiff's minor daughter J.V. and resides at 118 Irvington st, New Haven, CT, 06513.

134.     Defendant Gina Killian, *Official and individual capacities*, is a clerk at the New Haven Superior Court clerk's office located at 235 Church st, New Haven, CT, 06510.

135.     Defendant Governor Ned Lamont, *Official and individual capacities*, is the Governor of the State of Connecticut, with an address at 210 Capital Ave, Hartford, CT, 06106.

136.     Defendant Gregory Gallo, Esq., is a partner at Pellegrino & Pellegrino LLC and an attorney in the State of Connecticut. He is also the ex-brother-in-law and former landlord/business partner of the Defendant Matthew Lodice and has contracted several jobs through defendant Whole House Remodeling LLC with an address at 475 Whitney Ave, New Haven, CT, 06511.

137.     Defendant Happy Even After Family Law LLC is a family law firm located at 2531 Whitney Ave, Hamden, CT, 06518.

33- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

138.     Defendant Susan Lettelleir, *Official and individual capacities,* is the president of the Board of Directors for Defendant Woodbridge Child Center with an address of 4 Meetinghouse Lane, Woodbridge, CT, 06525.

139.     Defendant Woodbridge Child Center Inc. is a 501c(3) tax-exempt corporation registered in the state of Connecticut with an address of 4 Meetinghouse Lane, Woodbridge, CT, 06525.

140.     Defendant Jocelyn Percell, *Official and individual capacities,* is an employee of the Defendant Woodbridge Child Center Inc. with an address of 4 Meetinghouse Lane, Woodbridge, CT, 06525.

141.     Defendant Jessica Maybeck, *Official and individual capacities,* is a former employee of Defendant Woodbridge Child enter Inc. with an address 307 Soundview Ave, Shelton, CT, 06484.

142.     Defendant Healing Springs Wellness Center LLC is a mental health treatment provider located at 1006 S. Main St, suite 4, Plantsville, CT, 06479.

143.     Defendant Heather Collins, *Official and individual capacities*, is the Court Planner II for the Centralized ADA Office for the State of Connecticut with an office at 90 Washington Street, 3rd floor, Hartford, CT, 06106.

144.     Defendant David Rohan, *Official and individual capacities,* is an inspector for the State of Connecticut State's Attorney's Office for the New Britain Judicial District and a former employee of the City of New Britain and New Britain Police Department with an address of 20 Franklin Square, New Britain, CT, 06051.

145.     Defendant Heavenly Gift Childcare Center LLC is a childcare center located at 14 Park st, #106, Thomaston, CT, 06787.

146.     Defendant Honorable Arthur Hiller, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD at 14 West River st,

Milford, CT, 06460.

147.     Defendant Honorable Cherie Phoenix-Sharpe, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD, at 14 West River st, Milford, CT, 06460.

148.     Defendant Honorable Christine P. Rapillo, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the New Britain JD ,at 20 Franklin Square, New Britain, CT, 06053.

149.     Defendant Honorable Christopher Griffin, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the New Haven JD at 235 Church street, New Haven, CT, 06511.

150.     Defendant Honorable Dawne G. Westbrook, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch and is a judge member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

151.     Defendant Honorable Edward Graziani, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch at 14 West River st, Milford, CT, 06460.

152.     Defendant Honorable Erika Monique Tindill, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD at 14 West River st, Milford, CT, 06460.

153.     Defendant Honorable James Abrams, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch and is a Judge Member of the Judicial Review Council is a for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

154.     Defendant Honorable James Kenefick, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch at 235 Church street, New Haven, CT, 06510.

155.     Defendant Honorable Jon M. Alander, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the New Haven JD at 235 Church street, New Haven, CT, 06510.

156.     Defendant Honorable Kevin Randolph, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch and a judge member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

157.     Defendant Stephen M. Carroll, *Official and individual capacities*, is a public member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

158.     Defendant Honorable Margarita H. Moore, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD at 14 West River street, Milford, CT, 06460.

159.     Defendant Honorable Mark T. Gould, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the New Haven JD at 235 Church street, New Haven, CT, 06510.

160.     Defendant Honorable Matthew P. Vaccarelli, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch in the probate district of Waterbury, Connecticut with an address at 65 Center street, Waterbury, CT, 06702.

161.     Defendant Honorable Maureen Price-Boreland, *Official and individual capacities*, is a

judge employed by the State of Connecticut Judicial Branch who is in the Meriden JD at 54 West Main street, Meriden, CT, 06451.

162.     Defendant Honorable Michael Kamp, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the New Haven JD at 235 Church street, New Haven, CT, 06510.

163.     Defendant Honorable Peter Brown, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD at 14 West River street, Milford, CT, 06460.

164.     Defendant Honorable Scott Jones, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch who is in the Ansonia-Milford JD at 14 West River street, Milford, CT, 06460.

165.     Defendant Honorable Tammy Geathers, *Official and individual capacities*, is a judge employed by the State of Connecticut Judicial Branch at 14 West River street, Milford, CT, 06460.

166.     Defendant Howard Levine, *Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association, with an address of  900 Chapel St #10, New Haven, CT, 06510.

167.     Defendant Irene Antar, O.D. , *Official and individual capacities*, is an optometrist domiciled in the state of Connecticut living at 21 Burma rd., Woodbridge, CT, 06525.

168.     Defendant James Henke, *Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association, with an address of  900 Chapel St #10, New Haven, CT, 06510.

169.     Defendant James Lambo, *Official and individual capacities*, is a former employee of the Connecticut Department of Correction and former customer of Defendant Whole House

Remodeling Company LLC and best friend of Defendant Matthew Lodice with an address of 54

Joy Road, Middlebury, CT, 06762.

170.     Defendant First Selectman of the Town of Orange James Zeoli, *Official and individual*

*capacities*, is the First Selectman for the Town of Orange, with an address of 617 Orange Center

Rd, Orange, CT, 06477.

171.     Defendant Jamie Hobart Lambo, *Official and individual capacities*, is a state marshal for

the State of Connecticut, a former Waterbury Police Department officer, former Connecticut Joint

Public Safety and Security Committee Clerk, former Committee Clerk for the State of Connecticut

Senate Democrats, and is the husband of the best friend of Defendant Matthew J. Lodice, with an

address of 46 Pine street, Watertown, CT, 06795.

172.     Defendant Jane Adamik, *Official and individual capacities*, is a Child Advocate at the

Umbrella Center for Domestic Violence Services of BHcare with an address of 435 East Main

Street, Ansonia, CT, 06401.

173.     Defendant Kelly Pinto, *Official and individual capacities,* is the Chief Clerk,  for the

Superior Court Juvenile Matters with an address of 7 Kendrick Ave, Waterbury, CT, 06702.

174.     Defendant Officer Mortalli of the Hamden Police Department, *Official and individual*

*capacities,* is an employee of the Hamden Police Department with an official address of 2900

Dixwell Avenue, Hamden, CT, 06518.

175.     Defendant Several Other Jane Doe and John Doe Officers from the Hamden Police

Department, *Official and individual capacities,* are employees of the Hamden Police Department

with an official address of 2900 Dixwell Avenue, Hamden, CT, 06518.

176.     Defendant Janet Ortiz, *Official and individual capacities*, is the office manager for the

Center for Children's Advocacy, with an address of 211 State Street, Bridgeport, CT, 06605.

177.     Defendant Magistrate Judge Jennifer Aguilar, *Official and individual capacities*, is a magistrate judge working for the State of Connecticut Judicial System with an address of 235 Church street, New Haven, CT, 06510.

178.     Defendant Jennifer Gallo Lodice is the sister-in-law of Defendant Matthew J. Lodice and the sister of Defendant Greg Gallo and has a listed address of 60 Inwood Lane, Bristol, CT, 06010.

179.     Defendant Jessica Mayo, Ph.D, *Official and individual capacities*, is the Assistant Professor of Clinical Child Psychology and Licensed Psychologist at the Yale Child Study Center with an address of 350 George Street, New Haven, CT, 06510.

180.     Defendant Jessica Strusky*, Official and individual capacities*, is the daughter of Defendants Karen Bowers and Roy Bowers and a resident of Connecticut residing at 100 Salem Rd, Prospect, CT. She is also an optometric assistant at Dr. Deluca Dr. Marciano and Associates in Prospect, Connecticut. Her address is 100 Salem Rd, Prospect, CT, 06712.

181.     Defendant Jia Luo, *Official and individual capacities*, is a public member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street, #5, Hartford, CT, 06106.

182.     Defendant Joaquina Borges King, Esq., *Official and individual capacities*, is an attorney licensed to practice law in the State of Connecticut and an attorney member of the Judicial Review Council, with an official address of 505 Hudson Street, #5, Hartford, CT, 06106.

183.     Defendant John Parese, *Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association.

184.     Defendant Joseph DeCicco, Esq., *Official and individual capacities*, is an attorney licensed to practice law in the state of Connecticut and was appointed as the court-appointed counsel for plaintiff's minor child A.L. for a termination of parental rights proceeding against the Defendant

Matthew J. Lodice.

185.     Defendant Joseph M. Porto, *Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association.

186.     Defendant Joseph Merschman, *Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association.

187.     Defendant Josh Lambo, *Official and individual capacities*, is the Godfather of the minor child A.L. and the best friend of the Defendant Matthew J. Lodice and the husband of Defendant Jamie Hobart Lambo and the brother of Defendant James Lambo. He is also an employee of the State of Connecticut Department of Corrections employed as a Correctional Officer.

188.     Defendant Judicial Marshal Andrews, New Haven Superior Court, *Official and individual capacities*, is a judicial marshal employed by the State of Connecticut working at 235 Church street, New Haven, CT.

189.     Defendant Judicial Marshal Hayden, Badge #567 of the New Haven Superior Court, *Official and individual capacities*, is a judicial marshal employed by the State of Connecticut working at 235 Church street, New Haven, CT.

190.     Defendant Judicial Marshal Runlett, New Haven Superior Court, *Official and individual capacities*, is a judicial marshal employed by the State of Connecticut working at 235 Church street, New Haven, CT.

191.     Defendant Justin Attai, *Official and individual capacities*, is a legal assistant and employee of Ganim Legal, LLC.

192.     Defendant Karen Bowers, *Official and individual capacities*, is the biological mother of the Defendant Matthew J. Lodice and resides at 48 Quarry Hill rd., Waterbury, CT, 06706.

193.     Defendant Katherine Verano, *Official and individual capacities*, is the CEO of Safe

Futures, Inc. and is also a public member of the State of Connecticut Judicial Review Council, at 505 Hudson street, #5, Hartford, CT, 06106.

194.     Defendant Safe Futures Inc. is a non-profit organization registered in the State of Connecticut at 16 Jay Street, New London, CT, that receives contracts from the State of Connecticut Department of Social Services. Located at16 Jay Street, New London, CT, 06320.

195.     Defendant Kevin Dunn, Esq. , *Official and individual capacities*, is the Executive Director of the Judicial Review Council for the State of Connecticut, at 505 Hudson street, #5, Hartford, CT, 06106.

196.     Defendant Klingberg Family Center, Inc. is located at 370 Linwood street, #1949, New Britain, CT, 06052.

197.     Defendant John Carangelo, *Official and individual capacities*, is an employee of the Town of Orange and a selectmen for the First Selectman office with an address of 617 Orange Center Rd, Orange, CT, 06477.

198.     Defendant PJ Shanley, *Official and individual capacities*, is an employee of the Town of Orange and a selectmen for the First Selectman office with an address of 617 Orange Center Rd, Orange, CT, 06477.

199.      Defendant Mitchell R. Goldblatt, *Official and individual capacities*, is an employee of the Town of Orange and a selectmen for the First Selectman office with an address of 617 Orange Center Rd, Orange, CT, 06477.

200.     Defendant Ralph Okenquist, *Official and individual capacities*, is an employee of the Town of Orange and a selectmen for the First Selectman office with an address of 617 Orange Center Rd, Orange, CT, 06477.

201.     Defendant Judy W. Williams, *Official and individual capacities*, is an employee of the

Town of Orange and a selectmen for the First Selectman office with an address of 617 Orange Center Rd, Orange, CT, 06477.

202.     Defendant Town of Orange Connecticut Board of Selectmen is a municipal department of the Town of Orange with an address of 617 Orange Center Rd, Orange, CT, 06477.

203.     Defendant Town of Orange Board of Police Commissioners is a municipal department of the Town of Orange with an address of 617 Orange Center Rd, Orange, CT, 06477.

204.     Defendant Town of Orange Board of Police Commissioner Chairman Jack Barton, *Official and individual capacities,* is the chairman of the Defendant Town of Orange Board of Police Commissioners with an address of 617 Orange Center Rd, Orange, CT, 06477.

205.     Defendant Marian Hurley, *Official and individual capacities,* is a member of the Town of Orange Board of Police Commissioner with an address of 617 Orange Center Rd, Orange, CT, 06477.

206.     Defendant Clerk Magdala Doe of the Milford Superior Court, *Official and individual capacities,* is a clerk working at the Milford Superior Court with an official address of 14 West River Street, Milford, CT, 06460.

207.      Defendant Roy Cuzzocreo, *Official and individual capacities,* is a member of the Town of Orange Board of Police Commissioner with an address of 617 Orange Center Rd, Orange, CT, 06477.

208.     Defendant Nyjahwahn Walker, *Official and individual capacities,* is a member of the Town of Orange Board of Police Commissioner with an address of 617 Orange Center Rd, Orange, CT, 06477.

209.     Defendant Christopher Carveth, *Official and individual capacities,* is a member of the Town of Orange Board of Police Commissioner with an address of 617 Orange Center Rd, Orange,

CT, 06477.

210.    Defendant Kristianna Tyler, *Official and individual capacities*, is former clerk for the New Haven Superior Court and an executive member of the New Haven County Bar Association with an address of  900 Chapel St #10, New Haven, CT, 06510.

211.    Defendant Kristin Wolf*, Official and individual capacities*, is a member of the executive committee of the New Haven County Bar Association with an address of  900 Chapel St #10, New Haven, CT, 06510.

212.    Defendant Richard Blumenthal, *Official and individual capacities,* is a United States Senator for the State of Connecticut with an address of 90 State House Square, 10th Floor, Hartford, CT, 06103.

213.    Defendant Lancia Blatchley, *Official and individual capacities*, is a mental health treatment provider employed at Healing Springs Wellness LLC and a resident of the state of Connecticut. She is also the Domestic Violence Program Coordinator for LifeBridge Community Services, with an adderss of 1006 South Main st, Suite 4, Plantsville, CT, 06479.

214.    Defendant Larae Plummer, *Official and individual capacities*, is a social worker working for the Department of Children and Families Milford Office, at 38 Welligton rd, Milford, CT, 06460.

215.    Defendant Leonard Rodriguez, *Official and individual capacities*, is an executive committee member for the New Haven County Bar Association, with an address of  900 Chapel St #10, New Haven, CT, 06510.

216.    Defendant Lieutenant Anderson of the Orange Police Department, *Official and individual capacities*, is a lieutenant employed at the Orange Police Department located at 314 Lambert road, Orange, CT, 06477.

217.     Defendant Lieutenant Benjamin Borelli of the Connecticut State Police Troop I in Bethany, *Official and individual capacities*, is a lieutenant employed with the Connecticut State Police Troop I of Bethany, CT, 06524.

218.     Defendant Lieutenant DeRubeis of the Orange Police Department, *Official and individual capacities*, is a lieutenant employed with the Orange Police Department., with an official address of 314 Lambert Rd, Orange, CT, 06477.

219.     Defendant Lieutenant John Prisavage of the New Britain Police Department, *Official and individual capacities*, is a lieutenant employed with the New Britain Police Department. Located at 10 Chestnut Street, New Britain, CT, 06051.

220.     Defendant Lieutenant Judicial Marshal Dadio, Badge #113 of the New Haven Superior Court, *Official and individual capacities*, is a judicial marshal employed with the New Haven Superior Court at 235 Church st, New Haven, CT, 06510.

221.     Defendant Lisa B. Giliberto, Esq., *Official and individual capacities*, is the former counsel of the Defendant Elizabeth Protzman, an employee of The Victim Rights Center of Connecticut Team, and the Children's Law Center of Connecticut with an address of 8 Research Parkway, Wallingford, CT, 06492.

222.     Defendant Detective Lisa R. Steeves of the New Britain Police Department, *Official and individual capacities*, located at 10 Chestnut Street, New Britain, CT, 06051.

223.     Defendant Lizzy Cretella, *Official and individual capacities*, is a resident of and is domiciled in the State of Connecticut and is legal assistant and an employee of Zingaro, Cretella, and Rasile LLC with an official address of 681 State St, New Haven, CT, 06510.

224.     Defendant Mayor Joe Ganim, *Official and individual capacities*, is the Mayor of the City of Bridgeport with an address of 999 Broad Street, Bridgeport, CT, 06604.

225.     Defendant Lori Doe, Clerk from New Haven Superior Court, *Official and individual capacities*, is a clerk employed in the New Haven Superior Court with an official address at 235 Church st, New Haven, CT, 06510

226.     Defendant Lori Semrau, Esq., *Official and individual capacities*, is an employee of the State of Connecticut working at the Court Service Center for the Milford Superior Court located at 14 West River st, Milford, CT, 06460.

227.     Defendant Louis A. Annecchino, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association with an address of 900 Chapel St #10, New Haven, CT 06510.

228.     Defendant Judicial Marshal Santana for the Milford Superior Court, *Official and individual capacities,* is a judicial marshal employed by the State of Connecticut with an address of 14 West River Street, Milford, CT, 06460.

229.     Defendant Luz Santana, *Official and individual capacities*, is the supervisor for the office of the Family Violence Victim Advocate at the Derby Superior Court GA5 for the Umbrella Center for Domestic Violence Services—A program of BHcare, with an official address of 106 Elizabeth Street, Derby, CT, 06320.

230.     Defendant Lynda Sorensen, *Official and individual capacities*, is a public member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

231.     Defendant Makana Ellis, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association with an address of 900 Chapel St #10, New Haven, CT 06510.

232.     Defendant Maressa Latoracca, *Official and individual capacities*, is an employee of the

New Haven Superior Court Family Services CSSD division and is the supervisor of Defendant Annamaria Baranowski and has an official address of 235 Church Street, New Haven, CT, 06510.

233.    Defendant Margaret Penny Mason, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association with an address of 900 Chapel St #10, New Haven, CT 06510.

234.    Defendant Margot Kenefick Burkle, Esq., *Official and individual capacities*, is a visiting clinical lecturer in law at Yale Law School, the daughter of Defendant Honorable Judge James Kenefick, an attorney at New Haven Legal Assistance Association, with an address of 205 Orange Street, New Haven, CT, 06510.

235.    Defendant Mark D. Phillips, Esq., *Official and individual capacities*, is an attorney member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

236.    Defendant Mark Wachter is a resident of the state of Connecticut and has an address of 156 Briarcliff Rd, Hamden, CT, 06518.

237.    Defendant Martha Weiler, Esq, *Official and individual capacities*, is an attorney employed at Welty Esposito & Weiler LLC, with an official address of 385 Orange Street, New Haven, CT, 06511.

238.    Defendant Mary Kozicki, *Official and individual capacities*, is the administrative director for the State of Connecticut Office of Victim Services with an official address of 225 Spring Street, 4th Floor, Wethersfield, CT, 06109.

239.    Defendant Mary-Ann Charles, Esq., *Official and individual capacities*, is an attorney licensed in the State of Connecticut and a partner at Charles & Boni-Vendola, LLC with an official address of 14 Ronald Lane, Cos Cob, CT, 06807.

46- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

240.     Defendant Matthew J. Lodice, *Official and individual capacities*, is the biological father of the plaintiff's minor child A.L. and has a registered address of 48 Quarry Hill road, Waterbury, CT, 06706.

241.     Defendant Dorothy Daniel Roddy, *Official and individual capacities,* is the treasurer for Saint Barbara Greek Orthodox Church with an address of 480 Racebrook Road, Orange, CT, 06477.

242.     Defendant Matthew J. Lodice, on behalf of his minor child D.L., *Official and individual capacities*, has a registered address of 48 Quarry Hill road, Waterbury, CT, 06706.

243.     Defendant Matthew J. Lodice, on behalf of his minor child S.L., *Official and individual capacities*, has a registered address of 48 Quarry Hill road, Waterbury, CT, 06706.

244.     Defendant Maura Mastrony, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association with an address of 900 Chapel St #10, New Haven, CT 06510.

245.     Defendant Megan C. McGrath, *Official and individual capacities*, is an attorney in the state of Connecticut that is employed at Happy Even After Family Law LLC with an official address of 2531 Whitney Ave, Hamden, CT, 06518.

246.     Defendant Melissa Swan*, Official and individual capacities*, is the director and owner of Defendant Bunny Village Learning Center, LLC, with an official address of 41 Village Lane, #101-103, Bethany, CT, 06524.

247.     Defendant Meredith McGloin*, Official and individual capacities*, is an investigative social work supervisor at the Connecticut Department of Children and Families with an official address of 505 Hudson Street, Hartford, CT, 06106.

248.     Defendant Merit Lajoie*, Official and individual capacities*, has been an employee of the

State of Connecticut Office of the Victim Advocate for 23 years and is the current Complaint Officer for the OVA with an address of 505 Hudson Street, #5, Hartford, CT, 06106.

249.     Defendant Michael Hillis, Esq, *Official and individual capacities*, is an attorney employed at Dombroski Hillis LLC with an address of 129 Whitney Avenue, New Haven, CT, 06510.

250.     Defendant Michelle M. Murphy *Official and individual capacities* is a public member of the Judicial Review Council for the State of Connecticut, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

251.     Defendant Milford Superior Court Clerk Laura, *Official and individual capacities*, is a clerk employed at the Milford Superior Court at 14 West River st, Milford, CT, 06460.

252.     Defendant Monica Cloud Rogers, *Official and individual capacities*, is the legal services advocate counselor for The Umbrella Center for Domestic Violence Services of BH*care* with an address of 435 East Main Street, Ansonia, CT, 06401.

253.     Defendant Monica Perez, *Official and individual capacities*, is a registered nurse for the State of Connecticut, former employee of Hartford Hospital, former wife of Defendant Matthew J. Lodice and mother of Defendant D.L., current travel nurse for The Nurse Network, and current nursing supervisor for iCare Health Network with an address of 15 Panthorn Trail, Southington, CT, 06489.

254.     Defendant Town of Southington is a town in the State of Connecticut with an official address of 75 Main Street, Southington, CT, 06489.

255.     Defendant Rosa Chiropractic and Wellness is a business registered in the State of Connecticut with an address of 1177 Wolcott Street, Waterbury, CT, 06705.

256.     Defendant Rosa Chiropractic Center LLC is a business registered in the State of Connecticut with an address of 1177 Wolcott Street, Waterbury, CT, 06705.

257.     Defendant Southington High School is a school in the town of Southington located in the

State of Connecticut with an official address of 720 Pleasant Street, Southington, CT, 06489.

258.     Defendant Anthony Ingala, *Official and individual capacities,* is an ICU Nurse employed

by Defendant Saint Mary's Hospital with an address of 56 Franklin Street, Waterbury, CT, 06706.

259.     Defendant Nancy Doe, Clerk from New Haven Superior Court, *Official and individual*

*capacities,*  is a family clerk for New Haven Superior Court with an address of 235 Church Street,

New Haven, CT, 06510.

260.     Defendant Greek Orthodox Archdiocese of America is an organization with an address of

8 East 79th Street, New York, NY, 10075.

261.     Defendant Saint Barbara Greek Orthodox Church is a religious organization with an

address of 480 Racebrook Road, Orange, CT, 06477.

262.     Defendant Father Peter J. Orfanakos, *Official and individual capacities,* is the parish priest

for Saint Barbara Greek Orthodox Church with an address of 480 Racebrook Road, Orange, CT,

06477.

263.     Defendant Nancy Sasser, *Official and individual capacities*, is a family clerk for New

Haven Superior Court with an address of 235 Church Street, New Haven, CT, 06510.

264.     Defendant Nancy Valentino, *Official and individual capacities*, is a member of the

Executive Committee of the New Haven County Bar Association with an address of 900 Chapel

St #10, New Haven, CT 06510.

265.     Defendant Natalie Caban, *Official and individual capacities*, is a social worker employed

with the Department of Children and Families Central Office for New Britain CT with an address

of One Grove Street, 4th Floor, New Britain, CT, 06053.

266.     Defendant New Britain Police Department is a police department in the City of New Britain

located at 10 Chestnut Street, New Britain, CT, 06051.

267.     Defendant Officer Strzalka #341 of the New Britain Police Department, *Official and individual capacities*, is an employee of the City of New Britain and has an address located at located at 10 Chestnut Street, New Britain, CT, 06051.

268.     Defendant New Haven Child Support Enforcement Services is a branch of Connecticut Child Support Enforcement and has an address of 414 Chapel Street, New Haven, CT, 06511.

269.     Defendant New Haven County Bar Association is a Bar Association is a Bar Association located in the State of Connecticut with an address of 900 Chapel St #10, New Haven, CT 06510.

270.     Defendant John Lambo, *Official and individual capacities,* is a resident of the State of Connecticut and has an address of 32 Grandview Ave, Watertown, CT, 06795.

271.     Defendant New Haven Legal Assistance Association Inc. is a non-profit legal aid organization with an address of 205 Orange Street, New Haven, CT, 06510.

272.     Defendant New Haven Police Department is a police department in the city of New Haven located at 1 Union Ave, New Haven, CT, 06511.

273.     Defendant Nicole Tung, *Official and individual capacities*, is a member of the Executive Committee of the New Haven County Bar Association with an address of 900 Chapel St #10, New Haven, CT 06510.

274.     Defendant Numerous Jane Doe and John Doe Dispatch and police officers from Connecticut State Police Troop I in Bethany, CT, *Official and individual capacities,* are police officers and dispatch officers employed by the State of Connecticut and have an address located at 631 Amity Rd, Bethany, CT, 06524.

275.     Defendant Numerous Jane Doe and John Doe Dispatch and police officers from The New Britain Police Department, *Official and individual capacities,* are police officers and dispatch

officers employed by the City of New Britain located at 10 Chestnut street, New Britain, CT, 06051.

276.     Defendant Kim Coleman is an attorney licensed in the state of Connecticut, alumnus of Quinnipiac University School of law, and owner of Coleman is a member of the Connecticut Criminal Defense Lawyers Association and owner of Coleman Law LLC with an address of P.O. Box 17645, West Haven, CT, 06516.

277.     Defendant Connecticut Criminal Defense Lawyers Association is an organization registered in the State of Connecticut with a registered address of P.O. Box 1776 Waterbury, CT, 06721.

278.     Defendant Coleman Law LLC is a law firm owned by Defendant Kim Coleman with an address of 112 Broad Street, Milford, CT, 06460.

279.     Defendant Numerous Jane Doe and John Doe Dispatch and police officers from The Orange Department, *Official and individual capacities*, are police officers and dispatch officers employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

280.     Defendant Office of Victim Compensation is administrative office in the State of Connecticut and has an address of 225 Spring Street, 4th floor, Wethersfield, CT, 06109.

281.     Defendant Office of Victim Services Training is a sub-unit of the State of Connecticut Office of Victim Compensation and has an address of 225 Spring Street, 4th floor, Wethersfield, CT, 06109.

282.     Defendant Officer Aliza Esposito of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

283.     Defendant Officer Andrew Satkowski of the Orange Police Department, *Official and*

*individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

284.     Defendant Officer Artabane of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

285.     Defendant Officer Bailey of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

286.     Defendant Officer Jeffrey Fernandes of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

287.     Defendant Officer John Lane of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

288.     Defendant Officer Justiano Nieves of the New Haven Police Department Badge # 22, *Official and individual capacities*, is an officer employed by the City of New Haven and has an address located at 1 Union Ave, New Haven CT, 06510.

289.     Defendant Officer Kurt Correia #132 of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

290.     Defendant Officer Padro of the Waterbury Police Department, *Official and individual capacities*,  is an officer employed by the City of Waterbury with an address located at 255 East Main Street, Waterbury, CT, 06706.

291.    Defendant Officer Piscitelli of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

292.    Defendant Officer Repice of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

293.    Defendant Officer Ristiano of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

294.    Defendant Officer J. Seeger of the Waterbury Police Department, *Official and individual capacities*, is an officer employed by the City of Waterbury with an address located at 255 East Main Street, Waterbury, CT, 06706.

295.    Defendant Officer Taylor of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

296.    Defendant Officer Yelenik of the Orange Police Department, *Official and individual capacities,* is an officer employed by the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

297.    Defendant Dean Paul Chill, *Official and individual capacities,* is the Associate Dean for Academic Affairs & Clinical Professor of Law for the University of Connecticut School of law with an address located at 55 Elizabeth Street, Hartford, CT, 06105.

298.    Defendant Bruce Freedman, Ph.D., *Official and individual capacities,* is a licensed psychologist with an office address of 6 Northwest Drive, Suite 306, Bloomfield, CT, 06002.

299.     Defendant Paul Ganim, *Official and individual capacities,* is an attorney who is domiciled in the State of Connecticut and employee of Ganim Legal LLC, and has an address of 2370 Park Ave, Bridgeport, CT, 06604.

300.     Defendant Paul Lodice Jr., *Official and individual capacities,* is the biological son of Defendants Paul Lodice Sr. and Karen Bowers and the brother-in-law of Defendant Greg Gallo and the ex-husband of the Defendant Jennifer Gallo Lodice. He is also the brother of Defendants Matthew J. Lodice and Scott Lodice. His address is Unit 52 10 Ebert Drive, Bristol, CT, 06010.

301.     Defendant Paul Lodice Sr., *Official and individual capacities,* is the father of defendant Lodice and former firefighter for the Monroe Fire Department with an address of 9 Lazy Brook road, Shelton, CT, 06484.

302.     Defendant Preferred Pediatrics LLC is a pediatrician office located at 88 Noble Ave, #101, Milford, CT, 06460.

303.     Defendant Valentina Restrepo, *Official and individual capacities*, is an employee of Preferred Pediatrics LLC, located at 88 Noble Ave, #101, Milford, CT, 06460.

304.     Defendant Kelly Daly R.N., *Official and individual capacities*, is an employee of Preferred Pediatrics LLC, located at 88 Noble Ave, #101, Milford, CT, 06460.

305.     Defendant Diana Lopusny MD, *Official and individual capacities*, is an employee of Preferred Pediatrics LLC, located at 88 Noble Ave, #101, Milford, CT, 06460.

306.     Defendant Jane Doe employees of Preferred Pediatrics LLC, *Official and individual capacities,* are employees of Defendant Preferred Pediatrics LLC, located at 88 Noble Ave, #101, Milford, CT, 06460.

307.     Defendant Allison Pearson FNP, *Official and individual capacities*, is an employee of Preferred Pediatrics LLC, located at 88 Noble Ave, #101, Milford, CT, 06460.

308.     Defendant Quinnipiac University is a private undergraduate university in the state of Connecticut located at 275 Mount Carmel Ave, Hamden, CT, 06518.

309.     Defendant Quinnipiac University School of Law is a private law school in the state of Connecticut located at 370 Bassett Rd, North. Haven, CT, 06473.

310.     Defendant Rachel Reeves, *Official and individual capacities,* is the Director of Field Placement and Pro Bono Programs and Assistant Clinical Professor of Law at the University of Connecticut School of Law with a listed address of 55 Elizabeth street, Hartford, CT, 06105.

311.     Defendant Randi Calabrese, Esq., *Official and individual capacities,* is a member attorney at the Connecticut Bar Association with a listed address of 126 Bradley Rd, Ste. 1, Madison, CT, 06443.

312.     Defendant Raneil Smith, Esq., *Official and individual capacities,* is an employee at Miller, Rosnick, D'Amico, August, & Butler PC with an address of 1087 Broad Street, Bridgeport, CT, 06604.

313.     Defendant Catherine Whelan is an attorney licensed in the State of Connecticut and owner of Catherin Whelan Law LLC with an address of 530 Old Post Road, #3, Greenwich, CT, 06830.

314.     Defendant Catherin Whelan Law LLC is a law firm owned by Defendant Catherine Whelan with an address of 530 Old Post Road, #3, Greenwich, CT, 06830.

315.     Defendant Rape Crisis Center of Milford Inc. is an organization located at 70 West River street, Milford, CT, 06460.

316.     Defendant Renee Casey MD, *Official and individual capacities,* is a pediatrician located at 88 Noble Ave, #101, Milford, CT, 06460.

317.     Defendant Renew Your Mind LLC is a mental health service provider with an address of 21W W. Main Street, 4th Floor, Waterbury, CT, 06702.

318.     Defendant Isamel Bodden, Administrative Associate II, of the Waterbury Police Department, *Official and individual capacities,* is an employee of the City of Waterbury and has an address located at 255 East Main street, Waterbury, CT, 06706.

319.     Defendant Connecticut State House Representative Mary Welander, *Official and individual capacities,* is the State Representative for the Town of Orange and has an office address located at Legislative Office Building Room 4000, Hartford, CT, 06106-1591.

320.     Defendant Chief of Police of the Orange Police Department Robert J. Gagne, *Official and individual capacities,* is the chief of police for the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

321.     Defendant Robert McConnell, *Official and individual capacities,* is a social worker for the Waterbury Department of Children and Families with an address of 395 West Main Street, Waterbury, CT, 06702.

322.     Defendant Roy Bowers, *Official and individual capacities,* is the husband of Defendant Karen Bowers and the step-father of Defendant Matthew Lodice and has an address located at 48 Quarry Hill Rd, Waterbury, CT, 06706.

323.     Defendant Safe Haven of Greater Waterbury Inc. is a non-profit organization in Connecticut with an address is listed as 29 Central Ave, Waterbury, CT, 06702.

324.     Defendant Sandra Lugo Gines, *Official and individual capacities,* is the Chair of the Americans with Disabilities Committee of the Connecticut Judicial Branch with an address of 90 Washington Street, Hartford, CT, 06106.

325.     Defendant Sarah Hanna, *Official and individual capacities,* is an appellate clerk working at the Connecticut Appellate Court Clerk's Office with an address of 231 Capitol Avenue, Hartford, CT, 06106.

326.     Defendant Scott Lodice, *Official and individual capacities,* is a resident of Connecticut located at 59 Cliff street, 2nd floor, Shelton, CT, 06484.

327.     Defendant Scott Lodice, on behalf of his minor child T.L., *Official and individual capacities,* located at 59 Cliff street, 2nd floor, Shelton, CT, 06484.

328.     Defendant Sean McElligott, *Official and individual capacities,* is an executive member of the New Haven County Bar Association with an address of  900 Chapel St #10, New Haven, CT, 06510.

329.     Defendant Connecticut State Senator James Maroney, *Official and individual capacities,* located at 22 Saranac Road, Milford, CT, 06460.

330.     Defendant Sergeant Bartley of the Orange Police Department, *Official and individual capacities,* is an employee of the Town of Orange with an official address of 314 Lambert Rd, Orange, CT, 06477.

331.     Defendant Sergeant Jared Barselau of the New Britain Police Department, *Official and individual capacities,* is an employee of the City of New Britain with an address located at 10 Chestnut street, New Britain, CT, 06051.

332.     Defendant Sergeant Joel Portorreal of the Connecticut State Police Troop I in Bethany, CT, *Official and individual capacities,* is an employee of the Connecticut State Police Troop I in Bethany with an address of 631 Amity road, Bethany, CT, 06524.

333.     Defendant Sergeant Judicial Marshal Powers, Badge #157 of the New Haven Superior Court, *Official and individual capacities,* is a judicial marshal for the New Haven Superior Court and employee of the State of Connecticut with an address of 235 Church street, New Haven, CT, 06510.

334.     Defendant First Selectman James Zeoli for the Town of Orange, *Official and individual*

*capacities,* is the first selectman for the Town of Orange with an official address of 617 Orange
Center road, Orange, CT, 06477.

335.    Defendant Sergeant Judicial Marshal  Schweitzer, Badge #129 of the New Haven Superior
Court, *Official and individual capacities, ,* is a judicial marshal for the New Haven Superior Court
and employee of the State of Connecticut with an address of 235 Church street, New Haven, CT,
06510.

336.    Defendant Sergeant Kirby of the Orange Police Department, *Official and individual
capacities,* is a sergeant employed with the Orange Police Department, with an official address of
314 Lambert Rd, Orange, CT, 06477.

337.    Defendant Several Jane Doe and John Doe Connecticut Judicial Marshals from Milford
Superior Court, *Official and individual capacities,* are judicial marshals employed with the State
of Connecticut and work at 14 West River st, Milford, CT, 06460.

338.    Defendant Several Jane Doe and John Doe Connecticut Judicial Marshals from Derby
Superior Court, *Official and individual capacities,* are judicial marshals employed with the State
of Connecticut and work at the Derby GA 5 Court, with an official address of 106 Elizabeth Street,
Derby, CT, 06418.

339.    Defendant Several Jane Doe and John Doe Connecticut Court Marshals from New Haven
Superior Court, *Official and individual capacities*, are employed with the State of Connecticut and
work at 235 Church st, New Haven, CT, 06510.

340.    Defendant Several Jane Doe and John Doe Derby Superior Court Clerks  from the Derby
GA5 Clerks Office, *Official and individual capacities,*  are employed with the State of Connecticut
and work at the Derby GA 5 Court, with an official address of 106 Elizabeth Street, Derby, CT,
06418.

341.     Defendant Several Jane Doe and John Doe Milford Connecticut Superior Court Clerk's Office Clerks, *Official and individual capacities,* are clerks employed by the Milford Superior Court with an address located at 14 West River st, Milford, CT, 06460.

342.     Defendant Several Jane Doe and John Doe New Haven Superior Court Clerk's Office Clerks, *Official and individual capacities,* are clerks employed by the New Haven Superior Court with an address located at 235 Church street, New Haven, CT, 06510.

343.     Defendant Shakeria Brown, *Official and individual capacities,* is the owner of Renew Your Mind LLC with an address at 21W W. Main Street, 4th Floor, Waterbury, CT, 06702.

344.     Defendant Connecticut Legal Rights Project, Inc. is a 501(c)(3) non-profit tax-exempt corporation with a registered address of PO Box 351, Silver Street, Middletown, CT, 06457.

345.     Defendant Shari-Lynne Cuomo Shore, *Official and individual capacities,* is a member of the executive committee for the Connecticut Bar Association, and an executive member of the New Haven County Bar Association with an address of  900 Chapel St #10, New Haven, CT, 06510.

346.     Defendant Shawniel Chamanlal, *Official and individual capacities,* is the owner of Healing Springs Wellness Center LLC, located at 1006 S. Main St, suite 4, Plantsville, CT, 06479.

347.     Defendant Jay Grossman is a member of the board of directors for Nexstar Media Group, Inc. and has an official address of 545 East John Carpenter Freeway, Suite 700, Irving, TX, 75062.

348.     Defendant Nexstar Media Group, Inc. is a media company that owns several news stations in the state of Connecticut, and has an address of 545 East John Carpenter Freeway, Suite 700, Irving, TX, 75062.

349.     Defendant Shelby Summers, *Official and individual capacities,* is the director of student affairs at the University of Connecticut School of Law with an address of 55 Elizabeth Street,

Hartford, CT, 06105.

350.　　Honorable Karen Demeola, *Official and individual capacities,* is a former Dean of the University of Connecticut School of Law and current judge presiding at 155 Church street, Putnam, CT, 06260.

351.　　Defendant Stacy Votto, *Official and individual capacities,* serves as an Executive Committee Officer for the New Haven County Bar Association with an official address of 900 Chapel St #10, New Haven, CT, 06510.

352.　　Defendant Stan Strusky, *Official and individual capacities,* is the husband of Defendant Jessica Strusky, and a resident of Connecticut residing at 100 Salem Rd, Prospect, CT, 06712.

353.　　Defendant State of Connecticut is a state with an official address located at 210 Capitol Ave, Suite 104, Hartford, CT, 06106.

354.　　Defendant State of Connecticut Senate Democrats is an organization located at 750 Main street, Suite 1108-3, Hartford, CT, 06103.

355.　　Defendant Stephanie Bernstein, Esq, *Official and individual capacities,* is an attorney in the State of Connecticut with an official office address located at 124 Washington Avenue, Middletown, CT, 06457.

356.　　Defendant Stephanie Roberge, Esq., *Official and individual capacities,* is the Chairperson and an attorney member for the State of Connecticut Judicial Review Council, with an official address of 505 Hudson Street #5, Hartford, CT, 06106.

357.　　Defendant Stephanie Sgambati, *Official and individual capacities,* is domiciled in the state of Connecticut and serves as an Executive Committee Officer for the New Haven County Bar Association with an official address of 900 Chapel St #10, New Haven, CT, 06510.

358.　　Defendant Tahlisa Brougham, *Official and individual capacities,* is an employee of New

Haven Legal Assistance Association, Inc. with an official address of 205 Orange Street, New Haven, CT, 06510.

359.     Defendant Tamar Birckhead, *Official and individual capacities,* is domiciled in the state of Connecticut and serves as an Executive Committee Officer for the New Haven County Bar Association with an official address of 900 Chapel St #10, New Haven, CT, 06510.

360.     Defendant The Center for Family Justice, Inc. is a non-profit organization in Connecticut located at 753 Fairfield Ave, Bridgeport, CT, 06604.

361.     Defendant The DeCicco Law Firm, LLC is a law firm located at 27 Holmes Ave, Waterbury, CT, 06710.

362.     Defendant The Community Foundation for Greater New Haven Inc. is a non-profit organization located at 70 Audobon St, New Haven, CT, 06510.

363.     Defendant The Umbrella Center for Domestic Violence Services of BHcare, is a subsidiary of BHcare located at 1000 Bridgeport Avenue, Suite 310, Shelton, CT, 06484.

364.     Defendant The University of Connecticut is a non-profit state University in the State of Connecticut located at 233 Glenbrook Road Unit 4100, Storrs, CT, 06269.

365.     Defendant Thomas A. Esposito, *Official and individual capacities,* is an attorney licensed to practice law in the State of Connecticut and a member of the State of Connecticut Marshal Commission, with an address of 450 Columbus Blvd., Suite 1403, Hartford, CT, 06103.

366.     Defendant Tim Pothin, *Official and individual capacities,* is domiciled in the state of Connecticut and serves as an Executive Committee Officer for the New Haven County Bar Association with an official address of 900 Chapel St #10, New Haven, CT, 06510.

367.     Defendant Town of Orange First Selectman's Office is the municipal government office for the Town of Orange with an address of 617 Orange Center Rd, Orange, CT, 06477.

368.     Defendant University of Connecticut School of Law is the only public state of Connecticut Law School in the state and owned by the University of Connecticut, with an address of 55 Elizabeth Street, Hartford, CT, 06105.

369.     Defendant United States Department of Justice Civil Rights Division is a branch of the United States Department of Justice with a listed address of 950 Pennsylvania Avenue NW, Office of the Assistant Attorney General, Main ,Washington, DC, 20530.

370.     Defendant Victim Rights Center of Connecticut Inc. is a non-profit located at 8 Research Parkway, Wallingford, CT, 06492.

371.     Defendant Violence Against Women Prevention Program Inc., is part of the Gladstein Family Human Rights Institute and has a registered address at The Dodd Center For Human Rights, 405 Babbidge road, U-1205, Storrs, CT, 06269.

372.     Defendant Welty Esposito & Weiler, LLC, is a law firm located at 385 Orange Street, New Haven, CT, 06511.

373.     Defendant Whole House Remodeling Company LLC, *Official and individual capacities*, is a full-service remodeling and construction company owned and operated by Defendant Matthew J. Lodice registered at 48 Quarry Hill Rd, Waterbury, CT, 06706.

374.     Defendant William Tong, *Official and individual capacities,* is the State of Connecticut Attorney General at the Office of the Attorney General for the State of Connecticut, with an official address of 165 Capitol Avenue, Hartford, CT, 06106.

375.     Defendant Yale Child Abuse Clinic is owned by Yale New Haven Health Services Corporation Inc and is owned by Yale School of Medicine and has an address of 1 Longwharf drive, New Haven, CT, 06511.

376.     Defendant Yale University is the parent educational institute of Yale New Haven Health

Services Corporation Inc, a 501(c)(3) tax-exempt corporation non-profit registered at 789 Howard Avenue, New Haven, CT, 06519.

377.     Defendant Yale New Haven Health Services Corporation Inc. is a 501(c)(3) tax-exempt corporation non-profit registered at 789 Howard Avenue, New Haven, CT, 06519.

378.     Defendant Yale University Child Study Center is a branch of Yale University that offers mental health services to children and is a part of Yale School of Medicine with a registered address of 230 S. Frontage Rd, New Haven, CT, 06519.

379.     Defendant Zingaro, Cretella, and Rasile LLC is a law firm located in the State of Connecticut with a registered address of 681 State Street, New Haven, CT, 06511.

380.     Defendant Trinity Health of New England Emergency Medical Services, Inc. is owned by Defendant Trinity Health Inc. is the parent company of Defendant Trinity Health of New England Corporation Inc. is the parent company of Saint Mary's Hospital in Waterbury, CT, and has a registered address of 114 Woodland Street MS-510358, Hartford, CT, 06105.

381.     Defendant Trinity Health of New England Corporation Inc. is the parent company of Saint Mary's Hospital in Waterbury, CT, and has a registered address of 114 Woodland Street MS-510358, Hartford, CT, 06105.

382.     Defendant Trinity Health Inc. is the parent company of Defendant Trinity Health of New England Corporation Inc. is the parent company of Saint Mary's Hospital in Waterbury, CT, and has a registered address of 114 Woodland Street MS-510358, Hartford, CT, 06105.

383.     Defendant Saint Mary's Hospital in Waterbury is a subsidiary of Defendant Trinity Health of New England Corporation Inc. is the parent company of Saint Mary's Hospital in Waterbury, CT, and has a registered address of 114 Woodland Street MS-510358, Hartford, CT, 06105.

384.     Defendant Carmelina Calabrese, *Official and individual capacities*, is the Patient Advocate

for Saint Mary's Hospital in Waterbury, CT, with a listed address of 56 Franklin Street, Waterbury, CT, 06706.

385. Defendant CT Bar Institute Inc. is a non-profit 501(c)3 non-profit charitable organization that is funded by the Connecticut Bar Association and has an address of 30 Bank Street, New Britain, CT, 06051.

386. Defendant Stephanie N. Doe, *Official and individual capacities,* is the Director of Quality for the Quality Department of Saint Mary's Hospital in Waterbury, CT, with a listed address of 56 Franklin Street, Waterbury, CT, 06706.

387. Defendant Maureen Cooney, *Official and individual capacities,* is the supervisor for the Department of Health Information Management for Saint Mary's Hospital in Waterbury, CT, with a listed address of 56 Franklin Street, Waterbury, CT, 06706.

388. Defendant New Haven County Bar Foundation Inc. is a 501(c)(3) organization registered at 171 Orange Street, New Haven, CT, 06510.

389. Defendant Jared Mastej, *Official and individual capacities,* is a resident of the State of Connecticut and resides at 36 Center Street, West Haven, CT, 06516.

390. Defendant Officer Joseph Mortalli of the Hamden Police Department, *Official and individual capacities*, with an address of 2900 Dixwell Ave, Hamden, CT, 06518.

391. Defendant Julio Ortiz, *Official and individual capacities*, is a former employee of the State of Connecticut State Police and a current independent contractor working with the state of Connecticut as a private investigator. He is the owner of Fortified Investigations and Security, LLC, with a listed address of 87 Alpine Street, Bridgeport, CT, 06610.

392. Defendant Fortified Investigations and Security LLC, *Official and individual capacities*, is a registered business and state contractor in the state of Connecticut owned and operated by

Defendant Julio Ortiz, with a listed address of 87 Alpine Street, Bridgeport, CT, 06610.

393.     Defendant Connecticut Bar Association Inc. is a Connecticut legal profession member organization located at 30 Bank Street, New Britain, CT, 06051.

394.     Defendant Director of Health for the Town of Orange Amir Mohammad, *Official and individual capacities*, 605A Orange Center Road, Orange, CT, 06477.

395.     Defendant Honorable Lynda B. Munro is a retired judge and former presiding judge for the Family Division in New Haven Superior Court with an address of 850 Main street, P.O. Box 7006, Bridgeport, CT, 06601-7006.

396.     Defendant CT probate e-filing is a branch of the Office of the Probate Court Administrator with a registered address of 186 Newington Road, West Hartford, CT, 06110.

397.     Defendant Office of the Probate Court Administrator is a division of the State of Connecticut with a registered address of 186 Newington Road, West Hartford, CT, 06110.

398.     Defendant Connecticut Fatherhood Initiative is a program run by the State of Connecticut Department of Social Services with a registered address of 55 Farmington Avenue, Hartford, CT, 06105.

399.     Defendant Connecticut Department of Corrections is a department of the State of Connecticut with an address of 24 Wolcott Hill Road, Wethersfield, CT, 06109.

400.     Defendant York Correctional Institution is a prison in the State of Connecticut with an address of 201 West Main Street, Niantic, CT, 06357.

401.     Defendant Connecticut Department of Labor is a department of the State of Connecticut with an address of 200 Folly Brook Boulevard, Wethersfield, CT, 06109.

402.     Defendant Connecticut Department of Developmental Services is a department of the State of Connecticut with an address of 460 Capitol Avenue, Hartford, CT, 06106.

403.      Defendant Kylie Vaccarelli BCBA LBA, *Official and individual capacities*, is a resident of the State of Connecticut with an address of 42 Grove Street, Ansonia, CT, 06401.

404.      Defendant Eunice Doe Clerk from Milford Superior Court, *Official and individual capacities*, is a clerk employed by the state of Connecticut with an address of 14 West River street, Milford, CT, 06460.

405.      Defendant Jane Doe Clerk from Milford Superior Court who signed plaintiff's fee waiver application on 9/21/23, *Official and individual capacities*, is a clerk employed by the state of Connecticut with an address of 14 West River street, Milford, CT, 06460.

406.      Defendant Autumn Ames, *Official and individual capacities*,  is a 2L student at the University of Connecticut School of Law and a former courtroom clerk from the New Haven Superior Court with an address of 235 Church street, New Haven, CT, 06510.

407.      Defendant State of Connecticut Department of Administrative Services State Marshal Commission is an administrative branch of the state of Connecticut with an address of 450 Columbus Blvd., Suite 1403, Hartford, CT, 06103.

408.      Defendant Honorable Gerard Adelman, *Official and individual capacities,* is a judge for the Superior Court for the State of Connecticut with an address of 1 Court Street, Middletown, CT, 06457.

409.      Defendant Steven Dembo, *Official and individual capacities,* is an attorney licensed in the State of Connecticut with an official address of 576 Farmington Ave, Hartford, CT, 06105.

410.      Sidney Horowitz, Ph.D., is a psychiatrist in the State of Connecticut that is a member of the Connecticut Council for Non-Adversarial Divorce with an official address of P.O. Box 1551, Naugatuck, CT, 06770.

411.      Defendant Officer Ray Laplante, *Official and individual capacities,* is an officer with the

Orange Police Department with an address of 314 Lambert Road, Orange, CT, 06477.

412.     Defendant Yale Law School Learning Center Inc. is a 501(c)(3) tax-exempt organization

with an address of 127 Wall Street, New Haven, CT, 06520.

413.     Defendant Dave Carlson, *Official and individual capacities,* is an employee of the state of

Connecticut Department of Children and Families with a role of answering the phone and taking

in calls on the DCF careline, with an address of 505 Hudson street, Hartford, CT, 06106.

414.     Defendant New Haven Superior Court Clerk Mike Doe, *Official and individual capacities,*

is a clerk employed at the New Haven Superior Court with an address of 235 Church street, New

haven, CT, 06511.

415.     Defendant Honorable Holly Abery-Wetstone, *Official and individual capacities,* is a judge

employed with the New Britain Superior Court with an address of 20 Franklin Square, New

Britain, CT, 06051.

416.     Defendant Statewide Legal Services of Connecticut, Inc. is a 501(c)(3) tax-exempt

corporation with a registered address of 1290 Silas Deane Highway, Suite 3A, Wethersfield, CT,

06109.

417.     Defendant Stephanie Janes, *Official and individual capacities,* is a LMFT with a registered

address of 284 Racebrook Rd, #222, Orange, CT, 06477.

418.     Defendant Officer Hunt of the Orange Police Department, *Official and individual

capacities,* is an officer employed at the Orange Police Department with an official address of 314

Lambert Rd, Orange, CT, 06477.

419.     Defendant Cindy Dugan of the Rape Crisis Center of Milford, *Official and individual

capacities,* is an employee of the Rape Crisis center of Milford with an official address of 70 West

River street, Milford, CT, 06460.

420.     Defendant Samantha D'Occhio, *Official and individual capacities,* is the girlfriend of defendant James Lambo with an address of 54 Joy road, Middlebury, CT, 06762.

421.     Defendant Brian Hobart, *Official and individual capacities*, is a state marshal with an official address of 56 Center street, Waterbury, CT, 06702.

422.     Defendant Steven Rosa, *Official and individual capacities*, is a longtime friend of defendant Matthew Lodice with an address of 715 Lakewood road, Waterbury, CT, 06705.

All above cited Defendants have participated, either through direct and overt acts, omissions, associations, or in conspiracy with and through aiding and abetting in the ongoing and systematic obstruction of justice that has directly damaged and caused irreparable harm to the business and property of the Plaintiffs.

## **NATURE OF ACTION**

This is an action alleging fraud, civil conspiracy to commit fraud, abuse of process, and racketeering, money laundering, extortion, violations of civil rights, violations of fundamental rights, discrimination, misuse of federal funding, human trafficking, tax evasion, and other false claims and torts all arising from an intricate and longstanding interconnected web of a RICO scheme in which each of the defendants play a specific and unique role that was designed and implemented to defraud the United States, the impoverished, the self-represented, the uneducated, the disabled, and any other class of people that has suffered immeasurable injustices and inequalities at the hands of the State of Connecticut RICO enterprise[1].

---

[1] Through this lawsuit, plaintiff seeks to be the catalyst for monumental changes in child welfare and judicial practices nationwide. This legal challenge aims to dismantle the corrosive "Cash for Kids" operation that has been ongoing for decades and demands transparent grant allocations, compensatory and punitive damages, a public apology, and more.

Plaintiff has been completely and permanently stripped of her fundamental right to parenting[2] her minor child A.L. and has lost any and all current or future ability to access, visit, raise, or have any contact whatsoever with her minor four-year-old child A.L. as a result of a court order put in place by Defendant Grossman on May 25th, 2023, which essentially delegated all judicial authority to Defendant Lodice.

Defendant Grossman entered in an order that plaintiff's pre-existing agreement that she and Lodice had signed just one year prior be modified so that plaintiff's access would be "as determined by the father, in the presence of a third-party designated by the father" which essentially gave Lodice the right to completely terminate[3] any and all access, visitation, and contact between plaintiff and her minor daughter A.L.

Since 5/31/23 until now, Defendant Grossman has not allowed plaintiff to address any grievances within the court and has completely blocked plaintiff from seeking modification, contempt, or any other relief by denying any and all requests for leave that plaintiff files with the court and forcing every other court in the state of Connecticut to transfer any and all cases involving plaintiff to the New Haven Superior Court in the New Haven JD to be heard solely by Defendant Grossman[4].

Plaintiff was never found to be "unfit" by any court in any state and the overt acts and omissions of the defendants as a collective in perpetuating several underlying RICO schemes resulted in plaintiff being ordered to have no actual parenting time with her minor child A.L. without plaintiff having been

---

[2] See *Meyer v. Nebraska*, 262 U.S. 390 (1923)
[3] Plaintiff attempted on numerous occasions over the past 151 days to seek a modification of this order and has been completely barred from doing so, as Defendant Grossman also imposed an order that plaintiff was required to "file a request for leave with any and all future pleadings or motions" including emergency motions.
[4] Plaintiff has attempted to file a motion for disqualification of judicial authority, attempted to file a writ of mandamus, and has named Defendant Grossman in this lawsuit as a defendant, yet she has refused to disqualify herself and has instead resorted to extreme levels of intimidation, retaliation, and violations of plaintiff's fundamental rights.

proven "unfit" by clear and convincing evidence of actual harm to the minor child pursuant to a properly noticed fitness proceeding[5].

The United States Supreme Court has held[6] that "courts may not issue physical custody orders that grant no 'actual parenting time' to a 'fit' parent—unless that parent is found 'unfit'—with clear and convincing evidence of actual harm to a minor child[7].

Defendant Grossman stripped plaintiff of her fundamental right to raising A.L. without ever proving plaintiff unfit, while also ignoring the fact that plaintiff has had sole legal and sole physical custody of J.V. for more than seven consecutive years without any issues and has never had any substantiations of abuse or neglect[8].

*Smith v. Org of Foster Families*, 431 U.S. 816 (1977) established the principle that "the right to family integrity clearly did not originate with the enactment of the Fourteenth Amendment . . . [b]ut until relatively recently, few questioned that parents possessed a ***fundamental constitutional right to raise their children without undue state interference***."

Despite the fact that plaintiff and Lodice had reached a final agreement in November 2019, modified their agreement by mutual agreement in June of 2021, and modified it a second time by mutual agreement in April of 2022, Defendant Grossman immediately began entering in unsolicited and unfair "temporary" orders as soon as she became involved in plaintiff's case, which began a pattern of her

---

[5] Plaintiff and her minor children A.L. and J.V. have been wrongfully and unlawfully dispossessed of their fundamental rights and the overt acts and omissions of the defendants and those who are in association with the defendants have caused irreparable and permanent harm that will continue to cause pain and distress to plaintiff and her minor children for the rest of their lives.
[6] *Stanley v. Illinois*, 405 U.S. 645 (1972) was a case in which the court affirmed and established the principle that "[t]he Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 'basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, and '[r]ights far more precious ... than property rights,' May v. Anderson, 345 U.S. 528, 533."
[7] *See Stanley v. Illinois*, 405 U.S. 645 (1972); *Smith v. Org of Foster Families*, 431 U.S. 816 (1977); *Quilloin v. Walcott*, 434 U.S. 246 (1978); *Parham v J.R.*, 442 U.S. 584 (1979); and, *Santosky v. Kramer*, 455 U.S. 745 (1982).
[8] The highly restrictive and harmful order that Defendant Grossman imposed upon plaintiff was unconstitutional and goes completely against precedent set by the United States Supreme Court and is akin to treason as Grossman is and was well aware that her order violated both state and federal laws regarding child protection, custody, family unity, and access to children.

misusing her judicial authority in order to commit illegal racketeering overt acts to obstruct justice, launder funds, and ultimately traffic[9] A.L. directly into the hands of Lodice and D.L. where she had repeatedly stated she was being sexually abused.

Grossman's actions are also contrary[10] to the precedent affirmed in *Quilloin v. Walcott,* 434 U.S. 246 (1978), in which the court stated that they "have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.[11]'"

Grossman's orders deliberately and explicitly contradict the precedent that was also affirmed in *Santosky v. Kramer*, 455 U.S. 745 (1982) which held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence. . . . [b]ut until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.[12]"

Defendant Grossman, and all those who have acted in concert with her through their overt acts and omissions, have undermined plaintiff's rights under state and federal laws and have dehumanized plaintiff

---

[9] Rather than look out for the safety of the minor child A.L., Grossman directly harmed A.L. and permanently severed and destroyed the parent-child and parent-sibling relationship that A.L. shared with plaintiff and J.V. without any legal or logical justification other than the obstruction of justice[9] in protecting Lodice and D.L. from criminal accountability for the sexual assault of A.L.
[10] Grossman failed to consider any of the seventeen factors in the State of Connecticut's "Best interest of the child standard" and did not prove that there was any substantial change in circumstances which would have justified the complete severance of the parental-child relationship between plaintiff and A.L., while also severing the sibling relationship between J.V. and A.L.
[11] This was also affirmed again in United States Supreme Court precedent and seen in *Parham v J.R.*, 442 U.S. 584 (1979), when the Court again affirms that they have "historically . . . reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'"
[12] These cases underscore the importance the U.S. Supreme Court has placed on the rights of parents to raise their children without undue interference from the state, unless clear and convincing evidence of unfitness is shown.

in an effort to destroy the fabric of her being and drive her into bankruptcy and financial and emotional ruin.

Furthermore, Grossman entered in an order that transferred any and all of her judicial authority to the defendant Lodice, which then allowed Lodice to replace her as the final binding authority and dictate any and all access, contact, and visitation between plaintiff and A.L[13].

The State of Connecticut, through their employee Grossman, wrongfully dispossessed plaintiff of her fundamental rights, despite the fact that plaintiff was never found to be unfit, and without any findings of child abuse, child neglect, abandonment, or endangerment[14].

The order of supervised visitation does not equate to parenting and physical custody orders that grant "supervised visitation" such as the one imposed upon plaintiff, force noncustodial parents into a situation where they are awarded no actual parenting time[15].

Plaintiff has been deprived of her fourteenth amendment rights to the ability to exercise care, custody, and control of her minor child A.L. as a result of the imposition of this supervised visitation order that awards plaintiff no actual ability to access or contact her minor child and has resulted in plaintiff being separated indefinitely from A.L. with no way to see or speak to her at all[16].

---

[13] Grossman's order that plaintiff's access would change to being "as determined by the father" was a court order that granted plaintiff no "actual parenting time" which completely eliminated plaintiff's ability to have the actual ability to exercise the care, custody, and control of A.L., or the free exercise of religion and private speech with A.L.

[14] Moreover, Grossman not only gave Lodice the complete power and authority to dictate if or when plaintiff could ever see her minor child again, but Grossman also imposed that if and when said access to A.L. did take place, that it would have to take place as supervised visitation "in the presence of a third party designated by the father" with no actual schedule or clear method to exercise said visitation.

[15] The supervised visitation imposed upon plaintiff has left Lodice completely in control of if, when, where, how long, and with whom the access to A.L. takes place, which has resulted in Lodice stating that he will not allow plaintiff to have any further contact or access with A.L. and the court, police, medical professionals, mental health professionals, and any other named defendants in this action all affirming that Lodice is justified in terminating any and all access, contact, and visitation between plaintiff and A.L. and they have all colluded in overt acts and omissions to continuously obstruct justice and prevent plaintiff from ever gaining access to or having contact with her minor child again.

[16] Plaintiff has been stripped of the ability to exercise her religion with A.L. and has been stripped of the right to exercise private speech with A.L. which are both deprivations of plaintiff's rights guaranteed under the first amendment to the United States Constitution.

The orders imposed by Grossman have infringed upon plaintiff's fundamental rights guaranteed to her by the first and fourteenth amendments and preclude plaintiff's ability to exercise care, custody, and control of A.L. within the meaning of *Troxel v. Granville*, 530 U.S. 57 (2000), as well as her ability to exercise private speech with A.L. within the meaning of *Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) in that even if plaintiff is permitted to have phone or FaceTime calls with the minor child—on the rare occasions when Lodice allows for such—even those calls are ordered to be "monitored by the father" which eliminates any possibility of plaintiff having the ability to speak privately with A.L. ever again[17].

The orders issued by Grossman on 5/25/23, 5/31/23, and 6/22/23, grant plaintiff no actual parenting time and has caused plaintiff to suffer from the constructive termination of her right to parent and the right to familial association, both of which are protected by the first and fourteenth amendments to the United States Constitution[18].

Plaintiff is invoking her 14th Amendment "right to parent[19]"—i.e., to care, custody, and control of her minor daughter A.L., and also her 1st Amendment right to "familial association"—i.e., to private speech with her minor daughter A.L. (e.g., to pray together, to attend religious services together, to travel

---

[17] The supervised visitation order imposed by Grossman on plaintiff does not give plaintiff the opportunity to exercise any of her parental rights and deprives plaintiff of her rights guaranteed under the fourteenth amendment of the United States Constitution and the first amendment of the constitution, which effectively severs the parent-child relationship and exploits a loophole in which a parent's rights can be terminated without the court actually initiating a termination proceeding, leaving a muggy gray area where the standards can lead to children being left in dangerous situations.

[18] Likewise, the orders imposed upon plaintiff by Grossman run contrary to public policy. Under such a restrictive order, plaintiff is prohibited from actually "parenting" A.L. and is not awarded any parenting time whatsoever, which also denies A.L. the right to be "parented" by her mother and strips her from her right to a mother-daughter relationship[18] with a loving, suitable, and fit mother with whom she desires to reside.

[19] The Supreme Court has repeatedly affirmed and protected rights not specifically listed in the Constitution which, among other rights, include the right to direct the education and upbringing of one's children, the right to procreate, the right to bodily integrity, the right to use contraception, the right to marry, and the right to sexual intimacy.

together, to do activities together, to participate in medical appointments together, to participate in educational activities together, and lead by example on a daily basis[20])

Family Court judges in the State of Connecticut such as Defendant Grossman regularly engage in the statewide issuance of physical custody orders that grant "no actual parenting time" to "fit" parents such as plaintiff, and do so based on none other than the judge's own arbitrary discretion, oftentimes encouraged and influenced by the unconstitutional "Best interest of the child standard" in Connecticut which allows judges to make restrictive orders with only a preponderance of the evidence standard based on any or no factors listed in the statute at the judge's sole discretion[21].

Plaintiff also contends that the systematic statewide administrative policies that have been implemented and practiced within the State of Connecticut result in the continuous and ongoing violations of federally protected civil rights of countless litigants such as plaintiff.

*In re Zakai F.*, supra, 336 Conn. 291-93 states that "Supreme Court jurisprudence is clear that parents have a fundamental liberty interest in the care, custody, and control of their children. Over time, the Supreme Court expanded that interest to encompass the broader right to preservation of the family entity, that is, the right of a family to make private decisions about what is best for the family unit, free from unwarranted state intervention[22].

Grossman imposed[23] that plaintiff was required to file a "request for leave" before filing any motions or pleadings in the case, however did not impose this same restriction on Lodice.

---

[20] See *Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987).
[21] This allows for the encouragement of widespread corruption, money laundering, misuse of federal funding, racketeering, child trafficking, obstruction of justice, and abuse of children which has plagued the state of Connecticut for decades and is now directly and irreparably harming and impacting plaintiff and her minor children.
[22] Thus, the law appreciates the private realm of family life which the state cannot enter. This is the right to family integrity. Under Fourteenth Amendment due process jurisprudence, parents have a well-established fundamental liberty interest in their relationship with their children. Parents can therefore forcefully assert a constitutional violation when the state seeks to infringe on their familial relationship through the child welfare, criminal, and/or immigration systems."
[23] The orders imposed upon plaintiff by defendant Grossman completely severed any possibility of future contact or access between plaintiff and A.L., while terminating the plaintiff's physical and legal custody of the minor child A.L. and eliminating

Grossman consistently held plaintiff accountable for court orders yet did not do the same for Lodice. On numerous occasions plaintiff attempted to report violation of protective order and other crimes to the police when Lodice was violating the laws and the police refused to take plaintiff's statement, contacted the court and stated that Grossman instructed them not to make an arrest, or coerced and retaliated against plaintiff for attempting to address said grievances with the judicial or law enforcement or child protection administrative systems within the state.

The State of Connecticut Department of Children and Families, in concert with other shadowy associate defendants[24], systematically places minors in abusive environments. This operation is not just an egregious failure of duty but an active facilitation of child trafficking[25].

The trial court's unlawful termination of plaintiff's custody, visitation, and access to her minor daughter A.L., without any means to ensure reunification or reinstitution of her most basic parental rights, is a constitutionally impermissible barrier to plaintiff's fundamental right to family integrity. The trial court's order by defendant Grossman entirely precludes the plaintiff from communicating with A.L., the most basic role she has as a parent.

Grossman's order is even more concerning considering the fact that the plaintiff raised the issue and presented substantial evidence and proof of parental alienation, parasitic parenting, isolation as a form of coercive control and abuse, domestic violence, and the complete termination of any potential access

---

the possibility of plaintiff filing anything else in the case without the express consent of defendant Grossman.

[24] State judges in the family courts in Connecticut regularly and deliberately issue physical custody orders that grant no actual parenting time without finding parents unfit and without clear and convincing evidence of actual harm to a minor child by means of child abuse, child neglect, abandonment, or endangerment. This is in contrast with federal laws, and rights entitled to individuals by the United States Constitution, which are fundamental rights that the state actors have no authority to infringe upon.

[25] Judges within the state of Connecticut regularly fail to meet the requirement of finding parents unfit prior to issuing orders that deny parents their rights to procedural due process and equal protection under the law pursuant to the United States Constitution. This action exposes the clandestine machinations of a longstanding and intricate criminal enterprise spearheaded by the defendants. Plaintiff's revelations suggest an alarming nexus between state entities, trafficking operations, financial malfeasance, and a deeply entrenched system of gender-based discrimination.

that the plaintiff may have to her minor daughter A.L. by leaving any future access between plaintiff and her minor daughter at the finite and indefinite discretion of the defendant Lodice.

Grossman offered plaintiff no parenting schedule, no access schedule, no contact schedule, and completely voided a pre-existing contract and agreement that had been signed by both plaintiff and Lodice that was found to be in the "best interest of the child" by defendant Price-Boreland.

Grossman offered plaintiff no means for reunification or access or contact with her minor daughter and has maintained that Lodice is justified in terminating all contact and visitation between plaintiff and A.L. Grossman also intentionally ignored[26] reports by defendants Baranowski and Mayo which highlighted medical professionals having serious concerns about the sudden, unwarranted change in custody[27].

The ongoing exploitation of federal programs such as The Fatherhood Initiative and VAWA, while noble in intent, have become primary vehicles for siphoning federal funds. The funds, instead of supporting the marginalized, are funneled into the enterprise, bolstering its operations. By weaponizing these programs, defendants have created a scheme in which they are able to exploit billions of dollars while creating an environment where women, especially economically disadvantaged mothers, are routinely disenfranchised, silenced, and subjected to systemic statewide discrimination[28].

---

[26] Grossman also intentionally ignored reports by defendant Preferred Pediatrics which indicated that they instructed plaintiff to take A.L. to the hospital for a sexual assault DNA collection kit and reports by defendant Yale Child Abuse Clinic which include records stating that A.L. disclosed inappropriate contact between D.L.—who is 13 years her senior—and herself which defendant Plummer also ignored.

[27] Defendants Perez, Grossman, Cretella, Baranowski, Mayo, Lodice, D.L., DCF, Plummer, Steeves, Barselau, Prisavage, and others all conspired in order to allow A.L. to continue to be sexually abused by D.L. in an effort to accept bribes and financial incentives of transferring sole legal and sole physical custody to Lodice and removing any and all access, contact, or other communication between plaintiff and A.L.

[28] For almost half a century, multiple state departments have conspired to exploit federal grant programs, leveraging them not for public good but for personal gain. Key figures, shielded by their esteemed positions and the cloak of governmental authority, have purportedly developed an intricate money laundering system. This web encompasses a network of shell companies, illegitimate non-profit organizations, and complicit financial institutions, each playing a pivotal role in whitewashing billions of dollars in federal funding every single year.

76- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

This action arises from a pervasive and deeply entrenched scheme orchestrated by the defendants. The scheme involves egregious acts of racketeering, trafficking, money laundering, and systematic gender discrimination, causing profound and irreparable harm to plaintiff, her minor children, and millions of others similarly situated.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §1251, §1253, §1331 §1343(a) and §1332, because it can hear cases that fall both within the scope of the United States Constitution in Article III Section 2 and Congressional statutes as listed above.

Furthermore, this Court has jurisdiction to hear cases to be determined by the Due Process Clause of the Constitution's Fifth Amendment. Plaintiff's claims arise under the First and Fourteenth Amendments. This court has original subject-matter jurisdiction[29] pursuant to 18 U.S.C. § 1964(C) and 28 U.S.C. §1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal Rico")[30].

Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims[31] asserted allegedly occurred in this District[32].

---

[29] The United States Supreme Court's 1985 decision in *Sedima, S.P.L.R. v. Imrex Company* substantially expanded the various areas and types of factual circumstances to which the Racketeer Influenced and Corrupt Organizations (RICO) Act can be applied. A RICO claim is required to satisfy five basic elements per the law.

[30] This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, to redress defendants' conspiracy and pattern of corrupt and illegal activities in the State, including abuse of federal funded welfare and domestic violence programs, child support and welfare fraud, and corruption involving judges and state actors.

[31] This Court has personal jurisdiction over Defendants who are involved in the Connecticut Judicial System, particularly Defendants Grossman and other state court judge Defendants because they aimed and purposefully directed their illegitimate actions and obstructed justice in concert with one another while sitting on the bench of the State of Connecticut and presiding over multiple of the Plaintiff's cases.

[32] In fact, the entirety of Defendants erroneous actions and omissions took place within the district of the State of Connecticut. The events took place in state courts in Connecticut including in Derby, Milford, New Britain, Waterbury, Hartford, and New Haven, as well as in various other municipalities all within the State of Connecticut.

This Court has the authority to grant declaratory relief, 28 U.S.C. § 2201, as well as further relief requested in this Complaint, including injunctive relief, 28 U.S.C. § 2202 by rule 57 of the Federal Rules of Civil Procedure.

Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure. An award of costs and attorneys' fees is authorized by 42 U.S.C. § 1988.

This Court has personal jurisdiction[33] over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

This action alleging violation of federal statutes and the United States Constitution is authorized by 42 U.S.C. § 1983 and jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 and 1343(a)(3).

## **FACTUAL CONTENTIONS**

1.  The Plaintiff contends against a shadowy consortium comprising state departments, judiciary insiders, elite academic institutions, and opportunistic profiteers. This has allowed for ongoing constitutional parental rights breaches which contradict longstanding historical decisions such as *Santosky v. Kramer*[34] and *Troxel v. Granville* which place a heavy emphasis on parental sanctity, a sacred bond

---

[33] This Court has personal jurisdiction over all defendants in this action as all defendants are either domiciled in, do business in, have sufficient contacts with, or otherwise are or are associated with the state of Connecticut.

[34] Under New York law, the State may terminate, over parental objection, the rights of parents in their natural child upon a finding that the child is "permanently neglected." The New York Family Court Act (§ 622) requires that only a "fair preponderance of the evidence" support that finding. Neglect proceedings were brought in Family Court to terminate petitioners' rights as natural parents in their three children. Rejecting petitioners' challenge to the constitutionality of § 622's "fair preponderance of the evidence" standard, the Family Court weighed the evidence under that standard and found permanent neglect. After a subsequent dispositional hearing, the Family Court ruled that the best interests of the children required permanent termination of petitioners' custody. The Appellate Division of the New York Supreme Court affirmed, and the New York Court of Appeals dismissed petitioners' appeal to that court. The Supreme Court held that: 1. Process is constitutionally due a natural parent at a state-initiated parental rights termination proceeding. Pp. 455 U. S. 752-757. (a) The fundamental liberty interest of natural parents in the care custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. A parental rights termination proceeding interferes with that fundamental liberty interest. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. Pp. 455 U. S. 752-754. (b) The nature of the process due in parental rights termination proceedings turns on a balancing of three factors: the private interests affected by the proceedings; the risk of error created by the State's chosen procedure; and the countervailing

which has mercilessly been severed by the nefarious enterprise of the RICO scheme.

2. This Complaint unveils a sophisticated, deeply entrenched network spanning multiple state agencies and entities. Central to this purported web of corruption is an intricate scheme involving racketeering, trafficking, money laundering, and systemic gender discrimination that has ensnared countless innocent individuals, primarily women and children such as plaintiff and her minor children A.L. and J.V.

3. Although Connecticut may be famously nicknamed as the "Constitution State", the stark reality is that The Constitution State has been **unconstitutional**[35] since 1982 when they removed[36] the grand jury

---

governmental interest supporting use of the challenged procedure. *Mathews v. Eldridge,* 424 U. S. 319, 424 U. S. 335. In any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the public and private interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants. The minimum standard is a question of federal law which this Court may resolve. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard. Pp. 455 U. S. 754-757. 2. The "fair preponderance of the evidence" standard prescribed by § 622 violates the Due Process Clause of the Fourteenth Amendment. Pp. 455 U. S. 758-768. (a) The balance of private interests affected weighs heavily against use of such a standard in parental rights termination proceedings, since the private interest affected is commanding, and the threatened loss is permanent. Once affirmed on appeal, a New York decision terminating parental rights is *final* and irrevocable. Pp. 455 U. S. 758-761. (b) A preponderance standard does not fairly allocate the risk of an erroneous factfinding between the State and the natural parents. In parental rights termination proceedings, which bear many of the indicia of a criminal trial, numerous factors combine to magnify the risk of erroneous factfinding. Coupled with the preponderance standard, these factors create a significant prospect of erroneous termination of parental rights. A standard of proof that allocates the risk of error nearly equally between an erroneous failure to terminate, which leaves the child in an uneasy *status quo,* and an erroneous termination, which unnecessarily destroys the natural family, does not reflect properly the relative severity of these two outcomes. Pp. 455 U. S. 766-768. (c) A standard of proof more strict than preponderance of the evidence is consistent with the two state interests at stake in parental rights termination proceedings -- a *parens patriae* interest in preserving and promoting the child's welfare and a fiscal and administrative interest in reducing the cost and burden of such proceedings. Pp. 455 U. S. 766-768. 3. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence. A "clear and convincing evidence" standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process. Determination of the precise burden equal to or gre2ater than that standard is a matter of state law properly left to state legislatures and state courts."

[35] In fact, the state of Connecticut was one of the last states to adopt a state constitution separate from its original colonial charter. Connecticut operated under the "Fundamental Orders" from 1639, which is often considered the first written constitution in the Western tradition. Later, the state was governed by the Royal Charter of 1662, granted by King Charles II. Connecticut continued to operate under this charter until 1818. It wasn't until that year that Connecticut adopted its first state constitution. Before that, Connecticut was unique in that it used its colonial charter as its primary governing document even after the American Revolution. Most other states had adopted new state constitutions immediately after the Revolution or in the years that followed.

[36] Connecticut abolished its grand jury system in 1983. The state transitioned to a system where probable cause hearings before a judge would determine whether there was sufficient evidence to move forward with prosecuting serious felonies. Prior to this change, grand juries were used in Connecticut to determine whether to formally charge someone with a crime, especially in serious criminal matters. After 1983, the decision to prosecute serious crimes in Connecticut has generally been made by state

79- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

requirement, effectively removing the ability for the people to put checks and balances on the system.

4.  In the year 2000, Governor Roland got rid of sherrifs and he was also involved in corruption. When they did away with sherrifs[37], the power was supposed to be restored to the people. However, rather than give it back to the people, they seized many aspects of the authority and gave some of the authority to state marshals, and some of it to judicial marshals. All of that power, which belongs to the people, has been seized[38].

5.  The Defendants have participated in acts, omissions, affiliations, and other participating overt acts that have allowed them to systematically misuse federal grants and launder funds earmarked for the Fatherhood Initiative, VAWA, and CAPTA. Billions of dollars in federal funding is funneled into coffers within the state of Connecticut, only to be misappropriated and redirected to unauthorized, undisclosed, and illegal racketeering and trafficking activities.

6.  Plaintiff seeks relief for substantial injuries sustained to her business and property as a direct result of the Defendants' racketeering activities[39].

7.  The State of Connecticut Judicial System and the Family Division, as well as all associated Defendant employees and affiliates thereof, has systematically violated the constitutional and fundamental rights of thousands of parents and stripped them of their fundamental rights by failing to protect litigants' due process rights under the Fourteenth Amendment in the "interest of natural parents in the care,

---

prosecutors based on evidence presented at these probable cause hearings.

[37] In 2000, Connecticut voters approved a constitutional amendment to abolish the county sheriff system. This move came after numerous allegations of corruption, mismanagement, and political patronage within the sheriff system. The amendment took effect in 2000, and the duties formerly performed by sheriffs were transferred to other state entities.

[38] State marshals are all under the executive branch of Governor Lamont, and the judicial marshals fall under the authority of the judicial branch and of the judges. Section 25 of the Connecticut Constitution stated that this should be to the people, and the state removed that and instead outsourced it to the state marshals and judicial marshals. The Defendant Lodice is strongly connected to a network of prominent state marshals and judicial marshals, police, and other state and municipal actors.

[39] Plaintiff contends that a vast network, inclusive or state agencies, non-profit organizations, and various clandestine entities have all participated in various over acts and violated a plethora of rights in an effort to obstruct justice, extort funds, and engage in what can be described as State-sponsored racketeering within the State of Connecticut.

custody, and management of their child" which the Supreme Court, such as in *Santosky* has held **"[d]oes not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State[40]."**

8.  The Defendants have participated in a RICO scheme which has been carefully orchestrated to operate seamlessly to perpetrate a variety of illicit activities ranging from child trafficking and prostitution rings to embezzlement and financial fraud.

9.  Further, the Connecticut Department of Children and Families has failed to comply with regulations set forth in CGS § 17a-112(j) by making no reasonable efforts to reunite plaintiff and her minor daughter A.L. despite them being alienated from each other for the last seven months.

10. The Connecticut Department of Children and Families has failed to make any reasonable efforts to preserve the family as required by the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 1305 and the Adoption and Safe Families Act, 42 U.S.C. § 1305.

11. The Connecticut Department of Children and Families has failed to comply with the reasonable efforts requirement as mandated by both federal and state laws and has also failed to consider requirements as related to plaintiff's disabilities, including mental disabilities.

12. State court judges[41], who often have zero oversight from the federal courts, enjoy immunity from any and all corrupt, malicious, illegal, or obstructive acts that they perform through the unconstitutional doctrine of judicial immunity that is not part of the United States Constitution[42].

---

[40] Further, the Supreme Court has also held that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures . . . The 'fair preponderance of the evidence' standard prescribed by §622 violates the Due Process Clause of the Fourteenth Amendment . . . A preponderance standard[40] does not fairly allocate the risk of an erroneous factfinding between the State and their natural parents." *Santosky v. Kramer*, 455 U.S. 745 (1982).
[41] Many of the defendant judges named in this action have regularly and consistently engaged in ongoing racketeering acts and overt acts and omissions in an effort to further the open-ended continuity of the orchestrated RICO schemes under the blanket protection of "judicial immunity" which they exploit in order to engage in egregious amounts of corruption.
[42] Many of the judges, especially those working in the probate and family courts, are given the power to abridge liberty and seize property, while simultaneously causing enormous and irremediable harm to innocent people oblivious to the corrupt acts happening before their eyes. Individuals are stripped of any chance to protect their own interests in these situations since the

13. Family Court judges, such as Defendants Grossman, Tindill, Gould, Moore, and other named defendants, have maintained that the State of Connecticut's "Best Interest of the Child Standard in Connecticut[43]" which allows family court judges to issue no-contact, no-access/visitation, and absolute and final removal of custody orders—many times while also making said orders final, nonmodifiable, and permanent—without affording litigants the right to have the State be required to prove them unfit before terminating said rights, is acceptable and constitutional, which Plaintiff seeks to challenge in this lawsuit.

14. *The Best Interest of the Child Standard in Connecticut* provides a 17-factor test which outlines the factors that the court "shall consider" when "making or modifying any order . . . regarding the custody, care, education, visitation and support of the children" while maintaining that "[t]he court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision." *See CGS §46b-56.*

---

judges will irreparably abridge them.

[43] CGS § 46-56(c) (2021) states that " [i]n making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers but shall articulate the basis for its decision."

15. The Family Court System[44] in the State of Connecticut does not advise litigants of their rights during proceedings as they do in the Criminal Justice System in the State of Connecticut.

16. The Family Court System[45] in the State of Connecticut regularly will ignore many, if not all of the 17 factors laid out in 46b-56(c) of the Connecticut General Statutes and will oftentimes deny litigants due process, the right to counsel, the right to a trial, the right to cross-examine witnesses or family relations, the right to utilization of services, the right to enter in and present evidence, the right to be heard, and the right that parents have to the academic and medical records of their children under CGS § 46b-56(e)).[46]

17.  Defendants such as those associated with DCF, law enforcement, and the CT Judicial system violated plaintiff's rights under the ADA in that plaintiff was engaged in various protected activities, defendants knew that plaintiff was involved in a protected activity, adverse decisions and courses of action were taken against plaintiff, and clear causal connections exist between the protected activity and the adverse action in this case.

18. Defendants, as a collective, acted in concert with one another through a series of overt acts and omissions in a targeted effort to deprive plaintiff of her fourteenth amendment right to substantive due process by denying her the fundamental right to parent her minor daughter A.L. and refusing to provide plaintiff with reasonable accommodations in accordance with the ADA.

19. The acts of the defendants clearly show that they directly led to the severance of plaintiff's mother-

---

[44] The Family Court System in the State of Connecticut does not provide litigants with the right to counsel or the right to counsel being appointed or the cost of said appointed counsel being waived during proceedings as they do in the Juvenile Court System in the State of Connecticut.
[45] The Family Court System in the State of Connecticut does not provide litigants with the right to counsel or the right to counsel being appointed or the cost of said appointed counsel being waived during proceedings as they do in the Probate Court System in the State of Connecticut.
[46] By law, a parent not granted custody of a minor child has the same right as the custodial parent to the child's academic, medical, hospital or other health records, unless otherwise ordered by the courts (CGS § 46b-56(e)).

daughter relationship with A.L. and the state actions depriving plaintiff of custody to A.L. was so shocking, arbitrary, and egregious that the due process clause would not countenance it even were it accompanied by full procedural protection.

20. The acts and omissions of state officials, and their associates, as described within this complaint are egregious conduct that meets the criteria of being violative in a constitutional sense.

21. The Defendants and others who are involved in the acts and omissions described within this Complaint have engaged in the use of child custody as a veil for child trafficking[47], by allowing the state of Connecticut, through its agencies, to intentionally place minors in abusive environments.

22. Further, many of the defendants that are or are associated with several non-profit and not-for-profit organizations within the state have been engaging in a racketeering pattern of acts and omissions that consists of money laundering through the tax-exempt networks.

23. Defendant Grossman has failed to comply with federal judicial canons applicable to judges and has shown immense and severe bias against plaintiff. Defendant Lodice has repeatedly claimed to use his connections with other defendant judges, attorneys, state employees, and state contractors in order to purchase and secure custody of A.L.

24. Many of the non-profit entities regularly will misuse the funds received from the federal government, particularly from federal grants, and typically said funds are laundered through an intricate matrix of shell companies, nonprofits, and quasi-official entities. This intricate RICO system allows the state to disguise illegal gains while facilitating further exploitation of both government resources and taxpayer dollars.

---

[47] Defendants have consistently and repeatedly engaged in a complete manipulation of the child custody and family court system in an effort to conceal the trafficking of minors for financial gains. Judges will regularly make deals with attorneys in order to "sell" custody of children to the highest bidder in high-conflict custody and divorce battles, oftentimes leading children directly into the path of harm's way and overlooking the risks of long-term physical and psychological harm.

25. Defendants have also enabled[48] systematic and statewide gender discrimination and suppression that extends to every branch, arm, and leg of the state of Connecticut, and has become deeply entrenched[49] within society as a whole on a statewide level.

26. The Plaintiff was born in New Haven, Connecticut and has resided in Connecticut within New Haven County for the past 32 consecutive years.

27. The Plaintiff has documented disabilities which are protected under the *Americans with Disabilities Act* which include ADHD and PTSD that was caused by intense and severe levels of exposure to childhood trauma that included sexual abuse, homelessness, victimization[50] by the criminal justice system, and living in poverty.

28. The Plaintiff was, as the late Honorable Judge Richard Damiani stated, repeatedly "victimized by our system[51]" and as a result possesses a remarkably intuitive perspective and inside knowledge and exposure to the ongoing RICO scheme and for-profit judicial system operations being orchestrated by the state and has suffered tremendously as a result[52].

29. DCF, the State of Connecticut Judicial System, the State of Connecticut Division of Criminal Justice, and many of the programs and organizations that receive funding[53] through the federal government

---

[48] Defendants, in concert with one another and as part of the RICO enterprise under the State of Connecticut, promote policies and programs that systematically marginalize women. Efforts to expose these alleged wrongdoings or seek redress are met with state-sanctioned intimidation, legal barriers, and unjust legal actions.

[49] Several revered and reputable institutions within the State of Connecticut such as Defendant Yale have also been co-opted into this network, providing a veneer of legitimacy to the state's actions, and creating an environment where children are being exploited, silenced, trafficked, harmed, and ultimately stripped of all of their rights without recourse.

[50] Plaintiff was also repeatedly victimized by the very system that was federally incentivized, funded, and designed to theoretically protect her at the hands of the Connecticut Judicial System, DCF and other defendant state agencies who further exacerbated the trauma she was forced to endure so they would continue to act toward the furtherance of the RICO scheme that has also victimized countless others within the state of Connecticut for decades.

[51] Defendant Diamanto Antonellis (hereinafter "Antonellis") lost custody of plaintiff when plaintiff was fourteen years old, forcing her to then live under the care and custody of Antar, who then proceeded to neglect plaintiff for the four years he was acting as her sole custodial guardian. Antar deprived plaintiff of basic necessities like food, water, and shelter, while simultaneously making millions of dollars through a series of intricate RICO schemes that he orchestrated, all by and through business ventures in the State of Connecticut.

[52] See *State of Connecticut v. Christopher Katagis*, NNH-CR-07-0075571T.

[53] In spite of this, New Haven Superior Court, New Haven Child Support Enforcement Services, Connecticut Child Support

designed to help victims of abuse and domestic violence all collectively failed the plaintiff and directly

added to her lifelong trauma, pain, and suffering[54]. This is hallmark of the State of Connecticut's

longstanding for-profit judicial system and the pattern of due process violations, misuse of federal

funding, extortion, bribery, money laundering, racketeering, human trafficking, and obstruction of

justice[55].

30. Plaintiff seeks to challenge various unlawful practices and policies of the defendant officials of the

State of Connecticut[56] concerning various state operations such as the operation of Connecticut's child

welfare system, family court system, criminal justice system, probate system, and juvenile justice

system as it affects the daily lives of millions of individuals similarly situated to plaintiff and her minor

children.

31. Plaintiff contends that the defendants have failed to provide adequate protective services to children

who are abused, neglected, or who are at risk of abuse, neglect, and maltreatment, including their

failure to ensure that all reports regarding these children are investigated and responded to promptly

by caseworkers who are trained adequately and appropriately.

32. Furthermore, defendants[57] have collectively engaged in a systematic failure to make reasonable efforts

---

Enforcement Services, and The Department of Social Services all failed to comply with federal requirements regarding the enforcement of child support, which ultimately left plaintiff to continue to suffer in poverty.

[54] The Defendant Abdelghany Antar (hereinafter "Antar"), historically took advantage of and exploited several of these systematic RICO schemes in order to fraudulently obtain benefits through the DSS, reduce or eliminate child support obligations through fraudulently fabricated financial statements submitted in the New Haven Superior Court in an effort to defraud CCSES and in turn deprive the plaintiff of her right to the benefits of his financial support under federal laws as her biological father.

[55] The State of Connecticut Department of Children and Families also failed to properly protect plaintiff when she was a minor, leaving her in a dangerous and neglectful environment with no adult supervision, access to services, financial support, or means of survival. Plaintiff was not only abandoned by Defendant Antonellis and then by Defendant Antar, but ultimately it was the Department of Children and Families who abandoned plaintiff and failed to protect her from the ongoing harm.

[56] The State of Connecticut has the fourth highest per capita income in the United States with the mean household income at $115,337 per year, yet some of the most vulnerable women and children in the state continue to be repeatedly subjected to widespread violations of laws which were enacted to protect them and to ensure for each of them an opportunity for a safe and healthy childhood and a permanent family.

[57] The conduct of the defendants violates clearly established constitutional rights and it is not objectively reasonable for them to believe their acts did not violate those rights, making qualified immunity nonapplicable in this action.

to keep families together and have failed to adhere to federal laws and guidelines mandating the continued eligibility of federal funding incentives.

33. Qualified immunity does not apply to any defendants in this action because it has been clearly established at the time of the misdeeds that the state officers violated plaintiff's substantive due process rights by failing to direct the implementation of ADA policies and programs in child custody, neglect, and TPR proceedings[58].

34. The Department of Children and Families receives billions of dollars in grants from the federal government that is supposed to go toward the protection of children, however every single day children like plaintiff and plaintiff's minor daughter A.L. continue to be victimized, and then re-victimized by the system. The ongoing systematic intricately woven RICO[59] systems that all fall under the overarching blanket of the State of Connecticut is longstanding, deeply ingrained, and highly corrupted[60].

35. The reality for many children growing up poor was similar to that of the plaintiff as a child[61].

36. The State of Connecticut's child welfare system and family court system endangers the children that it is charged to protect, causes harm to children it is charged to help, and has been allowed to deteriorate

---

[58] The State of Connecticut and defendants have failed to ensure minimally-adequate and appropriate care is given to all children involved in contested custody disputes or juvenile proceedings and fail to adhere to federal guidelines in maintaining sibling relationships, fail to ensure children receive adequate medical and mental health assessments pursuant to their age and abilities, and fail to ensure that children receive consistent parenting and nurturance in accordance with their individualized needs.

[59] Plaintiff witnessed Defendant Antar speak openly regarding the various RICO schemes being orchestrated by the State in an effort to let the "poor get poorer", which most people in the state just accept as normal life in Connecticut, which has one of the highest discrepancies between the rich and the poor in the country. Between 1989 and 2016, income inequality between the richest and poorest families in the United States *doubled.*

[60] Many, if not all, of the programs, commissions, coalitions, foundations, and other "non-profit" organizations that are part of the ***Non-Profit Sector RICO operation,*** which report to the IRS that they are charitable organizations that exist to help the poor, disabled, abused, uneducated, and otherwise disadvantaged people of society who lack the means and opportunities to ever have a level playing field with their peers and colleagues.

[61] The only difference is that although plaintiff was initially with Antonellis who genuinely was unable to financially provide for her, Antar ***was*** able to provide and was making ***millions of dollars through his own series of RICO enterprise schemes but*** chose to abuse and neglect the needs of plaintiff and her three siblings that are also his children instead financially. Antar was able to take advantage of the system and exploit the RICO enterprises for years without the State ever holding him accountable for anything.

to a state of systemic, ongoing crisis that has become a key piece in a nationwide—if not worldwide—humanitarian crisis that needs immediate resolution.

37. This ongoing crisis has spanned for decades, and continues to cause irreparable injury to plaintiff, her minor children, and thousands of other men, women, and children involved therein[62].

38. As such, Defendant Antar further engaged in repeated violations[63] of state and federal laws including wire fraud and mortgage fraud in obtaining multiple fraudulent mortgages and then intentionally defaulting on the loans while continuing to collect rent from tenants and failing to pay anything toward the mortgages.

39. Defendant Antonellis, the plaintiff's mother, was an immigrant from Greece who had no college education or clear understanding of how to handle real estate transactions. Antar extorted her and fraudulently told her he would marry her and convinced her to use $150,000 of her money from a wrongful death settlement from her father as a down payment on a single-family residence[64] in Bethany, CT, which Antar secured under his name under the guise that he would pay the mortgage.

40. On December 11, 1995, after Antar missed a substantial number of mortgage payments on the property, the New Haven Superior Court issued a judgment of strict foreclosure against the defendants Antar and Antonellis. See *First Trust National Association v. Ali Antar, et al,* NH-CV-94-0356294-S

41. After receiving initial notice of judgment of foreclosure on January 22, 1995, and a subsequent 30-

---

[62] The statute of limitations would still allow plaintiff to make claims in that there are certain circumstances where the limitations period may be extended and may not apply, such as in federal civil rights police discrimination and harassment cases. Equitable tolling also would apply in that it allows for the statute of limitations to be extended in some situations where the plaintiff, despite using due diligence, could not or did not discover the injury or violation until after the expiration of the limitations period.

[63] Antar orchestrated various schemes throughout the years and ultimately after being indicted on federal charges for conspiracy to commit wire fraud, he "pled guilty on July 19, 2011, to an information charging him with one count of conspiracy to commit wire fraud under 18 U.S.C. § 371 for his leadership role in a mortgage fraud scheme involving 21 homes in greater New Haven." See *United States of America v. Abdelghany* Antar, 3:11-CR-00123-CFD

[64] This house, located at 151 Cheshire road in Bethany, CT, was where the plaintiff resided from her birth in September of 1991 through March of 1996. Plaintiff lived there from the ages of 0-4.

88- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

day extension of the February 13, 1996, ejectment date, on March 13, 1996, plaintiff and her family were forcibly evicted[65] from the home and given only 24 hours to vacate the premises.

42. From March of 1996 until August of 2001 the plaintiff was also sexually abused by the defendant Katagis while under the care and custody of the defendant Antonellis. This abuse took place in houses in West Haven, New Haven, and Bethany, CT when plaintiff was between the ages of four and nine years old[66].

43. DCF was summoned to the plaintiff's home on numerous occasions during this time based on allegations of abuse and neglect being called in by third parties, yet DCF failed to intervene in any of said calls, which is paramount to their ongoing pattern of ignoring abuse and neglect while still exploiting federal funding in a RICO scheme that has spanned for decades[67].

44. In 2001, plaintiff attempted to disclose the sexual abuse to Defendant Antonellis, but rather than be supportive or report the abuse to authorities, Antonellis instead chose to cover up the abuse and accuse plaintiff of lying[68].

45. Plaintiff then was forced to continue to live in the same home[69] with Defendant Katagis after he was informed that she disclosed the sexual abuse to their mother Defendant Antonellis, and due to the

---

[65] Plaintiff and her family experienced homelessness and lived in a homeless shelter in Waterbury, CT immediately after being evicted from the house in Bethany before finally moving into a rental house in West Haven, CT.

[66] Plaintiff is still able to pursue the claims for the violations of her rights that occurred when she was a juvenile because the statute of limitations may be tolled for plaintiffs who were minors when the misconduct occurred until they reach the age of majority. Once they become adults, the typical statute of limitations would then begin to run.

[67] DCF, which exists as a sub-organization within the overall organization of the State of Connecticut, has a longstanding history of failing to protect children within the state and allowing them to continue to be abused, neglected, and at times even murdered. DCF is misusing and fraudulently laundering federal funding. The State of Connecticut DCF currently has a federal Administration on Children and Families ACF grant along with other grants from additional federal funding sources. In spite of this, they have failed repeatedly to intervene in the ongoing case of plaintiff's minor daughter A.L. being sexually abused.

[68] In various instances, the defendants engaged in fraudulent concealment, which also will extend the statute of limitations to bring forth her claims from when she was a juvenile. In situations where the defendant fraudulently concealed the cause of action from the plaintiff, this can sometimes toll the statute of limitations until the plaintiff discovers or reasonably should have discovered the cause of action.

[69] Defendant Antonellis regularly would leave Defendant Katagis in charge of the home, and he regularly paid the majority of the bills for the home. Defendant Antonellis had almost nothing in her name while Defendant Katagis owned and paid for everything.

request of Defendant Anastasia Ganim, plaintiff was even forced to share a bedroom with Katagis and two of her other siblings for several years so that Defendant Anastasia could have the luxury of having her own bedroom.

46. From 2001 until 2005, while living in a rented home in Woodbridge, CT, the plaintiff experienced significant amounts of physical abuse[70] by the Defendant Katagis, against her and against her brother Antonios Antar who is mentally disabled and has profound Downs Syndrome and is completely nonverbal.

47. In 2006, plaintiff reported to the Woodbridge Police Department in Woodbridge, CT, that she had been sexually abused as a minor by Katagis from the ages of four to nine, after Defendant Antonellis had called the police to the home in Woodbridge in an effort to "have plaintiff arrested".

48. After plaintiff brought up the sexual abuse to Antonellis in the presence of three officers from the Woodbridge Police Department, said officers instructed plaintiff to come with them to the police station for further questioning[71].

49. After several hours of questioning and the police taking a verbal statement from plaintiff, they instructed plaintiff to use the phone at the police department to call Antonellis to come pick her up. Antonellis answered the phone and swore at plaintiff and told her that she would not be coming to pick her up since she "tried to put her kid in jail" and hung up the phone[72].

50. Plaintiff was released to Defendant Antar from the Woodbridge Police Department and a DCF

---

[70] On one occasion, Katagis threw a plastic lawn chair at plaintiff's face with all of his force and strength and hit her in the face and broke her nose because he was angry. On another occasion, Katagis came home angry and upset that plaintiff's brother Antonios had an accident on the floor in the home and, as a cruel and unusual punishment, he smashed Antonios's face in his own feces to punish him for having an accident.

[71] Plaintiff, at the age of fourteen years old with no attorney or parent or legal guardian present, then went to the Woodbridge Police Department where she gave a very detailed and lengthy statement to the Woodbridge police which included very intrusive and detailed questioning by the police for several hours.

[72] Plaintiff was then informed by the Woodbridge Police Department that if she could not get her mother to come and pick her up that she would have to call Defendant Antar to pick her up or else she would be forced to go into the custody of the Connecticut Department of Children and Families.

90- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

investigation commenced. Defendant Antonellis lost custody of plaintiff and she lived in various apartments after that in West Haven, East Haven, New Haven, and Woodbridge, CT.

51. The Woodbridge Police Department contacted the Connecticut State Police Troop I in Bethany, CT and informed them that the sexual abuse occurred in three separate towns and that it did not occur in the Town of Woodbridge. CSP Troop I stated that it would be in the plaintiff's best interest if she were to come to the barracks in Bethany and give her statement one more time, in lieu of having to give three more statements[73] to Bethany, New Haven, and West Haven.

52. Defendant Antonellis told plaintiff that Defendant Katagis asked her to try to convince plaintiff not to go to the CSP Troop I in Bethany to give this statement, and Antonellis and Katagis worked together in concert with one another to try to obstruct justice and bribe[74] plaintiff into staying silent about the sexual abuse.

53. Plaintiff refused this bribe and insisted on going to the police to give the statement. Plaintiff gave the statement to the police at CSP Troop I in Bethany and verbally gave her statement while a trooper typed what plaintiff was saying on a laptop. Antonellis, despite driving plaintiff there, told troopers that she did not believe plaintiff and that she was not supporting plaintiff in any way and that she felt plaintiff was lying about the abuse[75].

54. On December 24, 2007, the Connecticut State Police Troop I Bethany left a voicemail on Defendant Antonellis's home phone in which they stated that they had a warrant[76] for the arrest of Defendant

---

[73] The statement alone is extremely traumatic as the police at the time would ask extremely invasive and detailed questions about the abuse which can be very difficult to talk about in such detail, especially when victims are only fourteen years old like plaintiff was at that time.

[74] Defendant Antonellis told plaintiff that Katagis said that she could "name her price" and that whatever amount of money she wanted in lieu of going to the police would be secured.

[75] The trooper told Antonellis that "kids don't just make this stuff up" and attempted to get Antonellis to understand the severity of the issue, but Antonellis was more concerned with protecting her son as she had already told plaintiff that she "wasn't her kid anymore."

[76] Defendant Antonellis then became enraged and told plaintiff "thanks for the Christmas present" and continued to retaliate and intentionally inflict emotional distress and pain on plaintiff in retaliation for the prosecution and arrest of her son Defendant

Katagis and that he was required to turn himself in for his arrest and was being charged with risk of injury to a minor, unlawful restraint, and sexual assault, for the incidents which took place during plaintiff's childhood.

55. Antonellis regularly admitted that, despite having five total children, that Katagis was her favorite child as he supported her financially, did not have any Egyptian blood like plaintiff and her siblings, and because he was the first-born[77].

56. Antonellis allowed plaintiff to become homeless and plaintiff was forced to find ways to survive without any money, food, housing, transportation, income, or family or emotional support.

57. Plaintiff was also expected to maintain taking honors and advanced placement rigorous courses in high school and prepare for college, all without any guidance or assistance from anyone.

58. At one point, plaintiff was even forced[78] to go into the custody of the State of Connecticut Department of Children and Families and lived in a foster home in Shelton, CT after Defendant Antar had plaintiff living in an apartment with no heat, no hot water, no food, and several building code violations.

59. Plaintiff also was involved in an unhealthy relationship with an individual that involved extreme levels of domestic violence and abuse from 2007 until 2009, which resulted in plaintiff being arrested numerous times for assault, breach of peace, disorderly conduct, and at least three felony violation of protective order charges[79].

---

Katagis.

[77] Antonellis would often treat plaintiff as a scapegoat and blame plaintiff for all of the issues and problems in her life, using plaintiff as a verbal punching bag in order to take her frustrations out on and feel more justified in her decision to completely abandon her own daughter.

[78] The West Haven Police Department and DCF told Defendant Antar that they "wouldn't even let their cat step foot in the apartment" but scolded him asking how he could "let his daughter live here". Plaintiff became accustomed to living in environments as a teenager that had none of the basic necessities like food, shelter, and water. Plaintiff was left to figure out ways to survive on her own without any parental or adult supervision or guidance, while trying to manage being in high school and preparing for college.

[79] Both plaintiff and this individual were arrested numerous times together and the State of Connecticut domestic violence laws at the time required that both parties had to be arrested and required that restrictive protective orders be forcibly imposed on both parties regardless of their wishes.

60. Plaintiff experienced extreme violations of her Constitutional rights by judges in the New Haven Superior Court when dealing with many of these criminal charges as a juvenile. Plaintiff was given several cruel and unusual punishments and continues to suffer trauma as a result.

61. After violating the state-imposed protective order for the third time in December of 2008, plaintiff posted a $250.00 bond to the Woodbridge Police Department and was released from jail. Plaintiff was supposed to go to court the next day, but there was a snowstorm and court was cancelled, and plaintiff was told that she would get a new court date in the mail.

62. On January 15, 2009, plaintiff appeared for her arraignment in New Haven Superior Court at 121 Elm Street, New Haven, CT, to be formerly arraigned on a felony violation of protective order charge. Plaintiff was seventeen years old at the time and was represented by the late public defender Janet Perrotti and Defendant Antar was also present for the proceeding[80].

63. At that point, the judge then stated that he was "raising [plaintiff's] bond to a $25,000 CASH ONLY bond[81] and continuing the case until January 20, 2009.

64. Plaintiff was then chained to several other female prisoners and taken to Union Avenue jail at the New Haven Police Department before being escorted into another van that ultimately took plaintiff to York Correctional Institution in Niantic, CT[82].

65. Plaintiff spent five days incarcerated at York CI under unimaginable conditions that cause plaintiff to become physically ill and sick during the time there. Plaintiff attempted to request medical attention

---

[80] The New Haven Superior Court Judge arraigned plaintiff on the charges and immediately said to plaintiff "This is your third time violating this protective order, the protective order says no contact. No contact means no contact. Clearly you do not understand what a court order is."
[81] Plaintiff was then immediately placed into handcuffs and shackled and taken into custody of judicial marshals and brought into the basement of the New Haven Superior Court GA5 to be held in a holding cell and await the arrival of employees of the Department of Correction.
[82] Plaintiff was placed into the custody of the Department of Correction and was forced to stay inside of a cell with three other juvenile defendants in which plaintiff was locked in said cell for a total of 23.5 hours a day for five consecutive days.

while incarcerated and was told that the procedure is that inmates must fill out a written request for medical attention that would then sit in a box for "up to 10 business days" until it was reviewed by a provider[83].

66. The conditions that inmates such as plaintiff were or are forced to endure while being subjected to the custody of the state of Connecticut Department of Corrections and in York Correctional Institute in Niantic, CT constitute torture, cruel and unusual punishment, and violate several international laws regarding human rights[84].

67. The entire system is unconstitutional. While collar crimes are punished with luxury stays at these "prisons" without so much as a fence around it, while simultaneously those in state prisons often experience the most unimaginable acts and witness the most deplorable conditions imaginable every single day[85].

68. Individuals like plaintiff have seen these injustices firsthand for her entire life and continues to be subjected to being perpetually "victimized by the system" like the court manifested as her destiny fifteen years ago.

69. After five days in prison, on January 20, 2009, plaintiff was then escorted by the DOC to New Haven Superior Court through the same process of buses and transport vehicles that took her to York, where she then awaited to appear before the same judge who incarcerated her.

70. Plaintiff then appeared in front of the judge where she was then immediately released from custody

---

[83] Plaintiff was told that this procedure for addressing concerns of female inmates needing medical attention was the same regardless of if the female was experiencing a medical emergency or not. There was no other option for inmates to see a nurse, doctor, or paramedic and inmates were dehumanized, degraded, and treated as if they are worthless by employees of the State of Connecticut Department of Corrections.
[84] In comparison, white collar criminals are often sent to federal prison, such as defendants Joe Ganim and Abdelghany Antar, who were living in an essential resort-style housing compound in West Virginia together and continued to brag about the amenities and luxuries available to them as inmates.
[85] There is no equal protection for the poor. There is no equal protection for those who are not politically connected. There is no equal protection for those who are not already protected by the status of their family, last name, bank account, or affiliation with any of the above.

and her case was dismissed.

71. The judge stated that he imposed the 5-day 23.5 hour/day imprisonment in a maximum-security women's prison for plaintiff in order to "teach [plaintiff] a lesson" and stated that the imprisonment was a fair punishment for plaintiff's technical violation of a restrictive state-imposed protective order that neither plaintiff nor the protected party wanted[86].

72. During plaintiff's incarceration at York Correction Institute in Niantic, CT, plaintiff also became aware of another racketeering scheme that has been going on in the state of Connecticut involving the Defendant State of Connecticut Department of Corrections.

73. Several other prisoner inmates that plaintiff came into contact with while incarcerated at York CI informed plaintiff that many of the correctional officer employees of the DOC that are or were employed at York CI would engage in an in-house prostitution ring in which many of the inmates and state employees were involved.

74. Plaintiff was informed that this in-house prostitution ring involves several complicit state actors and organizations and has been active and operating within York CI for decades, and likely still operates today[87].

75. Each inmate is given a handbook upon arrival that contains the following chilling warning as a welcome to new prisoners on the first page: **"You are subject by law to the authority of the Department of Correction, even if you have not been sentenced. You must comply with the rules of the facility. Staff will enforce the rules. If you respect the property of others and their privacy, comply with the rules of the facility and obey the orders of staff, more opportunities for personal**

---

[86] The domestic violence laws, statutes, and administrative practices that exist within the state of Connecticut are biased against women, discriminatory, and allow for cruel and unusual punishments to occur without any protections of constitutional rights or equal protection.
[87] Defendant York CI ensures that all female prisoners are aware that they are under the control of the state and have no rights.

**development will be open to you. The time you spend here can be productive if you are determined to make it so. The choice is yours.**

76. The truth however is that the choice is never actually yours when you, as an inmate, are considered the "property" of the state of Connecticut, the Department of Corrections, and York CI and its employees, contractors, actors, and affiliates.

77. The inmates currently under the custody of the state of Connecticut Department of Corrections have no way to contact anyone in the outside world or escape from their confinement in institutions such as York, and many times are denied access to mental health, medical, and basic services that they are entitled to through the United States Constitution[88].

78. Plaintiff suffered extreme levels of violations of her constitutional and federal rights while incarcerated in the conditions of York CI and still suffers from PTSD as a result even nearly fifteen years later.

79. Inmates further explained to plaintiff that, since many of the inmates are relying solely on commissary in order to survive, that the correctional officers will often pay the female inmates in exchange for sexual intercourse[89] or other sexual favors by putting money on their commissary or "on their books" as many inmates refer to it.

80. Inmates have no use of cash or regular money while incarcerated in York CI, which is like being in a different world compared to life on the "outside" and where the dehumanizing tactics such as no mirrors above the sink in the bathroom to even be able to look at yourself end up causing many people to lose touch with who they are and their disassociate from their identity as whole.

---

[88] Plaintiff endured immense trauma while incarcerated at York CI in January of 2009. Plaintiff was unable to eat any of the food that was given to her and there was no option for commissary for those prisoners who were stationed in the "medical unit" where all prisoners are forced to go for a total of 23.5 hours a day for the first 2 weeks of their stay before being transitioned to the dormitory units where they are allowed more time outside of the cells on a daily basis.
[89] The inmates explained to plaintiff that York CI—a level five maximum security prison and the only women's correctional institution in the state of Connecticut—which houses more than 729 inmates as of January 2023, is heavily corrupted and that many of the inmates and correctional officers engage in and solicit the in-house prostitution trafficking ring.

81. Just like in the family courts and probate courts and juvenile courts how it is "cash for kids" and "cash for seniors" or "cash for estates" in the Department of Correction and the prison system such as in York CI, it is "commissary for sex" and inmates of York CI consistently report sexual harassment and sexual abuse by employees as per recent publicly released audit reports[90].

82. The female prisoners have little to no way to fight back or stand up for their rights, and many women die in prisons in the state of Connecticut after being subjected to the torture they have to live through on a daily basis while under the care of the DOC[91].

83. Many of the men's prisons also engage in the correctional officer assisted drug trafficking in which the same scheme of commissary for drugs takes place.

84. In the men prisons the men will ask relatives to give them commissary and put commissary money on their accounts. The DOC employees at said facilities then, in turn, will take that money and traffic illegal drugs into the facilities to give to the inmates.

85. In York CI, drugs are trafficked, and sex is also trafficked, where in the sex trafficking the DOC employees are the ones providing the commissary, yet in the drug trafficking they are the ones accepting the commissary[92].

86. Unless someone has ***actually been there*** or experienced the trauma of being imprisoned in a maximum-security prison such as York CI, and unless they have been in the medical unit where they are on the 23.5 hour a day lock down status, they can never understand what it does to someone. They

---

[90] The State of Connecticut, York CI, and the employees of the Department of Correction are all complicit and all have engaged in overt acts and omissions in order to allow the open-ended continuity of the commissary for sex RICO scheme in which they are able to profit off of the desperation of the female prisoners in the state.
[91] The Department of Correction, and many of the employees who are defendants in this action such as defendant Josh Lambo and James Lambo are aware of the corruption that occurs within the DOC facilities statewide.
[92] The State of Connecticut, the Department of Corrections, and many other named defendant actors and departments are well aware that this is, has, and will continue to happen indefinitely and choose to look the other way. Ask any inmate or anyone who has ever had a loved one incarcerated and they will affirm this.

can never understand how it can change the way a person's brain chemistry acts and how it can change someone's life and perspective on everything.

87. Inmates are dehumanized just as those who were sent to concentration camps in the holocaust were dehumanized[93] and stripped of their identities, children, families, rights, dignity, and soul.

88. Out of the 240 hours that plaintiff spent in the custody of the Department of Corrections in 2009, 235 of those hours were spent locked in an 8x10 cell with three other people all under the age of eighteen. Plaintiff was only seventeen years old and experiencing serious trauma based on being the victim in the case of State v Katagis that was pending at the time.

89. DCF, the State of Connecticut, DOC, and any other named defendants who were involved at the time did nothing to protect plaintiff when she was a minor and allowed plaintiff to be intentionally harmed and subjected to further abuse.

90. That same month, in January of 2009, plaintiff was also scheduled to appear as a witness in the trial of State v. Katagis, in which Defendant Katagis had plead not guilty after turning himself in on the warrant one year prior.

91. Plaintiff was the only witness[94] that the State of Connecticut had in the case. There was no DNA evidence, no forensic interview, no eyewitnesses, and no other evidence at all other than the statement that Plaintiff gave to CSP Troop I Bethany in the summer of 2006.

92. Plaintiff was informed that Katagis would be taking a guilty plea and receiving, in lieu of the ten-year imprisonment he would have received if he was found guilty at trial, five years of probation and five years of a suspended sentence, and that if he had had been convicted, he would have received ten years

---

[93] When you are an inmate, the Department of Corrections gives you an "inmate number" and that is what you are referred to at all times after that number is assigned. Plaintiff spoke with many inmates while incarcerated and saw first-hand as an eye-witness what was happening right in front of her own eyes.
[94] As soon as Katagis saw that plaintiff showed up to the trial and was prepared to testify, he immediately told his attorney that he wanted to cancel the trial and take the guilty plea instead.

in prison[95].

93. Katagis was sentenced on June 4th, 2009, during which the judge stated "There's not much I can say about this, this case was around for quite some time. We discussed it at great length. My major concern in this matter was really not you; it was really the young girl, the alleged victim in this matter. The dynamics of your family came into play. I knew you were going back into the house when the young girl left the house. That was done so that you could work and support the family rather than see the house go into foreclosure."

94. The Judge, the late Honorable Richard Damiani, also put it on the record that it was not until a GAL was appointed to intervene in DCF's failure to protect plaintiff and her rights as a crime victim, and he noted that "the young girl was not only victimized once with you, but she was again being victimized by our system. And I think everyone did work very hard . . . worked very hard to resolve it, and really, somehow to enumerate the traumatic impact on the young girl. And I'm glad she's graduating from high school, and I hope she goes on to college[96]. But she has quite a load to haul around with her now."

95. On June 24, 2009, plaintiff graduated from Amity Regional Senior High School in Woodbridge, CT at the age of seventeen with her high school diploma.

96. Antonellis suggested that plaintiff invite Antar to the graduation, despite his unstable relationship with plaintiff and inability to be a consistent father figure for plaintiff or any of her siblings, which plaintiff reluctantly did.

97. Antar did not attend the graduation, however he did show up to the dinner afterwards where he ended

---

[95] The States Attorney John Waddock at the time repeatedly asked plaintiff what she wanted to see happen to Katagis in the case and plaintiff repeatedly said that she didn't want prison time to be part of the sentence as plaintiff wanted to ensure that the rest of her family would not become homeless if he were to be incarcerated since he was paying the mortgage.
[96] Plaintiff not only went on to college, but graduated at the top of her class with a BA in political science and is currently a 2L law student at the University of Connecticut School of law as a candidate for her JD.

up getting upset at the price of the bill which was a total of $60.00 for seven people and covered the price of three large pizzas. He did not pay for any of the tax or tip, expressed his shock at the price, and stated that he was going to the bathroom[97] after throwing the $60.00 cash on the table for the bill.

98.  On June 25, 2009, plaintiff then attempted to approach Antar and requested that he provide her with money to purchase food, as she was only seventeen years old at the time and living independently in an apartment that was attached to Antar's office in East Haven, CT, and Antar had agreed to provide plaintiff was a budget of $10.00 per day for food in lieu of buying plaintiff groceries.

99.  Plaintiff attempted to ask Antar for the $70.00 for the food and Antar responded by telling plaintiff that things were "going to change now" and told plaintiff that "if she wanted food she can go get a job and work" and told plaintiff that "she can get a job somewhere else and not work for him" and also informed plaintiff that she would be evicted from the apartment in ten weeks once she reached the age of eighteen, despite plaintiff having nowhere to go and no income, car, or financial support[98].

100.    Plaintiff got upset with Antar and contacted the State of Connecticut Department of Children and Families care line and made a report that her father was refusing to provide her with food or water or money to purchase said necessities, and DCF contacted Defendant Antar a few days later.

101.    Antar then retaliated against plaintiff for contacting DCF, and he called the East Haven Police Department and wrote a statement against plaintiff claiming that he allegedly saw plaintiff vandalizing his car days prior, despite there being no vandalism or damage to the car at that time.

102.    The police then secured a warrant for plaintiff's arrest, and plaintiff was arrested and charged with

---

[97] Antar never returned from the bathroom, and plaintiff began to grow suspicious because he had not returned, which led plaintiff to look in the parking lot to see if he was at his car. When plaintiff went outside, she saw Antar was attempting to leave in his car without saying goodbye and without giving her anything as a gift for her high school graduation. Plaintiff attempted to approach Antar as he was trying to leave, and he nearly ran plaintiff over with his car and sped off and went home.
[98] Antar was supposed to be taking care of plaintiff and providing her with food and shelter, as he had been her primary custodial guardian for the preceding three years, yet Antar insisted on cutting plaintiff off from all food and financial support ten weeks before her eighteenth birthday, despite being legally obligated to provide for her until a minimum of the age of eighteen.

criminal mischief by the East Haven Police Department and was held on a $1000.00 bond.

103.    Antar then showed up at the police department and posted the entire $1000.00 bond in full and told plaintiff that he only called the police on her to "teach her a lesson."

104.    Plaintiff then, at the age of seventeen, was forced to sleep in her car until she went back to court to ask for the protective order to be modified[99].

105.    Plaintiff was arraigned in the New Haven Superior Court by Judge Richard Damiani, the same judge who had sentenced and presided over the criminal case with defendant Katagis and was once again subjected to a cruel and unusual punishment as a minor by the state of Connecticut judicial system.

106.    In July of 2009, after already having posted bond and been released and attended at least two separate court appearances in the criminal mischief case, defendant Antonellis received a phone call from the New Haven Superior Court while she and plaintiff were out shopping at the mall.

107.    Antonellis stated that the prosecutor from the New Haven Superior Court contacted her and told her that she needed to immediately stop what she was doing and drive to the New Haven Superior Court on 121 Elm Street in New Haven, CT, so that plaintiff could meet with her.

108.    The prosecutor did not explain to Antonellis why plaintiff was being summoned to court via a phone call without any prior notice, however she complied and immediately brought plaintiff to the courthouse.

109.    Upon arrival, the prosecutor presented plaintiff with an ultimatum: 1) leave the courthouse that same day with the Department of Children and Families and go directly into the custody of the State

---

[99] Plaintiff was then told by the East Haven Police Department that, despite the fact that plaintiff resided in an attached apartment of the same building that Antar resided in, that it was still considered the same home and that she would have to find somewhere else to go since they were issuing a full no-contact protective order that barred plaintiff from being near Antar or his residence.

of Connecticut and live in foster care for a minimum of ten weeks until her eighteenth birthday or 2)

leave the courthouse that same day with the Department of Corrections and go directly into the custody

of the DOC and live at York Correctional Institution in Niantic, CT for a minimum of ten weeks until

her eighteenth birthday.

110.    The prosecutor gave plaintiff no alternative option and told plaintiff she needed to give an

immediate answer and decide on the spot which she preferred[100].

111.    The prosecutor then told plaintiff to go into the courtroom and see the Honorable Judge Richard

Damiani, who then issued another cruel and unusual punishment against plaintiff[101].

112.     Judge Damiani immediately stated that he was raising plaintiff's bond again and raised plaintiff's

bond to $5,000 CASH ONLY, however he also imposed a restriction that the bond could "**only be**

**paid at the next court date**" which was scheduled for ***three weeks away.***

113.    In doing so, the judge not only issued a cruel and unusual punishment without any notice or due

process protections for plaintiff but did so without any scheduled court proceeding or giving plaintiff

the opportunity to be heard.

114.    This also prevented plaintiff from being bonded out at all by post-dating the bond by three weeks,

meaning that it was the equivalent of plaintiff being held without bail, as she had no legal option to

bail out regardless of how much money she had access to[102].

---

[100] Plaintiff then, after having been extremely traumatized from her prior experience while in the custody of the Connecticut Department of Children and Families while living in foster care, informed the prosecutor that she would not be going back into foster care.
[101] Judge Damiani passed away several years ago so it will remain unclear if he was aware that plaintiff was the same victim in the State v Katagis matter but plaintiff was unaware that he presided over the Katagis case at the time and had no knowledge of his connection to the matter or his awareness and knowledge of the facts surrounding plaintiff and her residency status at that time.
[102] This was a cruel and unusual punishment against plaintiff, as she had already been imprisoned in York CI six months prior during that same year as a cruel and unusual punishment in the violation of protective order case. Both times, plaintiff already bailed out and posted a bond to get out of jail upon being arrested, and both times the judges unexpectedly "raised her bond" without notice.

115. The January 2009 bond that was an ultimatum of $25,000 cash or five days in prison was an attempt by the state of Connecticut at extortion of Defendant Antar. Plaintiff had informed her public defender that she brought Antar to the proceeding as he had promised that he would "get plaintiff out" in the event that her bond was raised "regardless[103] of how high the bond would be."

116. The second time that plaintiff was incarcerated at York Correctional Institute in July of 2009, plaintiff was still a juvenile and only seventeen years old and was again being punished for not wanting to go into the care of DCF, despite it being an established fact that DCF had done a poor job of handling plaintiff's case for several years prior.

117. The $5000.00 cash only bond that could only be paid three weeks later was the same as imposing that plaintiff be held without bail[104] for three weeks[105].

118. While in York Correctional Institution, plaintiff then contacted defendant Irene Antar and dictated to her to type a letter to then fax to the court to be read by Judge Damiani. In said letter, plaintiff stated that she wanted the state to allow her to be released from prison early, that she felt that she was being subjected to a cruel and unusual punishment, and that she just wanted to be released back in to society and not be subjected to incarceration.

119. Plaintiff explained in said letter that she would, in lieu of prison, be willing to spend the remainder of last year as a minor living back with Antar under the condition of being imposed to a curfew. The judge agreed and allowed plaintiff to come to court for a hearing after only five days incarcerated.

120. Plaintiff appeared in front of Judge Richard Damiani, and States Attorney Johnathan Waddock

---

[103] Although Antar made this promise, he was not willing to pay $5,000.00/night for five nights to get plaintiff out of prison when the alternative was allowing her to sit in prison for five nights and get out for free afterwards.
[104] Plaintiff had no legal way to get out of prison and was once again forced to be incarcerated just because her parents were deemed to be unfit, and the state was failing to protect her. Plaintiff's rights have been violated as a result of systematic failures within the state of Connecticut judiciary, DOC, DCF, and any and all other involved defendants listed in this action.
[105] Plaintiff eventually turned eighteen and experienced additional homelessness and moved around a significant number of times from the years 2009 through 2014 when plaintiff had her first child J.V. with defendant Viglione.

was present there, as well. Plaintiff, who stood there with handcuffs and shackles in a full court room as everyone watched, was then told that Attorney Waddock was "disappointed" in the fact that plaintiff, who he had just worked with as the victim in the Katagis case, was going down a path of incarceration[106].

121.    Plaintiff was then arrested again two months later in another domestic violence situation with the same individual who was the subject of all the prior domestic violence situations and was again arrested for assault.

122.    Plaintiff hired a private attorney after seeing the results of the State of Connecticut Public Defender's Office and the way that they handle the bulk of their cases within the state.

123.    Plaintiff became pregnant with J.V. during her senior year of college while pursuing an undergraduate Bachelors of the arts in political science from Southern Connecticut State University. Plaintiff graduated with her B.A. in Political Science when she was nine months pregnant with J.V. and was able to complete her undergraduate college educate prior to having her first child.

124.    Plaintiff endured severe levels of physical, financial, and psychological abuse at the hands of defendant Gerald Viglione who was regularly abusive toward plaintiff both before, during, and after her pregnancy with J.V.

125.    Defendant Viglione assaulted, battered, and caused intentionally inflicted emotional distress upon plaintiff which exacerbated post-traumatic stress disorder and caused her extreme levels of stress and anxiety that affected her pregnancy.

126.    Plaintiff endured physical violence and abuse from Viglione from 2013 through 2017 and from

---

[106] Attorney Waddock stated that he supported plaintiff's idea of being able to go back to Antar's property under the curfew, without any type of monitoring system, but under a court ordered curfew until her eighteenth birthday. Judge Damiani then released plaintiff and dismissed the case and stated that if plaintiff ever got arrested again that she would "owe two years to the state of Connecticut" and that the "two years in prison would be hanging over her head" as a file intimidation scare tactic against plaintiff.

2017 to present day, has endured extreme levels of emotional and psychological abuse including threats, harassment, and intimidation by Viglione. Viglione has also repeatedly colluded and conspired with defendant Lodice to try to cause further harm to plaintiff.

127.    In February of 2015, plaintiff attempted to take the LSAT to pursue her lifelong dream of becoming an attorney, but ultimately did not score well due to having no actual time to devote to studying as she was raising J.V. with no assistance of childcare[107].

128.    Plaintiff had a cumulative GPA from SCSU of close to a 3.875, yet plaintiff's LSAT scores were more considered "average" and did not reflect plaintiff's true academic capacity or abilities and were more the result of plaintiff not being able to study at all and taking the exam without any preparation.

129.    Plaintiff decided to temporarily abandon her goal of being an attorney and decided to focus on trying to obtain full-time employment instead.

130.    Plaintiff also was in an extremely abusive domestic violence situation with defendant Viglione who subjected plaintiff to physical violence and domestic abuse before, during, and after her pregnancy with J.V.

131.    Plaintiff stayed[108] with Viglione in spite of the abuse due to the fact that plaintiff had nowhere else to live and was unable to financially support herself on her own.

132.    Viglione was arrested on strangulation charges and a protective order was put in place to protect plaintiff. Plaintiff was also able to get a temporary restraining order through the New Haven Superior Court which was ultimately extended for over a year[109].

---

[107] Plaintiff attempted to apply to Defendants Yale University School of Law, Quinnipiac University School of Law, and University of Connecticut School of Law in 2015 and was not admitted at any law school in the state.

[108] Eventually, plaintiff finally called the police in April of 2016 to report the abuse after Viglione violently strangled plaintiff and threatened to murder her while in the presence of their then nineteen-month-old daughter J.V. before fleeing the scene.

[109] Viglione was prosecuted on the domestic violence charges and was convicted. Plaintiff established that she would have sole legal and sole physical custody of J.V. as of 2016 and has maintained said sole custody of J.V. to this day.

133.    Plaintiff was able to eventually purchase a home in December of 2017 in the Town of Orange where she was able to provide a stable home for herself and J.V. without the financial help of a man for the first time in her life.

134.    Plaintiff eventually met Lodice as he was a former coworker of hers and plaintiff became pregnant with A.L. unexpectedly in September of 2018.

135.    Lodice was enraged when he learned of plaintiff's pregnancy and stated that it would be in everyone's best interest, particularly that of his sons D.L. and S.L., if plaintiff were to abort A.L. in lieu of going through with the pregnancy[110].

136.    A.L. was born in May of 2019 and the state of Connecticut initiated a support action against Lodice as a result of A.L. and plaintiff receiving SNAP and Husky assistance through the State of Connecticut and a court date was scheduled with the IV-D magistrate support court at New Haven Superior Court to be heard on November 5, 2019.

137.    During this time, Lodice was also on probation as he was arrested in December of 2017 for two counts of felony risk of injury to a minor for leaving D.L. and S.L. alone while he went out with a former girlfriend for the day.

138.    Lodice was convicted in 2018 of reckless endangerment after taking an Alfred plea in order to avoid going to trial on his felony risk of injury counts.

139.    Defendant Lodice also admitted to participating in an insurance fraud scheme in which he intentionally set a fire in Trunc Pho, a restaurant he managed located at 1015 Meriden Rd, Waterbury, CT 06705 which his girlfriend Xuyen Le owned.

---

[110] Plaintiff and Lodice were never in a relationship and never officially lived together. Lodice made it clear that he was not interested in any type of romantic relationship with plaintiff and that if plaintiff insisted on keeping the baby that he would attempt to get along with plaintiff but that he would never be interested in a relationship or marriage or anything more with plaintiff.

140.   Defendant Lodice admitted, on numerous occasions, that due to the failing business that he and Le were operating, that he intentionally set a fire in order to collect on the insurance policy that Le had on the business, rather than watching the business fail to bankruptcy.

141.   Lodice admitted that he and Le collected a sizeable amount in insurance from the scam in which Lodice intentionally set the building ablaze in order to start the fire. Lodice also has admitted to being involved in organized crime and having associates within the Albanian and Italian American mafias and LCN, among others.

142.   Lodice has been abusive toward many women in the past including Xuyen Le, Monica Perez, and others, and was ultimately found to have substantiations of abuse/neglect with the Connecticut Department of Children and Families due to the incident in December of 2017 involving his two children with defendant Perez.

143.   Defendant Perez repeatedly made multiple statements under oath and under penalty of perjury in which she stated that Lodice was abusive toward both her and the children and that he was a domestic abuser.

144.   Defendant Lodice subjected plaintiff to a cycle of abuse, harassment, and mental torture in an effort to exert coercive control over her.

145.   Defendant Lodice would regularly subject plaintiff to insults, sexual harassment, psychological abuse, emotional abuse, and financial abuse. Many defendants named in this action were aware of the ongoing abuse and remained silent and assisted Lodice in covering up his crimes.

146.   Defendant Lodice would regularly try to use money, gifts, and bribery to try to "apologize" to plaintiff, with an ongoing cycle of abuse that intensified over time.

147.   Defendant Lodice would demand sexual favors with an insatiable appetite for sex, and would regularly sleep with multiple women and at times forced plaintiff to watch him have sexual intercourse

with at least two separate women and former friends of plaintiff while in plaintiff's own home.

148.    On numerous occasions, defendant Lodice forced himself upon plaintiff and recorded sex acts without plaintiff's knowledge or consent. Defendant Lodice also recorded multiple sexual encounters with other women without their knowledge or consent, as well.

149.    Defendant Lodice threatened plaintiff with bodily harm on numerous occasions, stalked plaintiff, and subjected her to sexual harassment, and harassed any and all subsequent partners that plaintiff attempted to be with.

150.    If plaintiff attempted to seek police or judicial intervention for relief from Lodice's abuse, he would regularly threaten plaintiff with bodily harm and further financial abuse. Defendant Lodice would regularly brag about the firearms he has, claiming that he has at least one AK-47 semi-automatic weapon that he "hid from the police".

151.    Defendant Lodice has a long history of severe alcoholism and substance abuse, as well as domestic violence and threats against his romantic partners.

152.    Defendant Lodice has used his vast network of corporations and affiliated entities, including personal connections with state and municipal officers to control and torture plaintiff for more than five consecutive years.

153.    On October 2, 2019, Defendants Lodice and Perez appeared in New Britain Superior Court for a hearing on Defendant Perez's application for emergency ex-parte order of custody regarding concerns about Lodice's failure[111] to properly parent[112] their minor children defendants S.L. and D.L.

---

[111] Lodice was arrested numerous times for domestic violence offenses involving Perez and Perez's former fiancé, who Lodice regularly threatened.
[112] In accordance with court filings in New Britain Superior Court, Perez indicated that Lodice would tell her that she could only get child support if she had sexual intercourse with him, that he would only sign for the children to get passports if she had sexual intercourse with him, and that he threatened to sue the psychiatrist who was prescribing his son ADHD medication and forced Perez to seek an emergency ex-parte custody order to avoid the children having to abruptly stop the medication that they had been on for a long-term period of time.

154.    Josh Lambo[113] would also share footage and nude photographs of Defendant Jamie Hobart Lambo with Lodice, and Lodice possessed many nude photographs of Defendant Jamie Hobart Lambo on his computer that he alleged were sent to him and shared with him by Josh Lambo[114].

155.    Lodice repeatedly stated that, although he knew that Jamie Hobart Lambo disliked him due to his negative influence[115] on Lambo, that he chose to remain close to them and their circle due to their status as public, state, and municipal officials and ability to assist him in any criminal, civil, or family matters he was facing. Lodice repeatedly stated that it was Jamie Hobart Lambo, more so than Josh Lambo, who was "well-connected" within the state and able to misuse her authority and act under color of law to accept bribes on his behalf[116].

156.    On November 5, 2019, plaintiff and Lodice appeared for their first hearing in the IV-D magistrate court in New Haven Superior Court regarding the State of Connecticut opening a case seeking that he pay child support for A.L. since both plaintiff and A.L. had been receiving assistance from the state of Connecticut in the form of SNAP benefits and HUSKY health insurance coverage.

157.    During said hearing, Lodice repeatedly committed perjury and lied under oath and maintained that, despite his former boss providing a signed document that stated that Lodice was receiving a salary of $70,000/year, that he claimed to only have an annual income of $12,000.00 after tax deductions which

---

[113] On numerous occasions, Lodice also secretly filmed himself having sexual intercourse with Perez and other unknown women, none of which were aware that they were being filmed or that Lodice was sharing said footage with other defendants such as Josh Lambo.

[114] Lodice also would regularly discuss the affairs of Lambo and Jamie Hobart Lambo and regularly would bring up the fact that he chooses to maintain ties with the Lambo, Hobart, Rosa, Ingala, and other associates of said families due to their involvement as employees of DOC, law enforcement, state marshals, and other connections.

[115] Lodice would regularly mock and ridicule Jamie Hobart Lambo, particularly regarding the fact that she would regularly use her resources available as a former police officer for the Waterbury Police Department and a state marshal and daughter of a state marshal to be able to stalk and keep tabs on defendant Lambo who Lodice claimed was repeatedly unfaithful, including during a vacation when Jamie Hobart Lambo forced Lambo to return to Connecticut after cloning his iCloud and stalking him and seeing through his messages that he was going to pay a prostitute for sexual intercourse.

[116] Lodice would regularly spend every holiday and special occasion with the Lambo/Hobart/Rosa/Ingala family, even more so than his own family, and maintained that he wished to fit in with them as he felt that the protection he could receive from their intricate connectiveness with the state was enough to make the maintaining of ties with them a big priority for him.

were also falsely deducted from his schedule C in an effort to commit tax evasion and fraud.

158.   Lodice then also told the court that $8,000.00 out of his $12,000.00 annual income goes to Perez for child support for S.L. and D.L., and the court stated that he would be responsible for $30.00 per week in child support obligation to plaintiff as a result of his fraudulently represented income figures.

159.   Plaintiff stated that, as a coworker and manager of the company that Lodice worked for, that she was able to obtain concrete evidence proving that Lodice had perjured himself regarding his income, and the court stated that they would have to schedule a continuance date for plaintiff and Lodice to return for a "special hearing" to determine the correct amount that should be paid for child support.

160.   On November 7, 2019, 2 days later, plaintiff and Lodice then appeared again at New Haven Superior Court again for a date in Family Court, in which plaintiff had filed another action seeking orders defining custody and visitation for A.L.

161.   Ultimately, on November 7, 2019, plaintiff and Lodice were able to reach a mutual agreement on custody, visitation, and child support which was entered in as a final order, and the case went to final judgement on that date. It was ordered that Lodice and plaintiff would share joint custody and plaintiff would have primary residency of A.L. and Lodice's visits would be "worked out with plaintiff on a week-by-week basis" due to his erratic and unpredictable work schedule and his inability to commit to a regular schedule with A.L.

162.   From November of 2019 through June of 2020, Lodice continued to try to coerce plaintiff into a being in a relationship with him and even attempted to attend coparenting and relationship therapy sessions to try to save the relationship. Ultimately, there was no saving the relationship and Lodice stated he was permanently giving up on trying to be with plaintiff on Father's day of 2020.

163.    In December of 2020, Lodice admitted that he had been having an affair[117] with defendant

Maybeck, who was A.L.'s daycare teacher at defendant Woodbridge Child Center Inc., and was

supervised by defendants Lettelier, Purcell, and Moretti. Plaintiff became aware of this affair and the

fact that WCC was regularly allowing Maybeck to take A.L. home without notifying the center or

plaintiff.

164.    Maybeck ultimately ended the sexual relationship with Lodice after she was terminated from WCC

and after plaintiff removed A.L. from WCC due to the traumatic impact she suffered from the betrayal

of the center and Maybeck and the safety issues with the center allowing teenage employees to

transport infants and toddlers without the knowledge or consent of the parents.

165.    From January of 2020 through October of 2021, plaintiff did not send A.L. to daycare and instead

spent every day with A.L. herself and would bring A.L. with her to work on days she needed to be in

the office to ensure that A.L. was not being cared for in negligent situations such as the one she was

exposed to with WCC.

166.    In April of 2021, Lodice started his company, defendant Whole House Remodeling Company LLC

with the assistance of defendant Dicosmo providing him with a minimum of $10,000.00 in cash as an

initial startup investment to start the company. Lodice deposited this money in his personal bank

account and never reported it as business income.

167.    From April of 2021 through June of 2021, Lodice continued to try to beg[118] plaintiff to be in a

relationship with him, and he continued to try to bribe plaintiff and tell plaintiff he would pay her cash

---

[117] Maybeck was only eighteen years old at the time and Lodice was 37 years old. Despite the fact that Lodice was almost twenty years older than Maybeck and despite the fact that she was A.L.'s daycare teacher and was in a committed long-term relationship with another man, Lodice continued to have sexual relations with and pursue a relationship with Maybeck.
[118] When plaintiff attempted to tell Lodice that she was only interested in a coparenting relationship with him and that she did not want to continue sexual relations, Lodice became enraged and began to abuse plaintiff even more continuously verbally and emotionally.

payments daily plus child support if she agreed to let him live with her.

168.    In June of 2021, plaintiff and Lodice officially modified the order and created a schedule that they

both agreed on which was entered in as a final order of the court through a motion to approve the

agreement without a court appearance.

169.    In July of 2021, Lodice then gave plaintiff an ultimatum stating that she had two options: 1) agree

to be in a relationship with him and allow him to move back in with her in her home, or 2) Lodice

would "make sure" that he got sole legal and sole physical custody of A.L. by paying off members of

his family and friends who are state and public officials and would "make sure" that I would have to

pay *him* child support[119].

170.    From March of 2020 through September of 2021, Lodice also collected pandemic unemployment

compensation insurance while also acting as a full-time owner/operator of Whole House Remodeling

Company LLC and received a minimum of $800.00 in weekly unemployment income from the

department of labor which was funded by federal funding due to emergency COVID relief[120].

171.    New Haven child support enforcement services was taking plaintiff's child support directly out of

Lodice's unemployment benefit each week. Plaintiff only received child support in 2021 from that

which was directly a result of an income withholding from the DOL and CCSES. Lodice paid $0

willingly of his court ordered $120.00 per week child support obligation and $0 willingly of his 50%

childcare obligation per court order during this time.

172.    A.L. attended defendant Tiny But Mighty Childcare from October of 2021 until December 31,

---

[119] In August of 2021, plaintiff informed Lodice that she did not wish to be in a relationship and Lodice promised that he would take A.L. away from plaintiff permanently and that he would force plaintiff to have to pay him child support in retaliation for plaintiff rejecting his offer to be in a sexual cohabiting relationship.

[120] Lodice committed unemployment fraud and fraudulently collected unemployment benefits, SNAP food stamp assistance, and husky medical from defendant Access Health International Inc., all while the state of Connecticut, DSS, and CCSES ignored the fact that he had multiple bank accounts with various assets and that he was operating a lucrative construction operation in his name.

2021, when defendant Alexis Stamos stated that unless A.L. was able to receive a flu shot prior to December 31,2021, that she would be forcibly removed from the center due to the unconstitutional state law that states that children under the age of five must get an annual flu shot in order to attend care.

173.    Defendant Alexis Stamos stated that if A.L. did not receive this vaccine prior to the end of 2021 that she would be terminated from Tiny but Mighty Childcare. Defendant Preferred Pediatrics stated that they had no flu vaccines in stock and stated that the soonest that A.L. could get the vaccine was in March of 2022.

174.    As such, plaintiff was forced to remove A.L. from care at Tiny but Mighty due to the ultimatum of vaccination or termination that Stamos provided plaintiff.

175.    Defendant Lodice then committed perjury and stated under oath that Stamos terminated A.L. due to plaintiff allegedly "picking her up late" and stated that the vaccine was not the reason.

176.    Lodice testified under oath under penalty of perjury that Stamos terminated A.L. from the center due to plaintiff allegedly being late, when this was never once stated as a reason by Stamos to plaintiff or risk of being potentially discharged from the center.

177.    On December 28, 2021, Stamos stated "I would love to keep her but state regulations are what runs my business and having her in care without a flu vaccine is unfortunately not in compliance. I have reached out to my licensor, and she told me I need to comply with the regulations and I cannot accept any unvaccinated kiddos in care."

178.    In spite of this, Lodice testified under penalty of perjury that Stamos terminated the relationship between A.L. and Tiny But Mighty Childcare due to plaintiff and due to plaintiff's alleged tardiness.

179.    In December of 2021, plaintiff also filed a motion for contempt against Lodice in the New Haven Superior Court due to his nonpayment of child support and due to his failure to comply with the court-

ordered agreement that they had signed six months prior that was entered in as an order. A court date was set for February of 2022.

180.    Upon receiving notice that plaintiff had filed said contempt motion against Lodice, Lodice then proceeded to threaten plaintiff and tell her that he would no longer be paying any of the court ordered support or childcare to plaintiff and stated that he would instead be planning on taking sole custody of A.L. and removing his child support obligation and instead make it so plaintiff would "have to pay him child support."

181.    Lodice then did not pay any child support at all from December of 2021 until June of 2022[121].

182.    On March 9, 2022, Lodice appeared in front of Defendant Aguilar and again lied under oath and committed perjury and claimed that plaintiff had "abandoned" their then 2-year-old daughter A.L. Lodice brought A.L. with him to the court date, and the court allowed him to proceed with the minor A.L. present, despite plaintiff personally witness the court instruct litigants that minor children were not allowed in court proceedings.

183.    Aguilar made an exception for Lodice. Aguilar also gave Lodice legal advice on the record. She asked him if he wanted sole custody and instructed him as to which motions to file and what to in order to secure that and then continued the case until June 1, 2022.

184.    Plaintiff was approximately 10-15 min late to said hearing as plaintiff had an issue finding parking in order to attend court in New Haven Superior Court[122], which has no parking and is in the middle of a busy downtown city, unlike the Milford Superior Court[123] which is the proper court for plaintiff's

---

[121] The child support IV-D magistrate court date that was originally scheduled for February of 2022 was continued until March of 2022 and the family court date was continued until April of 2022.

[122] Plaintiff's rights have been repeatedly violated consistently without any sign of stopping in New Haven.

[123] Plaintiff had tried to transfer her cases to Milford on numerous occasions and was denied this right. Plaintiff has been repeatedly told that any and all of her cases can only be heard in New Haven JD, despite Lodice residing in Waterbury JD and plaintiff residing in the Ansonia-Milford JD.

JD.

185.    After Lodice lied and told defendant Aguilar that plaintiff abandoned A.L., plaintiff attempted to

tell the judicial marshal that she was there for the hearing and explained that she had the parking issue,

but Aguilar instead scolded plaintiff and told her that the hearing starts at the exact minute it is

scheduled for, and stated that she would have to wait three more months before the case could be

continued and stated that she intentionally continued it to June 1, 2022 so that they could first "get an

update from what happens in family court."

186.    On April 5th, 2022, plaintiff filed for a civil protection order against defendant Elizabeth Protzman

which was granted on an ex-parte basis.

187.    Plaintiff's CPO against defendant Protzman was then subsequently granted for one year after a

hearing in which plaintiff was able to successfully prove that defendant Protzman had been engaging

in stalking behavior.

188.    Defendant Protzman has continued to relentlessly stalk plaintiff, has created several fake accounts

to stalk plaintiff on all of her social media accounts, and has even gone so far as to befriend individuals

such as Lizelle Martin and Mark Wachter after seeing their name in court documents regarding

plaintiff.

189.    Defendant Protzman then accused an individual named Julian of raping her out of retaliation

because she was angry that he rejected her for a second date, wasted resources that she didn't need

and obtained a free attorney, and retained two separate attorneys to attempt to overturn the CPO, all

the while continuing to regularly speak with defendant Lodice in an effort to try to use her official

capacity as the director and employee of various nonprofits in the state of Connecticut to hinder

plaintiff's case against Lodice.

190.    On April 8, 2022, plaintiff appeared in front of Defendant Grossman for the first time ever, for a

hearing on an application for emergency ex-parte custody.

191.    Plaintiff filed said motion in February, however the motion was not scheduled to be heard until April 8th, 2022, despite it being filed as an emergency ex-parte motion and despite the law stating that said motions needed to be heard *no later than fourteen days after the application is filed.*

192.    On April 8, 2022, plaintiff and Lodice appeared in front of Grossman and plaintiff's rights were violated completely[124] and absolutely.

193.    On the same day, immediately after court ended, plaintiff then attempted to ask Lodice to reasonably work with her and pick up A.L. from defendant Antonellis's house instead of meeting at a gas station[125] as it said in the order from June of 2021.

194.    Lodice refused to make this reasonable modification to the pick-up location and instead stated that he would either meet plaintiff at the gas station or not at all and if plaintiff wasn't at the gas station that he would not be taking A.L. for his court-ordered scheduled weekend visitation[126].

195.    Plaintiff then contacted Defendant New Haven Police Department and attempted to document the issue. Lodice then wrote a statement against plaintiff in which he also lied under oath and claimed that plaintiff was doing and saying things that did not occur.

196.    Defendant Aviles of the New Haven Police Department then coerced plaintiff, gave her legal advice, and instructed her to write a statement but specifically told plaintiff to *only include information about the family court issue and not to include anything else about threats or anything else that I had already told him verbally.* Plaintiff followed these instructions and did as she was told

---

[124] See transcript from 4/8/22 hearing in NNH-FA-19-5046828-S
[125] Lodice had not met at that gas station in months, but as a form of abuse and coercive control he would pick and choose when to insist on meeting at "the gas station or nothing" and would say that if plaintiff was not at gas station that he would then file that she abandoned the child and take A.L. away.
[126] Lodice did this despite plaintiff repeatedly telling him that she had a work appointment in a different town at the same time and that A.L. was with Antonellis and not plaintiff.

116- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

by Aviles.

197.    On April 11, 2022, Lodice then began to taunt and laugh at plaintiff during an exchange of A.L. stating that plaintiff had a "warrant[127] for her arrest" and that he "couldn't wait for plaintiff to be arrested on the warrant" and that he "hoped that plaintiff would get locked up in front of him during their family court proceeding" so that he could "watch and laugh" and repeatedly said how it would be "so great."

198.    Plaintiff then attended a proceeding with Lodice the next day in New Haven Superior Court with defendant Price-Boreland. During said proceeding, Lodice and plaintiff met with family relations, signed an agreement, and agreed to modify their parenting plan/agreement.

199.    Price-Boreland stated that plaintiff would be permitted to have a hearing scheduled on plaintiff's motion to transfer the case to the Ansonia-Milford JD, however she then denied plaintiff's motion without giving plaintiff said hearing or scheduling it[128].

200.    Plaintiff was then arrested several weeks later on a warrant from the New Haven Police Department and charged with "breach of peace" and "false reporting of an incident" and, upon the advisement of Defendant Raniel Smith, retained defendant Zingaro, Cretella, & Rasile LLC after speaking with Defendant Gene Zingaro who then referred the case to Defendant Don Cretella.

201.    The New Haven Police Department and its associated defendant officers subjected plaintiff to excessive force by handcuffing plaintiff and placing her in a holding cell at 1 Union Avenue in New Haven, CT, when plaintiff had a PTA and no bond.

202.    New Haven Police Department and its officers and employees kept plaintiff in custody for several

---

[127] Plaintiff attempted to ask Lodice why he was insisting that she had a warrant and Lodice stated that he would not give plaintiff any more information. Plaintiff attempted to contact the New Haven Police Department who stated that there was no such warrant.
[128] Price-Boreland ordered that the parties were to only have contact within the OurFamilyWizard app and stated that neither party was to make any disparaging statements about the other party during said calls with A.L.

hours and used excessive force by forcing plaintiff to remain in a locked cage when plaintiff had no

bond for her release.

203.    New Haven Police Department and its officers and employees discriminated against plaintiff by

choosing only to arrest plaintiff and not Lodice, despite him engaging in criminal activity.

204.    Defendant Cretella was able to get the case "nolled" after plaintiff successfully completed an anger

management program that had been pre-approved by the New Haven Superior Court at 121 Elm street,

in New Haven, CT.

205.    The parties then appeared on June 1, 2022 for the continued IV-D magistrate contempt proceeding

in which defendant New Haven Child Support Enforcement Services was also present.

206.    Lodice was found in contempt[129] of court on June 1, 2022, after a hearing in which plaintiff was

able to successfully prove that Lodice had lied under oath, misrepresented his income and finances,

and that he was clearly capable of paying the order but still willingly chose not to pay.

207.    A purge was set on June 1, 2022, and Lodice was taken into the custody of the Department of

Corrections. Lodice was told that he would have to pay approximately $2200.00 to be released from

prison.

208.    Immediately upon being taken by the judicial marshals, Lodice then approached one of the judicial

marshals and attempted to solicit business from him. Lodice gave the John Doe judicial marshal a

business card for his business Whole House Remodeling Company LLC and said judicial marshal

immediately contacted plaintiff and informed her of such[130].

209.    Lodice continued to maintain that his connections with multiple other defendants named in this

---

[129] Lodice stated that he "did not have the money" but was still somehow able to pay the full amount and get released from prison after less than 24 hours in custody.
[130] Lodice never willingly paid anything else for the remainder of 2022 absent the purge and other involuntary interception of his state and federal tax returns. Lodice also continued to engage in money laundering, racketeering, bribery, fraud, wire fraud, tax evasion, and other crimes under federal and state law.

action gave him security and the ability to "pay people off" to "force them to do what he wanted" and

to "make sure plaintiff never saw A.L. or received any child support payments from him again."

210.    Lodice continued to tell plaintiff that if she resumed having sexual intercourse with him on a

regular basis that he would "call off all court motions" but stated that if plaintiff refused, that he would

"move forward with causing plaintiff to lose everything.[131]"

211.    Lodice also colluded with defendant Andrew Marshall in 2021, who also called the Department of

Children and Families on plaintiff and made a false report in an effort to harass plaintiff and try to

defame and slander plaintiff.

212.    Both Marshall and Protzman followed Lodice's instructions and made false reports to DCF to try

to get plaintiff to lose A.L. and J.V.

213.    Lodice also made his own false report to DCF in 2021 as well. All three DCF reports that were

made against plaintiff by Marshall, Lodice, and Protzman were all dismissed and found to be

unsubstantiated[132].

214.    On June 28, 2022, plaintiff appeared for the second time ever in front of Defendant Grossman for

a hearing on "pending motions" which included multiple motions for modification and contempt that

had been pending and all scheduled to be heard on the same date.

215.    Defendant Grossman showed extreme levels of bias during said hearing and denied plaintiff her

procedural due process rights and rights under the ADA and rights as one not represented by counsel.

216.    Plaintiff attempted to state on the record that she needed additional time to hire adequate counsel,

but Grossman denied plaintiff that right and insisted that plaintiff does not have the right to an attorney

---

[131] Lodice also colluded with defendant Elizabeth Protzman, who also called the Department of Children and Families on plaintiff in 2022 and made a false report in an effort to harass plaintiff and to try to defame and slander plaintiff. The report that Protzman made was unsubstantiated after an investigation by DCF.
[132] DCF consistently stated that they had no concerns of abuse or neglect by plaintiff and affirmed their opinion that plaintiff was entirely fit to parent both A.L. and J.V.

in a family proceeding.

217.   After this proceeding, plaintiff immediately filed a motion for disqualification of judicial authority, as well as a complaint against Grossman with the defendant Judicial Review Council.

218.   After filing said complaints, Grossman then began to retaliate against plaintiff and attempt to violate plaintiff's rights further.

219.   In August of 2022, after defendant Cretella had gotten the criminal case nolled for plaintiff, plaintiff had a consultation with Cretella regarding the possibility of him representing plaintiff in the family matter now that the criminal matter had been resolved in plaintiff's favor.

220.   Cretella stated that he was an experienced attorney who had been doing family law for "more than twenty years" and stated that he would "guarantee" that plaintiff would "never lose custody" and stated that he could "guarantee" that he could also get attorneys fees, a child support increase, and fix loopholes in the schedule with plaintiff and Lodice.

221.   Cretella stated that the only way that he would represent plaintiff was if plaintiff paid him a flat rate in full at the time of signing the retainer for $15,000.00.

222.   Cretella stated that everything[133] would be included through a trial and that he would guarantee the aforementioned resolutions.

223.   Plaintiff, who as a single mother of two that had not received child support in months, hired Cretella and put the entire amount[134] of the retainer on a credit card, as plaintiff did not have the funds at the time.

---

[133] Cretella stated that he could not guarantee that plaintiff could gain sole legal and sole physical custody of A.L. like she desired, however stated he could guarantee that he could maintain her having primary residency and joint custody and resolve the issues regarding loopholes in the schedule, attorneys' fees, child support, and arrears.

[134] As soon as Cretella got paid, he immediately started to make it clear that he was not willing to put any effort into actually helping plaintiff or doing anything that he said he would do. Cretella essentially committed fraud and extorted plaintiff for the $15,000.00 knowing plaintiff was afraid of what Grossman, who was showing clear bias, would do.

224.    Cretella told plaintiff that "complain or asking Grossman to recuse herself would only cause her to retaliate further" and stated that he has known her for more than twenty years, teaches as an adjunct professor with her at Quinnipiac University School of Law, and that he attended law school with her at QU School of Law[135].

225.    Plaintiff also provided defendant Zingaro & Cretella LLC and defendant Don Cretella with a substantial amount of evidence, documentation, and other proof that was supposed to help support plaintiff's claims in the case. Plaintiff also informed defendant Cretella of what her goals with the case were, and defendant Cretella stated that he can help plaintiff achieve them for the price of $15,000.00 flat rate.

226.    Plaintiff informed defendant Cretella that she wanted the court order to be modified so that if A.L. expresses that she does not want to have the daily phone call with Lodice that she would not be forced into it. Plaintiff also stated that she wanted to be able to modify the agreement so that she would be the sole decision maker for any medical or educational decisions for A.L.

227.    Plaintiff also informed defendant Cretella in writing that she wanted to modify the parenting plan so that on Greek Orthodox Easter that Lodice would be required to drop A.L. off to either plaintiff, plaintiff's mother, or a babysitter no later than 9:00AM on Greek Orthodox Easter Sunday.

228.    Plaintiff also requested that defendant Cretella represent her interest in that she wanted to modify the agreement so that it stated that Greek Palm Sunday would be spent with the plaintiff and so that it would be modified so that Lodice would be required to drop off A.L. either to plaintiff or to plaintiff's mother or a babysitter no later than 9:00AM on Greek Orthodox Palm Sunday.

229.    Plaintiff also informed defendant Cretella that she was seeking "sole custody since [Lodice] says

---

[135] Cretella stated that plaintiff would "be fine with Grossman" and stated he would be withdrawing the recusal motion and withdrawing plaintiff's motion to transfer.

he has no money for bills or food, can not fix his broken car, and claims that he can not provide for himself, or his three children." Defendant Cretella stated he was confident that plaintiff could achieve the modifications she was seeking with his professional assistance as her counsel.

230.    Plaintiff also informed defendant Cretella that Lodice had, on numerous occasions, posted publicly that he was at Home Depot looking at doors that were over $3,000.00 each and requested that we subpoena Lodice's Home Depot Pro-Tool Contractor account purchase record from Home Depot. Plaintiff stated that she was "sure he has spent an excessive amount of the last year and half since he started his business." Defendant Cretella claimed he would do these things, yet never did.

231.    Plaintiff also informed defendant Cretella in writing when she first hired him that Lodice had made several payments to the daycare in cash, such as a $200.00 cash payment made on 8/8/22. Plaintiff also informed Cretella that Lodice has paid "all payments to the previous daycare in cash, as well."

232.    Plaintiff also informed defendant Cretella that Lodice had taken her out to eat on 12/13/21 and pain in cash and had a large envelope filled with thousands of dollars in cash with him that day, as well. Lodice stated that the cash was a "deposit from a customer" before using some of it to pay for an extravagant dinner.

233.    Plaintiff also provided Cretella with information stating that Lodice also took her out to eat on 6/28/22 and that he paid for the meal in cash on that day, as well. He originally stated that he only had $40.00 to spend and told plaintiff she would have to pay for her own meal, but at the end of the meal he paid for the entire meal with over $120.00 in all cash.

234.    Plaintiff informed defendant Cretella that she had "tons of evidence that I need to sort through but that shows his ability to pay, and him talking about working, etc. I have a bunch of emails, texts, family wizard communications, etc. that I am still organizing and will give you, as well."

235.    Plaintiff also informed defendant Cretella that "several transcripts are ready. I would like copies

of each so I can go through them and highlight proof, etc." and explained the issue where Lodice

would "only bring [A.L.] home if the police force him, only follow the court order if there is a risk he

will get arrested, and only pay child support if he is incarcerated or forced."

236.   Plaintiff also stated that she "asked to suspend his professional license since he continues to work

and refuses to pay child support and that he makes approximately $20,000/month, per his statements."

237.   Plaintiff also informed defendant Cretella that Lodice was "lying about living in New Britain from

December 2021 through now. On 4/8/22 he said on the record that he lived at his moms. After I called

him out on the record, he admitted that he lied and [defendant Grossman] did nothing."

238.   Plaintiff also stated in her written communication to Cretella at the onset of their attorney-client

relationship the following:

> "since the last contempt I filed, I planned to file a new contempt for the following
> issues: I messaged him multiple times on 8/9/22 regarding issues with the daycare and
> his refusal to pay and he did not answer within 24 hours, messaged him multiple times
> on 8/8/22 regarding Angelina and he did not answer within 24 hours, messaged him
> multiple times on 8/4/22 regarding child support and he did not answer within 24 hours,
> messaged him on 8/5/22 regarding daycare and he did not answer within 24 hours,
> messaged him on 8/4/22 regarding his work schedule and right of first refusal and he
> did not answer within 24 hours, messaged him on 7/19/22 regarding the daycare and
> he did not answer within 24 hours, messaged him multiple times on 7/25/22 regarding
> his work schedule, right of first refusal, etc. and he never answered within 24 hours,
> messaged him on 7/24/22 and he did not answer within 24 hours, notified him of an
> important religious event that was to occur on 7/24/22 over a week in advance. The
> archbishop was in attendance and our child was scheduled for holy communion with
> her godmother, as well. He refused to bring her, despite being ordered to bring her to
> major religious events. He claimed that he called the church, but the church confirmed
> that was a lie, messaged him on 7/28/22 about child care and right of first refusal and
> he never answered within 24 hours, messaged him multiple times on 8/2/22 about his
> work schedule and coordinating right of first refusal and he never answered within 24
> hours, messaged him on 8/3/22 to ask him about his work schedule and coordinating
> right of first refusal and he never answered within 24 hours, messaged him on 8/4/22
> several times about A.L. and he never answered within 24 hours, messaged him on
> 8/2/22 regarding a medical appointment for A.L. and he never answered within 24
> hours, on 8/1/22, he refused to bring her to daycare per court order. He claimed she
> was sick, but also refused to take her to the doctor for a same day sick visit. He only

*brought her home after I said I would call the police if he didn't. He finally brought her after that. On two separate occasions he used her allegedly being sick as an excuse not to take her to school but also refused to bring her to the doctor for a same day sick visit to be seen, on 8/1/22 he made disparaging comments to me in the app calling me crazy and laughing at me when I tried to communicate with him, on 8/1/22 he did not respond to my message within 24 hours regarding bringing our child to the doctor. I sent him messages at 5:09PM, 5:08PM, and 5:01 and 5:07PM which he never replied to, on 6/28/22 after the mediator encouraged us to get lunch, he told me that if I started to have sex with him regularly again that he would give me 'whatever I want' and stated he would give me anything I asked for if I began engaging in sexual relations with him. He also kissed me and tried to grab me and gave me this ultimatum about payments, on 7/30/22 he refused to let me speak to the child at 7:00PM. I called multiple times, and he eventually threewayed the call with his fourteen year old son. My child stated to me that Matthew was not there, and that she was left alone with the fourteen year old D.L. to watch her. I was not given right of first refusal or allowed to speak to her after she stated that he left her alone with Dom. I called New Britain Police for a wellness check, however by the time they arrived over an hour later, they stated that Matthew was there, on 8/1/22 I messaged him twice and he refused to answer, on 7/30/22 I messaged him in the app and he never answered within 24 hours, on 7/30/22 he posted being at a winery with his girlfriend Cherish Sheehan during the time that he left the child alone with D.L., on 7/29/22 I messaged him about Angelina's doctor appointment and he never answered within 24 hours, on 7/28/22 I messaged him about right of first refusal and he never answered within 24 hours, on 7/28/22 my child stated that he screams and swears at her and repeated that he says 'are you fucking serious' and screams at her if she has an accident. I recorded her saying this."*

239.    Plaintiff also stated to Defendant Cretella that she wished to mirror certain terms from her agreement with defendant Viglione regarding their minor daughter, and stated that she wanted to modify her agreement with Lodice so that "the mother would have sole legal physical custody of the minor child A.L., the father shall have parenting time with the child every weekend from Friday at 6:00PM to Sunday at 6:00PM, if the father requests time off from parenting the child on the weekend for an event or work, he shall notify the mother 48 hours in advance. Said time shall be made up with a mid-week dinner between father and child from after-school until 8:00PM; drop off at the mother's residence, both parents shall be entitled to two (2) non-consecutive vacation weeks (seven (7) nights) each year. The parents shall give each other thirty (30) days notice of said vacations. Father shall provide a general itinerary including, but not limited to, hotel and travel accommodations. If the father

intends to take the child out of the state of Connecticut for said vacation(s) or a day-trip, he shall notify the mother."

240.    Defendant Cretella stated that he could easily achieve these goals, and stated that the $15,000.00 price tag he was charging plaintiff would be "well worth it." Defendant guaranteed that plaintiff could "never" lose custody.

241.    Plaintiff then appeared again in the magistrate court in front of defendant Aguilar who then, at the request of Cretella, chose not to hold Lodice in contempt for failing to pay any child support from June 1st of 2022 until September 1st of 2022.

242.    Cretella then served Lodice with a deposition notice and a request for production of documents in discovery and the matter was continued to November of 2022.

243.    In October of 2022, A.L. began making disclosures of sexual abuse and implicated that D.L. and S.L. were the perpetrators while she was in the care of Lodice during his parenting time[136].

244.    Defendant Yale Child Abuse Clinic conducted a "forensic interview" in which they immediately closed the police investigation and ended the interview after A.L. stated that she did not have any private parts.

245.    Plaintiff was told that the interviewer is "not allowed to ask the child any leading questions" during this interview and that the "interview is the same for all children ages of three through seventeen"

246.    After this, plaintiff was told she had no choice to resume sending A.L. to Lodice's home each weekend for unsupervised visitation[137].

247.    Cretella then marked off the motion for contempt for Lodice's nonpayment of child support as

---

[136] Upon advisement of defendant Lancia Blatchley who instructed plaintiff to contact DCF, plaintiff reported said abuse to DCF.
[137] Plaintiff followed the instructions of DCF, New Britain Police Department, and Cretella, and did as she was instructed without objecting.

well as the motion for modification to increase child support and told plaintiff that they would be continued to a later date, but in actuality marked them off entirely.

248.    Cretella also attempted to file for a motion for a GAL to be appointed to represent A.L. and cited the fact that plaintiff had attempted to get A.L. services through defendant BHcare which were blocked by Lodice as a reason for the court to intervene.

249.    Defendant Preferred Pediatrics also provided a letter stating the medical necessity of A.L. receiving treatment through a mental health professional.

250.    On December 1, 2022, Plaintiff then appeared with Cretella in front of Grossman again. Lodice failed to appear, but nobody held it against him in any way.

251.    Grossman then ordered that plaintiff had to sign medical protected releases to her mental health and A.L.'s mental health and DCF records and stated plaintiff would be punished if she did not comply.

252.    Plaintiff did as ordered and was thorough and made sure to include any and all providers she had seen in the five years immediately preceding that date. Lodice was told by defendant Dennis Reilly that he was required to also comply, yet he refused to sign releases.

253.    Defendant Grossman also stated on 12/1/22 that she would make it so plaintiff could "never file for a restraining order again" and stated that she wanted to "protect" Lodice from the burden of being taken to court on a restraining order application.

254.    Grossman's behavior has shown clear and absolute bias and prejudice against plaintiff that any reasonable person would see as contrary to the concept of an unbiased judicial tribunal.

255.    Lodice was not held accountable for refusing to show up for mediation, refusing to sign releases, or refusing to comply with request for production as served.

256.    Neither Defendant Grossman nor Defendant Griffin held Lodice accountable for this.

257.    Lodice also continued not to pay child support. No judge in New Haven Superior Court ever once

126- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

held him accountable for this.

258.    Defendant Gregory Gallo, who was renting Lodice an apartment during this time, continued to provide Lodice with off the record legal advice and use his connections with individuals such as Pellegrino, Grossman, Cretella, and other named defendants to allow Lodice to initiate a transaction in which Grossman "sold custody of A.L." to Lodice.

259.    On January 27, 2023, Lodice was arrested by the Orange Police Department on a warrant for harassment in the second degree based on a statement that plaintiff had written in November of 2022.

260.    Lodice posted bond and was released with conditions that stated he was not to contact, assault, interfere with, stalk, harass, abuse, follow, or harm plaintiff in any way[138].

261.    On January 29, 2023, Lodice violated the order by interfering with plaintiff and refusing to bring A.L. to her religious education class[139] at Saint Barbara Greek Orthodox Church in Orange, CT.

262.    At this time, there was a court order by defendant Grossman in effect that stated that Lodice was "required to bring A.L. to Sunday School and special religious events."

263.    After Lodice never showed up and did not bring A.L. or arrange for Bowers to bring A.L. to church, plaintiff then went to the Orange Police Department and made a report regarding the violation of conditions of release with Defendant Officer Lane of the Orange Police Department.

264.    Defendant Lane took plaintiff's written statement and issued a case number of 23-3324. Defendant Lane refused to make an arrest against Lodice and instead stated that he would simply call Lodice and ask him why he did not follow the court order and why he interfered with plaintiff in direct violation of his conditions of release.

---

[138] After Lodice was released, plaintiff was contacted by defendant Fernandes who informed plaintiff that Lodice indicated that he would have defendant Karen Bowers transport A.L. to Saint Barbara Greek Orthodox Church on January 29, 2023 so she could attend her mandatory religious education class pursuant to the family court order that was issued by defendant Grossman.
[139] Plaintiff was one of the Sunday School teachers for defendant Saint Barbara at this time, and plaintiff was also A.L.'s teacher and was assigned as one of the teachers to the three-year-old preschool class.

265.   Ultimately, defendant Lane refused to do anything and did not make an arrest against Lodice, despite there being probable cause and clear evidence that Lodice violated the conditions of his release.

266.   On January 30, 2023, Lodice was arraigned at the Derby court and a formal protective order was issued which stated that it was a full no-contact protective order but that it allowed for Lodice to "contact the plaintiff in the OurFamilyWizard app regarding the affairs and visitation of A.L" and for him to "initiate/facilitate contact with plaintiff for the purpose of contact with A.L." and that "exchange of the minor child must be pursuant to the most recent civil family order[140]."

267.   On February 1, 2023, A.L. began to make disclosures of sexual abuse. She was doing sexual motions on a stuffed animal and when plaintiff asked what she was doing, her response was "I am doing what D.L. does to me."

268.   Upon advisement of defendant Alexandra Warzocha, plaintiff then contacted DCF, who once again contacted defendant New Britain Police Department who then again assigned detective Steeves to the investigation.

269.   The New Britain Police Department, Cretella, and DCF all advised plaintiff not to send A.L. to Lodice for any of the weekend visits during the duration of the investigation[141]. The investigation commenced on February 1, 2023, and a forensic interview was scheduled for March 3, 2023, at Yale Child Abuse Clinic.

270.   Lodice continued to violate the protective order on numerous occasions beginning in February 2023 and running through July 24, 2023. Plaintiff reported over 100 violations of the protective order to multiple departments with solid proof in the form of video and audio recordings and witnesses. No

---

[140] The court put these terms in effect in contrast to what plaintiff had requested which was that exchanges be conducted by a third party and that the communication be strictly limited to the app.

[141] Plaintiff asked Cretella if he was going to be filing an emergency ex-parte motion to stop Lodice's visits and Cretella stated that it was "not necessary" and stated that "no judge would ever hold you in contempt for keeping your child safe."

128- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

police department was willing to arrest Lodice.

271.   In February of 2023, plaintiff attempted to contact her minor daughter A.L. while she was with Defendant Lodice, and Lodice repeatedly spoke to plaintiff on the phone in direct violation of the criminal order of protection that stated he was to have no contact with plaintiff outside of the OurFamilyWizard app.

272.   Lodice violated this protective order numerous times, including on one occasion[142] when plaintiff was in Middlebury, CT.

273.   When Plaintiff called to follow up afterwards, she was told by the Middlebury Police Department that the states attorney in Waterbury Superior Court stated that, despite plaintiff providing the police with a recording of Lodice violating the no-contact order, the court claimed there "wasn't any probable cause" to make an arrest and refused to charge Lodice[143] with the felony violation of protective order charge.

274.   On April 22, 2023, plaintiff received a message in a dating app "Tinder" from defendant Dylan Wingard, in which he made comments that were discriminatory based on stereotypes associated with wealth.

275.   Defendant Dylan Wingard also made statements that were based on intimidation that also admitted to corruption and the overall RICO scheme as it exists.

276.   During said conversation, plaintiff responded to defendant Wingard who has informed plaintiff that he typically spends his summers in "Nantucket" or "The Cape" to which plaintiff replied that "I

---

[142] Plaintiff recorded Lodice speaking to her on the call and went to the Middlebury Police Department and spoke to Defendant Gusto who stated that he would be applying for a warrant for Lodice's arrest for the violation of protective order. A report was made under case number 23-27033.
[143] This was part of a pattern where Lodice continued to violate the terms of the no-contact order but the police refused to make an arrest. This is an example of the discriminatory treatment that plaintiff has been experiencing when dealing with the police and asking for them to enforce the protective order.

haven't been to Nantucket ever" and that she had been to the cape "once".

277.    Defendant Wingard responded to plaintiff and said, "Never been to Nantucket and the Cape only

once??? Tsk Tsk....and yes last week was 100% a tease. Not fun being cold again all of a sudden this

past week."

278.    Plaintiff found that the exaggerated use of multiple question marks, the "tsk tsk" scolding and

condescending and judgmental comments of defendant Wingard were indicative of his bias against

plaintiff for being of a lower socio-economic status and essentially living in poverty.

279.    Defendant Wingard made it evident that he and his family are wealthy, and his attempts to brag

about his estate and the categorization of his family's net worth may have been an attempt at insulting

plaintiff and causing her emotional distress, as he is well aware that plaintiff typically applies for a fee

waiver and has seen plaintiff's financial affidavits and been present in plaintiff's IV-D hearings,

including on 6/1/22.

280.    Defendant Wingard even took it further and made additional comments to plaintiff in the dating

app and told plaintiff that the thing about the law is that it's "all about who you know" and told her

that "if people like you you're good" but said that "if they don't like you then you are screwed" which

to plaintiff seems almost as intimidation as defendant Wingard was well aware that defendant

Grossman "doesn't like" plaintiff as plaintiff had complained about this to defendant Wingard on

numerous occasions.

281.    On May 25, 2023, the parties appeared in front of Grossman for a hearing on "all pending motions"

after Grossman denied plaintiff's request for a continuance for additional time to retain replacement

counsel to replace defendant Cretella.

282.    During the hearing of 5/25/23, Grossman refused to allow plaintiff to be sworn in and only swore

in Lodice. Grossman also showed bias and preference toward defendant Cretella by saying "Okay.

Well, I'll remind you, Ms. Antar, that you were represented by a lawyer on the first day of this hearing, that your lawyer put on most of your evidence, called you on direct, put on that direct case. I have several hours' worth of testimony from you. Now I am going to take testimony from Mr. Lodice. Unless you have things that are maybe in rebuttal, there's probably not gonna be additional direct evidence from you." *See Transcript from 5/25/23 pg. 2, lines 10-15.*

283.   Plaintiff attempted to explain to Grossman that defendant Cretella had put on zero exhibits and no evidence during the previous hearing and requested additional time to retain replacement counsel.

284.   Defendant Grossman continued to deny plaintiff her rights and again stated "I want to be clear with you. . . . your lawyer put on your case. I don't know why you fired that very good lawyer between the last court date and today, but that doesn't get you a continuance or a do-over. So the case is gonna go like this: your—most of your evidence has already been presented to the Court through your counsel. Additional objective evidence was presented to the Court through family relations. Mr. Lodice needs today to put on his evidence and then we're probably gonna be done. So that's how this is gonna go."[144]

285.   *Rose v. Clark*, 478 U.S. 570, 577-78 (1986) held that "some constitutional errors require reversal without regard to the evidence in the particular case . . . [because they] render a trial fundamentally unfair."

286.   *Chapman v. California*, 386 U.S. 18, 23 (1967) also held that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as a harmless error.

287.   Grossman showed clear bias toward Cretella, her long-time friend, as well as toward Lodice.

---

[144] In accordance with *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), the court held that "although most constitutional errors have been held amenable to harmless error analysis . . . some will always invalidate the conviction." The decisions made by defendants such as Griffin, Jones, Grossman, Alander, Gould, and Tindill were clear violations of plaintiff's constitutional rights and cannot be seen as a harmless error and are invalid as such.

Lodice financially enriched Grossman, Cretella, and others such as Gallo either directly or indirectly through labor through defendant Whole House Remodeling Company LLC in order to "purchase" and "secure" custody of A.L. despite the fact that he was clearly unfit based on state, federal, and child protection laws.

288.    Defendant Cretella never introduced any evidence, despite plaintiff giving him a substantial amount of evidence.

289.    Family Relations never did anything other than misconstrue records that they got that all amounted to hear-say and that were misrepresented by Grossman.

290.    Defendant Grossman denied plaintiff several of her rights during the 5/25/23 hearing including denying plaintiff the right to a continuance to retain replacement counsel, denying plaintiff her right to equal protection, denying plaintiff the right to be heard, denying plaintiff the right against unlawful search and seizure, denying plaintiff the right against cruel and unusual punishment, and denying plaintiff the right to need to be proven unfit before terminating her access, care, and visitation with her minor child A.L.

291.    Defendant Grossman then forced plaintiff to go in the hallway during the hearing, and then instructed Lodice to immediately leave and go get A.L. from her school.

292.    Defendant Grossman showed severe prejudice against the plaintiff. *Arizona v. Fulminante*, 499 U.S. 279 (1991) held that the rule of per se prejudice or automatic reversal by differentiating between the concepts of "structural" and "trial" error: First, "structural defects in the constitution of the trial mechanism," 499 U.S. at 309. Then, there are per se prejudicial trial errors occurring "during the presentation of the case to the jury" *Id.* at 307, are subject to harmless error analysis. *Id.* at 307-08.[145]

---

[145] Also, in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court changed the standard that applies . . . for determining the harmlessness of constitutional 'trial' errors. However the court did not change, and in fact reaffirmed, its longstanding doctrine treating 'structural' errors as not subject to harmless error analysis and accordingly as prejudicial—hence

293.    Grossman then told plaintiff that she could "come back here in a week at 2:00PM" and told plaintiff

she was entering in a "temporary order" that plaintiff's "access with A.L. would be as determined by

the father in the presence of a supervisor designated by the father" and stated the parties would be

back in court on 6/15/23, which was actually three weeks away and not one week away.

294.    Defendant Grossman accused plaintiff of making false allegations of child abuse. Studies in the

United States have shown that, as Bandy Lee mentions in a letter published to a Grievance Committee

Member, "false allegations of child abuse are exceedingly rare (.1% to 2%)—and the problem of

underreporting more serious—family courts dismiss a vast majority of allegations as false, even when

there is credible evidence. This has resulted in a conservative estimate of 58,000 child victims being

transferred to their tormentors and rapists every year, resulting in hundreds of unnecessary deaths by

suicide or murder every year. The driver behind this is the billions of dollars per years in profits for

family court-connected actors, contingent on transferring child victims to their perpetrators

(misappropriation of public funds has also been implicated in the high levels of unreliable Child

Protective Services 'investigations,' with the involvement of family court)." See *Mental Health*

*Practitioners as Predators Facilitating False Diagnoses to Counter Abuse Allegations in Order to*

*Secure Custody Transfer of Children to Well Documented Abusers*

295.    In plaintiff's case, plaintiff reported that her minor child A.L. was alleging that she was being

sexually abused while in the care of her father defendant Lodice.

296.    Plaintiff had primary residency of A.L. for more than four consecutive years and defendant

Grossman abruptly and forcibly removed A.L. from plaintiff without any notice and without giving

---

reversible—per se: Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error
analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [ the
effect it had on the trial]." But, at the other hand of the spectrum of constitutional errors lie, "structural defects in the constitution
of the trial mechanism, which defy analysis by 'harmless error' standards." Also, the existence of such defects—deprivation of
the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process.

plaintiff any adequate opportunity to be heard. Defendant Grossman accused plaintiff of lying about the sexual abuse of A.L. and transferred sole legal, sole physical, and sole discretion of if or when plaintiff could ever see or speak to A.L. again to defendant Lodice as a cruel and unusual punishment toward plaintiff.

297.   Plaintiff never lied about the sexual abuse and has a significant amount of evidence to prove this. Plaintiff has over 70 videos in which A.L. describes, acts out, and discusses the extent of her being sexually abused. Defendant Grossman refused to allow plaintiff to show any of her evidence in court.

298.   Defendant Grossman determined that it was in A.L.'s best interest to be left alone unsupervised with defendant D.L. and to have no time or contact with plaintiff, and stated on the record that it was acceptable despite there being an open investigation into D.L. having sexually abused A.L. while in Lodice's care.

299.   In plaintiff's case, there is credible evidence that this is true, including several dozen videos of A.L. describing the abuse.

300.   A.L. has stated, on numerous occasions, that she has been sexually abused by both Lodice and his 17-year-old son D.L.

301.   Defendants such as Grossman, Tindill, members of the Lambo family, Rosa family, Ingala Family, Mina family, Gallo family, Strusky Family, Lodice Family, Perez Family, and other named defendants associated with them such as defendants Elizabeth Protzman, Mark Wachter, Ashley Gray, Andrew Marshall, and Gerald Viglione, have all colluded, acted in concert with one another, and worked together in an attempt to cover up the sexual abuse that has been occurring.

302.   On May 26, 2023, plaintiff then attempted to go to the New Haven Superior Court to file an emergency ex-parte application for custody of A.L. citing several shocking facts that were not discussed at the hearing on 5/25/23 due to Grossman violating all of plaintiff's rights and refusing to

134- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

allow plaintiff a chance to present any evidence or testimony during that hearing.

303.   Defendant Grossman then, in concert with other judicial marshals, clerks, judges, and other employees of the State of Connecticut Judicial System New Haven Superior Court at 235 Church Street, New Haven, CT, then committed overt acts in concert with one another to deprive plaintiff further of her rights.

304.   Plaintiff rushed to the court to try to get there prior to 5:00PM, since the unconstitutional rule that the state of Connecticut has that an emergency ex-parte application for custody must only be filed in person denies individuals their right to equal protection and forces them to have to comply with unrealistic expectations given the "emergency" nature of the application and the urgency involved.

305.   Plaintiff did not bring her wallet inside the clerk's office as plaintiff was not expecting to be required to pay for an emergency motion. Plaintiff attempted to file the motion, which she had prepared in advance and printed, and the clerk immediately told plaintiff that she would have to pay and purchase a "motion for modification" which she stated was $180.00 and told plaintiff that she would not be permitted to file the "emergency application for custody" without also simultaneously filing a motion for modification which was $180.00.

306.   Plaintiff stated she did not have the money and asked for a fee waiver. Plaintiff filled out the fee waiver application and put an accurate representation of her income at that time.

307.   Defendant Grossman then, within minutes, denied the fee waiver application, giving it back to the clerk and instructing her to inform plaintiff that the emergency petition could not be taken in unless plaintiff paid the $180.00 fee[146].

---

[146] This is again extortion by the judicial system. They stated that the fee waiver is available for those who can not afford it, and plaintiff qualified many times in the past, however Grossman would repeatedly deny plaintiff's fee waivers for no apparent reason and show extreme bias toward plaintiff and accuse plaintiff of lying about her income status, despite there being no evidence showing such.

308.   Plaintiff then stated she had her wallet in the car and asked if she could go get her credit card and come back in and the clerk told plaintiff if she stepped foot outside the clerk's office that she could not be allowed back in because it was a few minutes past 5:00PM and stated that under no circumstances would any of the judicial marshals permit her to reenter if she left.

309.   Plaintiff then had an ultimatum of somehow come up with the $180.00 without leaving the clerk's office or to leave and not be able to file the application[147].

310.   The clerk then took in the documents, and within minutes defendant Grossman immediately denied the emergency ex parte application, and the motion for modification and returned them back to plaintiff within less than two minutes, despite the ex-parte affidavit alone being more than ten pages long[148].

311.   Grossman then scheduled the court date for that motion for June 15, 2023, despite state law mandating that a denied emergency application for custody would by law need to be scheduled for a hearing "no later than fourteen days after the application is submitted" and extorted the $180.00 from plaintiff by forcing her to purchase an unnecessary motion for modification in order to file the motion she then immediately denied without reading.

312.   The defendant Judicial Review Council stated there were "no violations" of any of the code of judicial conduct or judicial canons or oath of office of Grossman, despite all of these blaring violations in the transcripts, audio, and record of the case[149].

313.   The Judicial Review Council has not updated any of their public information online in at least two

---

[147] After going back and forth for several minutes, plaintiff finally convinced the clerk to accept the numbers of her credit card without the physical card being present, and plaintiff paid the fee via credit card.

[148] Defendant Grossman didn't even read the application, but instead immediately denied the fee waiver and immediately denied the emergency application. Defendant Grossman then wrote in the order that the application was denied and put "Matthew Lodice has sole custody and Theodora Antar has supervised visitation."

[149] Defendant Kevin Dunn told plaintiff on multiple recorded phone calls that he believed Grossman was biased against plaintiff and that plaintiff's constitutional rights were clearly violated, but stated that it was "out of his hands" and that all he could do was "make recommendations to the council" but that he had "no authority to make the council do anything" and claimed that it was "completely up to their discretion" if and when they would make complaints.

years, however the most recent available statistics on their website claim that out of 78 received complaints that 78 of them were all dismissed.

314.    It seems unlikely that ***every single complaint*** would be meritless, and the Judicial Review Council consists of individuals who are all part of the same circles and help protect each other from any accountability.

315.    On May 31, 2023, Defendant Grossman entered in an order in plaintiff's NNH-FA-19-5046828-S custody docket in which she slandered the plaintiff, misrepresented the truth, and intentionally attempted to disparage and defame the plaintiff to obstruct justice and accept financial incentives from Lodice.

316.    Defendant Grossman then entered in orders on any and all other pending motions in the docket on that date, all of which said "ORDER: SEE ORDERS OF THE COURT RE: POST JUDGMENT MOTIONS DATED 5/31/23[150]"

317.    Defendant Grossman intentionally lied in the 5/31/23 order in an effort to obstruct plaintiff and to try to paint a negative image of plaintiff to try to damage her business, relationship, and ability to be involved in the life of her minor child A.L.

318.    Defendant Grossman knew that transferring sole legal and sole physical custody of A.L. to Lodice would result in plaintiff having little to no contact or access with A.L. as Lodice had made it clear that his goal was to terminate the mother-daughter relationship between A.L. and plaintiff.

319.    The actions of defendant Lodice and his associates constitute "state action" in that they were done under governmental encouragement of a private actor and joint activity and entwinement between the government and private actor defendants in this action.

---

[150] Defendant Grossman entered in identical orders to every motion that was pending in the file, despite none of them being heard or scheduled for hearings and referred any and all of the motions to orders directing to look at the 5/31/23 order. The 5/31/23 order slandered and defamed plaintiff so severely that plaintiff has suffered irreparable harm as a result.

320.    As in the precedent set in *Jackson v. Metropolitan Edison Co.*, it has been affirmed by the court that private actors can engage in public functions that are "traditionally associated with sovereignty" and that when this occurs, that state action is undoubtedly present.

321.    The plaintiff has suffered an injury in fact, as defined by the law, in the form of an invasion of many of her legally protected interests which are concrete and particularized, actual, and imminent.

322.    Plaintiff's injuries are neither conjectural nor hypothetical and the harm that plaintiff has sustained is irreparable.

323.    Further, there is a clear causal connection between the injury and the conduct complained of, and the injury is fairly traceable to the challenged action by the defendants and not the result of the independent action of any third party not before the court. It is also extremely likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision[151].

324.    Defendant Grossman violated the law by, without proving plaintiff unfit, forcibly removing A.L. from plaintiff's physical and legal custody and delegating the entirety of her judicial authority to Lodice and making the order completely unmodifiable and permanent.

325.    From 5/25/23 until 11/3/23, Lodice only allowed plaintiff less than 47 hours total with A.L. All judges that plaintiff has attempted to address this with during this time have maintained that it is perfectly reasonable and acceptable for Lodice to terminate all visitation, access, and contact between A.L. and plaintiff[152].

---

[151] Any past injuries also confer plaintiff's standing to seek injunctive relief in that plaintiff can clearly demonstrate that she is likely to be harmed again in the future in a similar way. Plaintiff has been personally injured by the actions of the defendants, is currently experiencing harm due to the defendants' illegal activity against her in the past, and currently faces a substantial likelihood of continued harm due to the illegal activity by the defendants in the future.

[152] All defendant judges, DCF employees, and others associated with A.L. have maintained that Lodice has the authority to terminate plaintiff's ability to have any contact, access, or visitation with A.L. and have encouraged Lodice to continue to isolate A.L. from plaintiff, despite plaintiff never having been proven unfit and never having harmed or neglected A.L. in any way.

326.     On 5/31/23, defendant Grossman also referred plaintiff's custody action to Family Services and assigned it for general case management with defendant Annamaria Baranowski.

327.     On June 15, 2023, plaintiff received an email from defendant Casey Brinkman from Connecticut Protective Moms from the email listed as CBrinkmanLegal@hotmail.com. She stated "Hi Theodora, I am with CPM advisory board and do high conflict coaching. Have you tried filing a recuse of Grossman? If not I would try to do so asap. I'm not an attorney. But I was very successful in a similar matter. Let me know how else I can help. Good luck, Casey Brinkman."

328.     Defendant Brinkman and Defendant CPM ultimately gathered information from plaintiff, and then blocked plaintiff from their group on Facebook "Connecticut Protective Moms" and offered plaintiff no help whatsoever.

329.     Plaintiff later attempted to contact CPM for help and was ignored on various occasions[153].

330.     Plaintiff had attempted to file a request for remote testimony for the hearing, as she is able to elect to do under CT Public Act 21-78 AKA Jennifer's Law, and defendant Grossman repeatedly denied plaintiff the right.

331.     Plaintiff attempted to reach out to several defendants, including WTNH news, which is owned by defendant Nexstar Media Group, and none of them showed up to the court to cover the violations of the law that plaintiff expressed.

332.     Plaintiff was forced to go to the courthouse that day, and was denied the right to testify remotely, which is a clear retaliation tactic designed to try to intimidate and cause plaintiff to feel threatened by defendant Grossman and other defendants employed at 235 Church street, New Haven, CT.

333.     Plaintiff also submitted a Motion for a change of venue in the custody action on 6/15/23 in which

---

[153] Plaintiff had cc'd the email address for Connecticut Protective Moms on an email sent out to several state representatives, senators, and other non-profit organizations seeking help and assistance on June 15th, 2023, prior to plaintiff's 2:00PM hearing.

plaintiff requested that the case be transferred to either the Ansonia-Milford JD or the Waterbury JD due to the fact that if the case remained in New Haven that it would be "prejudicial to [plaintiff's] interests that a fair trial by an impartial and unprejudiced court cannot be had in [that] court." Defendant Grossman denied said motion.

334.    On June 16th, 2023, Defendant Baranowski submitted a Notice to Court Family Services United that stated the following: "This matter was referred to Family Services by Judge Hon. Jane Grossman for General Case Management on 5/31/23. At this time Family Services is informing the court that: The matter is being returned to the court for further direction. Submitted by Annamaria Baranowski on 6/16/23."

335.    Defendant Baranowski also included a supplemental notice which stated the following: "On May 31, 2023, the Court ordered a General Case Management as follows: Family Relations will report to the court regarding the mother's statement that additional complaints of sexual abuse were initiated by her in May of 2023. Family Relations will attempt to speak with any person or provider familiar with this new complaint, including DCF, any police departments, and any medical providers including Hartford Hospital. The information gathered was presented to the Court on June 15th, 2023, in which Family Services was subsequently relieved of services. Respectfully submitted, Annamaria Baranowski, M.S., Family Relations Counselor II."

336.    Defendant Grossman failed to provide any "further direction" and instead deferred her judicial authority in its entirety to defendant Lodice.

337.    Plaintiff also contacted defendants Merit Lajoie, Mary Welander, James Maroney, and all of the non-profit organizations listed as defendants in this action on June 15th, 2023, and sent an email regarding the ongoing issue of her protective order not being enforced. Plaintiff's email was a direct response to prior communications between plaintiff and defendant Merit Lajoie, who had previously

stated that her role as the head of the defendant Office of the Victim Advocate was to address protective orders that are not being properly enforced by law enforcement.

338.    Plaintiff said the following in her email:

### _Problem with my protective order not being enforced and my rights as a victim being violated_

*On January 27, 2023, Matthew Lodice turned himself in on a warrant for his arrest for Harassment 2nd degree, and a full no-contact protective order was issued against him with me as the protected party. That protective order stated that Matthew could not interfere with me, stalk me, assault me, harass me, follow me, threaten me, contact me, etc. It had no exceptions.*

*On January 30, 2023, Matthew Lodice was arraigned in Derby Criminal Court in Derby, CT. A full no-contact protective order was issued on this date, with me as the protected party. The protective order states he cannot assault, threaten, abuse, harass, follow, interfere with, or stalk me. It says he must stay away from my home, cannot contact me in any manner, including by written, electronic, or telephone contact, and not to contact my home, workplace, or others with whom the contact would be likely to cause annoyance or alarm to me as the protected person.*

*It also states that he is allowed to contact me only in the OurFamilyWizard app regarding the affairs and visitation of our child. OurFamilyWizard is a parenting app that only allows for messages and does not include a call feature. The protective order also states that exchange of the minor child must be pursuant to the most recent Civil Family order. It also states that he is allowed to facilitate/initiate contact with me for the purpose of contact with our child in accordance with the most recent civil family order. He cannot have any direct contact with me outside of the app. This was confirmed through multiple transcripts of court proceedings in which the Judge Jones confirms that. This was also confirmed by Barbara Bellucci, victim advocate. Mr. Lodice has been harassing me for months by continuing to violate the protective order.*

*The transcript of the arraignment from 1/30/23 confirms that Mr. Lodice is not allowed to contact me. On page 1, lines 1-4, States Attorney Owen Kivella, Office of the State's Attorney, 106 Elizabeth Street, Derby, Connecticut, 06418 states "Matthew Lodice. This is not referrable to family services, Your Honor, and a full no contact. Mr. Lodice has an extensive DV history."*

*Matthew Lodice then committed perjury and stated on the record that "my ex, the person in this case, has filed for four restraining orders against me. All four were denied through court." (See transcript from hearing from 1/30/23, page 1, lines 6-10) At this point in time, Ms. Antar had filed for 4 separate restraining orders over the course of four years: 1 which was filed in December of 2020 1 which was filed in March of 2021, 1 which was filed in February of 2022, and 1 which was filed in November of 2022. Two*

*of them were granted by the court on an ex-parte basis, and one of them was dismissed for failure to prosecute for Plaintiff not showing up to the hearing. The statement that "all four were denied through court" is a lie, since 2 of the four were granted on an ex-parte basis by the court, and one of them was never even heard by the court. The records can prove that.*

*Matthew Lodice committed perjury a second time and also stated on the record that "She's called the cops 36 times on me. And the only one who was arrested was her for filing a false report." (See transcript from hearing from 1/30/23, page 1, lines 17-21) At this point in time, Ms. Antar had never called the cops 36 times on Mr. Lodice, and police records can prove that. Mr. Lodice's statement that she was "arrested for filing a false report" is also perjury as Ms. Antar was not convicted of any crime nor was she found guilty of any crime. Mr. Lodice states that she "filed a false report" and represents this as a fact, when this was never established by any court of law as fact.*

*Matthew Lodice committed perjury a third time during the hearing of his arraignment. On 1/30/23, Matthew Lodice stated on the record that "We have a custody case regarding our daughter coming Wednesday. And she's trying to muddy the water up and trip me up before that custody case comes." (See transcript from hearing from 1/30/23, page 1-2, lines 24-27) At this point in time, Mr. Lodice was well aware that an order had been entered by Judge Jane Grossman 4 days prior on 1/26/23 which was also sent to him via mail and electronically by counsel. The order #435701 dated 1/26/23 states that "The February 1, 2023 hearing is marked off." This was as a result of Ms. Antar's counsel filing a caseflow request which stated that the attorney wanted to request the 2/1/23 hearing to be marked off and rescheduled to the next available date because the "Defendant has not complied with the court order (entry #240.01) of 1/8/23. As such, Defendant has not provided the undersigned's office with the outstanding discovery needed to proceed with the scheduled hearing." Mr. Lodice lied under oath by stating that there was a custody case coming up on that Wednesday, since he was aware that the case was marked off due to his failure to comply with court orders and failure to produce discovery. He also lied by stating that "she's trying to muddy the water up and trip me up before that custody case comes" since Ms. Antar had filed the police report in November of 2022, and Mr. Lodice was not arrested until January 27, 2023. The police report that resulted in the warrant took three months almost to be served, which resulted in there being no possible way for Ms. Antar to have timed the arrest in conjunction with the hearing that he knew was marked off.*

*Matthew Lodice committed perjury a fourth time during the hearing of his arraignment. On 1/30/23, Matthew Lodice stated on the record that "Like, I won't be able to follow through the Judge's court order, too, because, like, I'm required to get a 7:00PM call— give her a 7:00PM call. I'm also required to drop her off with her mother at church on Sundays." At this point in time, there was no court order that required anybody to give a call. The order simply stated that "The nightly phone calls the child makes to the parent they are not with may occur at any time between 7:00 to 7:15." There was nothing in the court order that stated that Mr. Lodice was required to drop off the child to Ms. Antar's mother at church on Sundays. The order stated that "The court reiterates*

142- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*that under the existing orders the father is required to bring the child to special religious events and Sunday School." The order said nothing about Ms. Antar's mother. Mr. Lodice also failed to mention to the court that he was fully aware that Ms. Antar was the child's Sunday School teacher, and that he typically would be required to drop the child off directly to her, and not her mother, pursuant to the family order.*

*During the hearing of Mr. Lodice's arraignment, the transcripts also prove and show that Mr. Lodice and the court acknowledged that there was no contact outside of the app. The Judge, Scott Jones, asked Mr. Lodice "But based on what I see here, there is a reason—I mean, do you have a reason to have contact with her? Outside of having contact with her through the Family Wizard regarding exchange of the child?" Matthew Lodice responded by saying "Other than that, no. I don't have to. No." (See transcript from 1/30/23 pg. 4 lines 3-14)*

*Matthew Lodice committed perjury a fifth time during the hearing of his arraignment. On 1/30/23, Matthew Lodice stated on the record "Well, I do have to see her to drop off my daughter at church on Sundays, and I'm court ordered to do that out of Family court in New Haven." He directly contradicted his prior statement on the record in which he claimed that he was court ordered to drop the child off with Ms. Antar's mother. He then says he has to see Ms. Antar to drop off the child at church, which is also inaccurate, as he can easily drop her off without seeing Ms. Antar. (See transcript from 1/30/23, page 4 lines 17-24)*

*During his arraignment, Mr. Lodice also said that "I—look, I don't want to talk to her at all. I don't need to talk to her—" and acknowledged again that this order would not allow direct contact between the parties outside of the app. Judge Scott Jones then reiterates and says "you can't assault, threaten, abuse, harass, follow, interfere—all that stuff—which you're not going to have a problem with because you don't want to talk to her anyway...Right now, it just says you're allowed to contact the protected party regarding their child through the Family Wizard only and that might need to be tweaked. And exchange of child through a third-party. So, could the church exchange— occur through a third party?" (See transcript from 1/30/23, page 5 lines 10-27)*

*He then responds with perjury and says "It's not a church. She wants me to find someone to bring her there and I don't have anyone to bring her there. That's the issue. She's basically—she's trying to make it so I can't keep my end of, like, our agreement. So, this way, when we go to court, I have contempt motions against me. So, I'm trying to avoid getting contempt motions against me. So, like, I'm court ordered to bring her to her mother's church in Orange, I live in New Britain, every Sunday."*

*At this point in time, Mr. Lodice lies under oath by stating that "It's not a church" when he was well aware that the child attends Saint Barbara Greek Orthodox Church in Orange, CT, which is a church. He then lied under oath by stating that "she wants me to find someone to bring her there and I don't have anyone to bring her there."*

*Ms. Antar never once said she wanted him to find someone to bring her there and Mr. Lodice stated several times that he has many people, including his mother, who could*

*and have brought the child to church in his absence. His statements that "she's trying to make it so I can't keep my end of, like, our agreement" is also perjury and not based on fact. His statement that "I'm court ordered to bring her to her mother's church in Orange" also contradicts the statement he made minutes prior about "It's not a church" and is perjury in that nothing in the court order mentions Ms. Antar's mother. The church is the church that the child was baptized in and is an active member of, and Mr. Lodice is and was well aware of the fact that Ms. Antar was also baptized in and is an active member of that church, as well. His reference to the church as being solely that of Ms. Antar's mother and stating that he is court ordered to bring the child to Ms. Antar's mother's church is also perjury.*

*On 1/30/23, Matthew Lodice stated on the record when asked "who do you drop the child off with" that he dropped the child off "With her. With her or her mother. See, the problem is she's there sometimes, she's not there sometimes. So, if she's there, I'm going to be in violation. And I know, the second she sees me there, she's going to call the cops. She's going to do anything she could to trip me up. So, I'm—I want to avoid that as best as possible."  This was perjury, in that Mr. Lodice lied when he said "the problem is she's there sometimes, she's not there sometimes." He was well aware that Ms. Antar is a Sunday School teacher, and that she is there and required to be there every Sunday. He also said "if she's there, I'm going to be in violation" which is also perjury, because nothing in the protective order said anything about a 100 yard stay-away, and him simply being in the presence of Ms. Antar would not constitute a violation. His claims that "the second she sees me there, she's going to call the cops. She's going to do anything she could to trip me up" is also not based on fact. (See transcript from 1/30/23 hearing pg 6,  lines 1-27)*

*During the 1/30/23 hearing, the judge again makes it clear on page 9, lines 5-17 of the transcript that no contact outside of the app is permitted. He states "You got to stay— you can't contact her in any manner, including by written, electronic, telephone. Don't contact her home, workplace, school, or others with whom contact would likely cause annoyance or alarm. So, if contacting her mother for dropping off the kids is going to cause her annoyance and alarm, bring that to their attention. I have to do that in order to, you know—So, that contact is strictly for exchange of the child and issues related to the child. Maybe health, that kind of thing."*

*After a break in the proceedings, Judge Scott Jones then announced again the terms of the protective order on page 12, lines 3-21 of the transcript of the hearing from 1/30/23. He states clearly on the record to Mr. Lodice the terms, which are "You may not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person. You have to stay away from the home of the protected person and wherever the protected person shall reside. You cannot contact the protected person in any manner, including by written, electronic, or telephone contact. Don't contact their home, workplace, school, or others with whom contact will likely cause annoyance or alarm to the protected person. However, you are allowed to contact the protected party regarding visitation and affairs of your child in common via Family Wizard. And exchange of the minor child must be in accordance with—it says pursuant, but in accordance with the most*

*recent civil family order, whatever that most recent order is. Okay?" Mr. Lodice acknowledged this on the record and said "Okay." (See transcript from 1/30/23 hearing pg 12, lines 3-27)*

*Judge Scott Jones then continues and says "I signed this protective order. You're receiving a copy of it. Were you to violate it—you will be arrested and charged with a new offense that carries up to 10 years in jail and/or a $10,000 fine. Okay?" At this point, Mr. Lodice says to the Judge "Okay. So, if I call her at 7:00 P.M., like I'm court ordered allowed to do, I'm not going to have any issues calling my daughter at 7:00PM? Because that's one of the things, like—so, I'm court ordered to allow a call in at 7:00PM and I'm court ordered." (See transcript from 1/30/23 hearing pg 13, lines 1-8) He then says "Because I know she's going to try to call the cops if I do, and that's—I just want to be able to protect myself." Mr. Lodice then says "Matthew Lodice is allowed to contact the protected party regarding visitation and affairs of the child via Family Wizard. Exchange of the minor child must be pursuant to the most recent civil family order. That just says exchange of the child. It doesn't say anything about the call." At that point, Judge Jones said "It doesn't. You're right. Are there any other issues that you're going to come up with if I send you back?" Mr. Lodice then said "Just that and then the pickup and drop-off at the church on Sunday. I have to do in-person with her mother." This was perjury again because there was nothing stating that Mr. Lodice was required to do pickup and dropoff at the church on Sunday with Ms. Antar's mother. (See transcript from 1/30/23 hearing pg 14, lines 3-18)*

*The Judge then said "But this other one about the call, I believe you're right, and so—" At that point, the State's Attorney Kivela stepped in and said "Does Your Honor just want to write it in? I have no objection, if your Honor wants to handwrite something. (See transcript from 1/30/23 hearing pg 14, lines 23-27)*

*At this point in the hearing, the judge asks Mr. Lodice "And so, what is the issue, again?" Mr. Lodice replied and said "We're required between 7:00-7:15, we're required to allow and—either call or allow a call for our daughter's sake. So, my daughter can call her at 7:15. She can call me, and I can call my daughter vice versa. But it's court ordered that we have to have that call." The Judge then asked "So, then this is not through Family Wizard? This call—" Matthew then said "That's not through Family Wizard. That's why I'm—I want to make sure that I don't violate." The judge then said "So, if I put something like, in accordance with the civil family order—" and Mr. Lodice said "okay." Then the judge said "Does the civil family order speak to this call?" Mr. Lodice said "Yes." When asked by the judge what it says, Mr. Lodice said "It says very specifically we're allowed a call—we have to allow a call or call at between 7:00-7:15. I think they uses the word, facilitate a call." (See transcript from 1/30/23 hearing pg 15, lines 6-27)*

*The Judge then, in an attempt to accommodate the parties being able to speak to the child when with the opposite parent, says "So, Mr. Lodice is allowed to initiate contact with the protected party for the purposes of communication with the child in accordance with the civil family order. How about that?" Mr. Lodice said "yes. That would be*

145- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*perfect because then that covers—" The judge then said "And you're allowed to, not only initiate but receive a call from the protected party—" Mr. Lodice then said "yes, along with the—" and the judge then said "—to facilitate communication—" and Mr. Lodice said "For the daughter—for our daughter. Yup." And the judge said "—with the child in accordance with the—let me just—hopefully, I can remember that. Facilitate. Initiate. So, I wrote, Mr. Lodice is allowed to facilitate/initiate contact with the protected party for the purpose of contact with their child in common—or their child, in accordance with the most recent civil family order." (See transcript from 1/30/23 hearing pg 16, lines 7-27)*

*At this point, Mr. Lodice said "Perfect. Thank you, Your Honor." The Judge then told him "All right. And if I didn't finish advising you, if you violate the terms of this protective order then you will be arrested and charged with a new offense that carries up to 10 years in jail and/or a $10,000 fine." Mr. Lodice said "Yes, I understand." (See transcript from 1/30/23 hearing pg 17, lines 1-7)*

*Mr. Lodice then committed perjury by stating that he didn't plan on getting an attorney "Because I don't believe I need one. I haven't done anything—hurt—to harass her. I have proof that we've been seeing each other, talking to each other all along. I—" This is perjury. Mr. Lodice did many things to harass Ms. Antar. They also were not "seeing each other, talking to each other all along" with the exception of seeing each other for exchanges of the child and talking to each other regarding the child. He lied under oath and claimed they were seeing each other all along when that was not true. (See transcript from 1/30/23 hearing, pg 18, lines 3-6)*

*The statute of limitations for a felony is 5 years. Perjury is a class D felony. Violation of any term of a criminal order of protection is also a class D felony. A criminal violation of a protective order pursuant to §53a-223 "merely requires the issuance of a protective order against the defendant pursuant to §46b-38c(e)... and the defendant's violation of that order" (State v. Fagan, 280 Conn. 69, 76, 905A.2d 1101, 1107 (2006)).*

*Furthermore, the appellate court has stated that an intent to harass the protected party is not necessary, and merely an intent to perform behaviors which are prohibited by the protective order is sufficient in being deemed a violation. They stated that "regarding the mental element of the crime, 'we have explained previously [that] a violation of a protective order does not incorporate the specific intent to harass...All that is necessary is a general intent that one intend to perform the activities that constitute the violation.'" (State v. Binnette, 86 Conn.App.491, 497, 861 A.2d 1197 (2004), cer. denied, 273 Conn.902, 868A.2d 745 (2005)). (State v. Hasfal, 94 Conn.App. 741, 744-45, 894 A.2d 372, 375 (2006)).*

**Mr. Lodice has violated this protective order on numerous occasions since 1/27/23, all of which I have documented, as follows:**

146- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

1. *On 1/29/23, Matthew interfered with me as the protected party by refusing to bring the child to church for Sunday School. He interfered with my custodial rights, since the court order stated that is required to bring the child to Sunday School. He told the police on 1/27/23 when he was arrested that he would have his mother bring the child to her scheduled religious education class on 1/29/23. On 1/29/23, nobody showed up. I attempted to call his mother and left a voicemail on her home phone asking where the child was and asking that she call me back. His mother never returned my call. (See recorded call from this date as evidence) The child never was brought to the church. Thus, my custodial rights were interfered with, and Mr. Lodice denied me the right to exercise my scheduled parenting time with my daughter and interfered with our right to practice our religion pursuant to our constitutional rights and the court order which stated he was required to bring her there.*

2. *On 2/8/23, Matthew Lodice was trying to have contact with others to cause me annoyance/alarm by continuously asking our daughter on the phone if she was coming to see him that weekend and repeatedly telling her that she would be seeing him and his son, despite me telling him in the OurFamilyWizard app that she would not be there.*

3. *On 2/9/23, Matthew Lodice was trying to have contact with others to cause me annoyance/alarm by intentionally causing stress and anxiety in our daughter by continuously telling her that he would be seeing her that weekend despite me telling him in the OurFamilyWizard app that she would not be there.*

4. *On 3/29/23, Matthew Lodice interfered with me as the protected person by calling my child's school and telling them that she will no longer be attending the school, which caused her to then lose her spot permanently. He interfered with my custodial rights since our court order stated that all educational decisions must be made together, and he never asked me or consulted me before withdrawing her from the program she was in.*

5. *On 4/1/23, Matthew Lodice violated the no-contact order by speaking to me on the phone. I called Matthew's phone at 7:16PM so that I could speak to my daughter, pursuant to the most recent civil-family order. Matthew is ordered to have no contact with me outside of the OurFamilyWizard app. He is also ordered to allow me to have contact with my daughter while she is with him pursuant to the most recent civil order. Matthew never communicated with me in the app that my daughter was not with him. My daughter was at his mother's house. When I called, Matthew answered the phone himself and spoke to me directly and said, "hold on one second" He then said nothing, and I hung up. I then called back again at 7:03PM to try and speak to my daughter, and he spoke to me on the phone directly again and said, "hello can you hear me?" and then spoke to me again and said, "hold on one second". He then put the phone on mute and did not let me speak to my daughter. Then, at 7:07PM, I called back again to try to speak to my daughter. Matthew spoke to me again on the phone and said, "hang up right now? what?" "hello? the phone just said hang up right now. hold on one second." He never let me speak to the child, never communicated with me in the app that the child wasn't with him but continued to answer the phone and speak to me directly. (See 3 recorded videos from this date as evidence)*

6. *On 4/8/23, Matthew interfered with me as the protected person by interfering with my conversation with my child. He also violated the no-contact by speaking to me directly on the phone.*

7. *On 4/9/23, Matthew violated the term of exchange of the minor child being pursuant to the most recent civil family order by refusing to bring my child to a special religious event and Sunday School. This was Greek Palm Sunday. The order stated he is required to bring the child to special religious events and Sunday School and that he cannot interfere with me as the protected party. He interfered with my custodial rights as well as violated the term of exchange. He also violated the term of no interference as this interfered with my custodial rights at the time. He refused to drop off the child and refused to exchange the child pursuant to the most recent civil family order and refused to bring her to Sunday School and refused to bring her to a special religious event that she had scheduled on that day, as well. He forced me to drive all the way to his mother's residence in Waterbury, CT to pick up the child, and then he subsequently refused to pick the child up from me afterwards, and never came back to pick her up.*

8. *On 4/17/23, Matthew violated the protective order by having contact with others to alarm/annoy, harass, and intimidate me. During a phone call with the child, he told her "Well, soon enough…just like we talked about, maybe you'll be seeing daddy a lot more soon." The child didn't say anything and there was a pause. She then told him she wanted to finish watching her movie.*

9. *On 4/22/23, Matthew violated the protective order by trying to have third party contact with me and by having contact with others to annoy me and interfering during a phone call with my minor child. When I was speaking to my daughter, he says to her "tell mommy to shut her voice isolation off on the phone and you'll be able to hear it." I ignored him and attempted to speak to Angelina, who then said to me "can you shut the ice off on your phone" and Matthew continued to instruct her to act as a third party to contact me and said "no, tell her voice isolation." Angelina then got frustrated as he was trying to use her as a third party to communicate with me and said, "she won't say yes or no!" and Matthew then said, "don't worry then, just keep talking to her." He then instructed the child to hang up on me and forced her to hang up. I called back and told the child it wasn't nice to hang up on me and she said, "but dada told me to hang up!" (See recorded call from this date as evidence)*

10. *On 4/23/23, Matthew violated the term of the protective order that states that "Exchange of the minor child must be pursuant to the most recent Civil Family order." by refusing to pick up the child. He dropped her off at the church in the morning, and never came back to pick her up.*

11. *On 5/13/23, Matthew was interfering with the phone call by refusing to give the child the phone during the call. He was working in the other room and the child was in another room. When the child came back in the room, Matthew began to speak to Angelina to annoy me by speaking about how he was taking his son Sal to soccer lessons and how he paid for the soccer lessons for Sal, something he refuses to do for Angelina. Angelina*

*then, out of nowhere, says "Daddy said that I'm going to start living him with an only going to be with you sometimes. Daddy said that I will be living with him from now on. Do you remember when we were at church and dada tried to slam the door on you? I remember the police came to the church. I remember that. He can't slam the door on you." Then, Matthew began to laugh and kept trying to talk to the child during the call. He continued to laugh to mock and belittle me during the call when I was trying to speak to my daughter. He repeatedly attempted to interfere with the call and was commenting, telling the child to say things like "daddy never went to work today, he just stayed here" Matthew continued to interfere during the call and repeatedly tried to have third party contact with me by telling the child to "tell mommy this..." or "tell mommy that..." etc. The entire call was recorded. He interfered with the call repeatedly.*

12. *On 5/20/23, Matthew violated the no-contact term of the protective order by trying to have third party contact with me during a phone call with my child. This also caused me annoyance and alarm. Rather than messaging me in the OurFamilyWizard app, he instead said to my daughter during the call "Angelina, Ask mommy what time she is picking you up tomorrow."*

13. *On 5/21/23, Matthew violated the term of exchange being pursuant to the most recent civil family order by refusing to bring my child. He also violated the term of no interference as this interfered with my custodial rights at the time. He refused to drop off the child and refused to exchange the child pursuant to the most recent civil family order, and refused to bring her to Sunday School, Sunday School graduation, and refused to bring her to a special religious event which was a Pentecostal event that she had scheduled on that day, as well. I sent him several messages in OurFamilyWizard on this date asking him to bring the child pursuant to the court order, and he refused to do so.*

14. *On 5/28/23, Matthew attempted to harass me and cause me annoyance and alarm by threatening me with arrest. He also violated the no-contact order which says that conversations in the app must be limited to those regarding the affairs and visitation of our child. He contacted me in the app and stated that he was initiating criminal charges against me and stated that I had pending warrants for my arrest from New Britain Police Department. I then called and spoke to Sergeant Strzalka who confirmed that Matthew was lying to intimidate/scare me by making up fake warrants that did not exist. He confirmed that no such charges were pending.*

15. *On 6/4/23, Matthew Lodice tried to call my phone directly three times in a row. I did not answer.*

16. *On 6/4/23, Matthew violated the protective order and threatened me, stating that he would suspend all visitation between me and my daughter and told me that I can never see her again because we were at a dinner until 8:00PM. He stated we could stay there until 8:00PM, and then proceeded to threaten me with suspension of all future visitation and stated he was going to "press kidnapping charges on me." He demanded that we return the child to him, and then I informed him we would go to the New Britain Police Department to wait for him. He viewed my message in the OurFamilyWizard app at*

*8:41PM in which I stated we were at the police department and asked what his ETA was. He then refused to answer my messages and did not show up to get the child. At 9:52 PM, Officer Ryan of the New Britain Police Department contacted Matthew and Matthew stated that he could not come get the child because he did not have a functioning vehicle. I told Officer Ryan that if he did not come within 10 minutes that we would be leaving and going to sleep at my friend's house since he had abandoned the child. Officer Ryan then called Matthew back, and after having us wait at the police department from 8:40PM-10:00PM, Matthew finally showed up in his vehicle to retrieve the child. He told the officer he had no car, but then drove there in the car.*

17. *On 6/6/23, during a FaceTime call with my daughter, Matthew Lodice spoke to me directly in violation of the no-contact order. I called to FaceTime my daughter, and he immediately picked up the phone and was holding the phone so I could see him. I then said "Angelina" and he continued to look at me and then said to me "hold on one sec". I had previously asked him repeatedly not to speak to me during the calls that are for the sole purpose of me speaking to my child. He has been continuing to speak to me on almost every call with the child to cause me alarm, annoyance, harass me, and intimidate me. He has stated that he is above the law and that he can violate the no-contact order and that nothing will ever happen to me, which has caused me fear and alarm and caused me to be very intimidated and scared. He has tried to exert power and control over me for the past five years and has intimidated me in many ways by using coercive control. After he already spoke to me once, I again ignored him and attempted to say my daughter's name again by saying "Angelina?" Matthew then spoke to me directly again for the second time, and said "Hold on one sec I said." I then, again, tried to say "Angelina, where are you, I can't see you?" Matthew then continued to speak to me directly and said "I just said hold on one sec." attempted to cause me annoyance and alarm by taking the phone and staring at me repeatedly during the call to intimidate me. He then spoke to me multiple times directly on the phone while I was attempting to speak to my daughter.*

18. *On 6/8/23, Matthew violated the no-contact term of the protective order by speaking to me directly on the phone. He also ignored all my messages in OurFamilyWizard while he spoke to me directly on the phone, in direct violation of the protective order.*

19. *On 6/13/23, Matthew violated the no-contact term of the protective order by speaking to me directly when I went to pick up my child. When I attempted to get my child at 9:06PM, Matthew looked at me and said to me "please make sure she is back here in 30 minutes. She just went around the other side. 30 minutes she needs to be back." I messaged him in the app afterwards and said "I don't appreciate you once again violating the protective order by speaking to me directly. It was recorded and I will be reporting this to law enforcement. STOP talking to me outside this app. This is harassment." Matthew replied by telling me to "stop trying to get revenge."*

20. *On 6/17/23, Matthew violated the no-contact term of the protective order by speaking to me directly on the phone. He also ignored all my messages in OurFamilyWizard while he spoke to me directly on the phone, in direct violation of the protective order.*

150- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*21. On 6/17/23, Matthew Lodice violated the no-contact order by speaking to me on the phone. I called Matthew's phone at 7:33PM so that I could speak to my daughter, pursuant to the most recent civil-family order. Matthew is ordered to have no contact with me outside of the OurFamilyWizard app. He is also ordered to allow me to have contact with my daughter while she is with him pursuant to the most recent civil order. Matthew never communicated with me in the app that my daughter was asleep. When I called, rather than hand my daughter the phone, Matthew answered the phone himself and spoke to me directly and said "um, she's in bed already." I did not say anything at this time. He did not message me in the app, and instead spoke to me directly, in direct violation of the no-contact order. (See video recording from 6/17/23 at 7:33PM.)On June 21, 2023, plaintiff had a meeting with Defendants Shelby Summers, Dean Chill, and Rachel Reeves at The University of Connecticut School of Law in order to discuss issues regarding character and fitness for the Bar examination. During said meeting[154], defendants attempted to coerce and intimidate plaintiff and advised plaintiff that plaintiff should not accuse defendant Grossman of bias or lying[155].*

339.   On June 28, 2023, plaintiff attempted to go to the FBI office in New Haven, CT and gave the FBI

a statement about criminal activity involving Lodice. Plaintiff informed the FBI that she would also

be able to produce a flash drive with the evidence to back up the claims in the statement and told them

that the statement was something she wished them to review in the meantime[156].

340.   Plaintiff indicated that she would try to return and provided the agents with her phone number and

asked that they take the time to review her statement which was detailed and lengthy.

341.   Plaintiff did not have the opportunity to return and never heard back from the FBI regarding the

information that she did provide despite plaintiff informing them that there was a substantial amount

of information in the complaint that had never before been reported to any law enforcement agency.

342.   From June 28, 2023, through July 24, 2023, Lodice violated the full no-contact protective order

more than seventy times, all of which plaintiff recorded on video and audio. Plaintiff attempted to

---

[154] Plaintiff asked defendants how the appeal or lawsuit could potentially be used against plaintiff and Chill, Summers, and Reeves advised plaintiff that "no Bar organization in the country would ever admit" plaintiff due to character and fitness concerns based on the May 31, 2023, order that Defendant Grossman issued that included defamatory and slanderous information.

[155] Defendants Chill, Summers, and Reeves told plaintiff that if she complained, appealed, filed a lawsuit, or otherwise reported Defendant Grossman to the Judicial Review Council or any other disciplinary board.

[156] The FBI agent that plaintiff spoke to informed plaintiff that she could come back when she had the chance to meet with them to discuss and provide evidence and indicated that the best time to come was around 12:00PM-1:00PM in the afternoon.

report this to the police on numerous occasions, but officers from the Connecticut State Police Troop I Bethany, New Britain Police Department, Waterbury Police Department, Middlebury Police Department, Wallingford Police Department, New Haven Police Department, Woodbridge Police Department, and Milford Police Department all refused to arrest Lodice for violating the protective order.

343.    On July 24, 2023, after defendants Bellucci, Jones, Hillis, Barry, DeLeo, Grossman, and Lodice all conspired together to violate plaintiff's rights as a crime victim under state and federal law, Lodice's case was dismissed after plaintiff was denied the right to be heard or to have knowledge of a prior plea deal being offered to Lodice by the State[157].

344.    Plaintiff never authorized Hillis[158] to be involved in the State v Lodice case of which she was the victim, nor did she authorize him to attend in lieu of herself at the sentencing hearing which was never announced as a sentencing hearing[159].

345.    Lodice showed the court order that Grossman had written to Barry and she stated that, as a result of the order that Grossman imposed that completely slandered plaintiff, that she no longer was going to let plaintiff be a witness and stated that she "would not put plaintiff on the stand as a witness" and stated that she was calling plaintiff's credibility into question.

346.    As such, rather than issue a full nolle, the state of Connecticut completely dismissed Lodice's case, despite him having a long history of violent crime and criminal convictions involving defendants Perez, D.L., and S.L.

---

[157] Plaintiff received an email from Hillis, who was not representing her as the victim in the State v. Lodice matter, who attempted to intimidate and coerce plaintiff into "not objecting" to the state of Connecticut giving Lodice a conditional nolle for his harassment charge.

[158] Hillis told plaintiff, in an effort to intimidate her, that he "strongly suggested that she did not object to this" and stated that if plaintiff did that then maybe "she could ask the state to give her similar treatment in return in the very near future."

[159] Plaintiff was left completely in the dark and rather than help plaintiff, Hillis made ex-parte secret arrangements and deals with defendants Jones, Bellucci, and Barry in order to secure a full dismissal of charges for Lodice.

347.    On July 25, 2023, plaintiff contacted the Orange Police Department to report that Defendant Lodice was continuing to harass her during phone calls with her minor child A.L.

348.    Plaintiff supplied defendant Fernandes of the Orange Police Department with video evidence of the phone call in which Lodice attempted to beg plaintiff to speak to him, instructing plaintiff to "not be a child" and asking plaintiff to "just talk to him" repeatedly.

349.    Lodice did this while also knowing that there was a protective order in effect that barred plaintiff from having any contact with her outside of the OurFamilyWizard app. Plaintiff told Fernandes that she wished to press charges against Lodice for harassment and Fernandes told plaintiff that the case number would be 23-23037.

350.    Plaintiff asked Fernandes if he agreed that if plaintiff responded to any of Lodice's taunts during the call that it would be considered a violation of the protective order and Fernandes agreed.

351.    Plaintiff then asked Fernandes why, when she had made numerous statements to the Orange Police Department over the immediately preceding six months and supplied video evidence of Lodice speaking to her during calls, was he not arrested or charged with a felony violation of protective order charge[160].

352.    The Orange Police also told plaintiff that if she did the same, she would be arrested for a felony charge, which is a clear example of the discriminatory, misogynistic attitude that exists within the Town of Orange and the Orange Police Department[161].

353.    On July 26, 2023, Plaintiff attempted to contact the Orange Police Department again at 10:00AM

---

[160] Fernandes then claimed not to know why and stated that he thought the order was different at the time, however the order was exactly the same. When it was imposed on Lodice, the Orange Police department said he could speak to me as much as wanted in person or on the phone, so long as it was about our child.
[161] The Orange Police Department fails to properly train their officers and the Town of Orange, and first selectman James Zeoli fail to ensure that the public is safe from emotional and physical harm and threats such as domestic violence as defined under state and federal law.

and attempted to speak with Officer Ray LaPlante. Officer LaPlante did not answer and refused to provide law enforcement services to plaintiff out of retaliation and discrimination and violation of rights under color of law.

354.    This is consistent with the ongoing pattern of discriminatory acts and omissions of the defendants who are or are associated with the Town of Orange and the Orange Police Department.

355.    Plaintiff has been experiencing ongoing and relentless discrimination, retaliation, and deprivation of rights at the hands of the named defendants who are or are associated with the Town of Orange.

356.    On August 30, 2023, plaintiff attempted to call the Milford Superior Court to inquire whether or not her filing was received via fax and spoke to Defendant Clerk Magdala who claimed that the court "doesn't confirm faxes" and claimed that she was unable to confirm whether or not plaintiff's filing was received via fax[162].

357.    Plaintiff then asked Magdala to transfer her to someone who was in the Milford clerk's office and Magdala gave plaintiff an extremely difficult time and put plaintiff on hold and demanded that she provide the docket number first rather than just transferring plaintiff to the office like she requested.

358.    On August 31, 2023, plaintiff attempted to contact the Derby GA court clerk's office and spoke to Defendant Linda Doe. Defendant Clerk Linda refused to provide plaintiff with her last name and claimed that there was no supervisor available or present to speak with plaintiff regarding plaintiff's concerns.

359.    Defendant Clerk Linda Doe then proceeded to give plaintiff faulty legal advice and advised plaintiff not to file an appearance in the case, was extremely hostile and rude to plaintiff, and claimed that plaintiff's motions had not been received by the court, despite plaintiff receiving confirmation

---

[162] This was in spite of the fact that plaintiff had already received a fax confirmation for a different filing on the same day and had received fax confirmations from the court on numerous past occasions, as well.

that they had[163].

360.    On September 21, 2023, plaintiff attempted to file a new lawsuit against defendants Gray and

Wachter for their role in conspiracy to make false statement and lie under oath and commit perjury to

try to harm plaintiff.

361.    Plaintiff went to the Milford Superior Court at approximately 5:00PM on September 21, 2023, and

provided Defendant Jane Doe Clerk[164] of the Milford Superior Court with plaintiff's fee waiver

application, summons, and complaint to initiate a new suit.

362.    The clerk then took the paperwork. Plaintiff repeatedly asked the clerk and then confirmed multiple

times that the clerk would sign the summons regardless of if the fee waiver was granted or not and the

clerk said yes.

363.    However, the clerk never signed the summons. Under P.B. 8.1, the clerk is required to sign the

summons. The clerk intentionally refused to sign the summons and lied to plaintiff and told her that

she would sign it and never did. Even after state marshal Robert Miller brought the paperwork to the

Milford Superior Court and paper-filed the paperwork, the clerk still did not at any point sign the

summons despite stating that she would[165].

364.    On Sunday October 8th, 2023, at approximately 4:38PM, plaintiff attempted to contact A.L. via

FaceTime and defendant Lodice was extremely hung over, appeared to be under the influence of

alcohol and/or drugs, and was so inebriated that he could not even get up out of bed to give A.L. the

phone.

---

[163] This is characteristic of the ongoing bias, unequal treatment, and other negative experiences that plaintiff has encountered by the defendants, especially when dealing with those working within the state of Connecticut judicial branch.
[164] Said clerk then took plaintiff's application and told plaintiff that she would sign the summons and that the fee waiver application would be ruled on by the judge and that plaintiff would get the complaint, clerk signed summons, and fee waiver application with decision back in the mail in a few days.
[165] This is evidence of the ongoing systematic pattern of intentional obstruction of justice and violation of plaintiff's constitutional rights to equal protection and to due process under the fourteenth amendment of the United States Constitution.

365.   As the call progressed, A.L. then began to scream out in pain saying that her "butt hurt" and that her "stomach hurt" as she grabbed her private area and screamed in pain.

366.   Plaintiff then contacted the Waterbury Police Department and requested that they conduct a wellness check on A.L.

367.   Upon arrival, the Defendant Matthew Lodice refused to open the door for authorities and they subsequently kicked the door down by force.

368.   Lodice was then arrested and charged with felony risk of injury to a minor and resisting arrest/interfering with an officer for his failure to comply with a wellness check on the minor child A.L..[166]

369.   The Defendant Karen Bowers fraudulently forged documents to the hospital stating that she was the "legal guardian" of the minor child A.L., despite her having no legal rights, visitation, or custody with the child.

370.   The actions of all of the defendants combined allowed for the minor child A.L. to be then taken in for medical treatments without plaintiff's knowledge or consent, all of which plaintiff is still waiting to receive records on as plaintiff now has to prove to the defendant Saint Mary's Hospital that she is in fact the legal guardian of her child.

371.   On October 9th, 2023, at 6:20PM, plaintiff contacted defendant Department of Children and Families care-line in order to report the ongoing neglect and abuse of A.L. and that she was continuing to be isolated from plaintiff and J.V..

372.   Plaintiff spoke with defendant Dave Carlson from DCF who took in plaintiff's report over the phone. Plaintiff informed Defendant Carlson that A.L. was being abused, neglected, and experiencing

---

[166] The Defendant Lodice was taken into police custody and nobody from DCF, The Waterbury Police Department, or any of its third-party vendors, employees, or other associated state actors or employees of Trinity Healthcare/Saint Mary's hospital ever contacted plaintiff.

medical and emotional neglect. Plaintiff also informed defendant Carlson about the ongoing concerns regarding sexual abuse and regarding the untreated sex addiction of defendant Lodice.

373.    Plaintiff informed defendant Carlson that defendants Lodice and Perez had regularly had sexual intercourse in the presence of their children defendants S.L., and D.L., and that on numerous occasions Lodice had secretly recorded these sexual acts[167].

374.    Plaintiff also emailed Carlson a 29-minute-long recorded video in which plaintiff's Facetime call with A.L. from the night of October 8, 2023, was shared which included A.L. screaming in pain stating that her "butt and stomach hurt" and showed Lodice clearly under the influence of alcohol and drugs while parenting A.L.

375.    Defendant Carlson was extremely biased during the phone call, attempted to state that there was nothing concerning about Lodice and Perez having sex in front of their minor sons, and stated he would "forward the report and evidence to his supervisors" and that he would "see if they would take the report in.[168]"

376.    On October 10th, 2023, plaintiff attempted to file an application for relief from abuse in the form of a temporary restraining order application which she filed via the remote TRO email TRO-CPO.Milford@jud.ct.gov.

377.    On October 10th, 2023, at 4:34PM, plaintiff then received an email from the TRO-CPO Milford Shared Mailbox that stated the following: "Please see attached order transferring the above-referenced TRO application to the Judicial District of New Haven at New Haven." The email then had an attached

---

[167] Plaintiff emailed Carlson with evidence including one video in which Lodice and Perez had sexual intercourse in Lodice's car while S.L. was in the back seat. At the end of said video, both Perez and Lodice speak to S.L. and affirm his presence.
[168] As of November 2, 2023, not one individual from the state of Connecticut Department of Children and Families has contacted plaintiff regarding any of the events from October of 2023. Plaintiff contacted Waterbury DCF who confirmed that there was an assigned case worker and an active investigation yet said case worker has never once contacted plaintiff. DCF has acted as if plaintiff does not exist.

order that stated the following: "The transfer of this case to New Haven would serve the interests of justice/promote judicial efficiency because the parties have a pending custody action regarding the applicant. Accordingly, the court, sua sponte, hereby transfers this case to the judicial district of New Haven. 443514 Judge Cherie G Phoenix-Sharpe."

378.     The plaintiff had specifically cited the gross violations of her civil rights by New Haven Superior Court, as well as indicated that there was a TPR case pending in Waterbury Superior Court for Juvenile Matters, which would take precedence over any custody action, yet the court still sua sponte transferred the action to New Haven.

379.     Plaintiff has the right to choose her venue and to file her TRO in the proper JD for her residence. Neither the plaintiff, A.L., or defendant Lodice reside within the bounds of the New Haven JD, and the court has consistently attempted to intimidate, harass, and inconvenience plaintiff by transferring her cases to New Haven at random.

380.     Defendant Cherie G. Phoenix-Sharpe has shown bias, participated in obstruction of justice, and knowingly attempted to hinder the justice and prosecution against defendant Lodice in an effort to further harm plaintiff and her relationship with her minor child A.L.

381.     On October 11th, 2023, plaintiff continued to experience increased levels of retaliation from the Orange Police Department. The Orange Police Department and associated officers have continued to try to show discrimination, bias, and deprivation of rights under color of law in the form of severe and targeted retaliation, including but not limited to on 10/11/23 at 9:23AM.

382.     On 10/11/23, Plaintiff attempted to exercise her right of venue choice in filing an application for relief from abuse on behalf of A.L. against defendant Lodice in the Ansonia-Milford JD in Milford

Superior Court[169].

383.    The New Haven Superior Court issued a notice on 10/11/23 stating that a docket number for the case had "been assigned to the case of *Angelina Lodice PPA Theodora F. Antar v. Matthew Lodice,* Docket No. NNH-FA-23-5058262-S."

384.    Despite plaintiff making multiple complaints with the Judicial Review Council, filing multiple motions for disqualification of judicial authority, filing an appeal, and citing Defendant Grossman as a defendant in this lawsuit, Grossman has refused to recuse herself from plaintiff's custody/visitation case[170].

385.    On October 16th, 2023, Defendant Grossman denied plaintiff's motion to reargue/reconsider with no explanation other than the word "DENIED". This is consistent with her pattern of denying, rejecting, and blocking any and all motions that plaintiff has

386.    filed from 5/25/23 to date.

387.    On October 18th, 2023, plaintiff received a phone call from the Suspected Child Abuse Network of Hartford Children's Hospital requesting that an appointment be made for A.L. to come in for an appointment based on the incidents of October 8th, 2023.

388.    Plaintiff scheduled said appointment for A.L. and then contacted Defendant Preferred Pediatrics in order to follow up to inquire when A.L. was scheduled to be coming in for a physical appointment for her annual checkup that was six months past-due.

389.    Defendant Vanessa from Preferred Pediatrics confirmed that A.L. had an appointment that same day of October 18th at 11:30AM.

---

[169] The case was immediately, sua sponte, transferred to New Haven against plaintiff's will. Plaintiff specifically requested in the application that it not be transferred to New Haven, yet it was still forcibly transferred.
[170] Defendant Grossman has continued to show bias and abuse her authority in an effort to obstruct justice and harass plaintiff, in direct violation of judicial canons, federal laws, and the oath she took as a judge.

390.   Plaintiff informed Vanessa that she planned to attend said appointment as it is her legal right to be present at A.L.'s pediatric physical, and plaintiff had not seen A.L. in two months due to Defendant Lodice's ongoing isolation and alienation of A.L.

391.   Vanessa stated that plaintiff could come to attend said appointment and informed plaintiff that she could also obtain records that defendant Renee Casey had previously stated plaintiff could obtain. Under Connecticut state law, even a non-custodial parent has the right to obtaining medical and educational records for their child[171].

392.   Plaintiff then began to get ready and prepared some snacks, toys, and other gifts to surprise A.L. with and plaintiff was happy to hear that she could possibly get a chance to be reunited with her minor child A.L. and be present at the medical appointment.

393.   Defendant Vanessa then called plaintiff back and informed plaintiff that she contacted defendant Lodice to inform him that plaintiff would be at the appointment and defendant Lodice immediately demanded that defendant Vanessa forbid plaintiff from attending.

394.   Defendant Vanessa stated that Lodice informed her that there was a "restraining order in effect" that allegedly prevented plaintiff from being present at the appointment for A.L.

395.   Plaintiff then informed Vanessa that there was no such restraining order in effect and reiterated the fact that she legally is allowed to be at the appointment and obtain medical records for A.L.[172]

396.   The Orange Police Department confirmed that the only order in effect was one which plaintiff was already aware of which only protected Lodice that did not state that plaintiff had to stay 100 yards away from Lodice and only stated that plaintiff could not contact Lodice outside of the parenting app OurFamilyWizard and that plaintiff could initiate/facilitate contact with Lodice for the purpose of

---

[171] See C.G.S. § 46b-56(e)).
[172] Defendant Vanessa then hung up on plaintiff, and plaintiff contacted defendant Orange Police Department to call and inquire whether any new restraining order protecting A.L. was in effect.

contact with A.L. and that exchange of A.L. had to be pursuant to the "most recent civil/family order[173]."

397.    Plaintiff then called Preferred Pediatrics back again and informed them that the Orange Police Department confirmed that only the aforementioned protective order that did not prevent plaintiff from having any contact or access with A.L. or being present at the appointment or obtaining medical records was in effect, and plaintiff stated that she would be coming to the appointment to see A.L. and wanted to make sure that was fine before going all the way there.

398.    Dione from Preferred Pediatrics then stated that was fine and plaintiff packed several snacks, toys, and gifts for A.L. and drove to the appointment.

399.    At 11:30AM on October 18, 2023, plaintiff attempted to walk inside the building to accompany A.L. to the appointment, and plaintiff noticed that Lodice's vehicle was nowhere in sight. Plaintiff assumed that maybe Lodice had canceled or rescheduled the appointment upon learning that plaintiff was going to be there.

400.    Plaintiff attempted to enter the office of Preferred Pediatrics, and the door was locked. Plaintiff then sat in the hallway and waited on a bench for a few minutes before seeing several other parents walk in, go to another door, knock a few times, and then get let in.

401.    Plaintiff asked a Jane Doe employee of Preferred Pediatrics if she had to enter from that door, and the employee stated that she would check in plaintiff and instructed plaintiff to continue to wait in the hallway.

402.    The plaintiff was then detained and subsequently placed under arrest by one or more officers the Milford Police Department.

---

[173] In accordance with the terms of this protective order, there was nothing that indicated that plaintiff was to have no contact with A.L., nothing that indicated that plaintiff could not be within a certain vicinity of Lodice, and nothing that indicated that plaintiff could not be present for A.L.'s scheduled appointment.

403.     Plaintiff was then arrested by the Milford Police Department and charged with felony violation of
protective order.

404.     The Milford Police refused to protect plaintiff's rights, used excessive force, and ridiculed and
mocked and taunted plaintiff in retaliation[174].

405.     Officers from the Milford Police Department then handcuffed and placed plaintiff in a police
cruiser for transport to the Milford Police Department.

406.     Officer Vakos of the Milford Police Department ordered plaintiff to turn around and put her hands
on the cruiser before kicking plaintiff in the leg and ordering her to spread her legs farther apart.

407.     Officer Vakos then physically touched plaintiff to unreasonably search her and then handcuffed
plaintiff with the handcuffs so tight that they left marks on plaintiff. Plaintiff had repeatedly stated that
her wrist was injured as a result of the door being slammed on her wrist by the Jane Doe employee of
Preferred Pediatrics, but defendant Vakos continued to yell at, berate, degrade, and demean plaintiff
with excessive force.

408.     While being transported to the Milford Police Department, plaintiff repeatedly asked that the
handcuffs be loosened and was told no. Plaintiff repeatedly asked for water and was told no.

409.     The Milford Police Department then continued to try to slander and defame plaintiff by posting a
press release immediately after plaintiff's arrest which claimed that plaintiff "violated a protective
order" and included plaintiff's name and address.

410.     The Milford Police Department then retaliated and harassed plaintiff further by posting additional
posts on their social media page which included plaintiff's mugshot and information about plaintiff's
arrest.

---

[174] Plaintiff repeatedly asked for help from numerous defendants in this action and they either denied plaintiff help or
intentionally harmed plaintiff to protect either Lodice or their own personal or financial interests or reputations.

411.   The Milford Police department attempted to retaliate against plaintiff, attempted to slander and defame her, and tried to embarrass her and cause harm to her and her business and property with their "Daily Press Release 2023" post from October 19, 2023, in which they posted on their Facebook, twitter, Instagram, YouTube, and TikTok pages a press release that claimed that an incident took place on 10/18/23 that they described as "Domestic Violence- Violation of a Civil Protection Order" and included plaintiff's name, race, sex, age, address, and false claims that the charge was a criminal violation of a civil protection order and that the bond was a PTA.

412.   The Milford Police department stated in this defamatory and retaliatory and false press release the following: On October 18, 2023, officers were dispatched to 88 Noble Avenue. The victim stated that they have a protective order against Antar, who was currently at the location. After an investigation, it was determined that Antar had violated the order. She was taken into custody and charged accordingly."

413.   The information posted on the internet by the defendant Milford Police Department is inaccurate, defamatory, retaliatory, and was done with the sole intent to embarrass and harm the plaintiff in an effort to retaliate against her due to their close ties with the defendants Lodice and his associates.

414.   The Milford Police Department continued to cause intentionally inflicted emotional distress upon the plaintiff by creating a video montage that they then posted to their social media pages that includes plaintiff's name, address, identifying personal information, and photo.

415.   The Defendant Milford Police Department has a strong history of discrimination against women, including with their mishandling of an investigation in December of 2022 that resulted in the death of a woman.

416.   The Defendant Milford Police Department has been using excessive force due to them being sued for their mishandling of the woman's investigation which resulted in her death, and they have now

adopted a policy of using excessive force due to their prior policy of negligence leading to a wrongful

death, lawsuit, and the termination of one of the officers involved.

417.    The Defendant Milford Police Department and defendant Vakos attempted to cause plaintiff

further harm by trying to add plaintiff's minor child A.L. as a protected party after arresting plaintiff,

in spite of plaintiff telling them that defendant Lodice had been using coercion to isolate plaintiff from

A.L. and emotionally abuse plaintiff.

418.    Defendant Lodice did not allow plaintiff to see her minor child A.L. for a period of three months,

and did not allow plaintiff to speak to her minor child A.L. for several weeks. Plaintiff had no ability

to know where A.L. was, if she is safe, or who she is with. None of the defendants associated with the

state of Connecticut have done anything to remedy this and have instead chosen to deliberately

obstruct justice at the direction of Lodice.

419.    Plaintiff was denied due process on numerous occasions, including on October 23,2023, when

Defendant Griffin refused to allow plaintiff to show evidence, did not allow plaintiff to cross-examine

Lodice, and engaged in numerous retaliatory acts, including denying plaintiff accommodations under

the ADA or VAWA.

420.    Defendant Griffin told plaintiff that it was completely reasonable for Lodice to withhold A.L. from

plaintiff for two consecutive months and it was completely reasonable for Lodice to terminate all

access and contact between plaintiff and A.L. and told plaintiff there is nothing wrong with Lodice

only giving plaintiff two days of visitation in a period of five months.

421.    Griffin stated that plaintiff has no rights and stated that, despite never being proven unfit, that

Grossman's orders gave plaintiff no rights and that Lodice was not coercively controlling or isolating

or abusing A.L. by isolating her from plaintiff and her sibling[175].

422.   Plaintiff has been told repeatedly also that now that she has filed this action that "no attorney will ever help her" and plaintiff has been denied access to ever get A.L. back.

423.   Plaintiff's rights have been grossly violated on all levels and now she is experiencing defamation, slander, and retaliation.

424.   Defendant Protzman then proceeded to slander plaintiff to others, such as Jessica Doe, who she then stated lies about plaintiff in retaliation for being named in this suit.

425.   Defendant CPM and Betsy, Casey, and Jill of CPM also publicly posted stating that they were not supporting plaintiff.

426.   Plaintiff asked every non-profit listed in this action for help. Collectively they have received billions yet not one was willing or able to help plaintiff. The same goes for the courts and DCF and all other defendants[176].

427.   DCF fails to adhere to guidelines set forth in federal laws such as CAPTA and VAWA and other federal laws which mandate their participation and involvement in cases that include investigations into the welfare of children[177].

428.   Defendant Grossman modified[178] plaintiff's custody/access/visitation agreement on 5/25/23 after

---

[175] Plaintiff has exhausted all remedies and the entire state of Connecticut and judicial system is biased against plaintiff and there will never be any appearance of an unbiased tribunal in any venue in the state of Connecticut due to plaintiff being "blacklisted" as several named defendant attorneys have claimed.

[176] The policies and procedures and practices implemented and utilized within the State of Connecticut does not protect children, encourages the likelihood of children continuing to suffer from abuse and neglect, and continues to misuse federal funding incentives.

[177] In spite of the defendant Lodice being a registrant on the DCF abuse and neglect registry for substantiations of neglect and abuse involving defendants D.L. and S.L., and despite his long history of violent crime and domestic violence, he was only released with a $1500.00 bond and as soon as he got out he proceeded to threaten to "have plaintiff arrested" if she ever tried to contact him, defendant Karen Bowers, or A.L. again.

[178] Plaintiff has not seen A.L. in 8 weeks straight, and prior to that only saw her for less than 2 total days in a period of 20 straight weeks. Plaintiff is considered to be a "fit" parent and has sole legal and sole physical custody of her minor daughter J.V. and has had said sole custody since 2016.

denying plaintiff her right to be sworn in, right to due process, right to counsel, right to cross-examine

the defendant, and right to speak and show evidence, and entered in an order that grants plaintiff no

"actual parenting time," i.e., no "care, custody and control[179]" of her child A.L. while also forcibly

separating A.L. and J.V. from each other and terminating their sibling relationship[180].

429.    Defendant Lodice has even gone so far as to inform his extended family members that the same

power can be conferred on to them at his command[181].

430.    Plaintiff has ***never had her parental rights terminated, never had her legal guardianship***

***terminated, and has always been the biological mother, primary caregiver, and legal guardian of***

***her minor child A.L.*** In spite of this, the State of Connecticut Judicial System, Defendant judges, and

other defendants have all conspired to continue to violate plaintiff's right to the care, custody,

education, and control of her minor daughter. Plaintiff's rights were never terminated. Plaintiff was

---

[179] See *Troxel v. Granville,* 530 U.S. 57(2000). Troxel v. Granville, 530 U.S. 57 (2000), was a significant case in the United States Supreme Court that dealt with the rights of parents to direct the upbringing of their children, specifically in the context of grandparent visitation rights. The case involved a Washington State statute that allowed any person to petition a court for visitation rights at any time and authorized the court to grant such visitation rights whenever visitation may serve the best interest of the child. The grandparents of two minor children petitioned for visitation rights under this statute, against the wishes of the children's mother, who was their sole legal parent. The mother did not oppose visitation entirely, but wanted to limit the amount of visitation. The Supreme Court held that the Washington statute was unconstitutional because it infringed on the fundamental right of parents to make decisions concerning the care, custody, and control of their children. The Court recognized that parents have a fundamental right to make decisions concerning the rearing of their children, and that the Due Process Clause of the Fourteenth Amendment protects this right. Justice O'Connor, writing for the plurality, stated that "the interest of parents in the care, custody, and control of their children - is perhaps the oldest of the fundamental liberty interests recognized by this Court." The Court emphasized the importance of deferring to parental decisions and providing significant protection for parental rights. The Troxel decision underscored the fundamental nature of parental rights but also acknowledged that states have a role in protecting the health and well-being of children, and that third parties may sometimes have interests in a child's well-being. However, any law that allows a court to override parental decisions must not do so lightly, and must give significant weight to the parents' choices. It is important to note that the decision did not establish a specific test for evaluating parental rights claims, and the justices wrote multiple concurring opinions expressing different views on how such cases should be analyzed. The decision left many questions unanswered, and the legal landscape regarding third-party visitation rights and parental rights continues to evolve.
[180] Plaintiff has not been able to have any contact with A.L. since 10/8/23, as Defendant Lodice, who claims that his official capacity and state authority comes from Defendant Grossman, says that he has the authority and power to terminate any and all contact, access, and visitation between plaintiff and A.L.
[181] Defendant Lodice instructed Karen Bowers to lie and say she was the legal guardian of A.L., and both Lodice and Bowers told the Waterbury Department Officer Seeger that plaintiff allegedly had "no legal rights" and was "not the guardian" of A.L.

never proved unfit[182]. Plaintiff has sole legal and sole physical custody of her 9-year-old child and has never had any substantiations of abuse or neglect.

431.   One of the biggest aspects of the RICO scheme is that the standard of proof in family court is a preponderance of the evidence standard, and the statutes on the "Best interest of the Child" standard in the State of Connecticut are unconstitutional[183].

432.   A big part of the scheme[184] is that the state, and all of its associated non-profit organizations and other tax-exempt entities, receive billions of dollars every year from the federal government, and many times they deny individuals like plaintiff any access[185] to the law at all[186].

433.   Furthermore, the DSS and CCSES fail to comply[187] with federal laws that mandate them to collect child support from noncustodial parents and to enforce orders for failure to pay, which allows them to continue to receive federal funding without actually using any of the money to help people obtain their unpaid support[188].

---

[182] Defendant Lodice has several substantiations of abuse, neglect, and criminal convictions, however the fact that he has now been charged with his third felony risk of injury to a minor charge is still not enough for the courts to allow plaintiff any access at all or any contact at all with her minor child.

[183] The defendant judges acted outside of the scope of the judicial authority and are not permitted to claim judicial immunity in any way. Plaintiff has an enforceable contractual right to sue the defendant judges in their individual capacities for breach of contract in which plaintiff is the beneficiary. Defendant judges such as Grossman have a contract with the social contract in which plaintiff is a beneficiary.

[184] The Memorandum of Understanding that the State of Connecticut has signed, as well as many of their administrative rules and policies, discriminate against mothers, women, those who are poor, and those who are uneducated or disabled. The State, and all associated defendants, have regularly and repeatedly engaged in conduct that violates the plaintiff's fundamental, constitutional, federal, and state law mandated rights.

[185] Plaintiff has only seen her minor four-year-old child for less than 2 days in 6 months, despite trying to file multiple motions for contempt, modification, emergency ex parte custody, motion to reargue. See NNH-FA-19-5046828S.

[186] Not only did Defendant Grossman violate every single one of plaintiff and her minor children's rights, but she did so strategically, in a targeted, orchestrated method that involved many of the defendants in this action and involved financial incentives offered by Defendant Lodice and Defendant Whole House Remodeling Company LLC, with the assistance of his strong connections with individuals such as Defendants Gallo, Lambo, and Jamie.

[187] CCSES discriminates and violates the equal protection and due process rights of recipients in that only those who have jobs "on the books" get the orders enforced, which creates an incentive for individuals such as defendants Antar and Lodice to avoid working conventional jobs and to instead work in self-employment in an effort to further commit fraud, embezzlement, tax evasion, and evasion of child support duties, all of which amount to obstruction of justice.

[188] For instance, the New Haven Child Support Enforcement Services stated that their policy is that even if a non-custodial parent is a business owner and has multiple business and personal bank accounts with thousands of dollars in available balances, that as long as they pay a minimum of $1.00 every 6 months, then NHCSES will not take any action to garnish said parent's

434.    CCSES and DSS work in concert with one another in order to protect and further their own

interests within the RICO scheme since only recipients who are receiving cash assistance in the form

of welfare payments through the DSS are able to get full enforcement of the orders[189], including

garnishment of bank accounts.

435.    Furthermore, the defendant DSS regularly will make access difficult[190] or impossible for those

seeking services. The RICO scheme is able to continue to be furthered in that these organizations such

as DSS and Husky receive federal funding incentives and grants from the federal government which

are designed to help low-income individuals who may need the resources[191].

436.    Plaintiff is involved multiple pending civil lawsuits at this time including in the Superior Court for

Juvenile Matters in Waterbury, CT regarding a petition for termination of parental rights of the

Defendant Lodice, a child support magistrate IV-D support suit in the New Haven Magistrate Court

in New Haven, CT, a custody/visitation case in the New Haven Superior Court for family matters, and

three appellate matters regarding the aforesaid suits and other related suits.

437.    Plaintiff is also involved in a pending criminal action[192] in the Derby Superior Court in Derby, CT

which Plaintiff has filed to remove to the federal district court based on extreme violations of

---

bank account for the arrears. However, this is unconstitutional in that it violates equal protection since those who have child support orders against those who are not self-employed are able to get wage executions implemented by CCSES.

[189] CCSES will garnish bank accounts and seize assets if the money is owed to the State of Connecticut, but if the money is owed to an individual who is not receiving cash assistance, CCSES does nothing to enforce the order, in direct violation of federal laws and incentives which fund their very existence. This is a RICO scheme which allows them to do little to no work and refuse to collect payments unless they are being directly reimbursed to the state.

[190] The regional offices often have lines out the door, with those working in the offices showing little to no interest in their jobs, which is a hallmark of the bureaucratic attitude of most employees who have the State of Connecticut as one of their employers.

[191] Not only does the State of Connecticut, by and through its agents, completely limit and create extreme obstacles and hurdles to those seeking its services, but they simultaneously further their RICO scheme by providing sizeable salaries and pensions to their employees complete with full state benefits, while many times denying indigent applicants services such as cash assistance or SNAP due to them exceeding federal poverty limits by amounts sometimes as low as $4.00.

[192] Plaintiff is involved in another pending criminal action in Milford Superior Court in Milford, CT which Plaintiff has filed to remove to the federal district court based on extreme violations of constitutional rights and an inability to enforce said rights in the state court due to the unprecedented and extraordinary nature of the circumstances surrounding the overall case and controversy.

constitutional rights and an inability to enforce said rights in the state court due to the unprecedented and extraordinary nature of the circumstances surrounding the overall case and controversy[193].

438.   Defendants, by their actions[194] as officers of the court in the above-referenced case, are endangering the lives of the minor children and Plaintiffs. Specifically, the Petitioner/Father is abusive to the parties' minor child, who will do anything to maintain his control of the situation[195].

439.   Defendants were cognizant[196] and knew beyond a reasonable doubt that their actions violated Plaintiff's constitutional rights yet continued to violate said rights in an effort to silence and prevent Plaintiffs from obtaining justice[197].

440.   Defendants have created an intricate web of corruption and infiltrated every court, every legal discourse, every media outlet, every so-called agreement, every educational institution and military institution, and other organizations such as the family courts on the county and state level.

441.   This lawsuit concerns the need for equal justice and fairness that is demanded by the United States Constitution[198]. Furthermore, all individuals and citizens within the State of Connecticut are

---

[193] This action arises from Defendants, acting in concert with one another, to engage in a series of overt, arbitrary, corrupt, and improper actions such as: (1) adjudicating actions without proper notice and due process for Plaintiff; (2) colluding with other court appointees and/or representatives without the Plaintiff's approval; disseminating information in a manner that places the minor children's lives in danger; (3) lending a "blind eye" to the irrefutable evidence and allegations that the minor child A.L. is in extreme danger and doing nothing to substantiate same; (4) ignoring numerous reports of the abusive father and sexual abuse allegations against the father's son D.L.; and (5) collective conspiracy and acts to systematically attempt to discredit and defame the plaintiffs in a targeted attempt at covering up this abuse.

[194] Defendants are *failing* to allow critical evidence that will substantiate Plaintiff's claims of abuse, battery, personal assaults and psychological assaults, neglect, the allowance of sexual abuse and exposure to sexual acts, and coercive control of the minor children.

[195] In the above-referenced civil "domestic relations" case, the minor child of the parties Lodice and Plaintiff is in grave danger. Defendants simply ignore this fact and "lends a deaf ear" to Plaintiff's repeated pleas for help.

[196] Defendants are *not* entitled to any type of "qualified immunity" from liability while performing discretionary functions because their conduct *clearly violated* established statutory and/or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396,410 (1982).

[197] Moreover, a qualified immunity defense cannot be invoked by officials who **knew that they were violating the Constitution** (subjective bad faith), or who should have known that they were transgressing a clearly established constitutional rule (objective bad faith).

[198] Additionally, 42 U.S.C. § 1983 (1976) provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or uses to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. IO 403 U.S. 388 (1971)

guaranteed constitutional protections under federal law[199]. These Defendants _willfully_ violated federal laws[200] with impunity[201].

442.    Since Congress has not specified the damages recoverable in section 1983 and Bivens litigation, the courts have drawn upon the common law of damages to fashion remedies for deprivations of constitutional rights[202].

443.    Defendants have _failed_ to allow[203] the Plaintiff to specifically testify about the current dangerous living situations while her minor daughter A.L. is in Defendant Lodice's custody.

444.    The associated state agencies and nonprofits and those who work and are associated with said organizations and associations systematically use their roles in order to misappropriate funding, deny citizens their rights and access to services, and continue to receive federal funding[204] that is intended to protect children, support families, and offer legal assistance, while denying individuals those services.

---

(violation of fourth amendment).

[199] In 1871, Congress created a cause of action,' now codified in 42 U.S.C. section 1983, to redress the violation of constitutional rights by persons acting under color of state law. Subsequently, in a fitting centennial celebration of section 1983's enactment, the United States Supreme Court, in _Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,_ recognized a comparable cause of action against federal officials implicit in the Constitution.

[200] _In Carey v. Piphus_ [435 U.S. 247 (1978)] the Court ruled that while presumed compensatory damages may not be awarded in a section 1983 action for a violation of procedural due process, nominal and proven compensatory damages are appropriate to redress such a grievance.

[201] Plaintiff has sustained general and compensatory damages. _See, e.g., Monroe v. Pape,_ 365 U.S. 167, 187 (1961). The principal purpose of general compensatory damages is to put the Plaintiff in the same position as the Plaintiff would have been but for the Defendant's breach of a legal duty. By placing the costs of breach on the wrongdoer, compensatory damages. also perform a deterrence function.

[202] Civil rights and civil liberties play an important role in today's society. It impacts our daily lives. Civil right is the basic right to be free from unequal treatment, based on a certain religion, culture, gender, disability, and race. The freedom of assembly, freedom of speech, voting rights, and equal protection under the law are examples of civil rights. These rights give all citizens the opportunity of" ...life, liberty, and the pursuit of happiness."

[203] The new generation of judges, court actors and mental health professionals too often act like accomplices to pedophile criminals, acting in accordance with each other in an overall scheme akin to "cash for kids" allowing the enablers of the accurately accused criminals they declare to be acceptable custodians of the most vulnerable of our populations.

[204] The memorandum of understanding that exists in the State of Connecticut regarding the fathers' rights initiative, Title IV-D federal funding incentives, and lack of statewide training and resources has created a dangerous situation where individuals such as the plaintiffs are being deprived of their legal rights and property.

445.    The RICO enterprise scheme, over the last two decades, has caused harm to millions of other victims and has irreparably harmed the plaintiff[205] both personally and as legal guardian of her minor children.

446.    Defendant judges are not able to claim judicial immunity. Defendant judges have engaged in repeated judicial misconduct which has created a significant breach of the public trust.

447.    Plaintiff has been unlawfully and unreasonably deprived of her legal right and the legal rights of A.L. and J.V. to unreasonable interference with a mother-child and child-sibling relationship.

448.    The defendants have severed the sibling relationship between A.L. and J.V. and denied both children their fundamental and constitutional rights to be free from abuse, to freely exercise their religion, have a meaningful and sustainable relationship with plaintiff, and to preserve their relationship as siblings. Plaintiff and her minor children are entitled to, as per the Ninth Amendment, rights "retained by the people" and as per U.N. treaties the fundamental human rights against torture[206].

449.    The State of Connecticut has been misappropriating billions of dollars in federal funding for a minimum of two decades, giving rise to an outstanding level of fraud, racketeering, money laundering, abuse of process, civil conspiracy, human trafficking, extortion, and other crimes under federal and state laws[207].

---

[205] Plaintiff has been repeatedly and systematically been victimized by the RICO scheme and fraud of the defendants both personally and as a victim of the RICO scheme, and as such have suffered substantial injuries to their person, business, and property as a result of being victimized by the fraudulent racketeering corrupted scheme set forth by the defendants.

[206] When applying the *Glucksberg* test to determine whether a right is one entitled to the people, the court in *Washington v. Glucksberg* determined that there was a two-part test that could be performed in order to determine whether or not such an unenumerated right was invokable under the Ninth Amendment. This test determined that "in determining whether or not a right qualified as a fundamentally protected right, the right must first be 'deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty' and must also require a 'careful description of the liberty interest at issue."

[207] The State of Connecticut, and those working as its actor, vendor, agent, employee, or representatives, whether lawfully or unlawfully, has exploited the underprivileged and disadvantage people in society in order to orchestrate, implement, and perpetuate a scheme that involves fraud on massive levels and billions of dollars in federal funding.

171- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

450.    The Family court system in the state of Connecticut engages in a fraudulent RICO scheme that involves a predictable pattern that aligns with the same patterns being implemented in courts all over the country.

451.    In each system, courts first take an abuse allegation and counter it with an alienation rebuttal before then making a drastic custody switch and mandating that the children, parents, or both need to engage in lengthy, expensive "treatment" which causes severe levels of trauma to the children and parents involved.

452.    Specifically, Plaintiffs bring this action against the aforementioned Defendants pursuant to substantial violations to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Connecticut Code of Judicial Conduct, 42 U.S.C. § 1983, Child Abuse Prevention and Treatment Act, Title II of the American with Disabilities Act, Adoption and Safe Families Act, Keeping Children and Families Safe Act, Family Educational Rights and Privacy Act, United States Ethics Rules for Judges, The Convention Against Torture, Code of Conduct for Judges, 5th Amendment to the United States Constitution, equal protection rights under the 14th Amendment to the United States Constitution, deprivation of parental rights, Title IV-D of the Social Security Act, 1st Amendment to the United States Constitution, Freedom of Assembly, Freedom of Speech, Free Exercise, The Establishment Clause, Family First Prevention Service Act, Fostering Connections to Success and Increasing Adoptions Act, 28 U.S.C. § 1253, Victims of Child Abuse Act, False Claims Act, 31 U.S.C. 3729, U.S.C. 2461, Rules Governing the Courts of the State of Connecticut, The Violence Against Women Act, various additional violations of civil rights, various other violations of rights as crime victims, restrictions of constitutional rights, violations of fundamental unenumerated rights under the United States Constitution, due process violations, violation of various state and federal criminal statutes, and

otherwise malfeasance acting under the color of law[208] by either direct, indirect, or through association and conspiracy and other applicable state and federal laws. There is no adequate remedy by appeal or other action that will ensure that the Plaintiff's constitutional rights are protected in this matter. The plaintiff also has uncovered a series of unconstitutional practices, policies, laws, and/or statutes that need careful judicial analysis and review to answer unprecedented and unclear questions of law involving fundamental rights which will significantly impact the public in a widespread capacity.

453.    In furtherance of the RICO scheme and their own personal, social, and financial gains, the Defendants, in conspiracy and in conjunction with each other, have deliberately and repeatedly acted under the color of law while annihilating the Plaintiffs' right to due process defined by the Fifth, First, and Fourteenth Amendments of the United States Constitution.

454.    This Complaint will affirm acts of encroachment under  42 U.S. Code § 1983 and the Racketeer Influenced and Corrupt Organizations Act (RICO). Plaintiff is seeking injunctive relief, compensatory damages, punitive damages, costs, treble damages, and declaratory judgment from defendants for said violations of rights.

455.    Plaintiff files this Complaint pursuant to the Judicial Conduct and Disability Act of 1980, 28 U.S.C. § 351-364 against Defendant Grossman and all other Defendant Judges, Defendant Clerks, Defendant Judicial Marshals, and any other employees of the Defendant State of Connecticut Judicial

---

[208] A civil rights complaint is used to bring claims that seek relief for the violation of a person's federal or constitutional rights. Title 42 § 1982 (the civil rights statute) does not confer rights, but instead allows individuals to enforce rights contained in the United States Constitution and defined by federal law. To state a claim under § 1983, the person seeking relief (a plaintiff) must allege (1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused by conduct of (3) a person acting under color of state law (a defendant). *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Under this law, a person who acts under color of state law to violate another's constitutional rights may be liable for money damages, declaratory relief (a court declaration that a violation is occurring), or injunctive relief (an order for the defendant to act or stop acting in a particular way).

System named in this complaint for their involvement and misconduct in multiple cases involving the plaintiffs, including but not limited to the following cases relevant to Plaintiff:

1. *Theodora F. Antar v. Matthew J. Lodice,* Docket No. NNH-FA-19-5046828-S

2. *Theodora F. Antar(ST/CT) v. Matthew J. Lodice*, Docket No. NNH-FA-19-6096801-S

3. *Theodora F. Antar v. Matthew J. Lodice*, Docket No. NNH-FA-22-5055233-S

4. *Theodora F. Antar v. Gerald Viglione Jr.*, Docket No. NNH-FA-16-4068691-S

5. *Angelina M. Lodice PPA Theodora Antar v. Matthew J. Lodice*, Docket No. AAN-FA-23-5023487-S

6. *Theodora F. Antar v Matthew J. Lodice*, Docket No. NNH-FA-23-5057106-S

7. *Theodora F. Antar v Matthew J. Lodice*, Docket No. NNH-FA-22-5052817-S

8. *Mark Wachter v. Theodora F. Antar*, Docket No. NNH-FA-23-5056534-S

9. *Theodora F. Antar v. Scott Lodice*, Docket No. NNH-FA-23-5057984-S

10. *Theodora F. Antar v Matthew J. Lodice*, Docket No. NNH-FA-23-5057371-S

11. *Theodora F. Antar v Matthew J. Lodice*, Docket No. AAN-FA-23-5023887-S

12. *Theodora F. Antar v Matthew J. Lodice*, Docket No. AAN-FA-23-5023124-S

13. *Angelina Maria Lodice PPA Theodora F. Antar v. Dominic Lodice*, Docket No. AAN-FA-23-5023488-S

14. *State of Connecticut v. Matthew J. Lodice*, Docket No. A05DCR-23-0190622-S

15. *State of Connecticut v. Theodora F. Antar*, Docket No. A05D-CR23-0191150-S

16. *Theodora F. Antar v. Elizabeth Protzman,*

17. *Theodora F. Antar v. Mark Wachter, et al.,* Docket No. AAN-CV-23-5024049-S

18. *Angelina Lodice PPA Theodora F. Antar v. Matthew Lodice,* Docket No. NNH-FA-23-5058262-S

Any other associated dockets including any labeled *State of Connecticut v. Theodora F. Antar* that have no public record and any in which have resulted in full dismissals.

456.    Plaintiff alleges that Defendants[209], individually and as a collective, within their sub-organizations but as members of the overall organization based on associations, acts, and omissions, conspired to and engaged in acts or omissions to further the goals of the RICO scheme, which has been impacting victims for decades.

457.    Furthermore, several of the other Defendant state actors have engaged in numerous instances of judicial and/or official legal misconduct including, but not limited to racketeering, fraud, bribery, extortion, tampering with witnesses, and obstruction of justice. Plaintiff will show that Defendants' actions caused the deprivation of Plaintiff and Plaintiff's minor children's constitutional rights[210].

458.    Plaintiff also seeks the court to take judicial notice of plaintiff's challenge to the federal rule of civil procedure which dictates that a pro-se parent plaintiff does not have the right to include their children as a plaintiff on a federal lawsuit, and that the minor child must be represented by counsel in order to be part of the lawsuit. However, there is no right to counsel, and no right to paid counsel for minor children in said cases, which is a violation of the constitutional right to due process and equal protection[211].

459.    Plaintiffs are required to meet 2 barriers: 1. They must find a civil attorney that will agree to

---

[209] The Defendant Grossman, the leader of one of the such sub-organizations, and member and affiliate with several of the other sub-organizations, also abused her authority and conspired with other defendants and orchestrated an intricate scheme involving obstruction of justice, tampering with witnesses, intrinsic fraud upon the court, and other acts in violation of state and federal laws, including but not limited to bribery, racketeering, and trafficking of children into homes where they were more likely to experience sexual abuse in an alarming pattern and trend. Defendant Grossman knowingly and deliberately violated laws while acting in her official and individual capacity and has consistently and repeatedly violated the Canons of the Code of Conduct for State Judges, namely Cannons 2A and 3.

[210] See 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th Cir. 1981).

[211] If an indigent parent plaintiff is unable to find an attorney willing or able to represent their children in a lawsuit, that plaintiff must then be forced to exclude said children and the child is then deprived of their constitutional right to equal protection and due process of the law.

represent their minor child(ren) in the civil lawsuit, which may not be an easy task if the claims are

against the state actors that many attorneys work with regularly and 2. They must be able to afford

said attorney[212].

460.    Plaintiff further contends that the Defendants, in conspiracy with and in collusion with one another,

and as part of a longstanding RICO scheme[213] involving the misappropriate of federal funding from

Title IV-D of the Social Security Act, CAPTA, VAWA, and other corrupt acts acted knowingly,

improperly, and with deliberate indifference to the Plaintiffs' established constitutional and civil rights

acting under the color of law[214].

461.    Defendants, collectively and in conspiracy with one another, have violated the rights of Plaintiff

under the Fourteenth Amendment of the Constitution of the United States of America, the Due Process

Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States of America,

and the Equal Protection Clause. "All persons born or naturalized in the United States, and subject to

the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state

shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United

States; nor shall any state deprive any person of life, liberty, or property, without due process of law;

nor deny to any person within its jurisdiction the equa1 protection of the laws[215]."

---

[212] Many attorneys do not take cases on a contingency basis, and many attorneys shy away from controversial cases in an effort to protect their reputation and careers and avoid retaliation or backlash by members of the Bar or the community. Plaintiff feels this is unconstitutional and wishes to include both her minor children A.L. and J.V. as plaintiffs on this action, yet per rules of procedure is barred from doing so. This rule violates the equal protection clause of the United States Constitution and should be revised to allow indigent parent plaintiffs whose children's rights have been violated to file pro-se lawsuits on their children's behalf without an attorney, otherwise they have no access to law and risk losing the chance to ever bring the claims in the future.
[213] This lawsuit concerns the need for equal justice and reform to the entire structure of the family court system in order to remedy the unconstitutional and damaging trends, patterns, and practices that have been denying countless parents and their children the fairness which is demanded and entitled to them by the United States Constitution. All non-custodial parents within the State of Connecticut are guaranteed constitutional protections under federal law. Collectively, these Defendants are systematically furthering their RICO scheme in an effort to continue the tradition of embezzling federal funding while simultaneously depriving citizens of their lawful rights and violating federal laws daily under the guise of sovereign impunity.
[214] *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255-56 (3d. Cir. 1994).
[215] The Fourteenth Amendment, ratified in 1868, uses the same eleven words, called the Due Process Clause, to describe a legal

462.     The Defendants have caused irreparable harm[216] to plaintiff, her minor children, and millions of

other people who have suffered similar or comparable harm at the hands of the defendants and all

other unnamed members and participants in the RICO scheme by a multitude of overt acts which have

spanned decades.

463.     Plaintiff continues to suffer[217] the results of the extensive abuses she was subjected to by the

Defendants. This is an action for damages and other relief arising under the United States Constitution

and the laws of the United States.

464.     Plaintiff has suffered from violations of her rights under state laws, under federal laws, under acts

of Congress, under ratified U.S. treaties, and under fundamental rights guaranteed to her as living

breathing human being, and as said rights apply to her children.

465.     The Defendants are all associated[218] with one another in a specified way or associated with the

overall case and controversy and as such they have all played a unique, yet crucial role in the

furtherance and perpetuity of the overall RICO scheme in systematically depriving the Plaintiff of her

---

obligation of all states. These words have as their central promise an assurance that all levels of American government must
operate within the law ("legality") and provide fair procedures.  The Fifth Amendment's reference to "due process" is only one
of many promises of protection the Bill of Rights gives citizens against the federal government. Originally these promises had
no application at all against the states (see *Barron v City of Baltimore* (1833)). However, this attitude faded in *Chicago,
Burlington & Quincy Railroad Company v. City of Chicago* (1897).

[216] Defendants' collective, repeated, and intricately orchestrated conduct was so obviously violative of Plaintiff's rights and
Plaintiff's resulting injuries are so severe that it is shocking to the conscience and can only be described as a sadistic form of
torture.

[217] The plaintiff has sustained injuries and psychological harm amounting to irreparable and permanent harm as a proximate
result of Defendants collective actions and systematic fraud and misconduct. These Defendants and other legal court
representatives and associated state actors should be voluntarily removed by self-recusal or involuntarily removed by this Court
and criminal indictments on federal charges should be levied upon them to ensure the public trust in the judiciary and to ensure
the fraudulent scheme will not continue indefinitely into the future without oversight.

[218] The defendants, in conspiracy with one another and through carefully planned and orchestrated acts, omissions, and
associations, have aided and abetted and conspired to partake in, invest in, and otherwise involve and associate themselves in
an ongoing and systematic corrupt organization deeply embedded within the State of Connecticut involving welfare fraud,
misappropriation of federal funding delegated to the states through Title IV-D of the Social Security Act, deprivation of rights,
torture, human trafficking, and engaging in acceptance of bribery and other illegal acts in a systematic scheme that has been
exploiting citizens, including the Plaintiff, for several decades.

rights[219] under federal law and the United States Constitution.

466.    The Defendant Grossman orchestrated[220] a scheme that included a massive obstruction[221] of justice

and tampering with witnesses in which she instructed and delegated to others to engage in acts or

omissions in an effort to facilitate in trafficking the Plaintiff's minor child A.L. into the hands of her

alleged sexual abuser in an effort to protect the Defendant Lodice or his minor child D.L. from any

potential criminal charges or liability related to such allegations of sexual abuse.

467.    The Defendants who are associated with the Defendant Lodice, including those who are or were

state actors, have engaged in the acceptance of bribes, obstruction of justice, and other acts and

omissions in an effort to further attempt to discredit the Plaintiff and her minor child A.L. and isolate

Plaintiff and her minor daughter from one another for the purpose of obstructing justice regarding the

allegations of sexual abuse[222] by the defendant D.L.

468.    Defendant Grossman, who has repeatedly refused to recuse herself or allow any other judicial

---

[219] This lawsuit is an attempt to stop the corruption in the State of Connecticut, particularly within the criminal justice and family branches of the judicial system and to end the ongoing corruption going on within the State of Connecticut by and through its actors, agents, associates, affiliates, and those acting through powers delegated either directly or indirectly through an arm of the state or anyone else given said powers or control. The Defendant Grossman, in conspiracy with multiple other Defendants, intentionally deprived and encouraged many of the other defendants to personally attack and deprive the Plaintiff of her constitutional, federal, state, and crime victim rights in an effort to cover up the ongoing molestation and sexual abuse of the Plaintiff's minor child A.L.

[220] The Defendant Grossman further engaged in a longstanding pattern of fraud, misappropriation of federal funding, racketeering, and other illegal acts. She is also a member of, affiliated with, or has a substantial influence over several of the other defendants named in this lawsuit, and has shown herself to repeatedly exhibit cruel and unusual punishments in an intentional scheme to further the sexual abuse of children and engage in human trafficking in violation of federal and state laws. She has violated rights guaranteed within several U.N. treaties that have been ratified by the United States and has maliciously and in an effort to retaliate against anyone who complains about her forced litigants to be permanently blocked from accessing the judicial system as a result of her influence, control, and leadership role within the overall RICO scheme. She also violated multiple judicial canons, deprived Plaintiff of both substantive and procedural due process, the right to counsel, and rights entitled through the Americans with Disabilities act, VAWA, CAPTA, and the United States Constitution, among others.

[221] Many of the Defendants, either directly, indirectly, or through acts, omissions, or association, have repeatedly violated laws in order to further their own financial gains and obstructed justice, engaged in taking or offering bribes, money laundering, fraud, racketeering, and abuse of children through deprivation of liberty against the Plaintiffs.

[222] The Plaintiff's minor child A.L. has on multiple occasions, made disclosures regarding the sexual abuse that she has experienced at the hands of the Defendant Lodice's minor child D.L., however this has been twisted to be used as a justification in the eyes of Defendant Grossman to deprive Plaintiffs of all legal rights and access to the justice system without protecting any of Plaintiff's constitutional or due process rights.

178- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

authority preside over any matter involving the Plaintiff, is also an adjunct professor at Quinnipiac

University School of Law, sits as one of the executive board members of the New Haven County Bar

Association, worked as a criminal judge in New Haven, a support magistrate judge in New Haven,

Waterbury, and Bridgeport, and was a staff attorney with New Haven Legal Assistance Inc. for more

than a decade, representing low-income[223] individuals in primarily family, criminal and housing

matters.

469.   Defendant Grossman had no qualms about removing the Plaintiff's minor child A.L. from the

loving arms of the Plaintiff/Mother, while also separating her from her minor sister J.V., only to give

custody to the abusive father under the sole reasoning of Defendant Grossman's baseless[224]

accusations that the Plaintiff was "lying" about the sexual abuse allegations[225].

470.   Furthermore, Defendant Grossman failed to protect the constitutional rights of the minor child

A.L. when delegated any and all of her judicial authority to the Defendant Lodice, forcibly alienating

the Plaintiff from her minor child and essentially removed all edicts regarding constitutional parental

rights and federal laws regarding domestic violence, child protection, and the fundamental rights of

---

[223] She is well aware of the challenges that low-income individuals face when being denied access to the law and being unable to obtain proper legal representation due to the furtherance of the RICO scheme. Defendant Grossman received her bachelor's degree from Quinnipiac University in Psychology and received her law degree from Quinnipiac University School of Law. She has many personal friendships and relationships with the other named Defendants in this action and as such has influenced the acts and omissions of said Defendants. Her history has also exposed her to extrajudicial facts, information, and knowledge regarding the plaintiff due to the plaintiff's history.
[224] The Defendant Steeves claimed to have investigated the abuse, but never even met the minor child A.L. Defendant Grossman made a ruling with no notice, no due process, and without even swearing the plaintiff in, and traumatically ordered that the minor child A.L. be unexpectedly and immediately transferred to the sole legal and sole physical custody of the Defendant Lodice without proving the plaintiff to be unfit. Defendant Grossman ordered on May 25, 2023 that the plaintiff would only be allowed to see the minor child A.L. "as determined by the father" and "supervised by a third party designated by the father" which essentially delegated her power as an arm of the state to the Defendant Lodice, who then subsequently delegated that power to many of the other defendants within the sub-organization within the overall RICO scheme.
[225] The Plaintiff submitted over 70 videos to the New Britain Police Department and to the Department of Children and Families, specifically to Defendant Plummer, and to Defendant Steeves, all of which included video evidence in which the plaintiff's minor daughter A.L. repeatedly discloses details regarding the fact that she is claiming to have been sexually abused by the Defendant Lodice's minor son Defendant D.L. on a regular basis over the past year and a half. The Defendant Grossman never saw a single one of the videos, nor did she ever see any evidence regarding said abuse.

parents.

471.   The State of Connecticut[226] and its associated arms, affiliates, and actors has engaged in a systematic pattern[227] of allowing accused and adjudicated batterers to receive joint or sole custody surprisingly often.

472.   The family court system[228] in the state of Connecticut is unconstitutional in that it does not allow or afford litigants the right to counsel if they are indigent.

473.   Several attorneys named in this complaint have denied the plaintiff legal representation[229], intentionally given the plaintiff dangerously reckless legal advice, and have played a role in the overall corrupt scheme which has been going on for decades within the state.

474.   The hurdles[230] to address areas of misconduct are many times insurmountable due to many of the entities designed to investigate having been proven to be ineffective, shielded by a cumbersome process and system of procedures that filter out many legitimate cases of wrongdoing brought to the

---

[226] The State of Connecticut RICO enterprise, by and through its agencies, commissions, departments, and other arms and legs and agents and actors, has exploited the poor by fraudulently obtaining billions of dollars in federal funding to create child protection, domestic violence, social services, and legal and mental health services to the poor to then deny the same poor indigent citizens of the State any such relief. Each defendant played a role in one way or another and is liable.

[227] The state of Connecticut and its associated arms, affiliates, and actors has engaged in a systematic pattern of allowing a clear and documented gender bias against women in custody litigation that has also been implemented in the criminal justice system and law enforcement agencies throughout the state.

[228] There is a systematic statewide embezzlement scheme occurring within the state of Connecticut, and many lawyers who practice in and out of the same courtrooms as the judges in this action will almost never report such behaviors including obstruction of justice, bribery, and the concealment of sexual abuse as they have to practice in front of the same judges and the same opposing lawyers on multiple occasions.

[229] This creates situations where attorneys who may want to do the right thing by representing those who have been victimized by the system or reporting such violations are put in a place where they are forced to weigh the possible retaliation by judges and players that could adversely affect them and future clients. The other concerns for them are the forms of blackballing by peers that sometimes goes on against those lawyers blowing the whistle within this industry.

[230] The City of New Haven and the New Haven County Bar Association, along with the Judicial Review Council have influenced the local media silence on family court corruption and the <u>local media is completely silent</u> about the <u>ongoing scandal in its Superior Court Judicial</u> <u>District of New Haven.</u> The New Haven Superior Court, city of New Haven, New Haven County Bar Association, and all those Defendants named in this action who have some association in the controversy are all engaged in corrupt activities and have continued to engage in statewide widespread corruption with no oversight.

attention of such groups. Not to mention most of these groups do not have the authority to initiate investigations.

475.   The Judicial Review Council, which is made up of some of the same judges and lawyers who are part of the same Bar Organization and circle of friends and social circle, all protect each other[231].

476.   The State of Connecticut has an unconstitutional[232] practice in that it does not allow attorneys to appear Pro Hac Vice for litigants who seek counsel that are not part of the corrupt organization unless the Pro Hac Vice attorney has a Connecticut Attorney who can endorse them and appear and at any and all court proceedings[233].

477.   Defendant Grossman[234] in accordance with multiple lawyers and psychologists has engaged in racketeering cohorts effectively marshal her victims- children and their protective parents-down the assembly line supervised by the local law enforcement and powered by money.

478.   Several of the defendants, in conspiracy and conjunction with one another, particularly Jane Grossman, as well as other defendant judges and state actors and their associates are engaged in witness tampering, suppression of evidence, and abuse and violation of Due Process[235].

---

[231] The University of Connecticut School of Law pushes an agenda on students that everything is about networking and "who you know" and as such creates a dangerous situation where those within the judicial system, attorneys, and members of the bar organization in the state of Connecticut handle cases by exchanging funds, favors, campaign dollars, or engaging in extrajudicial relationships, ex-parte communications, and back door deals in order to ensure that litigants are exploited financially as much as possible.

[232] The State of Connecticut has an unconstitutional practice in that it does not allow foreign attorneys to appear as a foreign legal representative as counsel for clients in Connecticut, but only allows said individuals to consult with individuals regarding the laws of their respective nation, unlike the neighboring state of New York which allows them to be full counsel.

[233] This is all part of the systematic structured gate-keeping scheme in order to monopolize the cash for kids for federal dollars and abuse of federal funding for personal wealth gain that has been ongoing in the state for decades.

[234] Many of the judges, particularly Defendant Grossman, have shown an indifference (enjoyment) of obvious suffering, concomitant lack of empathy, manipulation and humiliation of children and protective parents in an effort to extort funds and misappropriate funding to infiltrate the process of court proceedings.

[235] The Connecticut Judicial system, through its family courts are operating a money laundering and trafficking operation in total secrecy under the color of law. Without oversight by the public and the media, there is no hope that any of this will change. The state hides under the guise of sovereign immunity and judicial immunity, and the Judicial Review Council will systematically ignore any and all valid complaints while intimidating and encouraging attorneys not to make complaints.

479.    Indeed, several allegations contained in this Complaint clearly indicate that Plaintiff's civil rights claims against the state actors themselves are independent and directed not at the State of Connecticut; rather, at the Defendants[236] as individual "state actors."

480.    To begin with, the law of judicial immunity has long distinguished between retroactive and prospective remedies. In general, suits seeking prospective remedies are *not* barred by the doctrine of judicial immunity. *Pulliam v. Allen,* 466 U.S. 522, 541-42 (1984) ("judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity")[237].

481.    In the instant case, Plaintiff seeks, *inter alia,* declaratory[238] and injunctive relief[239] against Defendants[240].

482.    A judge enjoys protection from suits under 42 U.S.C. § 1983 ___only___ to the extent that he/she acts "as a neutral and impartial[241] arbiter of a statute," making no decisions of his/her own in the application of a statute of policy.

---

[236] For example, this Complaint asserts that Defendants "have acted under the color of the law while annihilating the Plaintiff's right to due process defined by the Fifth and Fourteenth Amendments of the United States"; that Defendants "have engaged in numerous instances of judicial misconduct"; and that Defendants "aimed and purposefully directed their illegitimate actions while sitting on the benches of the Superior Courts of Connecticut.

[237] Although the scope of *Pulliam* was narrowed by a 1996 amendment to 42 U.S.C. § 1983, declaratory relief remains exempt from judicial immunity under the clear terms of the statute. *See Kampfer v. Scullin,* 989 F. Supp. 194,201 (N.D.N.Y., 1997).

[238] This Complaint explicitly "requests that the Court enter an award in Plaintiff's favor declaring that any and all of the Defendant judges orders in regard to cases involving the Plaintiffs violate the Fourteenth Amendment civil rights and are thus devoid of any legal force and effect."

[239] Under the terms of the Third Circuit's ruling in *Allen v. DeBello, supra,* such relief is certainly not barred by the doctrine judicial immunity.

[240] A judgment stating that unconstitutional custody and relief from abuse orders issued in continuing litigation are "devoid of any legal force and effect" is relevant to every custody-related process or statutes that will arise in the future course of litigation; it is aimed at the "threat of repeated injury in the future" by preventing the state court from applying an illegal ruling at any step between the issuance of the declaratory judgment and a final order. Such prospective declaratory relief is not barred by judicial immunity.

[241] As the Third Circuit Court of Appeals has emphasized, "a judge who acts as an enforcer or administrator of a statute *can* be sued under Section 1983 for declaratory or (if declaratory relief is unavailable) injunctive relief." *Allen v. DeBello, supra,* 861 F.2d at 440 [emphasis added]. *See also Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 736 (1980) (judges acting in an "enforcement" capacity are "proper Defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies [are]"); *Georgevich v. Strauss,* 772 F.2d 1078, 1088 (3rd Cir., 1985) ("Where a suit challenges statutes related to the judicial process or statutes previously enforced by the particular judge against the Plaintiff, judges are proper parties" in a civil rights suit) [internal quotation marks omitted].

483.    In this case, Plaintiff does not solely seek relief from the Defendant judges as "neutral arbiters" of a statute or policy. Rather, the Complaint alleges that "Defendants' conduct reveals a widespread RICO scheme that allows for a systematic culture of corruption, retaliation, racketeering, fraud, and deliberate indifference within the judicial system of the Connecticut court system, particularly within the Family Court system, and "a staggering failure of judicial self-governance[242] institutional system." These allegations[243] reflect the sort of "enforcement" role that renders a judge a "proper party" in a civil rights action under Third Circuit precedents such as *Allen* and *Georgevich.*

484.    Plaintiff's allegations, therefore, are directed, at least in part, against Defendants in their *personal,* not their official[244], capacity[245].

485.    Despite all of the abusive conduct by the father, Defendants transferred sole legal and sole physical custody to the violent and sadistic father who is on the DCF abuse and neglect registry and has no stable home of his own or adequate ability to care for said child. Collectively, the Defendants actions reap of collusion[246] with the cruel and abusive father.

---

[242] On numerous occasions Plaintiff, has filed complaints against the Defendants for unfair, unjust and prejudicial conduct. Plaintiff has received no meaningful response to any of these complaints.

[243] Plaintiff alleges that Defendants have both misapplied the law in issuing their rulings and have systematically and repeatedly enforced illegal policies prevalent in the Connecticut courts. It follows that Defendants are a proper party to this action, and that no doctrine of judicial or sovereign immunity bars Plaintiff's attempt to seek relief from Defendants' collective administration and enforcement of wrongful judicial and statewide policies and RICO schemes.

[244] As the U.S. Supreme Court has emphasized: Personal-capacity suits... seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, "[o]n the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo,* 502 U.S. 21, 25 (1991), *quoting Kentucky v. Graham,* 473 U.S. 159, 166 (1985) [emphasis in original]. Defendants have collectively engaged in copious additional patterns of retaliatory conduct, such as setting Plaintiff up for constant violations of court orders under credulous and false pretense.

[245] This is precisely the nature of Plaintiff's allegations in this case. And such claims are not barred by the Eleventh Amendment. "[T]he Eleventh Amendment," the Supreme Court has clearly stated, "provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Id.,* 502 U.S. at 30, *quoting Scheuer v. Rhodes,* 416 U.S. 232,237 (1974). Thus, any attempt to establish immunity from suit under the Eleventh Amendment- based as it is on a misrepresentation of Plaintiff's allegations - *must fail.*

[246] Inasmuch, Defendants are unwilling to protect the minor child A.L.'s safety; rather, they are willing to go extraordinary lengths to track down a protective parent like a common criminal and to separate the minor children from their primary loving and caring mother indefinitely with no clear path of reunification and no legal method of modification of any such orders. The Defendants' actions give credence and credibility to the likelihood that Defendants are colluding, aiding and abetting, and obstructing justice in an effort to further the overall goal of financial gain and the obstruction of justice in prevention of criminal

486.     Defendants conduct reveals a widespread culture of retaliation, racketeering, trafficking, money laundering, misuse of federal funding, torture, deprivation of rights, concealment and enabling of sexual abuse of children, bribery, and deliberate indifference within the judicial system of the Connecticut judicial system and its associates.

487.     The conduct of the Defendants also represents a staggering failure of the judicial self-governance[247] institutional system.

488.     The State of Connecticut, and its associated departments, actors, and other arms of the state, does not maintain broad immunity in cases that involve police misconduct. Furthermore, municipal governments are also liable[248] for instances of negligence of their employees.

489.     This does not completely bar litigants from bringing claims[249] against state officials for violations of their constitutional rights.

490.     Municipal governments are also subject to a greater level of liability that the State, and under Connecticut law plaintiffs can hold municipalities liable for certain instances of negligence. The law also requires that municipalities indemnify their employees for liability[250] from actions within the scope of employment unless the damage is "the result of any willful or wanton act."

---

charges being initiated against the defendant Lodice and his minor son D.L.

[247] The Connecticut State judiciary will not police itself voluntarily. This is a set of facts that calls for personal liability, punitive damages, systemic injunctive relief, and external intervention and oversight of the Defendants and the Connecticut State judiciary. A phrase that Theodore Roosevelt made popular should be stated here:·"No man is above the law and no man is below it; nor do we ask any man's permission when we ask him to obey it."

[248] The Supreme Court for the State of Connecticut also held that "[no] state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment."

[249] The State of Connecticut also passed a law in 2020 that allows plaintiffs to bring civil actions for equitable relief or damages for police misconduct, including for constitutional violations, which states that "No police officer, acting alone or in conspiracy with another, shall deprive any person or class of persons of the equal protection of the laws of this state, or of the equal privileges and immunities under the laws of this state, including, without limitation, the protections, privileges, and immunities[249] guaranteed under article first of the Constitution of the state."

[250] All state and municipal officers and employees named in this action engaged in willful and wanton acts and omissions that were done intentionally in order to harm the plaintiff and her minor children while protecting the financial and legal interests of the defendant Matthew J. Lodice and defendant D.L.

491.    So, while the American system of government is primarily democratic or majoritarian, it is not purely so. The Constitution[251] of the United States creates a government that operates as a limited democracy or what is at times referred to as a constitutional democracy because it places constitutional limits upon the authority of the government.

492.    Most of these limits[252] can be found in the Bill of Rights of the Constitution, which states, for example, that Congress shall make no law abridging freedom of speech, and that no state shall deprive any person of life, liberty, or property without due process of law or deny to any person the equal protection of the laws.

493.    As a society, we should demand a higher threshold when it comes to our children. Sadly, these issues come back to parental rights and the fact that the family court system places a higher priority on parental rights than what is truly in the best interest[253] of our children.

494.    Expensive attorneys have perpetuated this problem and need to be held accountable, too. Most of the time, these abusers just want to get off the hook of paying child support. Even worse is when they seek revenge by attempting to make the other parent pay *them* child support. Abusers do this by attempting to win full custody. Sadly, many times, this trick works! It is happening every day[254] across America. It is a dirty tactic, and it needs to not only be stopped but prevented!

---

[251] United States Constitution is based on one rather undemocratic idea, the idea that there is a need for protection against a tyranny by the majority. The Constitution recognizes that, while there should be majoritarian control of the government, there also should be some form of restraint upon the majority, because majorities can be selfish and oppressive or tyrannical, and some rights are so important that they should belong to everyone, even if the majority does not think so.
[252] Even if Congress and the President, which after all are elected by the people, decided unanimously to abridge someone's freedom of speech, they are proscribed from doing so by the Constitution. Even if a state legislature and governor voted unanimously to deny a person or group the equal protection of the laws, the state is prevented from doing so by the Constitution. The Constitution itself limits the authority of the Congress, the President, and the states to deprive individuals of their rights.
[253] Abusers routinely use family court as a weapon to punish their ex-spouses. The family court system has become a sword and not a place for fairness, justice, or child safety. It is appalling that courts are unable to detect who the high conflict party is, often lumping the victim into the mix. We need to raise awareness for all the parents who have lost custody battles and for the children who get caught in the crossfire.
[254] Our national statistics show that over a hundred children per year are killed by the parent that the judge mistakenly placed them with following a trial. This is a complete and tragic failure of the family courts. It's also the personal failure of the judges who are not able to detect immediate threats to children's safety. While some courts tunnel vision on assigning parents' rights

495.    Plaintiff and her minor child A.L. are among the millions of other similarly situated victims of family court and has suffered relentless abuse by her child's father. Each year, he has threatened the Plaintiff and given her an ultimatum of ongoing sexual relations or complete loss of custody[255], he has violated any and all court orders, filed countless, senseless motions and lied under oath repeatedly in order to obstruct justice and coercively control and punish the plaintiff indefinitely through the justice system.

496.    As we all already know, major portion of our legal system's failure[256] to protect abused[257] children occurs in state family courts.

497.    Traumatized originally by the perpetrator, the child is victimized again by the legal system designed to protect him/her[258].

498.    Fundamental to understanding why we are failing[259] the abused child is the fact that children who are victims of crimes are treated differently from all other victims of crimes. Only in instances of

---

to their children, the more important concern of a family court should be to protect the children. Child safety should come first! Money should not buy sole legal custody. Money-hungry, unethical lawyers shouldn't help beat up an ex who is just trying to be a good, loving mother and get away from an abuser.

[255] Defendant Lodice stated he would "guarantee" that the minor child A.L. be transferred into his custody and cited his relationship with several of the defendants as his connection and ability to bribe, secure, and guarantee said transfer of custody despite his concerning record of violence and abuse.

[256] Understandably, when the abuser is a parent of the child and the other parent is innocent of any complicity in the abuse, the "protective parent" often seeks to dissolve the relationship, or, if the abuse is discovered post-separation, seeks to restrict or eliminate visitation privileges. Unfortunately, the judicial system from which the protective parent and child are seeking justice and protection is comprised of judges and court personnel who lack sufficient training in child abuse issue and are often indifferent to the child's allegations of abuse, particularly allegations of sexual abuse.

[257] Mental health professionals and attorneys' ad litem are often appointed by judges in return for campaign favors and tend to be mere puppets of the court. Further, critical court decisions can be based more on personal relationships with lawyers than on sound legal principals. As a result, the protection of the child and any due process to which the child is entitled is given little or no consideration and the abuser is frequently given unrestricted visitation with the child, if not outright possession. Child abuse, whether sexual or physical, and child protection becomes only incidentally a custody question.

[258] This legal system was originally put into place in order to identify children who had been abused or severely neglected by their parents or caretakers, remove those children at risk of further abuse or neglect and place them in protective custody (or terminate parental rights and place the child with adoptive parents), and bring perpetrators of child abuse and criminal neglect before the bar of justice. However, since its creation, this system has devolved into one where incompetent, ineffective, overwhelmed, and sometime corrupt government officials and entire bureaucracies, who are accountable to no one, are making decisions resulting in abused and neglected children being left in dangerous homes.

[259] Although an alarming picture of the family courts' failure to protect children has already developed, the best evidence in support of this, particularly in cases involving parents attempting to save their children from further abuse, often involves court

crimes against children does our law enforcement establishment allow DCF, a social service agency, lacking law enforcement training, experience, and priorities to receive the initial report of abuse, to perform the initial "civil" investigation of the crime, and dictate the progress of the criminal case.

499.    Only in cases of child abuse is a victim forced by the state to live in the same home with his or her abuser. And, only in cases of child abuse is a person denied the right to be safe[260] in his or her own home. This points out a fundamental issue involving the rights of children: They have no rights. Because children cannot speak for themselves, they are denied access to justice and equal protection[261] under the law.

500.    In *Poe v. Ullman*, the court also rejected any type of formulaic approach to substantive due process in favor of a more open-ended common law approach whereby courts address questions about fundamental rights case-by-case, striving in each decision to balance the Constitution's respect for individual liberty and the demands of organized society. It remains to be seen what future rights such an approach might yield.

501.    This family preservation bias has been strongly motivated by federal funding which has required, as a condition to receipt of the funds, that local DCF agencies demonstrate that "reasonable efforts" have been made to preserve the family. Not surprisingly, when the vulnerable child abuse victim is

---

proceedings wherein the records have been sealed. Allegations of altered transcripts altered or destroyed government documents, ex parte' communications, and hearings held and orders issued without court reporters are not limited to the few highly publicized child abuse cases which make national news but are being heard throughout nation. Statistical data in support of this failure and its impact on our nation is overwhelming.

[260] Worse yet, DCF lacks the victim's perspective of law enforcement (whose complaining witness must be protected to preserve the criminal case). DCF's "client" is not the child, but the family. Their goal is to rehabilitate the perpetrator and preserve the "family unit"; to perform a social experiment at the child's expense. Unfortunately, few of such experiments have shown to be successful. Rates of re-abuse in such homes are astronomically high.

[261] Allowing DCF to control the criminal investigation and the determination of when or if to remove the child from harm's way has proved to be a fatal error by law enforcement. The statewide systematic approach to investigating allegations of childhood sexual abuse in the state of Connecticut not only silences young victims of abuse but also eliminates due process and violates the constitutional rights of crime victims.

kept in the same home with the person whom they may testify against and perhaps send to prison, the child often forgets or "recants" the allegations[262].

502.    As various parts of the country have experienced "system failures" with DCF, a national consensus[263] has developed that this family preservation agenda is risky and unworkable, and that children must be removed from homes whenever they are abused or neglected. This attitude is strongly supported by research from the social sciences.

503.    On October 23, 2023, all of plaintiff's rights under the Americans with Disabilities Act were again violated by clerks Gina, Mike, and other Jane Doe and John Doe clerks from the New Haven Superior Court.

504.    On October 23, 2023, Defendant Judge Alander entered in an order denying plaintiff's motion for disqualification of judicial authority that was seeking the recusal of defendant Grossman.

505.    Defendant Alander showed extreme bias in his ten-page written memorandum of decision in which he stated that he "told the marshal to inform the plaintiff that she was to immediately come to the courtroom" on October 4, 2023 for the hearing that was scheduled, despite plaintiff specifically requesting the ability to speak to the designated ADA coordinator prior to the start of the hearing[264].

---

[262] This would be no different than forcing an adult victim of rape or battery to live with their rapist or batterer during the pendency of the criminal investigation, except that children are placed in even greater danger. It is inherently contradictory to have the same agency responsible for the investigation of a crime and protection of the child, on the one hand, and the preservation of the abusive family on the other! Despite the best intentions of the most dedicated social worker, a child cannot be protected in an abusive home.

[263] While some efforts to rehabilitate parents who neglect or abuse their children have been successful, the results have never been predictable. In fact, the overwhelming statistical and clinical evidence indicates that most child abusers will continue to abuse, regardless of rehabilitation programs. Dr. Michael Stone, Ph.D., a nationally recognized expert on family violence and formerly one of the strongest proponents of family preservation, has stated that the evidence is in, and the policy of family preservation has been an abysmal failure.

[264] Defendant Alander admits that, despite plaintiff asking that he comply with the ADA and provide plaintiff with a reasonable accommodation for her disabilities, that he denied plaintiff her rights pursuant to the ADA, and that, in spite of plaintiff asking for additional time to speak with the ADA coordinator, that he "denied her request because it was unnecessary for her to speak further with the ADA coordinator as the coordinator had responded to her request in writing and any remaining accommodation issues dealt with the conduct of the proceeding and were for me to address."

506. This is factually incorrect and indicative of clear impropriety and bias on behalf of defendant Alander targeted in an effort to obstruct justice and hinder plaintiff's prosecution[265].

507. Defendant Alander knowingly misrepresented facts in his 10/23/23 memorandum of decision in a clear and deliberate attempt at obstruction of justice[266].

508. Defendant Alander only provided plaintiff with a 30-minute window of time to be able to present said evidence and oral argument as the hearing was scheduled from 10am-11am and defendant Alander was not even present and ready to commence the hearing until 10:30AM[267].

509. Furthermore, defendant Alander[268] claims that he was "prepared to address her additional accommodation requests at the hearing" however, he had announced prior to the start of said hearing that he would not be ruling on any of the requests, as it was "unnecessary" and would not explain further.

510. Plaintiff's rights under the ADA were also violated by several John and Jane Doe judicial marshals from the New Haven Superior Court[269].

511. Plaintiff e-filed each and every transcript and exhibit that was referred to in the detailed motion for disqualification of judicial authority and associated affidavit[270].

---

[265] Defendant Alander's allegation that the ADA coordinator had "responded to [plaintiff's] request in writing and any remaining accommodation issues dealt with the conduct of the proceeding and were for [him] to address" was inaccurate and not supported by any fact.

[266] Defendant Alander further acknowledges that he continued to violate plaintiff's rights under the ADA and maintains in his written memorandum of decision that after the plaintiff "asked for more time to speak with the ADA coordinator" that he "denied her request" and that he gave plaintiff an ultimatum that she could either "present evidence and oral argument regarding her motion for disqualification [or] . . . [he] would adjourn the hearing and decide her motion solely on the motion and accompanying affidavit."

[267] Plaintiff had repeatedly requested that the hearing be continued to a date in which plaintiff could have adequate time to present her argument, evidence, and witnesses, and defendants Alander and Grossman denied said requests for due process.

[268] Defendant Alander continued to violate plaintiff's rights under the ADA and show bias toward plaintiff by putting in a footnote on page 4 of his October 23, 2023, order the following: "the plaintiff appears to be quoting from transcripts of various hearings. She failed however to attach the relevant transcript pages."

[269] Plaintiff was denied the right to a reasonable accommodation due to her disability, retaliated against by Defendant Griffin, and ultimately denied all rights to due process under the fourteenth amendment by Defendant Griffin.

[270] Further, defendant Alander shows immense bias in that he fails to consider that plaintiff is not a trained attorney and should not be held up to the same standard as one, especially given her disability status.

512.    Defendant Alander also alleges that violations of plaintiff's "constitutional rights, including the right to freedom of speech, the right against unreasonable searches and seizures, the right to due process and the guarantee against cruel and unusual punishment as . . . matters to be addressed in an appeal of the underlying decision [and] not in a motion for recusal" however this is inaccurate[271].

513.    Defendant Alander[272] himself even notes that a judge is required to recuse themselves if "his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority" yet still denies plaintiff's motion for disqualification of judicial authority[273].

514.    This claim was false[274] and inaccurate. The parties' prior agreement[275] stated that the defendant was "required to bring the minor child to any religious, educational, social, and extra-curricular activities that she is involved in (including, but not limited to, Sunday School, birthday parties, dance, soccer, swimming, etc.)"[276]

515.    Defendant Alander also claims that plaintiff did not "show any evidence" of a relationship between Defendant Cretella and Defendant Grossman, despite it being an undisputed fact that they went to Quinnipiac University School of Law together, that they both teach as adjunct professors at the

---

[271] Defendant Alander claims that Judge Grossman did not show religious bias against plaintiff, however he ignores the fact that Judge Grossman put in orders on 6/29/22 and on 5/31/23 that prevented the minor child A.L. from practicing her religion.
[272] Defendant Alander attempts to hinder and obstruct justice by making additional claims in his 10/23/23 order which he knew to be false, including claims such as that "the parties' prior agreement limited the defendant's obligation to bringing the child to special religious events and Sunday school."
[273] There is no dispute to the fact that defendant Grossman has shown the existence of impartiality and that her impartiality is to be reasonably questioned. Defendant Grossman has refused to recuse herself for more than one year and has not followed or complied with recusal requirements in accordance with the laws of the state of Connecticut.
[274] Defendant Alander continues to make false and outlandish accusations in his order, including by claiming that the court "disagrees with plaintiff's interpretation of the prior agreement" when the plaintiff was the one who wrote the agreement with the defendant, and the agreement was clear and unambiguous.
[275] Defendant Alander attempts to use a quote from a case claiming that "adverse rulings by the judge do not amount to evidence of bias" however plaintiff established clear evidence of bias through her motion for recusal and associated affidavit in support of motion for disqualification of judicial authority, yet defendant Alander still refused to recuse Defendant Grossman.
[276] Defendant Alander intentionally published the false claim that the parties had agreed to limit the defendant's obligations to special religious events and Sunday School, when in reality, it was Defendant Grossman who imposed those restrictions by force upon the parties in her "temporary order" of June 29, 2022.

190- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

Quinnipiac University School of Law, and that Defendant Cretella personally stated to plaintiff that he has a close relationship with Defendant Grossman who he has known for more than twenty years[277].

516.    Furthermore, Defendant Grossman has had several ex-parte and off-the-record conversations with Defendant Cretella that plaintiff personally witnessed, including but not limited to on December 1, 2022, during a recess when plaintiff herself was forced to stand out in the hallway alone.

517.    The fact that Defendant Alander[278] can publish such an outlandish and wildly inaccurate claim such as that plaintiff's complaint "appears to be merely one of disagreement with Judge Grossman's decision" shows his bias and impropriety[279] and prejudice against plaintiff[280].

518.    Plaintiff also repeatedly requested that defendant Alander provide plaintiff with enough time in the hearing to be able to bring witnesses, and show evidence properly, and this request was repeatedly denied, thus violating plaintiff's constitutional rights in the process.

519.    Further, defendant Alander shows more bias in his 10/23/23 order by only focusing on transcript excerpts from June of 2022 before Defendant Grossman began to show extreme and increased levels

---

[277] Defendant Alander personally is aware of this relationship, yet he continues to deny the existence of a relationship. Defendant Grossman even referred to Defendant Cretella as a "good lawyer" and scolded and reprimanded plaintiff for terminating the attorney-client relationship, which that alone shows bias.

[278] Defendant Alander contradicts himself by claiming on page seven of his ten-page memorandum of decision that he undertook a "review of the transcript" however in earlier sections of his memorandum he claims that he was unable to validate the claims of plaintiff due to her "not attaching the pages of the transcript" which shows that he is deliberately choosing not to see and validate the transcripts, which plaintiff also e-filed properly as well.

[279] Defendant Alander also shows evidence of impropriety by claiming that plaintiff did not present any evidence of prejudice by Defendant Grossman, yet plaintiff cited significant evidence in her motion for disqualification of judicial authority and the associated affidavit, including with references to evidence that was e-filed as a case exhibit properly in the case file. Defendant Alander claims that it is "not necessary" for him to address plaintiff's claims about bias because plaintiff "did not include evidence regarding these claims" however that is simply not the case in that plaintiff did include substantial evidence that was properly e-filed and also properly cited said evidence, as well.

[280] Defendant Alander also makes another inaccurate claim when he states in his 10/23/23 order that the court "interrupted [plaintiff] because her statement was not relevant to the motion before the court" however this is inaccurate, and Defendant Alander claims he has no access to any of the transcripts, so he is falsely making allegations that have no actual factual basis to them, as the transcript clearly shows that everything plaintiff was stating before being interrupted was relevant to the proceeding.

191- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

of bias. Defendant Alander chooses to selectively find excerpts in which the bias is not as strongly

evidenced, while ignoring the excerpts that show severe violations of plaintiff's constitutional rights.

520.   Defendant Alander repeatedly alleges that plaintiff's motion "lacks evidentiary support in the

record" while he deliberately ignores the almost 200 pieces of evidence that plaintiff e-filed as e-filed

case exhibits in the case file.

521.   Defendant Alander attempts to dismiss plaintiff's claims by alleging that plaintiff's motion is

solely based on her "disagreement with the rulings and decisions that Judge Grossman has made in

[the] matter which were adverse to the plaintiff, particularly her decision to limit the plaintiff's parental

rights."

522.   This is factually inaccurate, in that defendant Grossman has no right or authority to terminate or

limit plaintiff's parental rights, which were not up for debate in the post-modification custody hearing

that took place in which Grossman denied plaintiff all of her federal and constitutional rights.

523.   Plaintiff's motion clearly outlines many decisions, rulings, excerpts from the transcript, and other

evidence to show the clear, severe, and undisputed evidence of bias and impropriety and violations of

judicial canons by Defendant Grossman, yet Defendant Alander chooses to ignore this in a targeted

attempt to continue to further obstruct justice[281].

524.   On October 23, 2023, Defendant Griffin also severely violated plaintiff's constitutional rights to

free speech, due process, and equal protection and told plaintiff she had no right to ask direct questions

to Defendant Lodice.

---

[281] Defendant Alander also notes that plaintiff has a substantial case showing that she should have sole custody of the minor
child, yet he still continues to ignore this and claims that "adverse rulings by the judge do not amount to evidence of bias
sufficient to support a claim of judicial disqualification" while ignoring all of the repeated citations citing instances of violations
of plaintiff's constitutional rights. Defendant Alander denied plaintiff's motion for disqualification of Defendant Grossman in
an effort to intimidate, harass, and hinder prosecution in an effort to continue the campaign against plaintiff funded by defendant
Lodice.

525.   Defendant Griffin told plaintiff she had no right to cross-examine Defendant Lodice based on his testimony[282].

526.   Defendant Griffin told plaintiff that it is completely reasonable for defendant Lodice to eliminate all access, contact, or visitation with A.L. and stated that it is up to Lodice to decide[283].

527.   Isolating someone from a family member is abuse under Public Act 21-78 aka "Jennifer's Law" under state law in the state of Connecticut.

528.   Lodice's actions also constitute abuse as defined by federal laws such as VAWA and CAPTA.

529.   Griffin's actions are violations of plaintiff and A.L.'s fundamental and inalienable rights.

530.   The standard for disqualification for bias or prejudice is fundamentally an objective one. It represents a legislative judgment that, due to the sensitivity of the question and inherent difficulties of proof, as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of the actual bias. Rather, if a reasonable person would entertain doubts concerning the judge's impartiality, disqualification is mandated[284].

531.   Even after the initiation of this action, the filing of a first amended complaint, and a widespread nationwide social media and exposure through various internet platforms, the plaintiff is still experiencing extreme and unwarranted levels of harassment, discrimination, and violations of her rights to unequal protection under the law by anyone who is involved in the state as a form of

---

[282] Defendant Griffin told plaintiff she had no right to enter in evidence in the form of video, audio, or other types of documentary evidence in the hearing for a temporary restraining order in which plaintiff filed as a PPA for her minor daughter A.L.
[283] Defendant Griffin deferred his judicial authority regarding the coercive control and abuse that plaintiff cited Lodice as subjecting A.L. to an instead stated that, in spite of it being a TRO hearing filed on behalf of A.L., that plaintiff was not permitted to discuss "anything related to issues about visitation."
[284] To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person. The standard indicates that the decision is not based on the judge's personal view of his own impartiality, and also suggests that the litigant's necessarily partisan views do not provide the applicable frame of reference. Rather, the judge ought to consider how his or her participation in a given case looks to the average person on the street.

retaliation.

532.    On October 23, 2023, plaintiff contacted Defendant Hillis and notified him that she was considering hiring replacement counsel due to the irretrievably broken-down relationship between herself and Hillis and their lack of communication regarding the criminal matter under A05D-CR23-0191150-S.

533.    Plaintiff texted Defendant Hillis and said, "Hey I'm thinking of hiring a different lawyer. Can we possibly get a continuance for tomorrow?"

534.    Hillis then responded to plaintiff and said "Yes. I'll text you new date." Plaintiff then responded and said, "Okay thank you."

535.    On October 24, 2023, Hillis then texted plaintiff and said, "November 22, 2023. Judge Damiani requires you to be there on that date. I will see you then."

536.    Plaintiff then responded and said, "Is that in Derby? My Milford case is on 11/22 at 2pm."

537.    Defendant Hillis then responded to plaintiff and said "Derby early. Two birds same day."

538.    Defendant Hillis never told plaintiff that she was required to appear in Derby Court on October 24, 2023, and implied that plaintiff would not be required to attend when he stated that he would "text [her] a new date" and plaintiff, as such, did not attend the proceeding.

539.    On October 24, 2023, the Derby GA05 Court then issued a Bail's Commissioner letter that stated "The records of the Bail Commission indicate that you failed to appear at your last scheduled court hearing as ordered. Your case has been continued to 11-22-2023 to appear on the below-listed charges. If you fail to appear on this date at 10:00AM, a re-arrest warrant will be issued. Sections 53a-172 and 53a-173 of the Connecticut General Statutes provide the following penalties for failure to appear on felony and misdemeanor charges."

540.    Defendant Hillis failed to inform[285] plaintiff that her appearance on October 23, 2023 was required and implied that she would be able to get a continuance on the date.

541.    On October 24,2023, after 23 days of waiting, plaintiff's multiple pending requests for several of her cases to allow e-filing on e-services on the Connecticut Judicial Website were finally approved, after plaintiff repeatedly emailed and asked why her requests were sitting dormant for several weeks[286].

542.    On October 24, 2023, plaintiff called the Milford Superior Court to inquire as to why they had not signed the summons that plaintiff had asked them to sign for a new defamation lawsuit filed in Milford Superior Court on September 21, 2023.

543.    Plaintiff experienced extreme levels of harassment in attempting to find out information from the clerk and was degraded, discriminated against, and retaliated against. Plaintiff was also treated with clear bias, unequal protection, and her rights were again violated.

544.    Plaintiff then filed another motion on 10/24/23 representing the facts as follows:

> *"Plaintiff hereby requests that the clerk at Milford Superior Court, in accordance with P.B. 8-1, comply with plaintiff's prior request to sign the summons in this lawsuit. Plaintiff spoke to the Jane Doe Clerk who signed plaintiff's fee waiver motion 101 and signed it as "clerk" on 9/21/23 at approximately 4:30PM on 9/21/23. Plaintiff requests that whoever signed be administratively cited for failing to comply with the law under the state of Connecticut. Said Jane Doe Clerk of Milford Superior Court on 9/21/23 told plaintiff that, in accordance with her duties under state laws, that she would sign the summons. Plaintiff handed the clerk the summons, the complaint, and an application for waiver of fees. Plaintiff asked the clerk to sign the summons, and the clerk stated that she would sign the summons regardless of if the fee waiver was granted or not. The clerk then took plaintiff's summons, complaint, and fee waiver, and stated that plaintiff would get an answer on the fee waiver application and receive all of her documentation back in the mail with the complaint, signed summons, and either denied or granted fee*

---

[285] Defendant Hillis attempted to sabotage plaintiff's case by failing to inform her that her appearance was required and allowing a bail commissioners letter to be sent out and refusing to communicate with the court that plaintiff had asked for a continuance.
[286] Plaintiff also noticed that several of the records on the internet such as on the judicial website, on google, and other records have been deleted and plaintiff has proof of such. Several named defendants in this case have the ability to manual remove records as they are public officials, state marshals, clerks of court, and other state employees.

195- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*waiver application. The clerk instructed plaintiff that she would then be required to give said paperwork to the state marshal for service. Plaintiff asked repeatedly and confirmed repeatedly, on 9/21/23 with the chief clerk in Milford Superior Court and the clerk stated she would sign the summons regardless of if the fee waiver got granted or not. The clerk then never signed the summons and sent the granted fee waiver, complaint, and unsigned summons in the mail back to plaintiff. Plaintiff gave the paperwork to state marshal Robert Miller, who inquired why clerk did not sign summons. Plaintiff informed State Marshal Robert Miller that the clerk informed her they would sign it. Marshal Miller then served the defendants. Plaintiff hereby requests now for the second time since 9/21/23 that the clerk sign the summons. The clerk has a duty to sign the summons and the clerk's refusal and deliberate failure to do so is evidence of bias and obstruction of justice. Section 8.1 of the practice book states as follows, "Any person proceeding without the assistance of counsel shall sign the complaint and present the complaint and proposed writ of summons to the clerk; the clerk shall review the proposed writ of summons and, unless it is defective as to form, shall sign it." Plaintiff's summons was not "defective as to form" nor was plaintiff ever informed of such. Then, in front of at least one witness who is able to testify, plaintiff called Milford Superior Court at 2:30PM on 10/24/23 and spoke to Eunice Doe, a female clerk present at the Milford Superior Court who was extremely rude, hostile, argumentative, intimidating, and discriminatory toward plaintiff. Said clerk Eunice told plaintiff that "the clerk will not be signing your summons" and when plaintiff asked why, Eunice refused to give plaintiff and answer and instead rudely said "you've done this before, you should know." Plaintiff then informed Eunice, who plaintiff personally has never recalled speaking to in the past, that this was actually plaintiff's first time filing a civil matter in Milford Superior Court for a civil lawsuit. Eunice then started yelling at and being extremely combative, argumentative, rude, hostile, and accusatory toward plaintiff. She was extremely unprofessional and said things like "Your summons will not be signed." When plaintiff asked Eunice to provide her with her name so she knew who was giving her an attitude and treating her in such a hostile matter that violates plaintiff's right against discrimination and retaliation under the constitution, Eunice then said "oh there we go, another person." When plaintiff asked Eunice what she meant by that, she then got angry and defensive and continued to argue and tell plaintiff she "didn't have time for this." When plaintiff pointed out that Eunice is a state employee of the state of Connecticut and it is her duty under PB 8.1 to sign the summons and that plaintiff, as a non-attorney, needs the summons to be signed, Eunice again continued to yell, act hostile, and lie and say things like "every time you talk to me you like to say that you're an attorney and you should know I'm not telling you anything." Plaintiff doesn't even know who Eunice is nor does she remember ever having enough of a meaningful conversation with this individual to even remember her name or know who she is at all, yet she clearly seems to know who plaintiff is and harbor a negative discriminatory bias against plaintiff. Eunice then proceeded to leave plaintiff on hold for approximately 40 minutes after arguing and stating that none of the clerks will sign the summons, despite it being their duty under state law. Plaintiff is asking that the state of Connecticut terminate Eunice as she said she has no time to help plaintiff. Plaintiff pointed out that her tax dollars pay for Eunice's salary and that she's on the clock*

*getting paid to help people while denying them help and Eunice said, "don't go there, my salary pays other people's salary" and got angry, defensive, and was extremely rude, hostile, unprofessional, and acted in a manner that makes plaintiff feel threatened. Plaintiff has the right to access the courts and equal protection under the fourteenth amendment and individuals like Eunice being paid by the state acting under color of state law have no authority to undermine, demean, harass, and refuse to help pro-se litigants that are trying to navigate a system for the first time to protect their rights. Plaintiff cites this as discrimination and seeks the court to take judicial notice of the fact that plaintiff is unable to move forward with anything until the clerk signs the summons as it is her duty to do. Plaintiff did everything she is required to do, and the clerk is now required to do her part so the lawsuit can proceed. Telling plaintiff that they will "not sign the summons" yelling at plaintiff and then leaving plaintiff on hold for an hour and being rude, hostile, argumentative, and refusing to uphold their duty is a violation of their contract with the state. Plaintiff will be adding said clerk as a defendant to an existing lawsuit in federal district court as she is violating plaintiff's rights and refusing to uphold her duty which is then obstructing justice and violating plaintiff's rights to address grievances and access the courts. This is discrimination, violation of rights under color of law, and illegal. Eunice should not be paid by the state to deny people their rights. Discrimination is illegal. The fact that she seems to know plaintiff when plaintiff has no idea who she even is is disturbing. Plaintiff asked the clerk to sign the summons on 9/21/23, the clerk refused. Plaintiff asked a second time on 10/24/23, and the clerk refused. This is plaintiff's third time making the same request. If the clerk does not sign it, this is proof of unequal protection and violations of plaintiff's constitutional rights and the fourteenth amendment due process clause. State courts and their employees are NOT permitted to violate the law or the constitution. See exhibit A attached."*

545.   In spite of plaintiff asking the clerk on 9/21/23 to sign the summons, filing a request on 10/24/23 for them to sign the summons, and again a second request/motion and notice of intent to sue and complaint against the clerk on 10/24/23 for refusing to sign the summons, the clerk continued to state that she was instructed by her superior the chief clerk from Milford Superior Court that under no circumstances is she or any other clerk in the Milford Superior Court permitted to sign the summons for plaintiff[287].

546.   This is clear evidence of violations of plaintiff's rights. Plaintiff has the clear legal right to the

---

[287] Defendant Clerk Eunice Doe from Milford Superior Court and Defendant Clerk who signed plaintiff's fee waiver and took plaintiff's application on September 21, 2023, committed a felony by refusing to sign the summons. The summons also contains a notice which states "If this summons is signed by a Clerk: a. The signing has been done so that the plaintiff will not be denied access to the courts."

summons being signed and addressing the courts.

547.   Plaintiff did everything she was legally required to do to get the summons signed by a clerk in order to be able to "not be denied access to the courts," yet the clerk has for over a month now refused to sign the summons and is effectively blocking plaintiff from accessing the courts.

548.   On October 26, 2023, plaintiff sent in her second public records request to the Milford Police Department requesting the records regarding the incident of October 18, 2023. The plaintiff had previously requested same and her request has been wholly ignored by the defendant Milford Police Department.

549.   Defendant Milford Police Department not only grossly violated plaintiff's civil rights and intentionally and recklessly caused plaintiff injury, but then in an effort to retaliate against plaintiff further, they intentionally posted a press release on the internet stating that plaintiff was arrested.

550.   The press release contained information that was inaccurate and stated plaintiff was released on a PTA and that plaintiff was charged with a violation of a civil protection order. In actuality, plaintiff was charged with a violation[288] of a criminal protective order and was held on a $2500.00 bail for several hours.

551.   Rather than arrest the man, the Milford Police Department opted into outsourcing the investigation to the state's attorney's office, where Defendant Kelley then stated she "needed more evidence" and that there "wasn't probable cause" despite the victim providing hundreds of messages showing a clear violation[289].

---

[288] Plaintiff also did not violate any order as the press release falsely claims. The Milford Police Department, who have a history of gender discrimination and bias against women, have blood on their hands, along with Defendant Margaret Kelley, for the murder of a woman who attempted to ask them to arrest her former partner for hundreds of violations of a protective order.
[289] The woman was murdered and since then Milford Police Department decided to make an example out of plaintiff due to their pending litigation regarding the incident from December of 2022. Milford Police have attempted to make an example out of plaintiff by treating her with excessive force, humiliation, violation of rights under color of law, and unlawful detainment.

552.    On November 4, 2023, plaintiff contacted the defendant Waterbury Police Department to request that they conduct a wellness check on her child A.L. after Lodice abruptly ended the call and blocked plaintiff from having any contact with A.L.

553.    Plaintiff called the police and spoke with operator 552 from the defendant Northwest Communication Inc., and the case number was 23-102832.

554.    Said operator 552 then put plaintiff on hold, and then kept her on hold for almost ten minutes and asked several questions before even putting the call in. Many times, said dispatch operators will screen the calls and even deny plaintiff the ability to make a call based on their own biases.

555.     In spite of plaintiff calling the police at 8:20PM, plaintiff did not receive any phone call back from the police department until almost 2:00AM the next day.

556.    This is consistent with the ongoing pattern of negligence by the Waterbury Police Department and the third-party company that they use to take in the dispatch calls for the city.

557.    On November 8th, 2023, plaintiff repeatedly tried to contact her minor child A.L. by attempting to contact Defendant Lodice, and he continued to keep plaintiff blocked in an effort to prevent her from contacting A.L.

558.    Plaintiff attempted to contact Lodice by calling from a different number, and Lodice refused to answer. Plaintiff attempted to contact defendant Karen Bowers to speak to A.L., and she intentionally did not answer. Defendants Lodice and Karen Bowers have kept plaintiff blocked on all three of their collective phone lines for more than one month in an effort to prevent her from being able to speak to her minor child A.L. and interfere with her rights to speak to her child.

## COUNT ONE Violations of 42 U.S.C. § 1985(3) Conspiracy to violate Civil Rights

559.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

560.   U.S.C. Section 241 "makes it unlawful for two or more persons to agree to injure, threaten, or

intimidate a person in the United States in the free exercise or enjoyment of any right or privilege

secured by the Constitution or laws of the United States or because of his or her having exercised such

a right[290].

561.   Violations of §241 do not require[291] the element of a commission of an overt act. Violations of

§241 are applicable to the law enforcement misconduct and hate crime prosecutions and "was

historically used . . . in human trafficking prosecutions."

562.   42 U.S.C. § 1985(3) allows an individual to file a civil lawsuit if two or more persons conspire for

the purpose of depriving, either directly or indirectly, any person or class or persons of the equal

protection of the laws, or of equal privileges and immunities under the laws, including conspiracies to

interfere with a person's civil rights.

563.   Defendants are in violation through their acts which constitute hindering the legal process, witness

participation, and conspiring to deny equal protection rights to plaintiff.

564.   Plaintiff has been harmed as a result of the illegal acts of the defendants and is entitled to damages,

injunctive relief, and other remedies as a result of being irreparably harmed by the conspiracy

described within this action.

565.   The actions of the defendants described herein constitute egregious violations of plaintiff's

constitutional rights, especially plaintiff's rights to due process, equal protection, and freedom from

gender discrimination[292].

---

[290] Defendants, in concert with one another and through acts, omissions, and associations, conspired to infringe on plaintiff's
federally protected rights and those of her minor children A.L. and J.V.
[291] In these situations, "the offense is always a felony, even if the underlying conduct would not, on its own, establish a felony
violation of another criminal civil rights statute. It is punishable by up to ten years imprisonment unless the government proves
an aggravating factor (such as that the offense involved kidnapping, aggravated sexual abuse, or resulted in death) in which
case it may be punished by up to life imprisonment and, if death results, may be eligible for the death penalty."
[292] Defendants conspired to deprive plaintiff of her natural relationship with her minor daughter A.L. in an effort to protect the

566.   Defendants colluded with one another and conspired to act in concert with one another to deprive plaintiff of her rights and held plaintiff's pro-se pleadings to a standard that is unreasonable and unconstitutional. The court has held that "pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same high standards of protection as lawyers." *Jenkins v. McKeithen*, 395 U.S. 411, 421 91959); *Picking v. Pennsylvania R. Co.*, 151 Fed 2nd 240; *Pucket v. Cox*, 456 2nd 233.

567.   Defendants conspired to interfere with and terminate the natural mother-daughter and sibling relationships between A.L., J.V. and plaintiff in order to further their own financial and personal interests and attempt to violate plaintiff's rights under color of law[293].

568.   Defendants engaged in multiple overt acts, such as making and accepting bribes, engaging in ex-parte communications, diverting funds designated for protection from relief from abuse, denying plaintiff the right to address grievances with law enforcement and through the judicial system, and engaging in wire fraud[294].

569.   Defendants violated the plaintiff and her minor children's rights under the 1st, 4th, 5th, 14th, 10th, 9th Amendments and under numerous federal statutes and acts of Congress by denying plaintiff the right to equal protection, the right to be heard, the right to the free exercise of religion, the right to address grievances with the government, and many other fundamental enumerated and unenumerated and

---

interests of Lodice. Defendants did this in contrast to the decision held in *Santosky* which affirmed that "until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."

[293] Defendants conspired to accept bribes and financial incentives, obstruct justice, attempt to silence and retaliate against plaintiff, and agreed with one another as co-conspirators to infringe upon plaintiff's federally protected rights by preventing plaintiff from being able to aid in the prosecution of the defendant D.L. for allegations of sexual abuse in an effort to protect defendant Lodice.

[294] Defendants engaged in a pattern of overt acts for several decades in furtherance of the conspiracy to deprive plaintiff and her children of their federally protected rights as crime victims, rights to family integrity, and rights to equal protection under the law.

unalienable rights that the plaintiff and her minor children are undeniably entitled to[295].

570.    Defendants acted willingly with the intent to deprive plaintiff and her minor children of numerous federal rights in the interest of their own financial gains by acceptance of bribes, misuse of federal funding, tax evasion, money laundering, and fraud[296].

571.    In furtherance of this conspiracy, the conspirators committed several over acts, including money laundering, denying plaintiff the right to file motions in her custody/visitation/child support case, denying plaintiff the right to press charges or write statements against those violating laws and rights of the plaintiff, denying plaintiff right to the free exercise of her religion, denying plaintiff the right to cross-examine witnesses and the defendant, denying plaintiff the right to counsel, and other inalienable rights such as denying plaintiff the right to equal protection under the law and discriminating against plaintiff as a result of her race, socioeconomic status, education level, gender, and other factors as compared to defendants Viglione and Lodice in equal, if not identical and comparable situations[297].

572.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the

---

[295] Defendants used their positions within non-profit and not-for-profit organizations, law enforcement agencies, state agencies, and those working in political positions to further the goals of the defendant Lodice to ensure that plaintiff would be likely to never regain any contact or reunification with her minor daughter A.L. and completely and permanently sever the mother-daughter and sibling relationship that A.L. shared with plaintiff and J.V. for perpetuity in an effort to obstruct justice and protect D.L. from criminal charges for sexual assault of a minor.
[296] Defendants collectively as conspirators conspired and agreed among themselves to deprive plaintiff of her federally protected rights, specifically the right to equal protection under the law, freedom of speech, freedom of religion, the right to a trial, the right to due process, and many other federally protected rights.
[297] Other overt acts committed by the conspirators include perjury, witness tampering, making false statements, fabricating evidence, and unlawful detainments. The conspirators acted willfully and with specific intent to deprive plaintiff and her minor children of their federally protected rights.

intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

573.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

574.    Defendants, through an agreement and concerted action, engaged in conduct that violated U.S.C. § 241 by intentionally conspiring to injure, threaten, and intimidate plaintiff, impeding her free exercise and enjoyment of rights and privileges secured by the Constitution and laws of the United States, as detailed herein.

575.    Specific instances of defendants' misconduct, which require no overt act for a §241 violation, have been used historically in prosecutions for law enforcement misconduct, hate crimes and human trafficking, align with the present action where similar patterns of abuse and intimidation are evident.

576.    Under 42 U.S.C. § 1985(3), plaintiff seeks redress for the defendants' conspiracy to deprive her, either directly or indirectly, of equal protection of the laws and equal privileges and immunities under the laws, by interfering with her civil rights, including, but not limited to, the right to due process and equal protection under the law.

577.    Defendants' collective acts and omissions hindered the legal process and witness participation and constituted their conspiracy to deny plaintiff her equal protection rights.

578.    Plaintiff has suffered significant harm as a direct and proximate result of defendants' illegal acts, warranting damages, injunctive relief, and other appropriate remedies.

579.    The described actions of the defendants represent egregious violations of constitutional rights, particularly the rights to due process, equal protection, and freedom from gender discrimination as evidenced by the aforementioned factual contentions within this action.

580.    Defendants' collusion and conspiracy to act in concert to deprive the plaintiff of her rights held plaintiff's pro se pleadings to an unreasonable and unconstitutional standard, in violation of

established jurisprudence that mandates leniency in the evaluation of pro se litigants' pleadings.

581.    As a consequence of this unlawful conspiracy and the actions, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have suffered irreparable harm.

## COUNT TWO Violations of 42 U.S.C. 1983 Deprivation of Rights Under Color of Law-Discrimination

582.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

583.    18 U.S.C. § 242 makes it a crime for "someone acting under color of law[298] to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. It is ***not*** necessary that the offense be motivated by racial bias or by any other animus.[299]"

584.    The defendants engaged in state action under color of law as defined by the law. "State action is found when there are acts under color of state law, by using power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).

585.    Defendants have violated the plaintiff's constitutional rights as described under 18 U.S.C. § 242 which gives plaintiff standing to sue under 42 U.S.C. 1983 for deprivation of said rights under color of law through their actions as state and local officials, police officers, and other governmental agents, giving plaintiff standing to sue for damages and obtain injunctive relief.

586.    Defendants that are not explicitly the state or its entities or employees are also liable for state

---

[298] Defendants act under color of law when they wield power vested by a government entity. Those prosecuted under the statute typically include police officers, sheriff's deputies, and prison guards. However other government actors such as judges, district attorneys, other public officials, and public school employees can also act under color of law and can be prosecuted under this statute.
[299] The Department of Justice has previously "prosecuted public officials for thefts, false arrests, evidence-planning, and failing to protect someone in custody from constitutional violations committed by others."

action. State action is found "when a private actor is a willful participant in joint activity with the State of its agents." *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001).

587.   The facts within this complaint affirm and demonstrate a clear violation of 18 U.S.C. § 242[300].

588.   On numerous occasions, including on Friday, October 13th, 2023, the plaintiff experienced extreme levels of harassment by defendants such as the Orange Police Department and its employees[301].

589.   The defendants[302] engaged in numerous overt acts on various occasions under color of state law when these violations occurred. Defendant Dispatcher Salva (hereinafter "Salva") of the Orange Police Department, on numerous occasions, was extremely biased and rude and hostile toward the plaintiff and treated her with disrespect and attempted to discriminate and deprive plaintiff of her rights to equal protection[303].

590.   On numerous occasions, such as on 10/13/23, Defendant Kingston made large efforts to try to coerce plaintiff into not making statements against defendants such as Matthew Lodice, Scott Lodice, Jessica Strusky, D.L., T.L., Scott Lodice, Karen Bowers, Roy Bowers, and others, and spoke to plaintiff on the phone for approximately 30 minutes and attempted to coerce plaintiff not to write a statement and refuse to allow plaintiff to write a statement to seek criminal charges against various defendants named in this action[304].

---

[300] The defendants, by allowing Lodice to gain all control and authority over if, when, and how plaintiff could ever see or speak to her minor child A.L., have effectively stripped plaintiff of her rights and deprived plaintiff of her due process in terminating her relationship with A.L. without proving plaintiff unfit.
[301] Defendant officers, dispatch workers, and other employees of the Town of Orange and the Orange Police Department, as well as other defendants, acted under color of law to deprive plaintiff and her minor children A.L. and J.V. of their rights.
[302] The actions of Lodice constitute "child abuse and neglect" as defined in CAPTA which states that "any act or failure to act on the part of a parent or caretaker, which results in . . . emotional harm."
[303] Defendant Lieutenant Kingston of the Orange Police Department also engaged in overt acts on various occasions under color of state law to deprive plaintiff of her right to write a statement and seek the arrest of those who are committing crimes against her.
[304] On numerous past occasions, defendants made large efforts to accommodate the wishes of Lodice and Viglione in seeking criminal charges, writing statements, and being involved in civil/custody matters, while simultaneously denying all of these

591.    Plaintiff has been subjected to extreme and severe intimidation, threats, discrimination, violations of equal protection rights, and other violations of my rights as a victim of a crime by the Defendant Police Officers in this action and their respective departments[305].

592.    The Orange Police Department and Waterbury Police Departments have routinely used severe levels of intimidations, threats[306], and attempts to try to coerce[307] plaintiff into not writing a statement or submitting an affidavit for the warrant of the arrest of defendant Lodice for his ongoing abuse and harassment.

593.    The Defendants have been subjecting plaintiff to extreme retaliation[308] and extreme favoritism and protection of defendant Lodice who has a strong network of police and judicial and state marshals and correctional officers.

594.    Defendant officers named in this action have violated[309] plaintiff's rights severely, particularly in the Waterbury Police Department and the Orange Police Department, as well as with the New Britain Police Department.

---

rights to plaintiff.

[305] Defendant law enforcement officers and law enforcement departments named in this action have systematically and routinely discriminated against plaintiff and subjected her to severe emotional distress and harm.

[306] Plaintiff now lives in constant fear of not being able to report crime as the Orange Police Department and their associated officers and dispatchers have subjected plaintiff to discriminatory treatment that violates her rights and those of her minor children.

[307] Lieutenant DeRubeis of the Orange Police Department attempted to intimidate, insult, threaten, scare, mock, and harass the plaintiff when she attempted to write a statement. Plaintiff was told she did not have such right to make a statement and other defendant officers have routinely denied Plaintiff these rights, as well.

[308] Defendant officers from the Orange Police Department and Waterbury Police department have regularly tried to scare and use coercion against plaintiff to try to deter her from making a report, refuse to take the call in from dispatch, refuse to allow plaintiff to have an officer call her back or take her complaint, and laugh, mock, belittle, and intimidate plaintiff to the point where plaintiff no longer feels safe or protected by the law enforcement officers whose job it is to have a duty to protect her and her children.

[309] None of the aforementioned departments or any other officers or departments named in this complaint have conducted investigations in a fair and unbiased manner, but rather have shown extreme bias and retaliation toward the plaintiff for her attempts to try to seek services from the police. None of the aforementioned departments have shown the plaintiff or her minor children any respect and have violated all of our rights under the ADA, CAPTA, VAWA, crime victims' rights, and rights to seek services without being discriminated against in compliance with due process and equal protection rights set forth in the fourteenth amendment.

595.    Plaintiff's rights[310] have been violated so badly that plaintiff can no longer call either department without being treated extremely different than any other civilian, which causes plaintiff extreme level of emotional distress and fear.

596.    Defendants[311] have engaged in these acts, omissions, and affiliations repeatedly from 2017 until present, with the acts and omissions and overt actions increasing significantly after the birth of plaintiff's minor daughter A.L. and the initiation of court proceedings regarding child support, custody, visitation, and access to A.L.[312]

597.    Defendants violated plaintiff's fundamental right under federal law to family integrity as guaranteed under the United States Constitution.[313]

598.    The 2nd circuit has held that "parents and children share a compelling interest in remaining together as a family unit[314].

599.    The Supreme Court also held in *Santosky* that "the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.[315]"

---

[310] All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[311] Multiple defendants that are state officials, police, law enforcement agencies, and state marshals have repeatedly deprived plaintiff of her rights, privileges, and immunities secured by the Constitution and federal laws.

[312] Defendants' actions were done under color of law and violated many of plaintiff and plaintiff's minor children's federal rights as stated within this complaint. The defendants acted willfully and with the intent to deprive plaintiff of her rights and did so knowingly and unlawfully.

[313] In *In re Zakai F.*, 336 Conn. 272, (2020), the Connecticut Supreme Court explained the protections afforded to a parent under the United States Constitution in relation to her children. The court held that "[t]he fundamental right to family integrity guaranteed by the constitution fits within Connecticut law as follows, 'The right to family integrity . . . encompasses the reciprocal rights of both the parent and the children . . . the interest of the parent in the companionship, care, custody, and management of his or her children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association . . . with the parent." *Pamela B. v Ment,* 244 Conn. 296, 310, 709A. 2d 1089 ((1998).

[314] See *In re Christina M.,* 280 Conn. 474, 486-87, 908 A.2d 1073 (2006).

[315] Defendants colluded with and acted in concert with one another under the color of law to unlawfully strip plaintiff of her rights under constitutional and federal law and in accordance with Supreme Court precedent.

600.   Defendants, while acting under color of state law as law enforcement, public officials, state employees, or under influence of anyone with such authority, deprived plaintiff and her minor children of their rights, privileges, and immunities secured by the Constitution and laws of the United States, specifically the rights to equal protection and due process, the right to be free from unreasonable searches and seizures, the right against cruel and unusual punishments, as well as rights under the 1st, 5th, 4th, 14th, 9th, 10th, amendments and various federal laws and U.S. treaties[316].

601.   Defendants engaged in this conduct and acted willfully and with the intent to deprive plaintiff and her minor children of their inalienable rights as they are entitled to under federal and state law.

602.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

603.   The individual rights protected under the Fourteenth Amendment can be understood in three categories: (1) "procedural due process;" (2) the individual rights listed in the Bill of Rights, "incorporated" against the states; and (3) "substantive due process."

604.   "Procedural due process" concerns the procedures that the government must follow before it deprives an individual of life, liberty, or property[317].

---

[316] In doing so, defendants engaged in conduct that included racketeering activity, bribery, fraud, extortion, retaliation, and discrimination against plaintiff including, but not limited to, unlawful search and seizure, using excessive force, denying access to counsel, and refusing to allow plaintiff access to the courts.

[317] Historically, due process ordinarily entailed a jury trial. The jury determined the facts, and the judge enforced the law. In the past two centuries, however, states have developed a variety of institutions and procedures for adjudicating disputes. Making room for these innovations, the Court has determined that due process requires, at a minimum: (1) notice; (2) an opportunity to be heard; and (3) an impartial tribunal. *Mullane v. Central Hanover Bank* (1950).

605.   Defendants continually treated the Plaintiff in a demonstrably egregious, discriminatory, and hostile manner[318].

606.   Defendant Judicial Review Council and all other defendants associated with the Judicial Review Council collectively denied plaintiff her rights to equal protection under the fourteenth amendment by refusing to hold defendant Grossman accountable in plaintiffs two complaints made in July of 2022 and July of 2023 regarding misconduct by defendant Grossman.

607.   Defendant Ned Lamont and all other defendants associated with the legislative and executive bodies of the state of Connecticut denied plaintiff her rights to equal protection by refusing to censure, impeach, or remove defendant Grossman, despite multiple complaints being made by many individuals over the past five years regarding illegal conduct of defendant Grossman.

608.   Defendants colluded with one another in order to deprive plaintiff of her right to preservation of her relationship with her child A.L. which derives from the fact that plaintiff's achievement of a rich and rewarding life is likely to depend significantly on her ability to participate in the rearing of her child.

609.   Defendants conspired to deprive plaintiff from the right to enjoy the mutual care, company, love, and affection of her minor daughter A.L. which can not be taken away from her without due process of law.

610.   Plaintiff has continued to suffer from the harm that the defendants have caused her to experience and has and will require intensive medical and psychological care to recover from the trauma that she lived through.

---

[318] Defendants have constantly ignored evidence that father had coerced, threatened, and psychologically abused the minor children and made disparaging remarks about the Plaintiff. Defendants engaged in collective improper ex-parte' communications with one another in an effort to obstruct justice and ensure personal financial gains and incentives in the above-referenced cases.

611.    Defendants deprived plaintiff of her right to protection from interference in the relationship between her and her minor daughter A.L. and the right to the custody of her child is an element of liberty guaranteed by the 5th Amendment and the 14th Amendment of the United States Constitution.

612.    Defendants have engaged in state action, which is found "when a private corporation uses land or buildings that are owned by a government" See *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).

613.    Defendants have engaged in egregious violations of plaintiff's fundamental rights guaranteed by the Fourteenth Amendment as rooted in the precedent of *Monell v. Department of Social Services*, in an effort to deliberately strip away plaintiff's Fourteenth Amendment rights while engaging in the systemic wrenching of children from mothers without due process creating an orchestrated travesty that has impacted and harmed millions of people[319].

614.    Moreover, Defendants retaliated[320] against the Plaintiff for reporting judicial and state employee misconduct and wrongdoing.

615.    Defendant Grossman goes on to suggest that the mother should have an ... "assessment[321] by psychiatrist with a PhD level to determine" why the mother has allegedly "lied" about the sexual abuse allegations regarding her minor child A.L.

---

[319] Defendants have complied with standards set in *United States v. Turkette* to form an intricate association-in-fact enterprise that has acted as a coalition to deliberately engage in a long-standing pattern of racketeering, with the primary goal being institutional enrichment at the cost of familial bonds.

[320] Specifically, Defendant Grossman continues to relentlessly harass the Plaintiff with disparaging remarks, defamatory and slanderous public written opinions, and unfounded accusations. Defendant Grossman jointly with other defendants would openly conspire and collude with one another before, during, and after many of plaintiff's hearings.

[321] Tangentially, the abusive father has never been mandated to likewise have an assessment by a psychotherapist whatsoever. He was also exempt from an order to sign releases for the mental health treatment records from his previous provider, despite the defendant Grossman threatening the plaintiff with adverse legal action if she didn't comply. The hypocrisy is clear and the point well-taken.

616.    Defendants repeatedly denied plaintiff rights under the equal protection clause of the fourteenth amendment to the United States Constitution through discriminatory actions by state and local government officials[322].

617.    Defendants violated the plaintiff's rights under the Due Process Clause of the Fourteenth Amendment which has held that the integrity of the family unit is one that has found protection within.

618.    Children also have "an additional interest in safety and consistency[323]," which has not been afforded to plaintiff as a result of the defendants' pattern of violating plaintiff's rights without ceasing.

619.    Defendants, through their roles and affiliations as state, municipal, and government officials acted as judges, state appointed counsel, representatives of DCF, representatives of DSS, representatives of Yale, representatives of various non-profits, law enforcement, state marshals, judicial marshals, and other affiliates and accomplices abused and exploited their official roles and capacities in an effort to violate plaintiff and her minor children's rights under the fourteenth amendment[324].

620.    Defendants, in their capacity as state, municipal, local, and other officials, while acting under color of state law, deprived plaintiff and her minor children of their rights under the fourteenth amendment to the United States Constitution, specifically the right to equal protection under the law by engaging in systematic discriminatory actions, policies, and decisions that violated plaintiff's rights under federal law, thereby treating plaintiff differently than other similarly situated individuals without a legitimate governmental interest or rational basis[325].

621.    The defendants have, as seen in the precedent set in *Castle Rock v. Gonzales*, have engaged in

---

[322] Defendants regularly deprived plaintiff of her rights to life, liberty, and property, without due process of law. Defendants' actions and inactions violate plaintiff's rights under the Fourteenth Amendment to the United States Constitution.
[323] See *Osborne v Ohio*, 495 U.S. 103, 109, 110 S. Ct, 1691, 109 L. Ed. 2d 98 (1990)
[324] The actions of the defendants were done while they were acting under color of state law and defendants violated plaintiff's rights to equal protection and due process of law on numerous occasions as stated herein within this complaint.
[325] Defendants also violated plaintiff's right to due process by depriving plaintiff of life, liberty, and property without adequate legal procedures or protections.

repeated violations of the fourteenth amendment rights of plaintiff, which falls in line with the ongoing institutional statewide discrimination and bias against mothers, especially those reporting abuse[326].

622.   Defendants, acting under color of state law, willfully deprived Plaintiff of rights protected by the Constitution and laws of the United States, actionable under 42 U.S.C. § 1983.

623.   Defendants' state action, as delineated in U.S. v. Classic, constitute a misapplication of power held by virtue of state law, violating plaintiff's constitutional rights.

624.   Such actions, not requiring animus, were engaged in by defendants, state and local officials, police officers, and other governmental agents, who are liable for damages and injunctive relief due to the deprivation of plaintiff's rights under color of law[327].

625.   Defendants coerced plaintiff to deter her from pursuing legal actions against various individuals.

626.   Plaintiff endured extreme intimidation and discrimination by defendant police officers, infringing upon her rights as a crime victim. Defendant officers used coercion to prevent plaintiff from pursuing legal recourse against defendant Lodice, indicative of systematic racism, sexism, discrimination, favoritism, and retaliation.

627.   Defendants' actions have caused plaintiff distinct emotional distress, treating her differently from other civilians, which escalated after significant life event and legal proceedings.

628.   Defendants violated plaintiff's and her minor children's rights, including rights to equal protection and due process, freedom from unreasonable searches and seizures, and other enumerated and unenumerated rights.

629.   Defendants' willful conduct intended to deprive plaintiff of her inalienable rights, resulting in

---

[326] The discriminatory practices of the defendants are shielded by legal technicalities and a façade of impartiality which allow them to continue in a systematic manner.
[327] Defendants, including non-state actors, participated in joint activity with state agents, thus engaging in state action and discriminating against plaintiff in violation of her equal protection rights. Defendants displayed bias and hostility, attempting to deprive plaintiff of her right to equal protection.

substantial harm to plaintiff and her minor children, including emotional, physical, and financial damages. Defendants' systematic discriminatory actions have treated plaintiff differently from similarly situated individuals, such as Lodice, without justification, constituting a violation of equal protection under the Fourteenth Amendment.

630.   As a direct result of defendant's conduct, plaintiff and her minor children have suffered irreparable harm, meriting relief.

631.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

632.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT THREE Civil Action for Negligence – Conn. Gen. Stat. § 52-557n**

633.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

634.   At all times relevant hereto, the defendants of the Milford Police Department were employees of the City of Milford and were in the scope of their employment.

635.   The defendant, City of Milford, is vicariously liable for the aforesaid negligence of their employee defendants pursuant to Connecticut General Statute §52-557n.

636.   At all times relevant hereto, the defendants of the Orange Police Department were employees of the Town of Orange and were in the scope of their employment.

637.   The defendant, Town of Orange, is vicariously liable for the aforesaid negligence of their employee

defendants pursuant to Connecticut General Statute §52-557n.

638.    At all times relevant hereto, the defendants of the New Britain Police Department were employees of the City of New Britain and were in the scope of their employment.

639.    The defendant, City of New Britain, is vicariously liable for the aforesaid negligence of their employee defendants pursuant to Connecticut General Statute §52-557n.

640.    At all times relevant hereto, the defendants of the Waterbury Police Department were employees of the City of Waterbury and were in the scope of their employment.

641.    The defendant, City of Waterbury, is vicariously liable for the aforesaid negligence of their employee defendants pursuant to Connecticut General Statute §52-557n.

642.    At all times relevant hereto, the defendants of the New Haven Police Department were employees of the City of New Haven and were in the scope of their employment.

643.    The defendant, City of New Haven, is vicariously liable for the aforesaid negligence of their employee defendants pursuant to Connecticut General Statute §52-557n.

644.    At all times relevant hereto, the defendant employees were employees of the State of Connecticut and were in the scope of their employment.

645.    The defendant, State of Connecticut, is vicariously liable for the aforesaid negligence of their employee defendants pursuant to Connecticut General Statute §52-557n.


**COUNT FOUR Civil Action for Deprivation of Rights - Retaliation 42 U.S.C. § 1983**

646.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

647.    Several defendants, including those associated with the Connecticut Judiciary and those who are involved in law enforcement, in collaboration with other entities, have sought to suppress plaintiff's

revelations by imposing legal barriers, initiating retaliatory legal actions, and fostering an environment of fear and intimidation.

648.    Defendants associated with The Orange Police Department and The New Britain Police Department unlawfully retaliated against Plaintiff for opposing them and filing complaints against them[328].

649.    Plaintiff asserts that the defendants, in concert in one another and through their actions and policies, have infringed upon her fundamental and constitutional rights, as well as those of her minor children[329].

650.    Defendants such as the Milford Police Department, city of Milford, and its employees regularly retaliate against women who complain about their discriminatory behavior. When women contact defendants such as Milford Police Department or Orange Police Department to report violations of protective order, Milford and Orange will refer the report to the court rather than make an arrest, leading to women being killed by senseless acts of violence.

651.    In contrast, when men such as defendant Lodice call to complain about violations of protective orders, defendants such as Milford Police Department rush to arrest women such as plaintiff and charge them with felony violation of protective order charges.

652.    Defendants have displayed a clear misogynistic attitude toward women and side with domestic abusers and retaliate against any women like plaintiff who speak out about the discriminatory conduct.

---

[328] The aforementioned conducts of the Defendants collectively constitute a "pattern of racketeering activity." Their actions are not isolated incidents but are intertwined in a complex tapestry of illicit financial transactions, deliberate misconduct, and systemic corruption.
[329] Defendants have engaged in blatant gender-based discrimination, which stands as a testament to their egregious breaches of both due process and equal protection mandates. Defendants' retaliations deprived Plaintiff of her right to equal protection guaranteed by the Fourth Amendment to the United States Constitution.

215- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

653.   Defendant Vakos of the Milford Police Department attempted to further retaliate against plaintiff by attempting to issue an order of protection that would mandate plaintiff to have no contact with her minor child A.L., despite there being no reason or basis to do so.

654.   Defendants' retaliation deprived Plaintiff of her right to due process under the la Defendants' retaliation caused Plaintiff damages enumerated below[330].

655.   Sergeant DeRubeis and Officer Yelenik coercing plaintiff and trying to intimidate against writing statement.

656.   On numerous occasions  including but not limited to 10/13/23, They refused to make an arrest or do anything regarding various crimes and denied rights.

657.   On 10/13/23, Plaintiff submitted the following statement to Defendant Taylor of the Orange Police Department and Defendant Kirby of the Orange Police Department:

> *"I, Theodora Antar, of 856 Shagbark Drive, Orange, CT, 06477 make the following statement. I am aware that making a false statement is a violation of Connecticut General Statutes Section 53a-157b and is a class A misdemeanor. I would like to press charges against Scott Lodice, Karen Bowers, Roy Bowers, and Matthew Lodice for various crimes. I was told that I need to report these crimes and specifically ask to press charges with The Orange Police Department as I am a resident of Orange and that only Orange will have jurisdiction to be able to press charges and make any arrests for these offenses. Matthew, Karen, and Roy all reside at 48 Quarry Hill Rd, Waterbury, CT, 06706. Scott resides at 59 Cliff street, 2nd floor, Shelton, CT, 06484. For the last 6 months, they have all been psychologically abusing me, harassing me, and using coercion to force me to not be able to see or speak to my child Angelina Maria Lodice. Per court order, Matthew is supposed to give me regular access to Angelina, supposed to give me a schedule with Angelina, and is supposed to allow me to have regular FaceTime calls with her. He has done none of the above. Matthew, Karen, and Roy have been denying me access to my child and completely isolating her from me from 5/25/23 until now. In the past 20 weeks they only let me my 4-yaer-old daughter Angelina Lodice for 1.5 days total. Angelina has repeatedly begged to see me and to come home and to see her sister who I have sole custody of, but Matthew and his accomplices have chosen*

---

[330] Defendants who are employed by the Orange Police Department and the Town of Orange, on numerous occasions, showed acts of retaliation including but not limited to filing for an arrest warrant against plaintiff on 5/11/23, two weeks after an incident, and mailing a letter on 5/14/23 to plaintiff in retaliation for plaintiff attempting to press charges against Defendant Lodice.

216- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

*to instead coerce us to be forcibly isolated from each other. In the past 8 weeks they let me see my daughter for a total of zero (0) days. I have not seen my child in 2 months, and I have not spoken to my child in six days. This is not by choice. I am being forced to do this by Matthew, Karen, And Roy. I have repeatedly begged for a chance to have access to my child, and they have all refused to allow me to have any access at all. This is coercion, harassment, and abuse. On 10/8/23, at 4:30PM, I called my child Angelina Lodice, and we had a Facetime call. My nine-year-old daughter was also present during this call and she witnessed the entire thing. The entire call was recorded via a screen recording on my iPhone and the audio was also recorded. I merged the screen recording together with the audio so the entire call if intact for review as evidence. I have previously emailed the call to the Orange Police Department, as well as to the Waterbury Police Department, and I am providing a flash drive today with the full 29-minute recorded call inside as evidence. During the call on 10/8/23, Matthew was on the bed drunk/passed out/hung over in the dark laying in his bed with the lights off while Angelina was in the room. At one point, he even tried to mount the phone on a tripod that he has mounted to his bed that he regularly uses to record pornography of several different women who he has visit with him there in his mother's basement where he resides. Matthew has a severe addiction to pornography and he and his brother began showing his son Dominic pornography at the age of 11. During this Facetime call on 10/8/23, Matthew was barely able to keep his eyes open and at several points Angelina puts the camera toward him and shows him on the screen and he looks to be drunk, hungover, and/or under the influence of drugs. Toward the end of the call, Angelina screamed in pain repeatedly during this call, and she said that her "butt hurts" and that her "stomach hurt" as she hurled over in pain repeatedly. I asked her if she was okay, and her response was "Daddy told me not to tell you where Dom works because you might ask." Dom is the 17-year-old son of Matthew Lodice who Matthew, Karen, and Roy regularly instruct to leave Angelina alone with as her "babysitter" while they are not there. I asked my daughter why she was bringing up Dominic when I asked her why her butt hurt, and her response was that "Dadda told me not to tell you things" (See recorded call from flash drive) Angelina has alleged that she was being sexually abused by Dominic for more than a year now, and there has not been a single police officer, DCF worker, social worker, doctor, or anyone else in this entire state that has even once asked her if she was being sexually abused, despite me providing multiple videos to DCF and the New Britain Police Department in which Angelina is making sexual motions/humping her stuffed animals and toys and when asked what she is doing, she says she is "doing what Dom does to me." In other videos she explicitly states that "Dominic puts his penis on her butt and her vagina" that "Dominic will do it on the floor behind the gray couch in the living room" and that "Dominic does this when daddy is at work and he takes Sal with him" and has even said that he witnessed Dominic doing this on camera and that he attempted to yell at Dominic and ask him what he was doing and told him not to do it again. However, she said that he did do it again repeatedly and that Matthew is aware and does nothing. I reported the abuse to DCF, and they assigned New Britain Police to the case but all they did was sent her to the Yale Child Abuse Clinic on 10/31/23 and on 3/3/23 in order to do a "forensic interview" where on the first day they asked her "is there any place on your body nobody else is*

*allowed to touch?" and her answer was "no." They then immediately ended the interview and closed the police investigation. The detective assigned to the case never even once met my child yet claimed to have "investigated" the crime. On 3/3/23, my child disclosed in her second forensic interview at Yale that Dominic "sits on her" and that he has her "sit on him" and that during this interaction he "tickles her belly". Despite having many videos in which she was humping her stuffed animals and saying "I'm sitting on them like Dom sits on me", the detective said that none of that mattered, and said their entire investigation was solely restricted to the interview with the social worker at the Yale Child Abuse clinic, and that they had no ability to investigate further, despite her making those disclosures. Angelina continued to make more graphic and detailed disclosures after that. I have provided several of the videos on a flash drive for the police to see exactly what I am talking about. I am making it very clear that I want to press charges against Matthew for risk of injury to a minor for intentionally leaving her alone with Dominic, I want to press charges against Dominic for the sexual assault of my daughter since he is 17 years old and is fully competent to understand. I also want to press charges on Matthew for 53a-73a for sexual assault in the fourth degree because on 9/14/21, Matthew sexually assaulted me at 755 Hill Street, Hamden, CT, and subjected me to sexual intercourse and accomplished the sexual contact without my consent while I was supposed to be meeting him to pick up fliers to distribute for his company Whole House Remodeling Company LLC. Matthew told me that I could come to the residence listed in Hamden where he was working remodeling a bathroom. The homeowners were not there. I went in there and as soon as I walked inside, Matthew grabbed me, pulled my pants down, bent me over on to the stairs, and penetrated me and forcibly had sex with me even though I repeatedly told him to stop. Matthew continued and did not stop until he was able to ejaculate. When he finished he got up, went back to working on the bathroom, and acted like nothing happened. The entire thing lasted less than 5 minutes. He told me that he could do whatever he wants to me anytime that he wants and that he has the right to have sex with me as he pleases, and told me if I didn't do what he wants he would not give me any child support, and that he would go after me in court to try to take my children away. I have been emotionally and psychosocially abused by him financially and sexually abused and subjected to torture from him since 2018 and he has always threatened to retaliate against me. I am fearful of him and he has tried to destroy my life. On 10/8/23 he was arrested for risk of injury to a minor, interfering with an officer, and resisting arrest. On 10/9/23 he told me if I called his phone, his mothers phone, or his work phone to try to contact my child that he would "have me arrested" for violating a protective order. The protective order says I can speak to my child, the court order says I can facetime her. He has threatened me with arrest and said if I try to see or speak to my child he will "have me arrested" and has said that his relationship with police, state marshals, judges, correctional officers, and other state actors will ensure this to occur. He has not let me see my child in 2 months and I contacted him on 10/9/23 asking to see her. He refused again and said to me that he would not let me see her again unless he could "go to a judge and say how I am hurting my child" I have repeatedly tried to call him, his mom, and his work phone and he blocked me on all of the calls. I try to call from restricted and his mom wont answer. Matthew answers and then tries to say hello hello but doesn't give*

*the phone to Angelina and knows that I can not speak to him outside the app. He does this intentionally to harass me. His brother Scott Lodice was told by the Wallingford Police Department that if he had any more contact with me that he would be arrested, and he has continued to harass me and so has Matthew. Scott Lodice repeatedly spoke to me on the phone on 8/12/23 when I attempted to talk to my child and Matthew told him he could harass me as long as there was no protective order, even though Officer Minnitor from the Wallingford Police Department told him it would be an arrest if he did again. Scott will also try to go in Angelina's room during facetimes and intentionally talk to her and get her not to talk to me and stand in front of the camera to intimidate me. Matthew speaks to me on calls constantly to harass me as well. He has not let me see or speak to Angelina and now it has been 6 days and I have no way to see or speak to my child despite court orders saying I can. I told him not to threaten me and he still does. He said I will not be seeing or talking to her until he can make up lies to a judge. His mother also fraudulently told Saint Mary's hospital that she was the legal guardian for my child, took her there, wrote herself as legal guardian and instructed them not to list me as guardian and consented to treatments on my child. This is fraud. When I last called Waterbury pd on Wednesday they said my child was not with the father and was with Roy and Karen. None of them will let me see or speak to her. Matthew has at least 2 registered guns. I feel harassed. I want to press charges for 53a-73a, 53a-151a, 53a-165aa, 53a-302, 53a-97, 53a-156, 53a-167, 53a-180aa, 53a-192, 53a-73a, 43a-98, 53a-64, 53a-183, 53a-181e."*

658.   Shortly thereafter, Defendant Taylor then called plaintiff to inform her that Orange had "no jurisdiction" over any of the crimes and that she would "speak to the court" regarding the possibility of just a coercion charge but said she "couldn't make any promises" and that the policy was that the police had to "refer everything to the court".

659.   She suggested that plaintiff call the Assistant Chief's Office to request that one detective be assigned to the case[331].

660.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and

---

[331] Defendant Taylor also stated that she would "speak to the court regarding the possibility of a warrant for Defendant Lodice's arrest for coercion under C.G.S. § 53a-192" but stressed that she "couldn't make any promises" and that the official policy for the Orange Police Department is that they "refer everything to the court and allow the court to determine the outcome of if someone is arrested or not."

include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

661.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FIVE Civil Action for Deprivation of Rights - Freedom of Speech 42 U.S.C. §1983

662.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

663.    Plaintiff engaged in constitutionally protected speech on matters of public concern, including but not limited to, speech concerning ongoing corruption, harassment, and retaliation by Defendants and within the Connecticut court system.

664.    Defendants' retaliation deprived Plaintiff of her right to equal protection guaranteed by the Fifth Amendment to the United States Constitution.

665.    At all relevant times, the defendants were agents, servants, or employees of the defendant municipalities or the state of Connecticut and its Police Department or judiciary, acting in their official capacities and under color of state law.

666.    At all pertinent times during the events subject to this action, the constitutional rights of plaintiff were being violated in the presence of each of the defendants.

667.    At all pertinent times during the events previously set forth, each of the defendants failed to intercede on behalf of plaintiff whose constitutional rights were being violated.

668.    At all pertinent times previously set forth the defendants had a realistic opportunity to intervene and to prevent the injuries sustained by plaintiff from occurring and failed to do so.

669.    As a direct and proximate result of the aforesaid failure to intervene of the defendants, plaintiff has suffered and continues to suffer great physical and emotional pain, including but not limited to mental anguish, frustration, and anxiety over the fact that she was and remains seriously injured.

670.    As a direct and proximate result of the aforesaid failure to intervene of the defendants, plaintiff has been limited in her ability to engage in her usual occupation as she had prior thereo and will be so limited in the future, resulting in a loss of earnings and earning capacity.

671.    Defendant Lodice, under color of law[332], has deprived plaintiff of her constitutional right to freedom of speech by denying plaintiff the ability to speak with her minor daughter A.L[333].

672.    Defendants' retaliation caused Plaintiff damages enumerated below.

673.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

674.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT SIX Violations of 18 U.S.C. §§ 1961-1968 – Racketeering activity**

675.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

---

[332] Defendant Lodice continues to infringe upon plaintiff's rights by reading all of plaintiff's messages within the OurFamilyWizard app and then saying nothing in response. Defendant Lodice has instructed other named defendants, such as defendant Karen Bowers to also deprive plaintiff of her federally protected right to free speech, as well, by instructing them to keep plaintiff blocked indefinitely.
[333] Defendant Lodice continues to keep plaintiff blocked so plaintiff has no access or ability to contact or speak with her minor daughter A.L. Lodice has stated that plaintiff can only speak to A.L. if and when he allows for such, without giving plaintiff any schedule or indication of if or when said calls will take place.

676.    The described activities of Defendants exhibit a "pattern of racketeering activity[334]," fulfilling the necessary elements for a civil RICO claim.[335]

677.    The defendants acted in concert with one another to deprive plaintiff of the parent-child relationship that is one of her constitutionally protected liberty interests protected by the 14th Amendment of the United States Constitution.

678.    As a result of the aforementioned acts, the plaintiff and her minor children have sustained irreparable and extreme levels of injury to their business and property which was directly caused by the racketeering activities of the defendants[336].

679.    Defendants have repeatedly colluded and engaged in obstruction of justice in order to prevent plaintiff from accessing the courts[337].

680.    Defendants' acts, omissions, and associations have amounted to obstruction of justice which is a predicate act under RICO[338].

681.    Defendant Grossman has become infamous for judicial misconduct and has engaged in a longstanding pattern of granting custody of minor children to their abusive parent.

682.    Defendant Eunice clerk on October 24, 2023, clearly violated plaintiff's right to access the courts which constitutes obstruction of justice under 18 U.S.C § 1503.

---

[334] Defendants have engaged in a well-established pattern of racketeering activities that were not isolated events, but instead formed a pattern. The racketeering activity of the defendants has lasted and shown a track record of continuity and continued growth over time as relevant to the relationship among the activities. The conduct that the enterprise engaged in is racketeering, fraud, bribery, extortion, and shows a clear pattern of racketeering activity that has resulted in immeasurable injury to plaintiff, her minor children, her property, and her business.

[335] The defendants have collectively engaged in well over two acts of racketeering activity within a 10-year period from 2013-2023. Defendants have repeatedly engaged in racketeering activity including fraud, bribery, money laundering, child trafficking, and many others.

[336] The defendants meet the "person" element requirement for a civil RICO claim pursuant to federal law and knew, or should have known, that their acts, omissions, and affiliations were illegal and constitute racketeering activity.

[337] Defendants have repeatedly colluded and engaged in obstruction of justice in order to prevent D.L. from being arrested for sexual assault against A.L.

[338] Defendants have repeatedly colluded and engaged in obstruction of justice in order to prevent their own RICO corrupt and overt acts in financial crimes to come to light.

683.    Defendants Levine Legal, Joshua Pascale, and Deccico failed in their fiduciary duties and legal

responsibilities to provide competent representation to A.L., failed to adequately work with plaintiff

in the underlying termination of parental rights proceeding, and failed to communicate with plaintiff.

684.    Defendant New Haven Legal Assistance Association, and any of its affiliates, board members, and

employees who are named as defendants in this action, colluded and conspired to act in concert with

one another to obstruct justice and prevent plaintiff from receiving help that she was entitled to under

the law.

685.    Defendants Scott Jones and Barbara Bellucci are both members of the executive board of the New

Haven Legal Assistance Association, as per the 990 filed for the 2018 tax year.

686.    Defendants Scott Jones, Michael Hillis, Barbara Bellucci, Laura DeLeo, Merit Lajoie, Lisa

Steeves, Larae Plummer, and Matthew Lodice all conspired together to prevent plaintiff from

receiving justice in the State v. Lodice criminal case in which plaintiff was the victim.

687.    Defendants have engaged in offenses such as extortion, bribery, mail fraud, wire fraud,

embezzlement, prostitution, and trafficking of persons and children for financial gains as part of the

racketeering scheme in violation of RICO.

688.    Defendants, in concert with one another, in a deliberate and intricate conspiracy engaged in

conduct that constitutes a "pattern of racketeering activity.[339]"

689.    The statutory elements[340] for a civil RICO claim are satisfied by the defendants' conduct, financial

---

[339] The defendants have colluded to deny plaintiff her constitutional right to the visitation with her minor child A.L. *Franz v. United States*, 707 F.2d 582, 595 (D.C. Cir. 1983) held that "noncustodial parents' rights are constitutionally protected. The court specifically found that the parent child relationship is a "liberty interest" protected under U.S. Const. amend XIV, 1, which specifically states: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.
[340] In *Sedima, S.P.R.L. v Imrex Company, Inc.*, 473 U.S. 479 (1985), the Court held that neither a prior criminal conviction nor a special "racketeering injury" was required to bring a civil RICO suit. Instead, the plaintiff only needed to show that they were injured in their business or property by a pattern of racketeering activity.

transactions, and concerted actions.

690.    The Ganim, Katagis, Antar, and Antonellis family, and associated defendants, deliberately broke the law in their attempts to work together to cover up the sexual abuse of plaintiff in order to attempt to protect defendant Katagis from criminal charges.

691.    Defendants from the families engaged in a pattern of overt acts, including obstruction of justice, in their attempts to cover up the sexual abuse, after plaintiff first informed defendant Antonellis in 2000 about the abuse before being silenced[341].

692.    The actions of the defendants from the above-mentioned families caused irreparable harm to plaintiff that warrant damages[342].

693.    The plaintiff has clearly established that the defendants, and others associated with the defendants, participated in the conduct of the enterprise's affairs, and the participation was through a pattern of racketeering activity[343].

694.    Defendant's conduct constitutes a clear pattern of racketeering activity which consists of numerous predicate acts and violations of the underlying criminal RICO statutes as applicable and cited within this action[344].

695.    The defendants, in coordination, have engaged in at least two instances of racketeering activity, misusing federal funds, and systematically denying plaintiff her due process rights. These actions are

---

[341] Defendants attempted to intimidate and bribe and interfere with plaintiff as a witness in an effort to interfere with the judicial process and cover up the acts of Katagis, including but not limited to attempted bribery and intentional infliction of emotional distress.

[342] The defendant family members also failed to meet mandatory reporting requirements by failing to report known and suspected cases of sexual abuse of both plaintiff and her minor daughter A.L.

[343] The plaintiff has clearly established the existence of one enterprise with various sub-enterprises that exist beneath it. The plaintiff has clearly established that the defendants, and others associated with the defendants, are either associated with or employed by the "enterprise."

[344] Many municipalities within the state of Connecticut, such as Stamford, Bridgeport, and New Haven, are heavily infiltrated with organized crime such as LCN, even inspiring the creation of entities such as the Presidential Commission on Organized Crime.

not isolated but constitute an ongoing and continuous pattern of criminal activity[345].

696.    The plaintiff, and her minor children, were all injured in their business and property as a result of the pattern of racketeering activity described herein by the defendants[346].

697.    The defendants have established the clear likelihood that the pattern of racketeering activity through predicate acts is highly likely to continue into the future through open-ended continuity[347].

698.    The plaintiff is able to establish that the defendants are "persons[348]" who collectively engaged in the racketeering activity described herein.

699.    All defendants listed herein this action, as well as other persons who are also part of the enterprise, have participating in the racketeering activity. All listed defendants are "persons" as referred to in the RICO statute.

700.    All defendants listed in this action are persons and the facts herein establish a pattern in which said defendant persons conducted and/or participated[349] in the conduct of the enterprise's affairs through a pattern of racketeering activity[350].

---

[345] Defendants, in concert with one another, form numerous sub-enterprises, and all form one larger enterprise, within the State of Connecticut. The complicity and acts, omissions, and affiliations of the defendant actors named herein has created a clear pattern of conduct and participation in an enterprise's affairs through patterns of racketeering activity in clear violation of 18 U.S.C § 1962(c).

[346] The defendants worked in concert with one another to violate and deprive plaintiff of her right to the preservation of the parent-child relationship between herself and her minor daughter A.L. The defendants have engaged in a clear and evident pattern of the racketeering and fraudulent activity made up of numerous predicate acts that were sufficiently continuous in nature.

[347] The defendants have also shown closed-ended continuity as applicable to various predicate acts and further predicate and overt acts may be forthcoming. The defendant Grossman has denied plaintiff her legal right to the modification of the orders that she forcibly imposed upon her without meeting the necessary legal requirements beforehand.

[348] Under RICO, a "person" can include individuals as well as entities like corporations, partnerships, and associations.

[349] Under federal law, This does not mean that the person needs to have primary responsibility or a formal position within the enterprise, but they must have some role in directing the enterprise's affairs.

[350] The activities described herein by the persons have significantly affected interstate commerce by causing individuals to remain trapped in the state of Connecticut pending final resolution of ongoing family matters, forcing individuals to only use attorneys licensed in the state of Connecticut or to have said attorneys "piggy-back" off of pro-hac vice out of state attorneys who still need letters of recommendation, permission from a judge, and the guarantee that a Connecticut attorney will be present at all proceedings in order for said attorney to attend.

701.    The activities[351] described herein by the persons have also significantly affected international commerce by eliminating the possibility of an attorney licensed in a foreign country to represent individuals in the state of Connecticut wishing to retain private counsel that is not affiliated with the enterprise[352].

702.    There are numerous commonalities between the individual predicate acts that come together to form the pattern of racketeering activity by the defendants[353].

703.    The acts of the enterprise that constitute the pattern of racketeering activity include serious offensive activities that have significantly affected the exchange of interstate and foreign commerce.

704.    The predicate acts have effectively prevented individuals from engaging in interstate and foreign commerce in regard to the legal industry and have created a monopoly and maintained and created a fraudulent system with virtually no oversight[354].

705.    The plaintiff has suffered extreme and unprecedented levels of emotional distress as a result of the conduct of the defendants. The conduct[355] of the defendants was and is outrageous and unreasonable[356].

706.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and

---

[351] The defendants have engaged in a clear pattern of the racketeering activity in which each of the individual predicate acts have all been related, in some way, to the others. This is consistent with the definition of the pattern itself. Each individual predicate act has been related to the common thread of the pattern of racketeering activity as a whole.
[352] This essentially creates a monopoly where the Connecticut Bar Association essentially eliminates the ability for attorneys in other states to do business with clients in the state of Connecticut, and vice-versa.
[353] All of the defendants took actions to further the same end through a series of overt and predicate acts that come together, through the facts and incidents as alleged, to establish a clear pattern of the racketeering and illegal fraudulent activity through the enterprise composed of numerous persons.
[354] The defendant Lodice recruited other defendants in order to assist and aid and abet him in interfering with the plaintiff's ability to continue a relationship free from interference with her minor child A.L. The conduct of the defendants was wrongful and intentional and done in a targeted attempt to harm the plaintiff.
[355] In many of the predicate acts described herein, such as those involving mail and wire fraud, interstate and foreign commerce has been significantly impacted and the impact has been built into the predicate acts.
[356] The defendant Grossman failed to give the plaintiff any reasonable parenting time with her minor child A.L. and denied plaintiff her constitutional right to be able to have a significant relationship with her minor daughter. She denied J.V. the constitutional right to having a sibling relationship with A.L., as well.

are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT NINE Tampering with a Witness 18 U.S.C. §1512

707.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

708.    The University of Connecticut, and the University of Connecticut School of law, engaged in

intimidation of a witness, obstruction of justice, violations of Title II of the ADA, discrimination

toward the plaintiff, and other civil rights violations, as well as the leaking of confidential information

and the engaging in ex-parte communications with Defendant Grossman, in addition to retaliatory

treatment, threats, and intimidation[357].

709.    Defendants[358] have deliberately and blatantly attempted to tamper with plaintiff as a witness in

several actions as a form of retaliation against plaintiff for filing this action.

710.    Defendants such as Lodice and S.L., Perez, D.L., Karen Bowers, Roy Bowers, Jessica Strusky,

Stan Strusky, Scott Lodice, and other defendants who are related to defendant Matthew Lodice through

blood or marriage also tampered with A.L. during the investigations into the sexual abuse by D.L.[359]

711.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and

associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained

irreparable harm and damages that include damages to business, property, reputation, and person and

include emotional, physical, psychological, and financial injuries and damages as a result of the

---

[357] Furthermore, the University of Connecticut School of law also tampered with and attempted to obstruct the plaintiff's ability to access her UConn email account, UConn Student Admin account, and UConn blackboard account, including but not limited to on October 16, 2023, causing interruptions in plaintiff's ability to continue her education and forcing plaintiff to report the issues to the IT Department for the University.
[358] The actions of Defendants such as clerk Eunice from the Milford Superior Court and the Jane Doe Clerk from the Milford Superior Court on 9/21/23 and 10/24/23 in their blatant refusal to sign the summons for plaintiff in her defamation lawsuit against defendants Wachter and Gray constitutes witness tampering under federal law.
[359] Other associated defendants also conspired to tamper with A.L. and plaintiff as witnesses in the investigations into the sexual abuse allegations against D.L. and also to the harassment, risk of injury to a minor, interfering with an officer, and resisting arrest charges against Lodice.

intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

712.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TEN violations of C.G.S. 17a-101 – Protection of children from abuse, Mandated reporters

713.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

714.     The state of Connecticut mandates that the public policy for child protection is "to protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse or neglect, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

715.    The family enterprise that consists of multiple named defendants and other unnamed participants conspired and engaged in a RICO scheme in an effort to deliberately obstruct justice and cover up the sexual abuse of plaintiff suffered at the hands of Defendant Katagis[360] for the majority of her formative years.

716.    The entire family[361] before, during, and after the conviction of Defendant Katagis, deliberately engaged in a RICO scheme that involved extortion, obstruction of justice, tampering with and bribing/intimidating a witness, and violation of rights. Many of the individuals either are or were

---

[360] The same family enterprise also refused to intervene or report any abuse or neglect of minor child A.L., despite her being abused, neglected, and uncared for without anyone being able to rescue her from this abuse.
[361] As a whole, this sub-RICO enterprise has used their political and state powers as well as their influence with others who are in such positions in order to attempt to pay off plaintiff to silence her regarding the sexual abuse, she suffered because of Katagis.

228- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

mandated reporters[362] at the time and still chose not to report the sexual abuse of plaintiff to authorities or to DCF.

717. Defendant Antonellis told plaintiff that she could have any amount of cash that she wanted, and that Katagis would pay, if she agreed not to go to the Connecticut State Police Troop I in Bethany, CT to provide a second statement to police in 2006 regarding the sexual abuse that occurred in her childhood.

718. Plaintiff did not accept this bribe and instead said she was seeking justice, validation, and to be free from abuse and neglect and sexual assault.

719. As such, the entire family abandoned plaintiff, continued to harass, intentionally cause emotional distress and harm[363], isolate, ostracize and discredit plaintiff in an effort to protect defendant Katagis.

720. From 2009 when Katagis plead guilty, until now, this "family enterprise[364]" has gathered for each and every special occasions over the last fourteen years while plaintiff was left isolated and alone without any family, home, money, or support[365].

---

[362] In accordance with Connecticut law, the following people are classified as mandated reporters of child abuse and neglect: 1) Any physician or surgeon licensed under the provisions of chapter 370 2) Any resident physician or intern in any hospital in this state, whether or not so licensed, 3) Any registered nurse, 4) Any licensed practical nurse, 5) Any medical examiner, 6) Any dentist, 7) Any dental hygienist, 8) Any psychologist, 9) Any school employee, 10) Any social worker . . . 14) Any paid administrator, faculty, staff, athletic director, athletic coach or director of a private youth sports organization, league or team and is eighteen years of age or older . . . 15) Any police officer . . . 18) Any member of the clergy . . . 21) Any optometrist . . . 24) Any mental health professional . . . 29) Any person who is a sexual assault counselor or a domestic violence counselor . . . 30) Any employee of the Department of Children and Families or any person who, in the performance of such person's duties, has regular contact with and provides services to or on behalf of children . . . 31) The Child Advocate or any employee of the Child Advocate . . . 38) Any family relations counselor, family relations counselor trainee, or family services supervisor employed by the Judicial Department."

[363] Even after defendant Katagis plead guilty to the crimes, the family still treated plaintiff and her minor children as strangers in the family, making sure that neither plaintiff nor either of her two children would ever be invited to any family gathering.

[364] To date, this enterprise of defendant has continued the tradition of obstructing justice and suppressing evidence of sexual abuse, refusing to make mandated reports, and allowing the abuse to continue through acts, omissions, or affiliations in concert with other state actor defendants.

[365] The actions of the defendants that are members of this sub-enterprise engaged in organized crime and violated the RICO act repeatedly through creating an illegal enterprise and a pattern of racketeering activity that allowed for sexual abuse to continue for two generations through both plaintiff and her minor daughter A.L.

721.    The actions taken by this enterprise (hereinafter "GAKA") constitute racketeering[366] activity and are affected by several enterprises affecting interstate commerce, specifically those organized and operated by defendants Antar and Ganim[367].

722.    Defendant Anastasia Ganim not only failed to uphold her oath as a state employee and failed to report abuse of plaintiff or her minor child, but she even chose to have defendant Katagis as the honorary "man of honor" at her wedding to Chris Ganim, while excluding plaintiff due to plaintiff expressing discomfort with being in the same wedding party as the individual who sexually abused her for the entirety of her childhood and left her with life-long trauma[368].

723.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

724.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT ELEVEN Violations of 18 U.S.C. § 250 Civil Rights Offenses Involving Sexual Misconduct**

725.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

---

[366] Any and all members of the GAKA sub-enterprise were also acting under the overarching blanket of the State of Connecticut through acts, omissions, and affiliations in order to continue to defame, discredit, torture, and emotionally harm the plaintiff and her children by forcing them to be estranged and isolated from the entirety of the family and excluded from any and all baptisms, weddings, holidays, birthday parties, and other family gatherings.
[367] Further, Defendant Antar conspired with Defendant Joe Ganim, Mayor of Bridgeport, in an effort to conspire against the United States to shorten their sentences while they were both in federal custody of the United States at Federal Correctional Institution Beckley together in Beaver, West Virginia between 2011-2014.
[368] The acts of this family enterprise did, do, and will continue to cause the plaintiff and her minor children irreparable harm in the future. They knew, or should have known, that their actions would cause irreparable harm, yet still proceeded to go forth with said acts, omissions, and affiliations in an effort to harm plaintiff and her minor children.

726.   Section 250 is a "penalty statute that applies to all civil rights offenses but is mostly used in conjunction with violations of 18 U.S.C. § 242, when government actors use their authority to commit sexual assault."

727.   Further, 18 U.S.C. § 250 also states that "every form of sexual assault under color of law [is] a felony"

728.   On March 10, 2023, A.L. was at daycare at Bunny Village in Bethany, CT when the Defendant Lodice suddenly and without warning, showed up at the daycare, woke up A.L. from her nap, took her and all of her belongings, and left[369].

729.   Melissa Swan contacted plaintiff on 3/10/23 shortly after Lodice left with A.L. from Bunny Village to notify plaintiff that he left with the child. Plaintiff had previously requested on numerous occasions that Defendant Swan the director of Bunny Village notify plaintiff and contact plaintiff directly via phone prior to allowing Defendant Lodice to take the minor child A.L. or pick her up from the center without her knowledge or consent.

730.   Plaintiff provided Swan with all of the court documents from the New Haven Superior Court which indicated that plaintiff had joint custody of the minor child and that she had primary residency, and all educational decisions were stated to be made by the parents together.

731.   Plaintiff also provided Swan with additional documentation regarding the order of protection which stated that Lodice could not abuse, assault, follow, stalk, harass, interfere with, or contact plaintiff outside of the OurFamilyWizard parenting communication platform.

---

[369] This was during an active investigation for sexual abuse being conducted by both DCF and the New Britain Police Department, specifically by Detective Lisa Steeves and her Sergeant Jared Barselau and Lieutenant Prisavage, all of whom were part of the Youth Division Bureau for the New Britain Police Department.

732.    Plaintiff had also had a private meeting with Swan shortly before this occurred regarding the fact that Lodice had failed to make any of his court-ordered payments toward the childcare of A.L. and that A.L. was at risk of being terminated from the center if payment was not made.

733.    Plaintiff was forced to incur thousands of dollars in additional debt and had to pay the portion of Lodice's childcare to prevent their daughter from losing her spot. Plaintiff intended to then address this in child support court, yet to date Connecticut Child Support Enforcement Services and New Haven Child Support Enforcement Services has stated that they will not proceed on any contempt or allow any hearing to be scheduled without the explicit consent to do so from Defendant Grossman.

734.    Plaintiff explained to Defendant Swan that she would pay for the balance via credit card and explained that there was a protective order and that Angelina had not been having visits with Defendant Lodice for several weeks upon advisement by DCF, New Britain Police, and Defendant Cretella, the former counsel for the plaintiff.

735.    At approximately 2:18PM on 3/10/23, Defendant Swan called plaintiff and told her that Lodice left with the child and all of her belongings but waited until he had already left to call, rather than calling before allowing Angelina to leave, like plaintiff had requested[370] repeatedly in the past.

736.    Plaintiff immediately hung up the phone and called 911 and reported that Lodice had abducted the child from Bunny Village without any of plaintiff's prior knowledge or consent, thus interfering with her ability to go to a scheduled psychiatric mental health appointment with Jessica Mayo Ph.D. of the Yale Child Study Center in New Haven, CT.

737.    Said appointment was scheduled to take place on 3/10/23 at 4:00PM, and it was supposed to be Angelina's first in-person appointment with Dr. Mayo after a series of virtual appointments that were

---

[370] Defendant Swan always stated she would comply and communicate with plaintiff prior to allowing any changes to the pick-up schedule for her minor child, however failed to do so on this occasion and on multiple prior occasions.

primarily one-on-one parent sessions between plaintiff and Mayo and a couple sessions with A.L. as well.

738.    Defendant Lodice was notified by Detective Steeves in February of 2023 that it was advised that his weekend visitation with A.L. be suspended until the completion of the investigation into the allegations of sexual abuse against his minor son D.L.

739.    Detective Steeves notified plaintiff that defendant Lodice stated that he "agreed it was in A.L.'s best interest for him not to have visits until further notice." Defendant Cretella told plaintiff to withhold A.L. from Lodice and instructed plaintiff not to send A.L. to Lodice for any weekend visits, in direct violation of the court order imposed by defendant Grossman.

740.    When plaintiff contacted Defendant Cretella on 3/10/23 and informed him that defendant Lodice had abducted A.L. from school and intercepted and interfered with plaintiff's ability to take A.L. to her psychiatric appointment, Cretella told plaintiff that he could not and would not file for an emergency ex-parte custody order and advised plaintiff to drive from Milford, CT to New Britain, CT to try to speak with defendant Prisavage.

741.    Defendant Cretella informed plaintiff that defendant Prisavage would ensure that A.L. would be returned to plaintiff.

742.    Plaintiff followed defendant Cretella's instructions, and was told by Connecticut State Police and New Britain Police Department that there was nothing they could do without an ex-parte, and A.L. was forced to remain with Lodice, D.L., and S.L. throughout the duration of the weekend.

743.    A.L. then disclosed to plaintiff that she was sexually abused on 3/11/23 while left alone in the care of D.L. while defendants S.L. and Lodice went to work.

744.    Plaintiff attempted to reach out to several listed non-profits asking for assistance, including DCF careline, and was denied services.

745.   Plaintiff attempted to reach out to defendant Larae Plummer and she responded to plaintiff only to inform plaintiff that it was her "day off" and that she couldn't respond.

746.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

747.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TWELVE Violations of the Eighth Amendment to the United States Constitution

748.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

749.   Defendants knew that their actions would have a damaging impact on the Plaintiff and her minor children's lives; and did so as a cruel and unusual punishment in order to inflict suffering and emotional harm on plaintiff.

750.   Each municipality named in this complaint failed to protect plaintiff and her minor children, failed to uphold their legal duties, misused federal funding incentives, and directly or indirectly caused abuse, neglect, and violence to continue in perpetuity.

751.   Each state actor or arm of the state named in this complaint failed[371] to provide services that they were contracted to provide, violated state and federal laws, and treated plaintiff with an immeasurable

---

[371] There is clear evidence that, within their sub-organizations that are all interconnected with one another, that each of the sub-enterprises created their own RICO scheme that affected interstate and foreign commerce by misuse of federal funding, fraud, tax evasion, and other violations through a clear, longstanding pattern of racketeering activity supported by the intentional lack of oversight in the State of Connecticut.

level of bias, discrimination, intimidation, harassment, abuse, and psychological torture[372] over the course of the past year and a half.

752.   Defendants' actions and inactions violate plaintiff's rights under the Eighth Amendment to the United States Constitution.

753.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT THIRTEEN Violations of the Fourth Amendment to the United States Constitution**

754.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

755.   Defendants that are law enforcement consistently violated plaintiff's constitutional rights through their actions of unlawful search and seizure.

756.   Defendant Grossman violated plaintiff's constitutional right against unlawful search and seizure by, without any notice, seizing plaintiff's four-year-old minor daughter A.L. during the court proceeding of 5/25/23.

757.   Defendant law enforcement officers such as Defendants Correia, Anderson, Satkowski, and judicial employees such as Barry, Jones, and DeLeo conspired with one another to unlawfully issue a warrant for plaintiff's arrest despite a clear lack of probable cause.

758.   Defendant law enforcement officers such as Vakos of the Milford Police Department conducted an unlawful search and seizure and forced plaintiff to be interrogated when plaintiff called the police to report that she had been assaulted by a Jane Doe employee of Defendant Preferred Pediatrics of

---

[372] Each time that a federal court dismisses a complaint that alleges anything to do with family court or the system, it only enables the state courts and state actors to freely dictate the terms of the lives of innocent litigants, many of which are poor, uneducated, and cannot fight against the system that intends to exploit them and their children for what amounts to billions of dollars in federal funding each year.

Milford.

759.    Defendant Correia failed to demonstrate probable cause but was still able to obtain a warrant signed by defendant Scott Jones despite no crime being committed and no actual evidence of any crime.

760.     Defendants' actions and inactions violate plaintiff's rights under the Fourth Amendment to the United States Constitution.

761.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

762.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT FOURTEEN Violations of 18 U.S.C. § 2246 Unsolicited Sexual Acts & Sexual Contact**

763.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

764.    Defendants Lodice, Katagis, D.L., and S.L. are liable for unsolicited sexual acts and sexual contact.

765.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

766.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and

are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FIFTEEN Violations of 18 U.S.C. §§ 2243(b), 2244(a)(4) Sexual Abuse of a Ward

767.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

768.   18 U.S.C. §§ 2243(b), 2244(a)(4) make it a crime[373] under federal law for "corrections officers or other individuals in federal facilities to knowingly engage in sexual conduct (or attempt to do so) with another person who is in official detention and under the custodial, supervisory, or disciplinary authority of the individual so engaging. Consent is not a defense."

769.   Defendant York Correctional Institute is liable for sexual abuse of a ward in accordance with the law.

770.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

771.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT SIXTEEN Violations of 18 U.S.C. § 245 Federally Protected Activities

238. Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

239. Subsection (b)(1) of 18 U.S.C. § 245 states the following:

---

[373] The penalty for a violation of 18 U.S.C. § 2243(c) is 15 years in prison, whereas the penalty for a violation of 18 U.S.C. § 2244(a)(6) is two years in prison.

*"**(b)**Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates, or interferes with, or attempts to injure, intimidate or interfere with—**(1)**any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from . . . participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United <u>States</u>; . . . **(D)**serving, or attending upon any court in connection with possible service . . . in any court of the United <u>States</u>; . . . participating in or enjoying the benefits of any program or activity receiving Federal financial assistance; or **(2)**any person because of his race, color, religion or national origin and because he is or has been—**(A)** enrolling in or attending any public school or public college; **(B)** participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any <u>State</u> or subdivision thereof; . . . **(D)** serving, or attending upon any court of any <u>State</u> . . . **(E)** traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air; **(F)** enjoying the goods, services, facilities, privileges, advantages, or accommodations . . . of any other establishment which serves the public . . . or **(4)**any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—**(A)** participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F); or **(B)** affording another person or class of persons opportunity or protection to so participate; or **(5)** any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F), or <u>participating lawfully in speech or peaceful assembly</u>[374] and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title[375] or imprisoned for any term of years or for life, or both, or may be sentenced to death. **(c)** Nothing in this section shall be construed so as to deter any <u>law enforcement officer</u> from lawfully carrying out the duties of his office; and no <u>law enforcement officer</u>[376] shall be considered to be in*

---

[374] opposing any denial of the opportunity to so participate—shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both;

[375] As used in this section, the term "<u>participating lawfully in speech or peaceful assembly</u>" shall not mean the aiding, abetting, or inciting of other persons to riot or to commit any act of physical violence upon any individual or against any real or personal property in furtherance of a riot. Nothing in subparagraph (2)(F) or (4)(A) of this subsection shall apply to the proprietor of any establishment which provides lodging to transient guests, or to any employee acting on behalf of such proprietor, with respect to the enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of such establishment if such establishment is located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor as his residence.

[376] For purposes of the preceding sentence, the term "<u>law enforcement officer</u>" means any officer of the United <u>States,</u> the District of Columbia, a <u>State,</u> or political subdivision of a <u>State,</u> who is empowered by law to conduct investigations of, or

*violation of this section for lawfully carrying out the duties of his office or lawfully enforcing ordinances and laws of the United States, the District of Columbia, any of the several States, or any political subdivision of a State."*

772.    Defendants have repeatedly violated plaintiff's federally protected rights as defined under this section.

773.    Defendants have repeatedly and unlawfully willfully injured, intimidated, and interfered with plaintiff or have attempted to do so by force or threat of force, because of plaintiff's race, color, religion, and/or national origin and because plaintiff has been attending the University of Connecticut School of law, participating, and enjoying services entitled to her under state and federal programs and activities, and engaging in private employment.

774.    Defendants have also violated plaintiff's rights by interfering with her ability to attend court proceedings and prepare to attend said proceedings.

775.    Defendants have repeatedly attempted to willfully interfere[377] with plaintiff's ability to seek justice for her minor daughter A.L.

776.    Defendants have repeatedly attempted to willfully interfere with plaintiff's ability to receive and continue to receive federal benefits.

777.    Defendants have repeatedly attempted to willfully interfere with plaintiff's ability to continue attending public school at The University of Connecticut School of Law.

---

make arrests because of, offenses against the United States, the District of Columbia, a State, or a political subdivision of a State. **(d)**For purposes of this section, the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States. (Added Pub. L. 90–284, title I, § 101(a), Apr. 11, 1968, 82 Stat. 73; amended Pub. L. 100–690, title VII, § 7020(a), Nov. 18, 1988, 102 Stat. 4396; Pub. L. 101–647, title XII, § 1205(b), Nov. 29, 1990, 104 Stat. 4830; Pub. L. 103–322, title VI, § 60006(c), title XXXII, § 320103(c), title XXXIII, § 330016(1)(H), (L), Sept. 13, 1994, 108 Stat. 1971, 2109, 2147; Pub. L. 104–294, title VI, § 604(b)(14)(C), (37), Oct. 11, 1996, 110 Stat. 3507, 3509.)

[377] Furthermore, this statute also "prohibits willful interference, by force or threat of force, with a person because he/she is or was participating in, or aiding or encouraging other persons to participate in, any of the benefits or activities listed above—or in any of the federal benefits . . . without discrimination as to race, color, religion, or national origin."

778.    Defendant First Selectman's Office of the Town of Orange and Defendant James Zeoli have failed

to ensure[378] that the public is safe from harm and failed to intervene in the Orange Police Department's

refusal to allow individuals such as plaintiff to report crimes or seek relief from law enforcement from

criminal activity[379].

779.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and

associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained

irreparable harm and damages that include damages to business, property, reputation, and person and

include emotional, physical, psychological, and financial injuries and damages as a result of the

intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

780.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and

are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT SEVENTEEN Violations of C.G.S § 53a-192 Coercion**

781.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

782.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and

---

[378] The role and responsibilities of a first selectman can vary depending on the specific statutes, ordinances, and traditions of the jurisdiction in which the position exists. The title "first selectman" is most commonly associated with New England states, especially Connecticut, where it often serves as the chief executive officer of a town.

[379] In general, the first selectman is responsible for the day-to-day operations and administration of the town government. Part of this responsibility often involves ensuring the well-being and safety of the town's residents, at least insofar as the functions of municipal government can address these concerns. Specific duties related to safety might include: Oversight of Public Safety Departments: The first selectman may have authority over, or at least work closely with, the town's police, fire, and emergency medical services to ensure they are adequately funded, staffed, and equipped to respond to emergencies and ensure public safety. Emergency Management: The first selectman often plays a role in emergency preparedness, response, and recovery, working alongside other local, state, and federal agencies. Public Health and Welfare: This can include overseeing or liaising with public health departments, ensuring safe drinking water, overseeing inspections, or ensuring that town facilities are safe for public use. Public Communication: Keeping citizens informed about potential risks, emergencies, or public health concerns and providing guidance on how to respond. Regulatory and Legislative Duties: The first selectman might be involved in proposing, supporting, or enforcing local ordinances that promote safety, such as building codes, health regulations, or traffic rules. While the first selectman's office has these responsibilities, it's essential to understand that the duty to ensure safety doesn't mean guaranteeing that no harm will ever come to any citizen. Rather, it typically means acting reasonably, responsibly, and in good faith to promote public safety through the tools and powers available to municipal government.

240- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

783.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT EIGHTEEN Violations of 42 U.S.C. § 12203- Prohibition against retaliation and coercion**

784.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

785.    The actions and policies of the defendants' amount to severe breaches of plaintiff's constitutional rights, including her rights to due process and equal protection under the law, and defendants have used coercion and retaliation tactics against plaintiff in an effort to manipulate her actions.

786.    Defendants acted in concert with one another to discriminate against plaintiff because plaintiff "opposed [various] act[s] or practice[s] made unlawful by 42 U.S.C. § 12203 in any manner in an investigation, proceeding, or hearing" under said chapter under federal law.

787.    Defendant Milford Police Department and its associates and employees have continued to retaliate against plaintiff in an effort to protect their financial interests and the interests of Lodice.

788.    Plaintiff provided the Chief of Police for the city of Milford a Demand to Cease and Desist Defamatory Conduct against plaintiff on November 16th, 2023, and the defendant Milford Police Department has refused to comply with plaintiff's cease and desist demand.

789.    Defendant judges, attorneys, and other state actors failed to maintain the ethical principles of their own profession and the rules of conduct set forth in their respective codes, knowingly made false statements of fact and law to the court and failed to correct a false statement of fact or law previously

made to the court and shall not offer evidence that they know to be false, failed to maintain independence, objectivity, or operate with fairness in dealings with parties and professionals, at all times and in all settings, failed to treat parties with respect, fairness, and good faith.

790.   Defendants discriminated against plaintiff on the basis of her race, color, religious creed, age, marital status, national origin, ancestry, sex, gender identity or expression, intellectual disabilities, mental disabilities, and physical disabilities, failed to perform responsibilities with reasonable diligence or in a prompt and timely manner, and failed to refrain from having ex parte communications concerning plaintiff's cases with the judicial authority involved in the respective matters in which he or she was appointed or involved in the proceedings, and failed to maintain documentation to substantiate recommendations and conclusions to keep written records of all interviews and investigations.

791.    Defendants repeatedly acted in concert and in conspiracy with one another to "coerce, intimidate, threaten, or interfere with [plaintiff] in the exercise or enjoyment of, or on account of his/her having exercised or enjoyed, or on account of his/her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by 42 U.S.C. § 12203."[380]

792.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

793.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and

---

[380] Plaintiff was aggrieved by the acts and omissions and overt actions of the defendants and as such has suffered irreparable harm.

are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT NINETEEN Violations of 42 U.S.C. § 2000d- Title VI of the Civil Rights Act of 1964

794.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

795.    Defendants have engaged in discrimination on the basis of race, color, or national origin in various programs and activities receiving federal financial assistance.

796.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

797.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TWENTY Violations of 31 U.S.C. §§ 3729-3733 – False Claims Act

798.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

799.    Defendants have systematically misappropriated federal funds designated for the Fatherhood Initiative, the Violence Against Women Act, and Child Protection.

800.    Defendants have submitted claims for funds to the federal government in the form of grant applications which are based on false or fraudulent representations.

801.    Defendants claim that they are conducting activities which are classified as charitable while exploiting federal funds for personal gains and profits and denying indigent individuals' relief under the programs.

243- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

802.     Defendants have engaged in fraud against the federal government in regard to their handling and distribution of federal grants, contracts, and other violations of the Federal Acquisition Regulation.

803.     Defendants have, on numerous occasions, knowingly submitted false claims to the federal government or caused others to submit said false claims for the purpose of obtaining funding.

804.     Defendants have repeatedly violated FAR and said violations lead to fraudulent claims for grants and other funding incentives to be submitted to the government.

805.     As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

806.     All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT TWENTY-ONE Violations of the First Amendment of The United States Constitution**

807.     Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

808.      Defendants' actions and inactions violate plaintiff's rights under the First Amendment to the United States Constitution.

809.      On October 18, 2023, the Milford Police Department and its named defendants not only engaged in excessive force and unlawful detainment of plaintiff but also violated plaintiff's right against infringement upon free exercise of her religion in accordance with the first amendment.

810.     Plaintiff informed the defendants from the Milford Police Department that she had a friend coming to post the $250.00 cash bond they imposed to release her. Plaintiff stated this bond would be there in

ten minutes, and she had been outside of a cell the entire time prior.

811.    One of the defendant Milford Police Department sergeants then demanded that plaintiff remove all of her religious prayer bracelets, two gold religious crosses, and another religious necklace that plaintiff had been wearing the entire time for several hours prior.

812.    He forced plaintiff to remove everything before going into a holding cell where there was nothing else but a bed and a urinal that had a camera right above it where there were other officers actively watching the camera.

813.    The cell had just the urinal, no feminine products, no toilet paper, no soap, and no paper towels or any other sanitary products. There were dead bugs visible and what appeared to be urine stains on the floor of the cell and the urinal had a spout on it for "drinking" water out of.

814.    Plaintiff was unreasonably restricted from her ability to practice her religion and was unnecessarily asked to remove these religious objects that were not and could not have been used in any way to harm plaintiff or any other individual in any way.

815.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

816.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TWENTY-TWO Violations of 18 U.S.C. § 666– Federal Program Theft

817.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

818.    Defendants have consistently engaged in federal program theft and have repeatedly misrepresented their intentions to exploit more funds from the federal government while denying program benefits to individuals who qualify and giving themselves sizeable salaries, bonuses, and full benefits through the State of Connecticut.

819.    Defendant New Haven Legal Assistance Association Inc. received a total of $4,625,572.00 in grants for the 2018 tax year. They state to the IRS and federal government that they are a charitable organization and that their mission is "to provide high quality legal services to individuals, families, and groups who are unable to obtain legal services because of limited income, age, disability, discrimination, and other barriers."

820.    New Haven Legal Assistance Association Inc. accepted federal grant funding for several millions of dollars, and denied legal assistance to plaintiff on numerous occasions, including but not limited to in November of 2022, and in June of 2023. They reported a net asset balance of $2,991,772.00 at the end of the 2018 tax year, which is evidence that they do not utilize the funding for its cited mission and purpose and are committing fraud.

821.    New Haven Legal Assistance Association Inc. also reported that they had a total of $1,018,127.00 in "investments categorized as publicly traded securities" and a total of $3,346,854.00 in total assets.

822.    New Haven Legal Assistance Association Inc. takes millions in grant funding and does not use it to help impoverished litigants such as plaintiff.

823.    From 2014 through 2018, New Haven Legal Assistance Association Inc. received a grand total of $21,179,606.00 in public support in the form of gifts, grants, contributions, and membership fees received.

824.    New Haven Legal Assistance Association Inc. also reported that they paid a total of $30,292.00 in "grants to other organizations for lobbying purposes" and a total of $34,954.00 in "direct contact with

legislators, their staffs, government officials, or a legislative body". They did this in spite of regularly denying impoverished litigants services. Every executive member with a paid salary had a salary of at least $129,163.00.

825.    This misappropriation is part of a broader racketeering operation wherein multiple state agencies and entities, in tandem with their co-conspirators, engage in nefarious activities, including trafficking and money laundering, to further their collective interests.

826.    Defendants have engaged in an ongoing pattern of racketeering activity involving theft and bribery related to programs that receive federal funds, including grants.

827.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

828.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT TWENTY-THREE Violations of 18 U.S.C. § 1341 Fraud by wire, radio, or television**

829.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

830.    The fraudulent acts described herein constitute fraud under federal law and the enterprise is liable for wire fraud in violation of 18 U.S.C. § 1341.

831.    Defendants have engaged in the use of mail and wire communications in furtherance of a fraudulent scheme, including by fraud related to federal contracts and grants.

832.    The defendants knowingly and willingly submitted fraudulent information under false pretenses

to the federal government for the purpose of obtaining funding.

833.    Defendants have misused and misappropriate billions of dollars in federal funding over the past several decades and have diverted a significant portion of them to foster and exacerbate high-conflict custody and divorce actions.

834.    The Family Division of the State of Connecticut Judicial Branch has, under the influence of many corrupt defendant judicial officers such as Grossman, has systematically denied litigants their due process rights. The purpose of this denial is to prolong cases, thereby maximizing the financial benefit to the court and affiliated parties from the misused federal funds.

835.    Plaintiff, like many other unsuspecting litigants, was repeatedly denied her due process rights by the colluding state actors during her custody, visitation, and child support proceedings regarding her minor daughter A.L. in the New Haven Superior Court.

836.    Plaintiff's case was repeatedly and unnecessarily extended, causing plaintiff to accumulate unwarranted and excessive legal fees, counseling sessions, and other costs, all while her due process rights were repeatedly and systematically infringed upon.

837.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

838.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


 **COUNT TWENTY-FOUR Violations of 18 U.S.C. § 1001 False Statements**

839.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

840.    Defendants have repeatedly made false statements and concealed information in various matters within the jurisdiction of the federal government, including statements related to applications for federal contracts and grants.

841.    Defendants have repeatedly represented that funds would be distributed for charitable purposes yet fail to do so and misappropriate funds on a regular basis for personal profits and gains with little to no oversight.

842.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

843.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT TWENTY-FIVE Violations of 42 U.S.C. § 1320a-7b Criminal penalties for acts involving Federal Health Care Programs**

844.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

845.     Billions of dollars in grant money has been procured by key defendants such as Yale and other non-profit organizations and their affiliates, many of whom serve on overlapping boards of directors, to be laundered through a series of shell companies and non-profit organizations to camouflage the illicit gains.

846.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and

associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

847.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT TWENTY-SIX Violations of 181 U.S.C. § 641 embezzlement of public money**

848.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

849.   Defendants have engaged in repeated misappropriation of funding and federal grant and contract fraud.

850.   Defendant Safe Haven of Greater Waterbury Inc., and its employees, affiliates, and associates embezzled public money for their own personal gains while denying services to those who were entited to it.

851.   Defendants have also misappropriated funding and violated terms of federal contracts and violated Federal Acquisition Regulations on an ongoing basis.

852.   Defendants, such as Connecticut Legal Services, Inc., misrepresent their charitable purposes and intentionally submit fraudulent information to the federal government in an effort to continue receiving federal funding.

853.   Connecticut Legal Services, Inc. claims to the IRS that their mission and most significant activity is "the organization provides access to justice for low-income individuals and their families" while providing no actual services to individuals in need of said services.

854.   Connecticut Legal Services, Inc. has not submitted any recent 990 or other income tax information

250- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

since 2020.

855.    As of 2020, Defendant Connecticut Legal Services, Inc. reported $13,303,288 received in contributions and grants, $7,974,707 in total assets, and $3,281,748 in total net assets and fund balances.

856.    Connecticut Legal Services, Inc. further misrepresents their purposes by also claiming that they provide "access to justice and protect[ing] critical civil legal rights of low income individuals and families through representation, systemic advocacy, advice, collaboration, and education."

857.    Connecticut Legal Services, Inc. also reported that their "total functioning expense" was $12,092,768, of which included $508,593 in "compensation of current officers, directors, trustees, and key employees", $1,570,850 in "grants and other assistance to domestic organizations and domestic governments", $5,601,568 in "other salaries and wages", $958,693 in "pension plan accruals and contributions", $1,578,922 in "other employee benefits", $287,542 in "lobbying" and other unclear expense categories.

858.    Connecticut Legal Services regularly and systematically denies low-income individuals access to their programs and services, consistently claiming that they lack funding, staffing, or resources in order to provide any actual help to those seeking the services.

859.    When an individual goes on to the website for Connecticut Legal Services, Inc., they see the following message: "Some people should reach out to us directly, rather than calling the Statewide Legal Services hotline. **Call us directly if you are in Connecticut outside of greater Hartford or greater New Haven, and you are:** -At least 60 years old; or -An undocumented immigrant. We never discriminate on the basis of national origin or immigration status, and we can, and do, serve undocumented people. Please visit our locations page to contact the CLS office nearest you. We have six full-service offices across the state—New London, Willimantic, New Britain, Waterbury,

Bridgeport, and Stamford—and an administrative office in Middletown."

860.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

861.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT TWENTY-SEVEN Violations of 18 U.S.C. § 1031- Major Fraud against the United States**

862.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

863.    Defendants have acted in concert with one another to engage in large-scale fraud in federal procurement and grant activities.

864.    Defendants knowingly engaged in schemes to defraud the federal government of more than $1,000,000.00 in connection with various contracts, subcontracts, grants, and other benefits.

865.    Defendants systematically and repeatedly failed and refused to comply with obligations under federal law governed by Title IV-D of the Social Security Act.

866.    New Haven Child Support Enforcement and its employees and agents has systematically failed to enforce plaintiff's child support order through administrative processes and through the courts.

867.    New Haven Child Support Enforcement has failed to ensure that non-custodial parents provide financial support for their children.

868.    New Haven Child Support Enforcement has failed to monitor the increasing income of non-custodial parents and failed to review or modify child support orders when there are significant

changes in circumstances, such as changes in income.

869.    New Haven Child Support Enforcement has systematically failed to comply with the laws and failed to collect child support payments from non-custodial parents and failed to enforce said court-ordered child support obligations.

870.    New Haven Child Support Enforcement has failed to comply with federal mandates requiring them to engage in wage garnishment, bank account garnishment, tax refund intercepts, and other enforcement mechanisms.

871.    New Haven Child Support Enforcement has failed to comply with federal mandates requiring them to distribute collected child support payments to custodial parents in a timely manner.

872.    Connecticut Child Support Enforcement Services has failed to comply with federal mandates requiring them to comply with data reporting requirements as related to child support cases to the federal government, including information on the collection and distribution of child support payments.

873.    New Haven Child Support Enforcement has failed to comply with federal mandates requiring them to collaborate with other state and federal agencies, such as the IRS and the Social Security Administration, to facilitate the enforcement of child support orders.

874.    The State of Connecticut Department of Social Services has failed to comply with federal mandates requiring them to collaborate with other state and federal agencies, such as the IRS and the Social Security Administration, to facilitate the enforcement of child support orders.

875.    New Haven Child Support Enforcement has failed to comply with federal mandates requiring them to collect and report past-due child support arrears and maintain records related to arrears collection.

876.    The State of Connecticut, and its associated administrative agencies such as Connecticut Child Support Enforcement Services, has failed to ensure that children such as A.L. receive financial support

from both parents, regardless of the parents' marital status, or to promote the well-being of children in accordance with federal and state laws.

877.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

878.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TWENTY-EIGHT Violations of 18 U.S.C. § 287- False, fictitious, or fraudulent claims

879.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

880.    Defendants knowingly and repeatedly made various false and fraudulent claims to the federal government for the purpose of receiving continued funding incentives.

881.    Many of the defendant legal service corporations have received a substantial amount in federal funding and have, as such, been subjected to certain obligations and restrictions regarding the provision of services.

882.    Defendant LSC's such as New Haven Legal Assistance Association are non-profit organizations that claim to fund legal aid programs across the U.S. and, as such, must provide legal assistance to eligible indigent individuals in non-criminal matters in accordance with restrictions in accordance with funding programs.

883.    New Haven Legal Assistance Association, and other defendant LSC's, have failed to comply with federal regulations and provisions regarding nondiscrimination in violation of Title VI of the Civil

Rights Act of 1964 which prohibits discrimination based on race, color, or national origin in programs or activities receiving federal financial assistance.

884. New Haven Legal Assistance Association, and other defendant LSC's and non-profit organizations, have misled in an attempt to defraud the United States and the federal government by alleging that they will provide said services to indigent litigants to secure funding while simultaneously denying said services to those litigants.

885. Several defendants depend on the terms and conditions associated with the federal funding that they receive and have violated the terms of the continued funding by failing to serve individuals, refusing to prioritize urgent cases, and failing to properly meet quotas.

886. Several defendants have failed to comply with restrictions on federal funding on the activities that the recipient can engage in and have spent the majority of the funding on their own salaries, full benefits, bonuses, and other personal expenses.

887. Several defendants have failed to comply with restrictions on federal funding as appliable to lobbying, involvement in certain types of litigation, and activities that can be considered political in nature.

888. As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

889. All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT TWENTY-NINE Violations of 18 U.S.C. § 371 – Conspiracy to Defraud the United States

890.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

891.     Defendants conspired in concert with one another to defraud the United States in various manners, particularly through contract and grant fraud.

892.    The defendants engaged in clear violations of plaintiff's constitutional rights. The United States Supreme Court has long held that, "[s]ome constitutional violations . . . by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988).

893.    Defendants breached their duties connected with their respective offices and official positions in further of their conspiracy to defraud the United States while deliberately denying plaintiff her rights in accordance with federal, state, and constitutional law, and are liable for such[381].

894.    Defendants committed overt acts in concert with one another in order to defraud the United States, including by denying plaintiff her federally protected and constitutional rights[382].

895.    Defendants conspired to defraud the federal government by misrepresenting their intentions when applying for federal grant funding, failing to comply with federal laws and regulations regarding the usage and continued reception of said funding, and denied individuals access to the programs that they received financial incentives for.

---

[381] "An officer of the court may be held liable in damages to any person injured in consequence of a breach of any of the duties connected with his office . . . The liability for nonfeasance, misfeasance, and for malfeasance in office is in his 'individual capacity' not his official capacity. . . When lawsuits are brought against federal officials, they must be brought against them in their 'individual' capacity not their official capacity. When federal officials penetrate constitutional torts, they do so ultra vires (beyond the powers) and lose the shield of immunity." *Williamson v. U.S. Department of Agriculture*, 815 F. 2d. 369; *ACLU Foundation v. Barr*, 952 F. 2d. 457, 293 U.S. App. DC 101, (CA DC 1991). The same rule applies to state officials.
[382] In *Miranda v. Arizona*, 384 U.S. 436, (1966), the court held that "where rights secured by the Constitution are involved, there can be no rule making or legislation, which would abrogate them." *Marbury v. Madison*, 5 US 137, (1803) similarly held that "the Constitution of these United States is the Supreme law of the land. Any law that is repugnant to the Constitution is null and void of law."

896.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

897.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT THIRTY Violations of The Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018

898.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

899.   Defendants have knowingly and continuously transferred custody of minors into environments marked by abuse, effectively facilitating a trafficking operation under the veneer of legitimate child protection efforts.

900.   Defendants deliberately denied and infringed upon plaintiff's constitutional rights in an effort to traffic plaintiff's minor daughter A.L. into the home of her known abuser father Defendant Lodice and D.L. who A.L. repeatedly stated was sexually abusing her while under the care of him and/or Lodice.

901.   Defendants denied plaintiff her rights to "life and personal liberty" which are, as the Supreme Court has held, "the natural rights of man.[383]"

902.   Defendants failed to conform to the Constitution of the United States and violated federal and state laws in an effort to traffic A.L. while denying plaintiff her rights.[384]

---

[383] See *U.S. c. Cruikshank*, 92 U.S. 542, 2 Otto 542, 23 L. Ed. 588.

[384] Every state must conform in the first place to the Constitution of the United States, and then to the subordinate constitutions of the particular state; and if it infringes upon the provisions of either, it is so far void." *Houston v. Moore*, 18 US 1, 5 L.Ed 19

903.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

904.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


## COUNT THIRTY-ONE Violations of 18 U.S.C. § 1593A- Benefitting financially from trafficking in persons

905.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

906.     Defendants knowingly benefitted financially from participation in a human trafficking venture.

907.    Defendants engaged in trafficking in persons by knowingly compelling A.L. against her will to be confined to the sole custody of defendant Lodice where she alleged she was being sexually abused by abusing or threatening abuse of the law or legal process.

908.    Defendants who are associated with defendant Lodice have benefitted financially from trafficking of A.L. into the hands of defendant Lodice and D.L. as A.L. has implied and stated that both have sexually abuse her.

909.    Defendant Lodice has bribed and paid off many of the listed defendants in this actions and used funds through tax evasion from failing to report and pay taxes on actual earned income and gross sales from Whole House Remodeling Company LLC.

---

(1840). The Constitution is the law of the land and there can be no statutes or rule making that would abrogate the constitution. The general principal is: anything that is repugnant to or abrogates the constitution is null and void of law.

910.    Defendants, Grossman, Tindill, and several other named defendants all benefited through financial incentives from defendant Lodice including Larae Plummer, Officer Fernandes, the Waterbury Police Department, Orange Police Department, New Britain Police Department, Lisa Steeves, Connecticut DCF, and several other defendants.

911.    Defendants justified the sexual behaviors of Lodice and D.L. toward plaintiff's minor child A.L. in that they claimed that D.L. could allegedly say he was "just wrestling" and several defendants made excuses for D.L.

912.    Defendant Lodice supplied financial incentives to many named defendants who are part of his circle of family, friends, and associates in an effort to gain their assistance in the trafficking scheme.

913.    Defendant Lodice is able to secure large sums of cash through money laundering in Whole House Remodeling Company LLC and, by offering cash and free remodeling services to other defendants, has been able to evade taxes and evade paying appropriate taxes to the IRS and the CT DRS. Defendant Lodice regularly maintains that he has substantial amounts of assets in the form of cash.

914.    Defendant Lodice will regularly offer to do remodeling jobs for a lower price if the customers pay in cash and then will subsequently not report said income to the IRS, thus laundering and being able to fund the trafficking operation.

915.    Defendants violated their oaths[385] to the Constitution of the United States of America in order to financially benefit from trafficking in persons and trafficking plaintiff's minor daughter A.L.

916.    Trafficking was carried out by various agencies, including DCF, the State of Connecticut Judicial

---

[385] *Cooper v. Aaron*, 258 U.S. 1, 78 S. CT. 1401 (1958) held that any judge who does not comply with his oath to the Constitution of the United States wars against that Constitution and engages in acts in violation of the Supreme Law of the Land. The judge is engaged in acts of treason. The U.S. Supreme Court has stated that "no state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. See also *In re Sawyer*, 124 U.S. 200 (188); *U.S. v. Will*, 449 U.S. 200, 216, 101 S. CT. 471, 66 L. Ed. 2d 392, 406 (1980); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404, 5 L. Ed 257 (1821).

System, and other named defendants.

917.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

918.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT THIRTY-TWO Civil Action for Deprivation of Rights – Excessive Force 42 U.S.C. § 1983**

919.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

920.     Plaintiff contends that defendants engaged in systematic discrimination against women in an effort to maximize federal funds derived from programs ostensibly designed to support fathers.

921.    Defendants of the Milford Police Department deprived plaintiff of her rights against discrimination and used excessive force against plaintiff on October 18, 2023, when they forcibly removed, arrested, and harmed plaintiff in an effort to discriminate against her as a woman.

922.    Defendants of the Milford Police Department have a longstanding history[386] of discrimination against women in domestic violence situations.

923.    Defendant Milford Police Department and its employees and affiliates, such as in the case of Julie

---

[386] In November of 2022, prosecutors from the state of Connecticut told the media that the Milford Police Department failed to resubmit a warrant application with the requested additional information that was seeking the arrest of a man who was accused of domestic abuse against his former partner. The woman was ultimately murdered by the suspect and the court stated that the Milford Police Department failed to return and resubmit a request for more information from the prosecutor's office for the Ansonia-Milford JD. The Milford Police Department, in contrast, sent a squad including two officers and a lieutenant and used excessive forced against plaintiff on 10/18/23 and arrested plaintiff for an alleged violation of protective order despite plaintiff not violating any terms of the protective order.

Minogue who was brutally murdered by her former partner in the presence of their two children, will regularly dismiss complaints filed by women and prioritize those filed by men, such as they did on 10/18/23 when they surrounded plaintiff and arrested her without providing her opportunity for counsel, reading her rights, or giving her the opportunity to receive reasonable accommodations for her disabilities as requested.

924.    Defendant Milford Police Department, in the case of Julie Minogue, received a complaint that contained more than 220 harassing text messages sent to Ms. Minogue by the suspect in the case, yet defendant Margaret Kelley stated that they determined that "more evidence was needed" and sent the application back to the defendant Milford Police Department. Ultimately, neither Milford Police Department nor the Ansonia-Milford JD prosecutor Margaret Kelley pressed any charges against the suspect, who ultimately murdered Ms. Minogue. This is a blatant example of how the Milford Police Department and Ansonia-Milford JD systematically discriminates against women in an effort to deprive them of their civil rights, such as in plaintiff's case.

925.     Defendants have deliberately marginalized and discriminated against women, particularly indigent mothers.

926.    Defendants used their status as state officers[387] to discriminate against plaintiff and violate her constitutional rights.

927.    Defendants involved with the Milford Police Department caused injuries and damages to the plaintiff through their negligence and carelessness in that they used excessive force and discriminated

---

[387] By law, a judge is a state officer. The judge then acts not as a judge, but as a private individual (in his person). When a judge acts as a trespasser of the law, when a judge does not follow the law, the judge loses subject-matter jurisdiction and the judges' orders are not voidable, but VOID, and of no legal force or effect. The United States Supreme Court stated that "when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

against plaintiff due to her status as a woman.

928.    Defendants have suppressed efforts by plaintiff and others to shed light on these issues by use of systematic state employee intimidation tactics, legal barriers, and spurious legal actions used to silence them.

929.    Municipal or State defendants named in this action are liable for the negligence and carelessness of the defendants they employ named within this action since their actions were done in the course of their employment.

930.    The aforementioned acts described herein of the New Haven Police Department and its associated employees and officers constituted the use of excessive force and a violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.

931.    The aforementioned acts described herein of the Orange Police Department and its associated employees and officers constituted the use of excessive force and a violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.

932.    The aforementioned acts described herein of the Milford Police Department and its associated employees and officers constituted the use of excessive force and a violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.

933.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

934.    As a direct and proximate result of the aforesaid factual contentions of the defendants, plaintiff has suffers and continues to suffer great physical and emotional pain, including but not limited to mental

anguish, frustration, and anxiety over the fact that she was and remains seriously injured. As a further result of the aforementioned acts and omissions of the defendants, the plaintiff has been limited in her ability to enjoy and engage in all of life's activities as she had prior thereto and may be so limited in the future.

935.    As a direct result of the acts and omissions of the defendants, the plaintiff has, and will in the future, incur expenses for medical and mental health treatment, therapy, and other related expenses as a result of the injuries.

936.    As a direct and proximate result of the aforesaid acts and omissions of the defendants, plaintiff has been severely limited in her ability to engage in her usual educational and occupational schedule as she had prior thereto and will be so limited in the future, resulting in a loss of earnings and earning capacity.

937.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT THIRTY-THREE Violations of 42 U.S.C. § 13925 – Violence Against Women Act**

938.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

939.    Defendants have engaged in repeated discrimination against plaintiff based on plaintiff's sex.

940.    Defendants receiving funding that originates in whole or in part from VAWA failed to comply with eligibility requirements in section 1201(d) of the Violence Against Women Act of 2000 (42 U.S.C. 3796gg–6(d)).

941.    The defendants engaged in an unlawful scheme perpetrated as an enterprise to unlawfully benefit from federal grants and initiatives aimed at promoting fatherhood, resulting in the unjust removal of plaintiff's minor daughter A.L.

942.   Defendants, under the guise of federal initiatives such as the CT Fatherhood Initiative and the Fatherhood.gov initiative, unlawfully manipulated grants and other funding sources that were designated under VAWA in an effort to unjustly enrich themselves and exploit true victims of domestic violence.

943.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

944.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

945.   Municipal or State defendants named in this action are liable for the negligence and carelessness of the defendants they employ named within this action since their actions were done in the course of their employment.

## COUNT THIRTY-FOUR Violations of 42 U.S.C. §§ 12101 et seq. – Americans with Disabilities Act

946.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

947.    Defendants regularly and systematically discriminated against plaintiff on the basis of her disabilities[388].

---

[388] Congress has maintained that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subject to discrimination. Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social

948.    Defendant Milford Police Department and its defendant officers named within this action deprived plaintiff of her rights under Title II of the Americans with Disabilities act by refusing to allow plaintiff the opportunity to provide a written statement and refusing to accommodate plaintiff's request for accommodations on October 18, 2023.

949.    Defendants regularly and systematically denied plaintiff her rights under Title II of the Americans with Disabilities Act by refusing to provide plaintiff with reasonable accommodations when requested[389].

950.    Defendants discriminated against plaintiff in violation of the ADA on account of her race, color, sex, national origin, age, and religion.

951.    Defendants held plaintiff to impossible standards as a pro-se non-trained attorney plaintiff with disabilities. It has been a long held opinion that "pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same high standards of perfection as lawyers."

952.    Plaintiff's equal opportunity rights as guaranteed under the ADA were denied on numerous occasions in spite of her disability status by both state and local government officials, effectively denying plaintiff services, public accommodations, employment, transportation, and telecommunications in the process.

953.    Defendant law enforcement officers have discriminated against plaintiff due to her disability status as both state and local government officials.

954.    Defendants have discriminated against plaintiff in state and local government services, programs, and employment.

---

problem."  See *Section. 12101 of Title 42 of the U.S. Code.*
[389] All police officer defendants named in this action have violated the Americans with Disabilities Act and denied plaintiff her rights as guaranteed within said act.

955.   Plaintiff has been discriminated by various defendants based on her attempts to gain employment within the state of Connecticut based on her disability.

956.   Plaintiff participated in fifteen interviews in 2023 for positions as a legal intern in jobs that are within the state of Connecticut with various of the defendants and was not offered any second interviews.

957.   Plaintiff was able to apply for said positions based on her disability status, yet was not offered any of the positions in spite of being more than qualified, and well more qualified that others who were offered said positions.

958.   Defendants have discriminated against plaintiff based on her disabilities in areas such as employment, public accommodations, education, communication, institutionalization, recreation, health services, and access to public services.

959.   Plaintiff has qualified disabilities in accordance with the defined meaning of the term "disabled" as defined in federal law.

960.   Plaintiff is a qualified individual with a disability and meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by various defendants as they are public entities.

961.   The state of Connecticut and any of its associated entity named defendants in this action, in accordance with section 12202 of the Americans with Disabilities Act, shall not be immune and can not invoke immunity under the Eleventh Amendment.

962.   The court has held that "In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

963.    Defendants have discriminated against plaintiff and denied her rights and protections under the ADA while receiving citizen complaints, interrogating witnesses, arresting, booking, and holding plaintiff as a suspect, operating telephone (911) emergency centers, providing emergency medical services, enforcing laws, and in the process of performing several other duties.

964.    Plaintiff is protected under the ADA as an individual who has a "disability" as defined by law in that she has a physical and/or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, and is regarded as having such an impairment[390].

965.    The defendant law enforcement agencies have repeatedly failed to comply with federal regulations under the ADA which require them to make reasonable modifications in their policies, practices, and procedures that are necessary to ensure accessibility for individuals with disabilities such as plaintiff.

966.    Many defendant municipalities, such as Orange, New Britain, and Waterbury, fail to train their employees to have sensitivity and awareness to help ensure equitable treatment of individuals such as plaintiff with disabilities.

967.    Defendants, in violation of section 12203 of the Americans with Disabilities act, unlawfully retaliated and used coercion against plaintiff in violation of the law.

968.    The law states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

969.    Defendants have violated the terms of the act by heavily discriminating against plaintiff.

970.    The law states that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any

---

[390] Plaintiff has also been discriminated against as someone who is associated with others who have a disability, in direct violation of the ADA. Defendants have misconstrued actions by the plaintiff as suspicious or illegal activity or uncooperative behavior when plaintiff's behavior was lawful and reasonable.

individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

971.    The defendants unlawfully retaliated against plaintiff and used coercion against plaintiff out of retaliation in violation of the law.

972.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

973.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT THIRTY-FIVE Violations the Ninth Amendment to the United States Constitution**

974.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

975.    Defendants collectively and repeatedly colluded and acted in concert with one another to deprive plaintiff of her constitutional and federal rights in violation of their duties to uphold the appearance of justice[391].

976.    Defendants' actions and inactions violate plaintiff's rights under the Ninth Amendment to the United States Constitution.

977.    Defendants acted in concert with one another to deprive plaintiff of her rights under the Ninth

---

[391] The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice" as seen in *Levine v. United States*, 362 U.S. 610, 80 S.Ct. 1038 (1960).

Amendment by infringing upon plaintiff's right to practice her religion as a family with her minor children, her right to parenting her children, and her right to being involved in the upbringing, care, and medical life of her child A.L.

978.    Defendants stripped plaintiff of her fundamental rights guaranteed by the Ninth Amendment of the United States Constitution.

979.    Defendants violated plaintiff's right to privacy as protected by the 9th Amendment of the United States Constitution.

980.    Defendants who are associated with the federal or state government named in this law suit, including those associated with law enforcement and the judiciary, all colluded and conspired to act in concert with one another in furtherance of an open-ended RICO scheme to deny plaintiff, and others, their rights under the Ninth Amendment.

981.    Defendants misused their authority in an effort to deny plaintiff her inherent individual rights not specifically listed in the Constitution and repeatedly violated said rights while acting as law enforcement, judicial, or legislative representatives.

982.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

983.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT THIRTY-SIX Violations of 42 U.S.C. §§ 620-627, 670-679 – The Federal Adoption Assistance and Child Welfare Act of 1980**

984.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

985.    Defendants' actions and inactions violate the plaintiff's rights under the Federal Adoption Assistance and Child Welfare Act of 1980.

986.    Defendants, comprised of numerous actors involved in state departments, judiciary insiders, academic institutions, and other opportunistic profiteers have created a sprawling association-in-fact enterprise that consists of an intertwined nexus involving keep players such as the Yale Child Abuse Clinic, DCF, the State of Connecticut Judicial System, and the Connecticut Fatherhood Initiative.

987.    Defendants have continued to violate terms of The Federal Adoption Assistance and Child Welfare Act of 1980 by refusing to comply with federal regulations and stipulations for continued status as grant recipients.

988.    Many defendants have engaged in a pattern of racketeering activity that has spanned years with evidence of both close-ended continuity through recurring prejudicial acts and open-ended continuity marked by a persistent future threat.

989.    Defendants have violated terms and provisions of The Federal Adoption Assistance and Child Welfare Act of 1980 in order to continue to receive federal financial incentives, and in the process have completely weaponized child custody and child protection.

990.    Defendants have, on numerous occasions, essentially trafficked millions of children and exchanged custody for monetary gains, allowing children to become mere commodities in an ongoing pattern of racketeering and fraud.

991.    Defendants have created a perverse system that violates federal laws and regulations and is a criminal enterprise protected by layers of bureaucracy and legal immunity that thrives on the silent

suffering of countless mothers and children.

992.    Defendants have engaged in the misappropriation and embezzlement of billions of dollars in federal funds intended for child welfare are instead spent on personal salaries and full state benefits for employees who negligently and recklessly allow children to continue to be neglected, abused, and murdered every day in the state of Connecticut.

993.    Defendants have misused said funds in order to position themselves for an enhanced lifestyle and financial gains, many of them even sitting as influential board members of many of the non-profit and not-for-profit organizations that are recipients of these funds.

994.    As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

995.    All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

**COUNT THIRTY-SEVEN Violations of 42 U.S.C. §§ 5101-5106 – The Child Abuse Prevention and Treatment Act**

996.    Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

997.     Defendants have failed to create and implement appropriate plans for children to ensure their proper care and permanent placement.

998.     Defendants' actions and inactions violate plaintiff's rights under the federal Child Abuse Prevention and Treatment Act.

271- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

999.    Defendants engaged in an unlawful scheme, acting as an enterprise, to unlawfully benefit from federal grants and initiatives aimed at promoting fatherhood, resulting in the unjust removal of plaintiff's minor daughter A.L.

1000.   The defendants have collaborated with one another to misuse federal funds designated for legitimate state operations such as the Department of Children and Families and other non-profit and not-for-profit entities designated to help children.

1001.   Instead of utilizing these funds appropriately, the defendants have systematically denied the benefits of the funding to those who need it the most.

1002.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1003.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT THIRTY-EIGHT Violations of 18 U.S.C. § 1509 – Obstruction of Court Orders**

1004.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1005.    18 U.S.C. § 1509 states that "[w]hoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined under this title or imprisoned not more than one year, or both.

1006.   Multiple defendants named in this action have violated this federal statute by preventing,

obstructing, impeding, interfering with, and willfully attempting to prevent, obstruct, impede, or interfere with, many orders that were entered in by the family court in the NNH-FA-19-5046828-S docket and others.

1007.   DSS and Child Support Enforcement Services also prevent the order for child support, childcare, and other financial obligations of Lodice from being paid[392].

1008.   The policies of the state of Connecticut Child Support Enforcement Services and their associated policies and procedures engage in unconstitutional practices such as allowing business owners and individuals who are self-employed to avoid[393] bank garnishment by making minimal payments such as $1.00 every six months, even with significant past-due child support arrears such as in plaintiff's case[394].

1009.   New Haven Child Support Enforcement allowed extremely minimal payments while not enforcing other collection methods in misalignment with their alleged primary goal as an agency, which is to ensure the financial support of the child.

1010.   By defendant officers of the Orange Police Department refusing to enforce the orders that were imposed upon Lodice such as the orders imposed by Aguilar, Grossman, Price-Boreland, and Jones.

1011.   The named defendant officers and affiliates of the New Britain Police Department, Middlebury Police Department, Hamden Police Department, New Haven Police Department, Orange Police Department, Milford Police Department, and Waterbury Police Department all refused to enforce the protective order that protected plaintiff or the family court orders that discussed the access and

---

[392] By Child Support Enforcement Services refusing to and interfering with, obstructing, and impeding the ability of the child support orders to be enforced, they are liable for obstruction of court orders.
[393] New Haven Child Support Enforcement failed to ensure that the child support obligations were met in a timely and consistent manner to provide for the needs of plaintiff's minor child A.L.
[394] New Haven Child Support Enforcement obstructed the court order which required them to collect an amount in excess of $15,000.00 in past-due child support arrears and childcare arrears owed to plaintiff by defendant Lodice.

visitation of A.L.

1012.   Defendant Lodice was only able to secure sole legal and sole physical custody of A.L. by engaging

in corrupt acts including bribery in order to secure the legal transfer of custody of the child[395].

1013.   Lodice colluded with defendants such as Grossman to paint a false narrative to attempt to discredit

plaintiff and A.L. regarding the abuse.

1014.   Even after Defendant Grossman instructed Lodice to provide plaintiff with a regular schedule for

seeing A.L., Lodice refused to do so, citing the absolute judicial authority delegated to him by

Grossman.

1015.   Each and every court, police department, DCF, and medical provider has affirmed that Grossman

has transferred her judicial authority to Lodice and that he has the sole discretion over whether or not

plaintiff can ever see or speak to A.L. again, despite plaintiff's parental rights never being terminated

and plaintiff never being found unfit.

1016.   Defendant Grossman has repeatedly stated that the only motions that will be scheduled are those

addressing payment of child support from plaintiff to Lodice. She has shown no sign of addressing

this issue of the more than $15,000.00 balance of arrears that is currently owed to plaintiff by Lodice.

1017.   Lodice, in concert with several of his accomplices, are all acting under the authority of and under

the color of state law, with the power vested in them through the state of Connecticut, specifically

through the presiding judge for family matters in New Haven Superior Court, defendant Grossman.

1018.   Defendant Grossman has completely violated any and all of plaintiff and A.L. and J.V.'s rights

under federal law, state law, and the United States Constitution.

1019.   Defendant Grossman has not permitted plaintiff to file any motions or pleadings without her

---

[395] Lodice used his close ties and associations with many of the state actor defendants named in this action including judges, attorneys, state marshals, judicial marshals, police commissioners, health care workers, and law enforcement in order to obstruct justice and interfere with plaintiff's ability to parent A.L.

express consent, which she has subsequently refused to give[396].

1020.   All defendants have encouraged Lodice to continue to isolate A.L. from plaintiff and to continue to conspire with one another to assist Lodice in removing all contact and access between plaintiff and A.L.

1021.   Plaintiff and her minor children A.L. and J.V. have been unreasonably isolated from one another as a result of the concerted acts of the defendants and law enforcement, child protection services, the judicial system, and medical professional defendants are all aiding and abetting Lodice in violation of federal laws regarding visitation between children, parents, and siblings. Neither plaintiff nor J.V. have had any access to A.L. in more than two consecutive months as of

1022.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1023.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT THIRTY-NINE Violations of 18 U.S.C. § 2071 – Illegally removing records

1024.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1025.   Defendants such as defendant Jamie Hobart Lambo, Grossman, and others have violated the law by illegally removing and concealing records in an effort to hinder prosecution.

---

[396] The State of Connecticut and all of its affiliates have refused to intervene in protecting A.L. from ongoing abuse and neglect at the hands of Lodice while encouraging the active isolation of A.L. from plaintiff indefinitely.

1026.  18 U.S.C. § 2071 states that "whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, documents filed or deposited with any clerk or officer of any court, shall be fined or imprisoned not more than three years, or both.

1027.  Defendants conspired to remove records, including those of the TRO application that was filed against defendant D.L. and the entire case-file of the Lodice v. Lodice action involving defendants Monica Perez and Matthew Lodice and defendants illegally removed said records from the court record in their entirety.

1028.  As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1029.  All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


 **COUNT FORTY Violations of 18 U.S.C. § 1951 Extortion under the color of the law**

1030.  Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1031.  Defendants obstructed, delayed, and affected commerce and attempted to do so by extortion in that the obtaining of property from another, with his consent . . . under color of official right and defendants acted knowingly and willfully in doing so.

1032.  Defendants knowingly and willfully committed, and attempted to commit extortion and their conduct affected interstate commerce by preventing plaintiff from being able to feasibly hire an out-of-state or out-of-country attorney to represent her in her matters in the state court.

1033.  The defendants induced and attempted to induce others, such as plaintiff, to part with their property—specifically money—and did so by the wrongful use of threat of force, violence, or fear, and thus interstate commerce was delayed, obstructed, or affected and they actions of the defendants were done knowingly and willingly.

1034.  The actions of the defendants constituted fraud, theft, seizure, and treason and outline an illegal, criminal "enterprise" being conducted in violation of the Hobbs Act of 1951.

1035.  Defendants repeatedly attempted to extort money and property from plaintiff under color of law and attempted to use plaintiff's minor daughter A.L. as a hostage in their attempted extortion scheme.

1036.  As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1037.  All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT FORTY-ONE Violations of  5 U.S.C. §§ 551–559 The Administrative Procedure Act**

1038.  Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1039.  Defendants have engaged in repeated violations of the Administrative Procedure Act in an effort to continually obstruct justice for their own increased financial gain.

1040.  Defendants failed to comply with federal requirements to issue subpoenas authorized by law to plaintiff upon her request, thus denying plaintiff her statutory and constitutional rights to due process under the law in violation of the administrative procedure act.

1041.   The actions of the defendants constituted fraud, theft, seizure, and treason and outline an illegal, criminal "enterprise" being conducted in violation of The Administrative Procedure Act of 1946.

1042.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1043.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT FORTY-TWO Violations of  18 U.S.C. § 2382 Misprision of Treason**

1044.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1045.   In accordance with 18 U.S.C. § 2382, "whoever having knowledge of treason, conceals and does not make known the same to some judge is guilty of treason for contempt against the sovereign and shall be fined under this title or imprisoned not more than seven years, or both."

1046.   Defendant Ned Lamont has committed treason and financial fraud for several years, and regularly will use his wife who files her taxes separately in order to evade taxes and launder funds.

1047.   Defendant Ned Lamont and his wife Annie Lamont committed treason by engaging in fraudulent business dealing with the state of Connecticut in order to administer covid tests that were from his wife's company with public money.

1048.   The defendants conspired with one another to violate the law and to obstruct justice while knowingly concealing the acts of themselves and other defendants within this action in an effort to protect themselves from criminal charges.

278- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

1049.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1050.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


**COUNT FORTY-THREE Violations of 42 U.S.C. § 1986 Action for Neglect to Prevent**

1051.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1052.   In accordance with 42 U.S.C. § 1986, "every person who, having knowledge that any of the wrongs conspired to be done or are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act to be committed, shall be liable to the party injured."

1053.   The defendant Milford Police Department and all other defendants affiliated and associated with the Milford Police Department neglected to prevent the unlawful arrest of plaintiff and the ongoing abuse that plaintiff has been subjected to by defendant Lodice.

1054.   The defendants conspired with one another to violate the law and to obstruct justice while knowingly concealing the acts of themselves and other defendants within this action in an effort to protect themselves from criminal charges.

1055.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and

include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1056.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FORTY-THREE Violations of 42 U.S.C. § 1983 Denial of Medical Treatment

1057.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1058.   Plaintiff was injured as a result of her wrist being slammed with the door at Preferred Pediatrics on October 18th, 2023, and plaintiff requested medical attention.

1059.   Plaintiff also requested hydration and stated she didn't feel well while in detention at the Milford Police Department on the same date.

1060.   When plaintiff told the defendants that she was injured, they were bound to immediately seek medical attention for plaintiff and their denial of medical treatment was a violation of plaintiff's fourth and fourteenth amendment rights under the Constitution of the United States.

1061.   Defendants of the Milford Police Department were negligent and careless with their treatment of plaintiff on October 18th, 2023.

1062.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1063.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FORTY-FOUR Intentional Infliction of Emotional Distress

1064.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1065.   The aforementioned actions by the defendants were intentional, willful, and deliberate and caused plaintiff to suffer from severe emotional distress, which the defendants knew or should have known would have resulted from their actions.

1066.   Said conduct was extreme and outrageous and was the cause of plaintiff's distress and the emotional distress sustained by plaintiff was and will continue to be severe. As a result of the defendants' aforesaid actions, plaintiff suffered and will continue to suffer damages as set forth above.

1067.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1068.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.


## COUNT FORTY-FIVE Assault

1069.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1070.   The aforementioned actions by the defendants constituted an assault of the plaintiff for which she sustained personal injuries and damages, some of which will be permanent.

1071.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and

include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1072. All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FORTY-SIX Battery

1073. Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1074. The aforementioned actions by the defendants constituted a battery of the plaintiff for which she sustained personal injuries and damages some of which will be permanent.

1075. As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1076. All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FORTY-SEVEN Negligence

1077. Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1078. The defendants were negligent and careless in their handling of the legal cases and criminal investigations involving plaintiff as described above.

1079. At all times relevant hereto the defendants employed by the state of Connecticut and its various municipal defendants named herein they were acting within the scope of their employment as police

officers, judicial officers, state employees, or other such employees employed by either the state of Connecticut or any of the municipalities named in this action.

1080.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1081.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

## COUNT FORTY-EIGHT Indemnification, Connecticut General Statutes § 7-465

1082.   Plaintiff repeats and realleges each of the following paragraphs as if set forth fully herein.

1083.   The police officer and other employee defendants named in this action were employed by the city of New Haven and were at all times acting within the scope of his/her employment.

1084.   The City of New Haven is legally liable to pay on behalf of each and every defendant all sums awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1085.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the City of New Haven in accordance with Connecticut General Statutes §7-465.

1086.   The police officer and other employee defendants named in this action were employed by the city of New Britain and were at all times acting within the scope of his/her employment.

1087.   The City of New Britain is legally liable to pay on behalf of each and every defendant all sums

283- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1088.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the City of New Britain in accordance with Connecticut General Statutes §7-465.

1089.   The police officer and other employee defendants named in this action were employed by the city of Waterbury and were at all times acting within the scope of his/her employment.

1090.   The City of Waterbury is legally liable to pay on behalf of each and every defendant all sums awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1091.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the City of Waterbury in accordance with Connecticut General Statutes §7-465.

1092.   The police officer and other employee defendants named in this action were employed by the town of Orange and were at all times acting within the scope of his/her employment.

1093.   The Town of Orange is legally liable to pay on behalf of each and every defendant all sums awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1094.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the Town of Orange in accordance with Connecticut General Statutes §7-465.

1095.   The police officer and other employee defendants named in this action were employed by the city of Milford and were at all times acting within the scope of his/her employment.

1096.   The City of Milford is legally liable to pay on behalf of each and every defendant all sums awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1097.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the City of Milford in accordance with Connecticut General Statutes §7-465.

1098.   The police officer and other employee defendants named in this action were employed by the city of the State of Connecticut and were at all times acting within the scope of his/her employment.

1099.   The State of Connecticut is legally liable to pay on behalf of each and every defendant all sums awarded for violations of plaintiff's civil rights and/or for any personal injuries and damages from the actions of its employees, which have resulted in injuries to plaintiff, pursuant to Connecticut General Statutes § 7-465.

1100.   Statutory notice of the plaintiff's claims and intention to bring this action was sent to the State of Connecticut in accordance with Connecticut General Statutes §7-465.

1101.   As a direct and proximate result of the conspirators' unlawful conspiracy and acts, omissions, and associations of the defendants, plaintiff, and her minor children A.L. and J.V. have sustained irreparable harm and damages that include damages to business, property, reputation, and person and include emotional, physical, psychological, and financial injuries and damages as a result of the intentional conspiracy to deprive plaintiff and her minor children of various federally protected rights.

1102.   All corporate defendants have the legal capacity to sue and be sued in their corporate name and are recognized as legal entities and thus have the legal capacity to be held accountable in this lawsuit.

286- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

## CONSTITUTIONAL CHALLENGES

Plaintiff hereby seeks to challenge the following state and federal laws, statutes, and administrative policies that plaintiff maintains are unconstitutional.

1.   The Fathers Count Act of 1999 and the  Fatherhood Grant Program under Section 403A of Title IV of the Social Security Act (42 U.S.C. 601-679B is unconstitutional in that it discriminates against women and mothers. The program allows for participants to be only those who are fathers to receive benefits while no comparable existing act or program is in effect that applies to mothers or women.

2.   Part A of Title IV of the Social Security Act is unconstitutional in that it discriminates against mothers and women by only providing grants that promote "responsible fatherhood" while failing to provide any of the same benefits or programs or federal funding as applicable to motherhood or women.

3.   The Gun Control Act of 1968 is unconstitutional because it goes against the second amendment of the United States Constitution. The restrictions that are imposed by this act infringe upon the rights of citizens to bear arms for their own protection. The act imposing unconstitutional restrictions on firearm possession for individuals subject to certain types of protection orders, which denies litigants their rights to bear arms.

4.   The Connecticut District Court rule that the parent of a minor child can not represent their child pro-se in a lawsuit is unconstitutional. The court has held that "the right to file a lawsuit pro-se is one of the most important rights under the Constitution and laws." *Elmore v. McCammon* (1986) 640 F. Supp. 905.

5.   The state of Connecticut rule that an attorney from a foreign country can not represent an individual in court in Connecticut pro-hac vice unless they have a license in at least one US state and the fact that they can only serve as a foreign legal consultant and advise on the laws of their respective nation is unconstitutional and a violation of the foreign commerce clause.

6.  The doctrine of judicial immunity is unconstitutional. The doctrine allows for gross misuse of power, bias, harm to litigants, and other issues that plague people who are trying to address their issues with the government. Any assumption that state judges and other officials are not to be held responsible for violations of United States laws, when done under color of State statutes or customs, is akin to the maxim of the English law that the King can do no wrong. It places officials above the law. This violates the constitutional guarantees to due process and equal protection.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendants, as follows:

a.      Compensatory Damages;

b.      Treble Damages;

c.      Actual Damages;

d.      Injunctive relief preventing and restraining all defendants from any future RICO violations;

e.      Punitive Damages;

f.      An order for the FBI to launch formal investigations into any and all criminal code violations cited within this suit, including but not limited to 18 U.S.C. § 241, and 18 U.S.C. § 242;

g.      An injunction against all defendants halting any and all illicit activities;

h.      An order requiring the establishment of a robust oversight mechanism to ensure transparency and adherence to federal grant guidelines;

i.      An order of permanent injunction enjoining Grossman and all persons and entities insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Grossman or any other defendants listed herein who receive actual notice of such order by personal service or otherwise, from directly or indirectly engaging in conduct in violation of the RICO act;

j.      All expenses and costs, including but not limited to, all attorney's fees (if applicable);

k.      An order finding all defendants liable for violating the aforementioned state, federal, and constitutional statutes, codes, and amendments;

l.      Declarative relief stating that Defendant Grossman and other Defendant Judges issued orders are null and void as said orders violate the Fourteenth Amendment civil rights and are thus devoid of any legal force or effect;

m.     Declarative relief stating that the use of the State of Connecticut Family Court "Best interest of the Child Standard" in dissolution and custody proceedings taking place in the Superior Courts of Connecticut in the Family Division is unconstitutional in that it allows a complete severance of any and all parental rights, access, or contact with a child without ensuring due process of law or requiring the court to find a parent unfit prior to severing said rights, access, or contact.;

n.      Injunctive relief enjoining Defendants from enforcing the established Court Orders against the Plaintiffs and recusing Defendants from any current or future civil or criminal matters involving the plaintiffs or their minor children.;

o.      An order for an immediate financial institution execution and wage execution from any business and/or personal bank account for Matthew John Lodice or Whole House Remodeling Company LLC to cover the amount of arrearage owed to plaintiff for previously ordered and accrued child support, child care, and medical costs for A.L.

p.      Issuance of an immediate order to stay judgment and proceedings in any and all dockets involving the plaintiffs, including but not limited to, the NNH-FA-19-5046828S docket until further notice;

q.      Issuance of an immediate injunction ordering reunification of Plaintiff immediately with minor daughter A.L.;

r.      Asset Forfeiture of all assets linked to the illegal activity described herein;

s.      An order that all tax exempt and government entities named herein produce full transparency and access to all financial records and statements;

t.   An order compelling the dissolution and/or restructuring of any entity used to commit RICO violations;

u.   Issuance of a declaration that it is unconstitutional for any parent to lose access, visitation, or contact with their children without first being proven unfit and being afforded all the same legal protections as a criminal defendant;

v.   A declaratory judgment affirming the unconstitutional and illicit nature of defendants' practices;

w.   Injunctive relief in the form of an order that no judge in any court be permitted to issue physical custody orders that grant no "actual parenting time"—unless a parent is found "unfit," i.e., having done actual harm to the minor child, which is the constitutional showing required for the State to divest custody;

x.   An order blocking the property of  all defendants involved in the controversy in accordance with Federal Executive Order #13818;

y.   A Declaratory judgment that the practices of the defendants are unlawful and in violation of RICO and for federal charges to be brought against all defendants for their respective crimes;

z.   Declarative relief that the State of Connecticut and all sub-enterprises named within were engaging in violations of RICO under color of law; and

aa.  Monetary award in damages payable to the Plaintiff not less than eight hundred million dollars ($800,000,000.00) in collective damages.

Respectfully submitted,

_____/s/_____

**Theodora Antar,** *The Plaintiff*

**theodoraantar@gmail.com**

290- COMPLAINT FOR FRAUD, RACKETEERING, ABUSE OF PROCESS, AND CIVIL CONSPIRACY

## <u>DECLARATION OF THEODORA F. ANTAR</u>

I, Theodora F. Antar, declares as follows:

1.     I am over the age of eighteen (18) years of age and am a party to this action. I have personal knowledge of the facts stated in this declaration, and if called as a witness, could and would testify competently to the truth of the facts stated herein.

2.     I make this declaration in support of this Complaint for Fraud, Racketeering, Abuse of Process, Civil Conspiracy, Damages, Declaratory Relief and Injunctive Relief, and I respectfully request that the Court accept my Complaint and grant the requested relief.

## <u>CERTIFICATION AND CLOSING</u>

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. The undersigned declares under penalty of perjury that she is the Plaintiff in the above action, that she has read the above Complaint and that the information contained in the Complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

_____/s/_____

**Theodora Antar, *The Plaintiff***

**856 Shagbark Drive, Orange, CT, 06477**